IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TOD CURTIS, individually and as beneficiary, FIRST UNITED TRUST COMPANY, as Trustee under Trust No. 10510, and ELTO RESTAURANT INC., an Illinois corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 08 C 3527 |
| IRVANA K. WILKS, Village of Mount Prospect mayor and Local Liquor Control Commissioner, MICHAEL E. JANONIS, Village Of mount Prospect Manager, WILLIAM COONEY, Village of Mount Prospect Economic Director, WILLIAM SCHROEDER, Village of Mount Prospect Building Commissioner, ROBERT ROELS, Village of Mt. Prospect Environmental Health Manager, FRANK KRUPA, Village of Mount Prospect Environmental Health Inspector, OZ DEVELOPMENT, LLC and the Village of Mount Prospect, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Guzman Magistrate Judge Nolan |
| Defendants. | ) ) | |

**DEFENDANTS WILKS, JANONIS, COONEY, SCHROEDER, ROELS, KRUPA AND THE VILLAGE OF MOUNT PROSPECT'S MOTION REQUESTING THAT THE COURT ABSTAIN FROM EXERCISING JURISDICTION OVER THE COMPLAINT**

Defendants, IRVANA WILKS, MICHAEL JANONIS, WILLIAM COONEY, WILLIAM SCHROEDER, ROBERT ROELS and FRANK KRUPA ("individual Defendants") and the VILLAGE OF MOUNT PROSPECT ("Village"), by and through their attorneys, KLEIN, THORPE AND JENKINS, LTD., move this Court to abstain from asserting jurisdiction over PLAINTIFFS' Complaint, and in support of their motion state as follows:

## Introduction

**A.      Downtown Redevelopment Activity In Mount Prospect:  A Brief Overview**

The Village of Mount Prospect has a strong history of community planning. Since 1961, the Village has maintained a Comprehensive Plan that guides planning and development policy for the community.  The Comprehensive Plan is periodically revised to respond to the changing character of the Village and its citizens.  *Village of Mount Prospect Comprehensive Plan 2007* at 5, attached and referred to herein as *Exhibit 1*.  In 2007, the Comprehensive Plan was revised through an intensive process that involved local officials, Village staff and citizens who sought to establish a consensus as to what types of development should take place in Mount Prospect.  *Id.* at 9.

One particular issue of concern for the Village is the development of its downtown area.  This part of the Village has been the subject of extensive planning by Village officials and residents.  In 1997, the Village formulated a development concept plan for the redevelopment of Mount Prospect's downtown sector.  *Downtown TIF Strategic Plan*, attached and referred to as *Exhibit 2*.  Further downtown redevelopment planning efforts have taken place more recently in 2003 and 2004.  *Id.* at 7, 57.  All of this activity indicates the Village's commitment to proceed with downtown redevelopment in a careful and methodical manner.  Over the last ten years, much of the Village's planning has become reality with downtown development projects coming to fruition.

Located within the Village's downtown is a small area called the Triangle.  This subsection of the downtown is one of the last areas targeted for redevelopment.  In order to facilitate redevelopment of the Triangle, the Village has engaged in property

acquisition and entertained plans for the revitalization of this downtown subarea. *Exhibit 2* at 7, 20. One of the Triangle area property owners is Plaintiff, Tod Curtis ("Curtis"), who owns and operates a restaurant called "Ye Olde Town Inn" and leases store fronts, offices and apartments – all of which are located at 6-18 West Busse Avenue in Mount Prospect (collectively the "Subject Properties").

**B.**    **The Plaintiff And Mount Prospect Redevelopment:  Disputes And Litigation**

Since 2007, Curtis and the Village have engaged in an ongoing dispute regarding the status and condition of the Subject Properties.  The Village cited the Subject Properties for numerous unsafe conditions caused by violations of the Village's Building, Property Maintenance, Fire Prevention and Health Codes on the Subject Property.  As a result of Curtis' recalcitrance in remedying code violations, the Village sought an administrative search warrant from the Circuit Court of Cook County that was granted on March 4, 2008. Shortly thereafter, a spate of lawsuits commenced concerning the alleged Code violations at the Subject Properties, some of which remain pending in the Circuit Court of Cook County (collectively, the "Code Violation cases").  On March 31, 2008, Curtis filed a complaint for injunctive and other relief that included § 1983 claims for alleged violations of his Constitutional rights to due process, equal protection and just compensation for the taking and damaging of private property. *Complaint for Injunctive and Other Relief*, attached and referred to herein as *Exhibit 3*.  On April 1, 2008, Curtis filed a motion to quash the administrative search warrant and to suppress the obtained by execution of the warrant. *Motion to Suppress All Evidence Obtained as a Result of an Administrative Search Warrant Issued on March 4, 2008, and to Quash the Warrant*, attached and referred to herein as *Exhibit 4*.  On April 7, 2008, the Village filed a

Verified Complaint for Injunctive Relief and a Motion for a Temporary Restraining and Preliminary Injunction against Curtis seeking an order to remedy the unsafe conditions persisting at YOTI. *Verified Complaint for Injunctive Relief* and *Motion for a Temporary Restraining Order and Preliminary Injunction*, attached and referred to herein as *Exhibit 5*. On April 10, 2008, a temporary restraining order was issued against Curtis by the Circuit Court of Cook County that prohibited the operation of Ye Olde Town Inn, among other things. *Order dated April 10, 2008,* attached and referred to herein as *Exhibit 6*. On April 11, 2008, Curtis filed with the Circuit Court of Cook County an emergency motion to dissolve the temporary restraining order that was denied following a hearing. *Order dated April 11, 2008*, attached and referred to herein as *Exhibit 7*.

As a result of the Circuit Court's own actions and a motion advanced by Curtis, the Code Violation Cases have been consolidated before Judge Richard Billik in the Chancery Division of the Circuit Court of Cook County. Curtis filed a motion to dismiss the Village's complaint for injunctive relief that was denied following a hearing by Cook County Circuit Court Judge Billik on April 18, 2008. *Order dated April 18, 2008*, attached and referred to herein as *Exhibit 8*. At the same hearing, Judge Billik granted the Village's motion to extend the temporary restraining order until he ruled on the Village's motion for a preliminary injunction following a hearing. *Order dated April 18, 2008*, attached and referred to herein as *Exhibit 9*.

On September 20, 2007, months prior to the advent of the Code Violation Cases, the Village filed a complaint for condemnation against Curtis seeking to take the subject property. The eminent domain matter remains pending before Judge Elmer J. Tolmaire

in the Law Division of the Circuit Court of Cook County.  *Amended Complaint for Condemnation*, attached and referred to herein as *Exhibit 10*.[1]

On June 13, 2008, Curtis filed a motion for voluntary dismissal of his complaint for injunctive and other relief pending before Judge Billik.  *Motion for Voluntary Dismissal of Action*, attached and referred to herein as *Exhibit 11*.  On June 19, 2008, Curtis' motion for voluntary dismissal was granted.  *Order dated June 19, 2008*, attached and referred to herein as *Exhibit 12*.   The next day, June 20, 2008, Curtis filed the extant matter that is now before this Court.  *Complaint for Relief of Civil Rights and RICO Violations*, attached and referred to herein as *Exhibit 13*.

The complaint asserts four claims against the Village and the individual Defendants.  Count I alleges a civil RICO action brought under 18 U.S.C. §§ 1962(c) and (d) against the individual Defendants.[2] Count II alleges that the Village and the individual Defendants subjected Curtis to intentional discrimination through selective enforcement of Village Code regulations that violated Plaintiff's equal protection rights.  *Exhibit 12* at ¶ 145.  Count III, a § 1983 action, claims that the Village and the individual Defendants deprived Plaintiffs of their constitutional rights to (1) due process under the law; (2) equal protection under the law; (3) just compensation for the taking and damaging of private property; and (4) freedom of speech under the First Amendment.  *Id.* at ¶ 153.  Count IV alleges that the Village and individual Defendants have engaged in a conspiracy to harm Plaintiffs and their interests in Mount Prospect and to deprive Plaintiffs of their rights to due process, equal protection and freedom of speech under the United States constitution

---

[1] On April 8, 2008, the Court granted the Village's motion for leave to file an amended complaint for condemnation.  The sole revision to the original condemnation complaint was a letter from Village counsel to Curtis making an offer to purchase the Subject Property.  The amended complaint for condemnation is attached as *Exhibit 10* so that this Court has the pending complaint in this matter.

[2] The RICO claim also is alleged against a Mount Prospect company, Oz Development, LLC.

in violation of 42 U.S.C. § 1985(3).  *Id.* at ¶ 159.  Curtis seeks an award of statutory and

punitive damages and attorneys fees and costs for each count.

The Village and the individual Defendants ask this Court to abstain from

exercising its jurisdiction over the Complaint based on the abstention doctrine initially set

forth in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96

S.Ct. 1236 (1976).  Curtis' actions in voluntarily dismissing his complaint for injunctive

and other relief before Judge Billik on June 19, 2008 and filing the instant matter in

federal district court the very next day creates a situation of parallel litigation that this

Court should avoid by waiting until the matters currently pending in the Circuit Court of

Cook County – including the Village's condemnation action – are resolved.  Further,

exceptional circumstances exist that recommends abstention to promote wise judicial

administration.

## Argument

Under *Colorado River Water Conservation District v. United States*, a federal

district court may at its discretion decline to exercise or postpone the exercise of its

jurisdiction to adjudicate a controversy properly before it when exceptional

circumstances merit such action.  424 U.S. 800, 813, 96 S.Ct. 1236.  The Seventh Circuit

has interpreted the *Colorado River* abstention doctrine to mean that, "a federal court may

stay or dismiss a suit in exceptional circumstances when there is a concurrent state

proceeding and the stay or dismissal would promote 'wise judicial administration.'"

*Caminiti and Iatarolo, Limited v. Behnke Warehousing, Incorporated*, 962 F.2d 698, 700

(7th cir. 1992).  To determine whether abstention is appropriate, a district court must

conduct a two-part analysis.  First, the court considers whether the concurrent state and

federal actions are parallel. If so, the court then determines whether "exceptional circumstances" warrant abstention. *Tyrer v. City of South Beloit, Illinois*, 456 F.3d 744, 751 (7th Cir. 2006); *Clark v. Lacy*, 376 F.3d 682, 685 (7th Cir. 2004). In this case, analysis under both prongs of the *Colorado River* test recommends application of the abstention doctrine.

**I.    The State Court Proceedings And The Federal Court Action Are Sufficiently Parallel To Warrant Application Of The *Colorado River* Abstention Doctrine**

According to the Seventh Circuit, "[t]wo suits are considered 'parallel' when substantially the same parties are contemporaneously litigating substantially the same issues in another forum." *Clark v. Lacy*, 376 F.3d at 686 (quoting *Calvert Fire Insurance Co. v. American Mutual Reinsurance Co.*, 600 F.2d 1228, 1229 n. 1 (7th Cir. 1979)); *Interstate Material Corporation v. City of Chicago*, 847 F.2d 1285, 1288 (7th Cir. 1988). The presence of additional parties or issues in one of the cases does not preclude a finding that the lawsuits are parallel for abstention purposes. *AAR International, Incorporated v. Nimelias Enterprises, S.A.*, 250 F.3d 510, 518 (7th Cir. 2001). To assess the parallelism of state and federal lawsuits, a district court should examine whether the suits involve the same parties, arise out of the same facts and raise similar factual and legal issues. *Tyrer v. City of South Beloit, Illinois*, 456 F.3d at 752.

Here, the concurrent state and federal court lawsuits are sufficiently parallel to warrant this Court applying the *Colorado River* abstention doctrine. Two state court cases involve the same parties as those contesting the extant federal court matter. The Village is the plaintiff and Curtis is the defendant in the preliminary injunction action in the Chancery Division of the Circuit Court of Cook County before Judge Billik, Case No. 08 CH 12821. The Village is the plaintiff and Curtis is the defendant in the

condemnation action in the Law Division of the Circuit Court of Cook County, Case No. 07 L 50940. The case before this Court names Curtis as the Plaintiff and the Village and Wilks, Janonis, Cooney, Schroeder Roels and Krupa as the defendants. The federal court complaint identifies the individual Defendants with regard to their positions with the Village. For purposes of the *Colorado River* parallelism inquiry, the same parties participate in the state and federal lawsuits.

A.    **The Village's Verified Complaint For Injunctive Relief And The Federal Court Action Are Parallel For *Colorado River* Abstention**

The concurrent state and federal court lawsuits raise essentially the same issues and arise out of the same operative facts. The district court complaint alleges *inter alia* that the Village employed endless harassing inspections of the Subject Property designed to oust Plaintiff from ownership, use and enjoyment, and the ability to develop his property. *Exhibit 12* at ¶¶ 1, 3, 97–115. The complaint further alleges that the Village has been engaged in an enterprise spanning almost a decade to force Curtis to sell his property at an artificially low price through the initiation of a bad faith condemnation proceeding. *Id.* at ¶¶ 1, 34, 39, 40, 41, 42–44, 46–59, 76. This purportedly bogus eminent domain action would prevent Curtis from developing the Subject Property pursuant to his own plans. *Id.* at ¶¶ 79–96.

The pending state court litigations address the chief allegations in Plaintiff's federal court complaint. The Village's pending motion for preliminary injunction sets forth in great detail an array of Building, Property Maintenance, Fire Prevention and Health Code violations that Curtis was repeatedly asked to remedy and, at the time the action was filed, had failed to fix. *Exhibit 5* at ¶¶ 6 – 11. Some of these code violations first were raised with Curtis in early 2007, and many additional violations remained

unaddressed during the early months of 2008.  *Id.* at ¶ 19.  A hearing on the Village's complaint for injunctive relief before Judge Billik in Cook County Circuit will consider the reasonableness of the inspections of YOTI that Curtis' federal court complaint alleges were initiated for illegal and unconstitutional ends.  Judge Billik likely will issue a ruling that will have *res judicata* effect indicating whether or not the Village's inspections of the Subject Property were a justified exercise of police powers motivated by concerns for public safety, welfare and preserving the integrity of Village Code provisions.  If Judge Billik finds that the Village did conduct its inspections of the Subject Property for legitimate reasons, such a ruling clearly would bear on Curtis' federal court claims.   For instance, Curtis' RICO allegations that the Village used repeated inspections of YOTI for harassment in an attempt to promote a purported scheme and enterprise to drive Plaintiff out of town would be undercut by a favorable ruling for the Village.

The basis for Curtis' class-of-one equal protection claim (Count II and Count III) is the allegation that the Village has subjected Plaintiff "to intentional discrimination by virtue of their selective enforcement of the Village Code regulations."  *Exhibit 12* at ¶ 145.  Curtis further alleges that the Village and individual Defendants sought to deprive Plaintiff of equal protection of the laws for "reasons of a personal nature" and they "had and have no rational basis for their selective enforcement of the Village Code against Plaintiffs."  *Id.* at ¶¶ 146-147.  The Seventh Circuit has indicated that to prevail class-of-one plaintiffs must present evidence that the alleged actions against them were motivated by personal *animus* and that no rational basis for the purported violative action by the governmental exists.  *See Cruz v. Town of Cicero, Illinois*, 275 F.3d 579, 587 (7th Cir. 2001); *Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005).  A ruling in favor of the

Village on its complaint for injunctive relief would adversely affect Curtis' equal protection claim.     Curtis' other §§ 1983 and 1985 allegations and claims similarly will be adversely affected by a state court ruling granting the Village the injunctive relief it seeks.

### B.     The Village's Eminent Domain Action And The Federal Court Action Are Parallel For *Colorado River* Abstention Purposes

The condemnation action pending before the Law Division of the Circuit Court of Cook County also addresses issues alleged by Curtis in his federal court complaint. Curtis specifically alleges that the actions of the Village and the individual Defendants violates his constitutional rights to due process and just compensation for the taking and damaging of private property.  *Complaint* at ¶ at 153.  Curtis has filed a Traverse and Motion to Dismiss (the "Traverse") the Village's pending eminent domain action.  *See Traverse and Motion to Dismiss*, attached hereto and referred to herein as *Exhibit 14*. The Traverse alleges the following:  (a) the Village did not make a good faith attempt to agree about just compensation to be paid for the taking and damaging of the Subject Property; (b) the Village is not acquiring the subject Property for a public purpose; (c) the Village, after acquiring title, will transfer the Subject Property to a private party and, consequently, the Village is not acquiring the Subject Property primarily for the benefit, use or enjoyment of the public nor for a public purpose; (d) the Subject Property is not blighted nor properly part of a conversation area; and (e) the taking is excessive.  *Id.* at ¶¶ 1-5.  Resolution of Curtis' Traverse challenging the legality of the Village's eminent domain action necessarily will address numerous issues raised by his federal court complaint.

Assuming *arguendo* that Judge Tolmaire denies the Traverse, the eminent domain litigation then proceeds to a trial on the issue of just and fair compensation for the Village's taking of the Subject Property. At the trial, Curtis will have an opportunity to present evidence as to the just compensation to which he is due for the taking of his property. A jury will determine how much Plaintiff must be paid as fair compensation for the Subject Property. The state court eminent domain litigation, then, will resolve many of the issues in Curtis' complaint that this Court would have to address.

## II.    The Existence Of "Exceptional Circumstances" Warrants Application Of The *Colorado River* Abstention Doctrine To Plaintiff's Complaint

The second prong of the *Colorado River* analysis considers whether "exceptional circumstances" exist that warrant a federal court deferring its jurisdiction over an action before it pending resolution of concurrent state court litigation. There are at least ten factors that a district court can consider in deciding whether "exceptional circumstances" exist that justify abstention under *Colorado River*.[3]    None of the factors necessarily is determinative with the weight given to any particular factor varying from case to case depending on the facts presented. *LaDuke v. Burlington Northern Railroad Company*, 879 F.2d at 1559. Courts should apply the exceptional circumstance factors "in a pragmatic flexible manner with a view to the realities of the case at hand." *Id.* (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corporation*, 460 U.S. 1, 21,

---

[3] These ten factors have been enumerated by the Seventh Circuit as: (1) whether the state has assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation, (4) the order in which jurisdiction was obtained; (5) the source of governing law; (6) the adequacy of state-court action to protect the federal plaintiff's rights; (7) the relative progress of state and federal proceedings; (8) the presence or absence of concurrent jurisdiction; (9) the availability of removal; and (10) the vexatious or contrived nature of the federal claim. *Caminiti and Iatarola, Limited v. Behnke Warehousing, Incorporated*, 962 F.2d at 701; *LaDuke v. Burlington Northern Railroad Company*, 879 F.2d 1556, 1559 (7th Cir. 1989).

103 S.Ct. 927 (1983). Here, sufficient factors pertain to justify the Court's decision to abstain from asserting its jurisdiction.

### A.    The Court Can Eliminate Piecemeal And Duplicative Litigation By Abstaining From Asserting Its Jurisdiction

This Court should abstain from asserting its jurisdiction over Curtis' complaint until the concurrent lawsuits state court have been resolved so as to avoid piecemeal litigation. "Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results." *LaDuke v. Burlington Northern Railroad Company*, 879 F.2d at 1560; *Clark v. Lacy*, 376 F.3d at 687. The Seventh Circuit noted the danger of piecemeal litigation in *Tyrer v. City of South Beloit, Illinois*, "[t]he legitimacy of the court system in the eyes of the public and fairness to individual litigants also are endangered by duplicative suits that are the product of gamesmanship or that results in conflicting adjudications." 476 F.3d at 756 (quoting *Lumen Construction, Incorporated v. Brant Construction Company*, 780 F.2d 691, 694 (7th Cir. 1985)).

The danger of piecemeal litigation exists here if the state court lawsuits and the federal case proceed at the same time. The possibility of inconsistent results arises in several guises. Judge Billik could make a determination in the Village's preliminary injunction action that the numerous inspections of the Subject Property about which Curtis complains in his federal complaint were justified by Plaintiff's ongoing refusal to comply with Village Code provisions. If this Court subsequently determined that the Village and the individual Defendants instigated the YOTI inspections for constitutionally violative and illegal purposes, state and federal courts would reach inconsistent and contradictory results based on a consideration of the same facts and the

actions of the same parties. Unless Plaintiff prevails on his Traverse, the state court eminent domain litigation will result in a jury awarding Curtis what it deems as just compensation for the Village's taking of the Subject Property. If this Court subsequently ruled that the Village violated Plaintiff's Fifth Amendment rights, inconsistent results would be reached on the same issue. *Caminiti and Iatarola, Limited v. Behnke Warehousing, Incorporated*, 962 F.2d at 701 ("The desirability in avoiding piecemeal litigation is the factor weighing most heavily in favor of a stay. . . . Thus, allowing both cases to proceed would result in duplicative and wasteful litigation with the potential of inconsistent resolutions of the issue."); *Tyrer v. City of South Beloit, Illinois*, 456 F.3d at 756 ("In this case, allowing the two suits to proceed concurrently would waste the parties' resources, risk duplicative rulings and reward a strategic gamesmanship that has no place in a dual system of federal and state courts.")

**B.** **The State Court First Obtained Jurisdiction Over The Disputes Between The Parties And Significantly More Progress Has Been Made In The Circuit Court Proceedings**

Two additional factors tipping the balance in favor of abstention by this Court are that litigation between the parties commenced first in the Circuit Court of Cook County and, consequently much more progress has been made in the state court proceedings. The Village filed its condemnation complaint in September, 2007, a full eight months before Curtis alleged violations of his Fifth Amendment as part his federal court complaint. The Village brought its verified complaint for injunctive relief against Curtis in state court more than two months prior to the initiation of the current federal court action. *Interstate Material Corporation v. City of Chicago*, 847 F.2d at 1289 (decision to

abstain based in part on the fact that state court assumed jurisdiction seven months before the federal district court).

The prior jurisdiction of the Circuit Court over the parties' disputes means that the state court proceedings have advanced considerably further than the district court litigation. The situation here is similar to that in *Lumen Construction v. Brant Construction Company, Inc.* where the state court issued a number of substantive rulings including a denial of plaintiffs' motion for partial summary judgment while the federal district court proceeding had "not moved forward substantially." 780 F.2d 691, 697 (7th Cir. 1986). The Seventh Circuit noted the greater progress of state court litigation in finding that the district court properly decided to abstain.[4] Judge Billik has made a number of substantive rulings that include denying Curtis' motion to dismiss the Village's verified complaint. The parties have engaged in discovery and the matter is ripe for hearing. In the condemnation action, the parties are engaged in discovery pursuant to Curtis' Traverse. Curtis' filing his complaint is the sole action taken in the federal court lawsuit; no substantive rulings have been issued.

## C.   Plaintiff's Rights Will Be Adequately Protected In State Court

Another factor weighing in favor of district court abstention in this matter is the ability of the state courts to protect adequately Curtis' legal rights. Curtis might point to the fact that his district court complaint sets forth a variety of federal claims – RICO, § 1983 civil rights violations and a § 1985 civil conspiracy action – that can be adjudicated properly in federal court. *Lumen Construction Inc. v. Brant Construction Company, Inc.*,

---

[4] The Court held that the district court should abstain from asserting jurisdiction rather than dismissing the lawsuit without prejudice. The Village and the individual Defendants are seeking abstention, not dismissal, regarding Curtis' complaint.

780 F.2d at 696 ("Civil rights complaints indeed command special protection from the federal courts").

In *Tyrer v. City of South Beloit, Illinois*, plaintiff sought to defeat a *Colorado River* abstention motion by arguing that federal rights and claims have a right to a federal court forum. The Seventh Circuit, in affirming the district court decision to abstain, observed that plaintiff originally brought his federal claims in a state court forum. 456 F.3d at 757. Similarly, in this case, Curtis filed a complaint for injunctive and other relief in the Circuit Court of Cook County that included the federal actions set forth in the complaint now before the district court. Curtis voluntarily dismissed his state court complaint one day and filed a federal court lawsuit the next day presenting substantially the same claims. This abrupt change in forum to litigate the same claims came after Judge Billik made several rulings adverse to Curtis' interest. The *Tyrer* court noted that, "[t]he insinuation that Illinois courts will not live up to the standard of full and fair adjudication of the issues is pure speculation that we expressly disavow." 456 F.3d at 757. Here, the state court judges presiding over the pending actions for preliminary injunction and condemnation unquestionably are capable of fully considering and fairly adjudicating the issues regarding Curtis' rights.

### D. Curtis' Federal Court Complaint Is A Contrived Action That Amounts To Forum Shopping

A further factor weighing in favor of this Court abstaining from asserting jurisdiction is the contrived nature of Curtis' federal court complaint. Here, Curtis initially elected to file his RICO and federal civil rights claims in the Circuit Court of Cook County. After Judge Billik made several adverse substantive rulings in related litigation, Curtis voluntarily dismissed his federal actions from state court and

immediately filed the same claims in federal district court. This action suggests Curtis seeks to "circumvent" the jurisdiction of a state court judge in order to proceed in a federal court forum that he believes will be more sympathetic to his claims. *See Lumen Construction, Inc. v. Brant Construction Company, Inc.*, 780 F.2d at 696; *Interstate Material Corporation v. City of Chicago*, 847 F.2d at 1289 (Seventh Circuit refers to vexatious or contrived federal court suits that seemed to be filed to avoid the consequences of prior decisions in state court proceedings). Such maneuvering represents forum shopping by Plaintiff that should not be countenanced by this Court. To mitigate the affect of Curtis' forum shopping, this Court should stay exercising its jurisdiction over Plaintiff's complaint until resolution of the pending state court matters.

**WHEREFORE,** for all the above-stated reasons, Defendants IRVANA WILKS, MICHAEL JANONIS, WILLIAM COONEY, WILLIAM SCHROEDER, ROBERT ROELS, FRANK KRUPA and the VILLAGE OF MOUNT PROSPECT respectfully request that this Honorable Court enter an order granting their motion for abstention and for any further relief deemed just and fair.

Respectfully submitted,

Irvana Wilks, Michael Janonis, William Cooney, William Schroeder, Robert Roels, Frank Krupa and the Village of Mount Prospect

By:_____ /s/Allen Wall _____

Everette M. Hill, Jr.
Lance C. Malina
Allen Wall
KLEIN, THORPE AND JENKINS, LTD.
20 North Wacker Drive, Suite 1660
Chicago, Illinois 60606(312) 984-6400

# Village of Mount Prospect

# COMPREHENSIVE PLAN



Housing and
Residential Areas



Economic
Development

Transportation and
Infrastructure

Community Facilities, Parks,
and Open Space

Prepared by the Community Development Department
Village of Mount Prospect
50 South Emerson Street
Mount Prospect, IL 60056
847/392-6000
www.mountprospect.org



EXHIBIT
1

# TABLE OF CONTENTS

CHAPTER 1: INTRODUCTION ........................................................................... 5

  Background and Process ........................................................................ 5

  Existing Sub Area and Strategic Plans ................................................... 7

  2007 Comprehensive Plan Update Process ......................................... 9

  Benefits of a Comprehensive Planning Program .............................. 10

CHAPTER 2: MOUNT PROSPECT – A 2006 SNAPSHOT ............................. 11

  Demographics: Population & Housing ............................................... 12

  Economic Development ...................................................................... 19

  Transportation & Utilities ................................................................... 25

  Community Facilities ........................................................................... 30

  Land Use, Zoning & Annexation ....................................................... 36

CHAPTER 3: VISION, GOALS, AND OBJECTIVES ..................................... 39

  Mount Prospect Vision Statement ..................................................... 39

  Housing and Residential Areas .......................................................... 40

  Economic Development ...................................................................... 41

  Transportation and Infrastructure ...................................................... 43

  Community Facilities, Parks, and Open Space .................................. 44

CHAPTER 4: LAND USE MAP AND DESCRIPTIONS .................................. 45

  Land Use ............................................................................................. 45

  Residential Areas ................................................................................ 46

  Commercial Areas .............................................................................. 47

  Industrial and Office Research Areas ................................................ 48

  Community Facilities, Parks, and Open Space .................................. 49

  Transportation .................................................................................... 50

CHAPTER 5: IMPLEMENTATION PROGRAM ............................................. 54

APPENDIX A: ADDITIONAL DEMOGRAPHICS ......................................... 62

APPENDIX B:  LARGE SCALE MAPS .......................................................... 66

# ACKNOWLEDGEMENTS

000376

## RESPONSIBILITY

The preparation of the Comprehensive Plan and coordination of planning for development within Mount Prospect rests with the Planning & Zoning Commission of the Village of Mount Prospect. The Planning & Zoning Commission is established under authority granted by Article VII of the Illinois Constitution (concerning Home Rule, adopted 1970) and by Chapter 24, Sec. 11-12-5, of the Illinois Municipal Code, which reads in part as follows:

The Planning and Zoning Commission is authorized

"(1) To prepare and recommend to the corporate authorities a comprehensive plan for the present and future development or redevelopment of the municipality. Such plan may be adopted in whole or in separate geographical or functional parts, each of which, when adopted, shall be the official comprehensive plan, or part thereof, of that municipality. This plan may include reasonable requirements with reference to streets, alleys, public grounds, and other improvements hereinafter specified. The plan, as recommended by the plan commission and as thereafter adopted in any municipality in this state, may be made applicable, by the terms thereof, to land situated within the corporate limits and contiguous territory not more than one and one-half miles beyond the corporate limits and not included in any municipality. Such plan may be implemented by ordinances (a) establishing reasonable standards of design for subdivisions and for resubdivisions of unimproved land and of areas subject to redevelopment in respect to public improvements as herein defined; (b) establishing reasonable requirements governing the location, width, course, and surfacing of public streets and highways, alleys, ways for public service facilities, curbs, gutters, sidewalks, street lights, parks, playgrounds, school grounds, size of lots to be used for residential purposes, stormwater drainage, water supply and distribution, sanitary sewers, and sewage collection and treatment; and (c) may designate land suitable for annexation to the municipality and the recommended zoning classification for such land upon annexation.

(2) To recommend changes, from time to time, in the official comprehensive plan.

(3) To prepare and recommend to the corporate authorities, from time to time, plans for specific improvements in pursuance of the official comprehensive plan.

(4) To give aid to the municipal officials charged with the direction of projects for improvements embraced within the official plan, to further the making of these projects, and, generally, to promote the realization of the official comprehensive plan."



000377

# CHAPTER 1:

# INTRODUCTION

Mount Prospect has a strong history of community planning, with seven major comprehensive planning programs being undertaken since the early 1960's. These prior planning programs were completed during periods of rapid growth and development within the Village and the greater northwestern suburban area. From 1950 to 1990, Mount Prospect grew from a small residential community of approximately 4,000 in a somewhat rural setting to an established and diversified community with an estimated population of 53,170 (US Census 1990) in an urban environment. In 2000 the estimated population for the Village totaled 56,706 (US Census Bureau – www.census.gov).

Mount Prospect is a mature, stable community. While vacant land remains to be developed on the south side of the Village, there are commercial areas of the community beginning to show signs of age; others are potentially underutilized and may have potential for redevelopment. Reinvestment in the community is evident with an average 3,616 building permits per year for the last ten years. For the last three years an average of 126 homes a year have had extensive improvements including first and second floor additions or complete tear-down and rebuilding of the primary residence. Almost 50% of single-family homes were built in the ranch, single-story style, while the Village also offers additional housing choices such as split-level, multiple-story, and multiple-family homes. The Village has continued to be a predominately residential community, with over 70% of the Village zoned residential.

## BACKGROUND AND PROCESS

The Comprehensive Plan guides planning and development policy for the Village. As the primary planning document, the Plan describes goals and objectives for existing and future development in the Village, as well as the steps necessary to achieve these goals.

Because the Village is dynamic, the Comprehensive Plan should be reviewed and updated regularly. This document represents an update of the Comprehensive Plan for Mount Prospect. The original Plan was adopted in 1965, revised in 1981 and updated in 1984, 1988, 1992, 1994, and 1998. Previous versions of the Plan were prepared by the Village with the assistance of a planning consulting firm and responds to a critical need to guide and coordinate local development and improvement actions. Previous plans included ongoing, short term, as well as long term planning recommendations for land use, transportation, and community facilities, through an action-oriented implementation program.


000378



The elements of the Comprehensive Plan affect all residents of the Village. The goals, objectives and policies presented in this Comprehensive Plan Update cover a number of important topic areas and are organized into four areas:



It is the Village's intention to comply with the elements identified in the recently approved Illinois Local Planning Technical Assistance Act (Public Act 92-0768, Sec. 5) through these four areas. Although funding has not been released from the State, the Village increases the likelihood of receiving future technical assistance grants that may be used to write or revise future local comprehensive plans for the Village.

000379



## EXISTING SUB AREA AND STRATEGIC PLANS

In many respects the Comprehensive Plan serves as an "umbrella plan" as the primary advisory land use planning document for the Planning and Zoning Commission and the Village Board. The Comprehensive Plan is general in nature, while sub area and strategic plans have greater detail on specific geographic areas of the Village. Sub area and strategic plans are developed by the Village of Mount Prospect to address more than just general goals and objectives. They frequently address extensive development and/or redevelopment issues, and the processes to carry out the strategic development. The goals and objectives of these sub area and strategic plans are drafted in compliance with the Comprehensive Plan, but remain "stand-alone" documents. Existing sub area and strategic plans include:

### SUB AREAS (Corridors)

**Central Road Corridor Plan:** Adopted and made part of the Official Comprehensive Plan in March 1996, this plan focused on the area bounded by Central Road, Northwest Highway, and the Arlington Heights – Mount Prospect corporate boundary. The corridor study provided a more detailed plan leading to specific actions based upon general planning principles outlined in the Village Comprehensive Plan. The plan also reaffirmed the Village's belief that the majority of the corridor should continue to be a combination of commercial and light industrial land uses.



**Rand Road Corridor Plan:** Adopted and made part of the Official Comprehensive Plan in May 1998, this plan provided the community with a general vision of how commercial and residential properties along Rand Road should be developed or redeveloped.

### SUB AREAS (Downtown)

**Tax Increment Redevelopment Plan and Project (with 3 Amendments):** Originally adopted in 1985 for the establishment of the downtown TIF district, the plan and project identifies strategic projects and redevelopment opportunities necessary to achieve the goals of the district. The TIF district itself has expanded its original boundaries by amendments made in 1988 and 1992. The 3rd amendment, adopted in August 2006, amended the existing redevelopment plan and project and extended the life of the TIF to 2022.





**Downtown TIF District Strategic Plan:** Adopted and made part of the Official Comprehensive Plan in February 1998, this plan, completed by the Downtown Strategic Plan Ad Hoc Committee, identified consensus on the most appropriate redevelopment alternatives in the downtown. The plan also outlined the process for redevelopment to occur and prioritized sites for redevelopment. At the request of the Village Board, a second Ad Hoc Committee met on a weekly basis from the beginning of December 2003 through mid-February 2004 to review the Strategic Plan.







The Committee, through a series of public meetings, reaffirmed appropriate development opportunities and recommended changes. This work lead to the expansion and extension of the TIF district in 2006. In addition, the Committee was also asked to look at other potential redevelopment opportunities that exist outside of the boundaries established by the existing Strategic Plan.

## STRATEGIC PLANS

Other strategic planning documents exist to guide the Village in daily operations. The *Capital Improvement Plan* and the *Village of Mount Prospect 5 Year Consolidated Plan* are documents that plan the allocation of resources necessary to implement the strategies of the Comprehensive Plan.

**Corridor Design Guidelines (2004):** Various major street and highway corridors throughout the Village were studied to determine the relative visual strength and condition of each. The guidelines serve as a manual for an overall program of corridor improvement throughout key sites in the Village. The key sites provide opportunities to identify the Village and welcome residents and visitors alike to Mount Prospect.



**Capital Improvement Plan (Annually):** Prepared by the Finance Department and Village Manager's Office with the help of each Village department, this plan is updated annually; it is a plan for capital expenditures and projects over the upcoming five years for the Village. The capital improvements plan gives a clear, comprehensive view of the Village's long-term capital needs and a firm basis from which to begin the preparation of the next year's operating budget.



**Village of Mount Prospect 5 Year Consolidated Plan (2005 – 2009):** Prepared by the Village's Neighborhood Planner, and adopted per Federal regulations through extensive public input and comment, this document guides the Village Community Development Block Grant Program. Plans are developed for a five year period and updated as needed. The current plan, for the planning period of January 1, 2005 through December 31, 2009, is a comprehensive five-year planning document that identifies the overall housing and community development needs of the Village. It outlines available programs and resources, and establishes a strategy for prioritizing and addressing these needs.







## 2007 COMPREHENSIVE PLAN UPDATE PROCESS

The 2007 Plan and Implementation program representing a significant commitment by Mount Prospect to guide and control its future. It was based on several months of intense effort by local officials, staff, and residents to review improvement needs and development requirements. It reflected a strong local consensus concerning what the Village should become in the future. The key steps for the 2007 Comprehensive Plan Update were:

**Existing Conditions Data Collection:**    Existing conditions data was compiled over the summer of 2006.  A summary (Chapter 2) presents information on population and housing; economic development; transportation, utilities, community facilities; and land-use, zoning, & annexation.  The summaries analyze each of these topics as they currently exist and gives a "snapshot" of the Village and offer a community profile as of 2006.

**Internal Staff Opportunities Review Workshop:**  In August 2006, an internal staff workshop was conducted that explained the purpose of the Comprehensive Plan and introduced the time line and methodology used for the update.  In this meeting a "brainstorming" session was conducted that evaluated opportunities in the Village as they relate to land use.

**Stakeholder Interviews and Focus Groups:**  During the Fall of 2006, interviews and focus groups were conducted with the school districts, park districts, townships, Mount Prospect Library, Economic Development Commission, Chamber of Commerce, Mount Prospect Downtown Merchant's Association, and key business and commercial property owners.  The Village was interested in 1) updating its community facilities (parks, schools, churches, etc.) inventory for the Plan; 2) discussing each organization's long range plans as they relate to land use; and 3) reviewing the status of the goals, objectives, and implementation section of the 1998 plan as it related to each organization.

**Village Board & Planning and Zoning Commission Meetings:** The Planning & Zoning Commission met regularly with Planning Division staff for the duration of the update. Two joint meetings (September and October 2006) with the Planning & Zoning Commission and Village Board focused on the overall planning process and goals for the Village, and the identification of major planning issues and opportunity areas.  Updates on the process, Plan draft text and maps were released regularly at the public meetings, on MPTV, the Village Newsletter and on the Village web site, where residents could post comments.



000382



**Land Use Map and Descriptions Open House:** Based on the preliminary discussions with stakeholders in the community the future land use map and descriptions were prepared and presented at an open house in December 2006. The open house served as an opportunity for citizen input on changes that were proposed to the 1998 generalized land use map.

**Plan and Program Preparation:** Based on preliminary consensus reached on preferred concepts and strategies, a draft of the 2007 Comprehensive Plan Document and Land Use Map were prepared and delivered to the Planning and Zoning Commission and other governmental organizations in February 2007. The Village believes that citizen input is extremely valuable and essential in the development of a well thought out and feasible plan. A public hearing was held on April 12, 2007 to receive public comments for the final document.

## BENEFITS OF A COMPREHENSIVE PLANNING PROGRAM

The process has encouraged local officials, staff, and residents to consider the future of their community more directly and to actively discuss future options and alternatives. A wide range of data and materials on local conditions was assembled and is provided in the next chapter. The plan considers where the Village is today, the issues we face as a community, and where we would like to go in the future. The final document is a plan for future growth and development which represents strong local consensus. The Comprehensive Land Use Plan and overall comprehensive planning program benefits the Mount Prospect Community because it:

- Promotes a balanced and orderly future development pattern which should enhance the local living environment.
- Establishes an overall framework for coordinating both public and private development.
- Provides guidelines by which the Planning and Zoning Commission and Village Board can review and evaluate individual development proposals.
- Provides a guide for public investments and can help ensure that local public dollars are spent wisely for community facilities and services.
- Clarifies long-range Village policies so that individual property owners and developers can prepare and coordinate their own development plans.

Most important, the updated Comprehensive Plan reflects the Village's commitment to planning for its future on a continuing basis.





CHAPTER 2:

# MOUNT PROSPECT – A 2006 SNAPSHOT

What is Mount Prospect all about?  This snapshot of the community seeks to answer the questions of "Where have we come from?" and "How do we compare to the region, the State, and the Country?"  Additional demographic information for the Village's neighboring communities can also be found in Appendix A.  The summary presents information on the Village's:

- **Population**
- **Housing**
- **Economic Development**
- **Transportation**
- **Utilities**
- **Community facilities**
- **Land-use**
- **Zoning**
- **Annexations**

Understanding the characteristics of Mount Prospect -- both the physical built-environment and the composition of the community's residents -- is important for a number of reasons, all of which will contribute to how land use in the community could change in the future.

- For example, the age of the population can create a demand for certain services such as schools, parks, senior housing or assisted living facilities, and increased public transportation.  At different points in their life residents will seek different recreation opportunities, have different expendable income levels, and desire different sizes and styles of housing.
- The composition of the population can lead to business development strategies such as seeking family oriented entertainment, increased day care and youth programming, or increased medical and health facilities.
- The age and condition of industrial, retail, and commercial buildings and the location of our business districts will impact continued investment in Mount Prospect and determine development and redevelopment prospects.

000384



As the presence of Randhurst Shopping Center, Kensington Business Park, and many other commercial districts show, Mount Prospect's location, amenities, and services have proven to be attractive to the business community. This in turn leads to the availability of jobs, goods, and services for our residents, and a diverse revenue base for government services, creating an attractive quality of life which the Village seeks to preserve, protect, and enhance.

## DEMOGRAPHICS: POPULATION & HOUSING

### Population

Mount Prospect experienced a 5% population growth between 1990 and 2000 and an estimated 1% growth since then. Census Bureau data indicates a Mount Prospect population of 52,634 in 1980, 53,170 in 1990, and 56,706 in 2000.

Population levels are impacted by construction activity. The community grew fastest between 1950 and 1989 when 86% of the dwelling units in the Village were constructed. New home construction tapered off in the 1990's but has not stopped. The Village Building Division reports 346 new housing units completed between 2000 and 2006 with an additional 66 units under construction as of January 2007. These units include downtown condominium construction, in-fill townhomes, and subdivision of existing single family lots. Existing homes are also undergoing expansion. With 47% of the single-family housing stock built in the ranch-style, second-story additions are not uncommon. This construction and investment produces new and expanded housing stock which could result in increased population. Details are found in the Housing and Construction Sections below.

Figure 2.1 Characteristics of our population

| | United States | Illinois | Cook County | Mount Prospect |
|---|---|---|---|---|
| Total Population | 281,421,906 | 12,419,293 | 5,376,741 | 56,706 |
| Median Age | 35.3 | 34.7 | 33.6 | 37.2 |
| Average Household Size | 2.59 | 2.63 | 2.68 | 2.61 |
| In Family Household* | 82.61% | 83.10% | 82.59% | 86.73% |
| Education – Bachelor's Degree or Above Attained | 15.80% | 16.73% | 18.02% | 24.4% |
| Median Household Income | $41,994 | $46,590 | $45,922 | $57,165 |
| Per Capital Income | $21,587 | $23,104 | $23,227 | $26,464 |
| Population below the Poverty Level in 1999 | 12.38% | 10.68% | 13.9% | 4.62% |
| Number of Housing Units | 115,904,641 | 4,885,615 | 2,096,121 | 22,081 |
| Percent of Housing Owner Occupied | 60% | 63% | 55% | 70% |
| Housing Owner Occupied | 69,816,513 | 3,089,124 | 1,142,743 | 15,483 |
| Housing Renter Occupied | 35,663,588 | 1,502,655 | 831,438 | 6,235 |
| Owners living in same home 5 years prior to census | 54.13% | 47.47% | 57.00% | 59.30% |

* Householder living with one or more individuals related to him or her by birth, marriage, or adoption.

Source: U.S. Census 2000      Summary File 1, Table P-13
                              Summary File 3, Tables P-1, P-9, P-37, P-53, P-82, P-87, H-1, H-6, H-7, H-18, PCT-21





Figure 2.2 Age Distribution of Mount Prospect Residents



Source: US Census 1980, 1990, 2000

Households in Mount Prospect tend to be families living in homes they own. The mobility rate has been stable with over 55% of households reported having been in their home for 5 years or more in each of the last 3 census counts.

Regardless of country of birth, the ancestry of Mount Prospect residents is more diverse. Settled predominately by German and other European settlers, Mount Prospect is now one of the leading ports-of-entry for the entire Chicago metro area and home to the area's seventh largest foreign born population (Metro Chicago Immigration Fact Book, pp. 3, 10). According to the 2000 Census 26.7% (15,159 residents) of the Village is foreign born residents, an increase from the 16.2% in 1990. This compares to 17.5% of the Chicago Metro region's population. The US Census Bureau defines "foreign-born" as including that portion of the population who were not U.S. citizens at birth. Foreign-born people are those who indicated they were either a U.S. citizen by naturalization or they were not a citizen of the United States.

Figure 2.3  Hispanic or Latino By Race

| | United States | Illinois | Cook County | Mount Prospect |
|---|---|---|---|---|
| Total Population | 281,421,906 | 12,419,293 | 5,376,741 | 56,265 |
| % Not Hispanic or Latino: | 87.45% | 87.68% | 80.07% | 88.23% |
| % White | 69.13% | 67.83% | 47.59% | 73.84% |
| % Black or African American | 12.06% | 14.95% | 25.86% | 1.74% |
| % American Indian and Alaska Native | 0.74% | 0.15% | 0.13% | 0.07% |
| % Asian | 3.60% | 3.38% | 4.80% | 11.15% |
| % Native Hawaiian & Other Pacific Islander | 0.13% | 0.03% | 0.03% | 0.04% |
| % Some other race | 0.17% | 0.11% | 0.14% | 0.08% |
| % Two or more races | 1.64% | 1.24% | 1.53% | 1.30% |
| % Hispanic or Latino: | 12.55% | 12.32% | 19.93% | 11.77% |
| % White | 6.01% | 5.65% | 8.69% | 6.74% |
| % Black or African American | 0.25% | 0.17% | 0.28% | 0.08% |
| % American Indian and Alaska Native | 0.14% | 0.10% | 0.16% | 0.12% |
| % Asian | 0.04% | 0.03% | 0.04% | 0.03% |
| % Native Hawaiian & Other Pacific Islander | 0.02% | 0.01% | 0.02% | 0.01% |
| % Some other race | 5.29% | 5.71% | 9.74% | 4.07% |
| % Two or more races | 0.79% | 0.65% | 1.00% | 0.72% |

Source: US Census 2000 Summary File 1, Table P-8





**Figure 2.4 Origin of Foreign-Born by Continent**

|  | United States | Illinois | Cook County | Mount Prospect |
|---|---|---|---|---|
| Total: | 31,107,889 | 1,529,058 | 1,064,703 | 15,159 |
| % Europe: | 15.80% | 25.50% | 27.06% | 34.39% |
| % Asia: | 26.44% | 23.53% | 21.78% | 35.00% |
| % Africa: | 2.83% | 1.71% | 1.74% | 1.22% |
| % Oceania: | 0.54% | 0.17% | 0.12% | 0.23% |
| % Americas: | 54.38% | 49.09% | 49.30% | 29.16% |
| % Born at sea | 0.00% | 0.00% | 0.00% | 0.00% |

Source: US Census Summary File 3, Table - PCT19

**Figure 2.5 Notable Groups of Foreign-Born by Country in Mount Prospect (2000)**

|  | Mount Prospect | % of Total Foreign-Born | Region Rank* |
|---|---|---|---|
| Total Population Foreign-Born: | 15,159 |  |  |
| Mexico | 3,875 | 25.56% | NR |
| India | 2,548 | 16.81% | 5th |
| Poland | 1,956 | 12.90% | 7th |
| Korea | 1,100 | 7.26% | 6th |
| Former Yugoslavia | 451 | 2.98% | 4th |
| Ukraine | 309 | 2.04% | 8th |
| Sub-Saharan Africa | 169 | 1.11% | 10th |
| Romania | 159 | 1.05% | 8th |
| Iraq | 152 | 1.00% | 6th |
| Bosnia-Herzegovina | 118 | 0.78% | 5th |

*The region includes the six counties of Cook, DuPage, Kane, Lake, McHenry and Will. The Metro Chicago Immigrant Fact Book ranked each municipality in the region by total population for each country of origin.

Source: Metro Chicago Immigrant Fact Book, 2003

**Figure 2.6  Foreign-Born Population in Mount Prospect (1960-2000)**



Source: Metro Chicago Immigrant Fact Book, 2003

This is no surprise as Mount Prospect is an ideal location for the foreign-born population due to its location within the Chicago Metro region, the various housing options, location to employment, connection to family & friends, and availability of bilingual services.  According to the Chicago Metropolitan Agency for Planning, the Chicago's rate of international immigration between 2000 and 2005 ranks in the top 5 percent of metropolitan regions in the nation.

Across the country, the first generation foreign-born population is increasingly choosing a suburban location, rather than the central city location in which previous generations first located.  Suburban Chicago has experienced dramatic growth among the foreign-born population. In 2000 the population reached an all-time high of 788,000 persons, a number that surpassed the foreign-born population in the City of Chicago for the first time.  The suburban foreign born population grew by 377,000 persons in the 1990s an increase of 91.9 percent.  Almost 33% of the foreign-born population in Mount Prospect arrived between 1995 and 2000, a higher percentage than Illinois (26%) and Cook County (25%).  Of the 15,159 foreign-born in Mount Prospect 65% have entered Mount Prospect since 1985.

The percentage of homes which speak a second language other than English in their home ranges between 45% to 60% in each of these four census tracts.  Overall, 42% of the total population of Mount Prospect is bi-lingual and 10% do not speak English well or at all (Figure 2.8).





**Figure 2.7 Year of Entry for the Foreign-Born Population**

|  | United States | Illinois | Cook County | Mount Prospect |
|---|---|---|---|---|
| Total: | 31,107,889 | 1,529,058 | 1,064,703 | 15,159 |
| % 1995 to March 2000 | 24.37% | 25.63% | 24.89% | 32.69% |
| % 1990 to 1994 | 17.99% | 19.34% | 19.56% | 18.52% |
| % 1985 to 1989 | 15.08% | 13.93% | 13.91% | 12.18% |
| % 1980 to 1984 | 12.14% | 9.89% | 10.27% | 7.43% |
| % 1975 to 1979 | 8.64% | 9.15% | 9.53% | 7.98% |
| % 1970 to 1974 | 6.43% | 7.12% | 7.39% | 5.24% |
| % 1965 to 1969 | 4.77% | 4.52% | 4.49% | 4.35% |
| % Before 1965 | 10.59% | 10.43% | 9.95% | 11.61% |

Source: U.S. Census 2000 Summary File 3, Table - P22

**Figure 2.8 Language Capability of Mount Prospect Residents, Ages 5 Years +**

|  | United States | Illinois | Cook County | Mount Prospect |
|---|---|---|---|---|
| Total: | 262,375,152 | 11,547,505 | 4,991,310 | 53,049* |
| % Speak Another Language (Total) | 17.89% | 19.23% | 30.81% | 34.94% |
| % and English "very well" | 9.77% | 10.10% | 15.53% | 16.87% |
| % and English "well" | 3.94% | 4.44% | 7.41% | 8.21% |
| % and English "not well" | 2.90% | 3.36% | 5.61% | 6.66% |
| % and English "not at all" | 1.28% | 1.33% | 2.26% | 3.20% |

* Residents 5 years and Older, hence does not add to 56,706.

Source: U.S. Census, Summary File 3, Table - PCT12

## Income

The Mount Prospect per capita income has increased steadily over the past two decades. As noted in Figure 2.9, in 2000, the per capita income of Mount Prospect was $26,464 and the median household income was $57,165, compared to Cook County's per capita income, which was $23,227 and average household income was $45,992. Figure 2.9 shows the variation of population, median household income, and per capita income in different 1-mile radius clusters within Mount Prospect as compared to the entire Village. The 1-mile radius may include area that is outside of the Village's jurisdiction.

**Figure 2.9 Select Mount Prospect Demographics**

| Area (1-mile radius from address listed below) | Population | Total Number of Households | Median Household Income | Per Capita Income |
|---|---|---|---|---|
| North Mount Prospect (Randhurst) | 13,062 | 4,708 | $66,521 | $27,200 |
| Downtown (100 S. Emerson) | 14,716 | 5,620 | $60,876 | $26,630 |
| South Mount Prospect (1601 S. Busse Road) | 13,179 | 6,567 | $45,574 | $23,737 |
| Village wide | 56,706 | 21,648 | $57,165 | $26,464 |

Source: Location One Information Systems (LOIS): US Census 2000 Summary File 3, Tables P-14, P-53, P-82



000389

## Housing

With highly rated schools and park district services, an excellent location within the Chicago Metropolitan Market, and a full array of Municipal services, it is no surprise that Mount Prospect has a strong housing market.

- According to the US Census, the total number of housing units in Mount Prospect has increased from 19,513 units in 1980 and 20,949 units in 1990 to 22,081 units in 2000.
- Of the 22,081 total units in 2000, 15,483 units (70.1%) were owner-occupied and 6,235 (28.2%) were renter-occupied.
- Mount Prospect is among the top ten communities in the State in terms of number of rental housing units.

A vacancy rate of less than six percent typically indicates a tight housing market; Mount Prospect's vacancy rates show a very tight market in both rental and owner-occupied housing.

- According to the 2000 census, the vacancy rate of all housing units has dropped from 3.2% in 1990 to 1.7%.
- Although there was an increase of 1,003 housing new housing units between 1990 and 2000, there was a decrease in the amount of rental units for the same period.

Figure 2.10 Mount Prospect Housing Occupancy and Tenure (1990-2000)

| Housing Occupancy | 1990 | % | 2000 | % |
|---|---|---|---|---|
| Total housing units | 20,949 | | 22,081 | |
| Occupied housing units | 20,281 | 96.8% | 21,718 | 98.36% |
| Vacant housing units | 668 | 3.2% | 363 | 1.64% |
| | | | | |
| Housing Tenure | 1990 | % | 2000 | % |
| Total occupied housing units | 20,281 | | 21,718 | |
| Owner-occupied housing units | 14,009 | 69.1% | 15,483 | 71.29% |
| Renter-occupied housing units | 6,272 | 30.9% | 6,235 | 28.71% |

Source: US Census 2000 Summary File 3, Tables H-1, H-7, H-8

Figure 2.11 Construction Date of Occupied Housing Stock

| Total | Illinois | | Cook County | | Mount Prospect | |
|---|---|---|---|---|---|---|
| Total | 4,591,779 | | 1,974,181 | | 21,718 | |
| % Built 1999 to March 2000 | 63,758 | 1.39% | 14,194 | 0.72% | 75 | 0.35% |
| % Built 1995 to 1998 | 245,208 | 5.34% | 51,084 | 2.59% | 455 | 2.10% |
| % Built 1990 to 1994 | 259,461 | 5.65% | 61,213 | 3.10% | 874 | 4.02% |
| % Built 1980 to 1989 | 452,605 | 9.86% | 143,517 | 7.27% | 2,329 | 10.72% |
| % Built 1970 to 1979 | 758,092 | 16.51% | 269,767 | 13.66% | 5,673 | 26.12% |
| % Built 1960 to 1969 | 670,989 | 14.61% | 321,783 | 16.30% | 6,447 | 29.69% |
| % Built 1950 to 1959 | 698,749 | 15.22% | 365,056 | 18.49% | 4,321 | 19.90% |
| % Built 1940 to 1949 | 416,481 | 9.07% | 219,875 | 11.14% | 977 | 4.50% |
| % Built 1939 or earlier | 1,026,436 | 22.35% | 527,692 | 26.73% | 567 | 2.61% |

Source: US Census 2000 Summary File 3, Table H-36



000389



The number of rental units available in Cook County has also been diminishing due to the escalating costs to operate them and increased condominium conversions. In 2002, Cook County Assessor Jim Houlihan, with Cook County Board approval, took initial steps toward alleviating the property tax burden on multi-family properties by implementing a phased-in reduction in the assessment level of multi-family rental buildings from 33% to 26%. The plan approved by the County Board will phase-in additional gradual assessment level reductions from 26% to 24% in 2006, 24% to 22% in 2007, and from 22% to 20% in 2008.

The Village Building Division reports 346 new housing units constructed between 2000 and 2006. An additional 66 units were under construction at the end of 2006. The new housing units include:

- 298 condominiums
- 81 townhomes
- 33 single-family homes

Rising property values, relatively low interest rates, and an older housing stock has created favorable conditions for housing reinvestment. Housing values have increased significantly in the past several years.

- In 2005, Mount Prospect provided 1,761 transfer stamps for real estate transactions. Multiple Listing Service information lists the average sales price of detached single family homes as $384,252.
- In 2006, Mount Prospect provided 1,618 transfer stamps for real estate transactions. Multiple Listing Service information lists the average sales price of detached single family homes as $397,472.

In 2006, 23 new single-family homes were built. Additions were constructed on 75 homes in the Village. These residential construction projects are distributed evenly through out the single-family neighborhoods in the Village. These additions are made by owners seeking to update their homes and provide additional bedrooms and family common area space as well as expanding the size of bedrooms, kitchens, and garages. Additions often include expansion of the basement level. This phenomenon has increased the housing values and is an unforeseen difference from the previous Comprehensive Plan stating that the residential character of the neighborhoods would experience little change.




## Construction

The Building Division tracks building permits as the permits are released. Figure 2.12 illustrates the estimated construction cost provided for permits issues over the past 7 years. Figures for 2006 include several projects still under construction: Briarwood Industrial Park at Linneman and Algonquin (500,000 s.f.), and the Alexian Brothers Medical Facility on Kensington (22,500 s.f.).

Figure 2.12 Village of Mount Prospect Permit Summary and Estimated Cost Valuations (2000-2006)

| Year | Commercial | Residential | Industrial | Misc. | Total | Inspections | Permits |
|---|---|---|---|---|---|---|---|
| 2000 | $9,832,416 | $13,637,301 | $780,302 | $2,292,983 | $26,543,002 | 14,821 | 3,584 |
| 2001 | $12,449,924 | $21,983,412 | $1,272,260 | $4,281,195 | $39,986,791 | 16,273 | 3,638 |
| 2002 | $15,010,405 | $19,238,089 | $81,500 | $138,310 | $34,468,304 | 13,825 | 3,122 |
| 2003 | $25,304,232 | $34,708,637 | $321,143 | $2,601,518 | $62,935,530 | 12,839 | 3,427 |
| 2004 | $24,777,823 | $27,148,816 | $103,101 | $87,267 | $52,117,007 | 13,364 | 3,429 |
| 2005 | $17,185,982 | $21,293,241 | $148,112 | $94,870 | $52,013,325 | 14,165 | 3,217 |
| 2006 | $11,582,856 | $25,246,995 | $367,499 | $78,632 | $305,339,941 | 9,590* | 2,866 |
| Total | $116,143,638 | $163,256,491 | $3,073,917 | $9,574,775 | $305,339,941 | 94,877 | 23,283 |
| Avg. | $16,591,948 | $23,322,356 | $439,131 | $1,367,825 | $43,619,992 | 13,554 | 3,326 |

*Decrease in inspection count is due to new software in 2006 and a reduced number of re-inspections after introduction of escalating re-inspection fees.
Source: Village Building Division

Figure 2.13 Major Development Activity, Village of Mount Prospect (2000-2006)

| 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| Metra Federal Credit Union | Randhurst Crossing Shopping Center | Kohl's (Route 83 & Dempster) | Costco, Randhurst Mall | Staples, Mount Prospect Plaza | The Emerson, Downtown |
| CVS (Golf Plaza I), Golf & Busse | Sevres Townhome Development | Mt. Prospect Park District Golf Course Club House | River West Condo Conversion | Elmhurst Townhomes, Condominium conversion | Stonegate Townhomes, Camp McDonald Rd. & Rand Rd. |
| ITT Technical Institute, Kensington Business Center | Citgo Gas Station, Rand Rd. & Central Rd. | Skil-Bosch | Buffalo Wild Wings, Randhurst Mall | Dennis Uniform, 1400 Business Center Dr. | Garden Fresh Market, Mount Prospect Plaza |
| Metra Station Reconfiguration | 5th/3rd Bank | Shops & Lofts | Harris Bank | Steve & Barry's, Randhurst Mall | Bed, Bath, & Beyond, Randhurst Mall |
| Capannari's | 1 E. Rand Shopping Center | Culver's | New Village Hall | Applebee's Remodel, Randhurst Mall | Founder's Row, Downtown |
| Autobarn Remodel | Fiesta Market | Liberty Square Townhomes | Parkway Bank | Village Residences, Downtown | Phillips 66 |
| Central Community Center | Caremark | | Village Parking Garage | | Early Days Day care |
| Dearborn Villas Townhomes | | | Mount Prospect Public Library Remodel | | Alexian Brothers Medical Facility |
| | | | | | Briarwood Industrial Park |



## ECONOMIC DEVELOPMENT

### Employment

In 2005, the Mount Prospect unemployment rate was 4.7% compared to the national average of 5.1% (U.S. Department of Labor). Mount Prospect has historically lower unemployment rates than Cook County and the nation. Higher education achievement, good transportation, and availability of jobs contribute to these lower unemployment rates. The U.S. Census Bureau reports a labor force (population 16 years and over) in 2000 of 45,174.

Figure 2.14 reports the type of jobs held by residents of Mount Prospect, Northwest Cook County, and in the State of Illinois, regardless of the location in which they worked. The jobs are classified through the NAICS (North American Industry Classification System) which was introduced in 2000. Previously, employment data for the country was classified by Standard Industrial Classification (SIC) numbers classification. SIC classified employment by industry and NAICS classifies employment by the type of work performed. For example - under the NAICS code, an administrative assistant working for a manufacturing company would be classified under the "professional, scientific, management, administrative, and waste management services" whereas the SIC code would have classified this person under the "manufacturing" category. Due to the shift in classification, the comparison of employment from past census counts is not available.

Figure 2.14 Employment by Industry

| Industry (SIC) | United States | % of Total | Illinois | % of Total | Cook County | % of Total | VoMP | % of Total |
|---|---|---|---|---|---|---|---|---|
| Agriculture, forestry, fishing and hunting, and mining: | 2,426,053 | 1.87% | 66,481 | 1.14% | 2,356 | 0.10% | 21 | 0.07% |
| Construction | 8,801,507 | 6.78% | 334,176 | 5.73% | 119,355 | 4.93% | 1,347 | 4.55% |
| Manufacturing | 18,286,005 | 14.10% | 931,162 | 15.96% | 342,422 | 14.14% | 5,254 | 17.74% |
| Wholesale trade | 4,666,757 | 3.60% | 222,990 | 3.82% | 92,706 | 3.83% | 1,689 | 5.70% |
| Retail trade | 15,221,716 | 11.73% | 643,472 | 11.03% | 244,344 | 10.09% | 3,493 | 11.79% |
| Transportation and warehousing, and utilities: | 6,740,102 | 5.20% | 352,193 | 6.04% | 162,465 | 6.71% | 1,932 | 6.52% |
| Information | 3,996,564 | 3.08% | 172,629 | 2.96% | 82,835 | 3.42% | 1,192 | 4.02% |
| Finance, insurance, real estate and rental and leasing: | 8,934,972 | 6.89% | 462,169 | 7.92% | 219,831 | 9.08% | 2,672 | 9.02% |
| Professional, scientific, management, administrative, and waste management services: | 12,061,865 | 9.30% | 590,913 | 10.13% | 306,482 | 12.66% | 3,645 | 12.31% |
| Educational, health and social services: | 25,843,029 | 19.92% | 1,131,987 | 19.41% | 454,951 | 18.79% | 4,440 | 14.99% |
| Arts, entertainment, recreation, accommodation and food services: | 10,210,295 | 7.87% | 417,406 | 7.16% | 179,592 | 7.42% | 2,055 | 6.94% |
| Other services (except public administration) | 6,320,632 | 4.87% | 275,901 | 4.73% | 120,337 | 4.97% | 1,214 | 4.10% |
| Public administration | 6,212,015 | 4.79% | 231,706 | 3.97% | 93,611 | 3.87% | 663 | 2.24% |
| **Total:** | **129,721,512** | | **5,833,185** | | **2,421,287** | | **29,617** | |

Source: US Census 2000 Summary File 3, Table P-49

000392



Figure 2.15 breaks out the types of jobs found at Mount Prospect businesses – regardless of where these workers live, they work in Mount Prospect.  Figure 2.15 does not include government, self-employed, or railroad employees.

Figure 2.16 is a table of the major employers in Mount Prospect as of 2005.

**Figure 2.15 Type of Employment Available - 2001-2005 (Number of jobs)**

| Industry (NAICS) | VoMP 2001 | VoMP 2002 | VoMP 2003 | VoMP 2004 | VoMP 2005 | 2005 Metro Chicago | 2005 Cook County |
|---|---|---|---|---|---|---|---|
| Agriculture, Forestry, Fishing, & Hunting (11) | 0 | 0 | 0 | 0 | - | 2,641 | 370 |
| Mining (21) | 0 | 0 | 0 | 0 | 0 | 1,627 | 846 |
| Utilities (22) | 0 | 0 | 0 | 0 | 0 | 10,258 | 4,162 |
| Construction (23) | 1,110 | 1,167 | 1,191 | 1,293 | 1,142 | 164,100 | 85,284 |
| Manufacturing (31-33) | 1,989 | 1,877 | 1,808 | 1,615 | 1,626 | 436,389 | 253,450 |
| Wholesale Trade (42) | 2,046 | 1,716 | 1,621 | 1,649 | 1,491 | 208,949 | 113,066 |
| Retail Trade (44-45) | 3,965 | 3,664 | 3,681 | 4,391 | 3,948 | 399,801 | 233,061 |
| Transportation and Warehousing (48-49) | 406 | 425 | 461 | 222 | 223 | 156,246 | 119,024 |
| Information (51) | 704 | 949 | 895 | 727 | 722 | 86,636 | 61,047 |
| Finance & Insurance (52) | 667 | 614 | 600 | 667 | 859 | 234,415 | 168,533 |
| Real Estate & Rental & Leasing (53) | 301 | 204 | 240 | 252 | 244 | 64,211 | 46,252 |
| Professional, Scientific & Tech Svcs. (54) | 878 | 880 | 768 | 855 | 1,093 | 275,642 | 191,602 |
| Mngmt. Of Companies & Enterprises (55) | 495 | 493 | 378 | 936 | 862 | 70,171 | 45,887 |
| Admin. & Sup. & Waste Mgmt. & Remed. Svcs. (56) | 1,104 | 1,303 | 1,598 | 2,445 | 2,438 | 267,833 | 166,710 |
| Educational Services (61) | 206 | 321 | 373 | 398 | 200 | 91,145 | 69,188 |
| Health Care & Social Assistance (62) | 893 | 928 | 836 | 809 | 779 | 399,298 | 285,507 |
| Arts, Entertainment, & Recreation (71) | - | 33 | 45 | 23 | - | 50,020 | 29,108 |
| Accommodations & Food Services (72) | 1,087 | 1,045 | 982 | 998 | 1,125 | 271,809 | 181,462 |
| Other Services (except Public Admin..) (81) | 639 | 671 | 577 | 564 | 527 | 136,765 | 93,769 |
| Unclassified (99) | - | 18 | 13 | 19 | - | 5,424 | 3,717 |
| All Industries | 16,517 | 16,308 | 16,067 | 17,863 | 17,339 | 3,333,380 | 2,152,045 |

Source: State of Illinois IDES – Where Workers Work

**Figure 2.16 Major Mount Prospect Employers (2006)**

| Employer | Product/Service | Employees |
|---|---|---|
| Caremark | Pharmaceutical Distributor | 800 |
| Skil-Bosch Tool Corporation | Tool Manufacturer | 576 |
| Metropolitan Life | Insurance Admin. Office | 445 |
| Cummins-Allison | Manufacturing Office Products | 435 |
| Village of Mount Prospect | Municipal Government | 307 |
| Mount Prospect School District 57 | Education | 298 |
| General Electric Healthcare | Physical Research | 250 |
| Siemens Bldg. Technology | Building Technologies | 250 |
| Prospect High School | Education | 250 |
| Jewel Food Stores | Grocery | 240 |
| Home Depot | Home Improvement Retail | 235 |
| Advance Medical Systems | Plumbing, Heating, A/C | 225 |
| Wal-mart | Retail | 200 |
| Arrow Road Construction | Construction | 180 |
| United States Post Office | U.S. Government | 175 |
| Advocate MSO, Inc. | Medical Office | 167 |
| American Recovery Systems | Adjustment & Collection | 160 |
| Warehouse Direct | Stationary | 160 |
| Costco | Retail | 151 |

Source: Village of Mount Prospect, IDCEO



000393


**Figure 2.17 a-d EAV Trend Village of Mount Prospect\***

*a. Taxable Valuation (VoMP)*

| Year | Res. | Comm. | Indust. | Rail | Total |
|---|---|---|---|---|---|
| 1992 | 52.20% | 31.30% | 16.60% | 0.00% | $913,687,843 |
| 1993 | 52.80% | 31.30% | 15.90% | 0.00% | $928,456,907 |
| 1994 | | | | | |
| 1995 | 54.60% | 30.50% | 14.90% | 0.00% | $985,165,507 |
| 1996 | 54.60% | 30.40% | 14.90% | 0.00% | $1,007,310,425 |
| 1997 | 55.40% | 30.00% | 14.60% | 0.00% | $998,653,071 |
| 1998 | 56.60% | 30.40% | 13.00% | 0.00% | $1,067,012,274 |
| 1999 | | | | | |
| 2000 | 56.50% | 30.10% | 13.40% | 0.00% | $1,098,576,961 |
| 2001 | 60.40% | 27.40% | 12.10% | 0.00% | $1,265,677,194 |
| 2002 | 60.40% | 27.50% | 12.10% | 0.00% | $1,370,487,084 |
| 2003 | 61.40% | 26.70% | 11.80% | 0.00% | $1,340,727,033 |

*b. Village of Mount Prospect Percent of Total Change (1992-2003)*

| Residential | Commercial | Industrial | Railroad |
|---|---|---|---|
| 9.30% | -4.50% | -4.80% | 0.00% |

*c. Taxable Valuation (Cook County)*

| Year | Res. | Comm. | Indust. | Rail | Total |
|---|---|---|---|---|---|
| 1999 | 46.40% | 37.04% | 16.16% | 0.40% | $85,481,091,000 |
| 2000 | 48.27% | 36.14% | 15.18% | 0.41% | $90,744,082,000 |
| 2001 | 49.74% | 35.15% | 14.70% | 0.41% | $99,093,259,000 |
| 2002 | 51.21% | 34.26% | 14.13% | 0.40% | $110,505,476,000 |
| 2003 | 51.59% | 34.77% | 13.19% | 0.46% | $120,048,338,000 |

*d. Taxable Valuation (Illinois)*

| Year | Res. | Comm. | Indust. | Rail | Total |
|---|---|---|---|---|---|
| 1999 | 60.01% | 27.54% | 12.05% | 0.40% | $183,831,813,000 |
| 2000 | 61.00% | 27.23% | 11.38% | 0.39% | $194,963,187,000 |
| 2001 | 61.73% | 26.77% | 11.13% | 0.37% | $211,441,653,000 |
| 2002 | 62.56% | 26.31% | 10.77% | 0.36% | $232,152,619,000 |
| 2003 | 63.31% | 26.37% | 10.10% | 0.22% | $251,299,158,000 |

\* Includes the incremental valuation in the Village's tax increment financing district (classified as commercial valuation).

Source: MP Comprehensive Annual Financial Reports 1998-2005, Illinois Department of Revenue

## Equalized Assessed Value (EAV)

Analysis of the EAV is one method of measuring the economic health of a community.  Figure 2.17 lists the total equalized assessed values (EAV) for residential, commercial, and industrial properties in the Village between 1992 and 2003. The EAV is the value of a property on which the tax rate is applied. The EAV is a percentage of the market value adjusted by a multiplier determined by the State to equalize discrepancies in assessed values throughout the State. The Cook County taxation system differs from the rest of the State because different property classifications are taxed at different percentages of value ranging from 16% for single family homes to 38% for commercial properties.

000394



Until the early 1990's the total value of all property in Cook County was approximately 50% or less residential properties and 50% non-residential properties. In recent years that ratio has changed as 1) residential properties have increased in value with a strong sales market, and 2) businesses have relocated to the collar counties.

The Village of Mount Prospect seeks to maintain an equal proportion of residential and commercial/industrial EAV, spreading the tax burden evenly for its residents and business owners. However, as the data shows the Village's proportion of commercial and industrial EAV continues to fall.

- Between 1992 and 2003 the total EAV for the Village has steadily risen by 46%. Rising residential property values contributed to an increase of the residential EAV by 72.8%, while the commercial and industrial EAV increased by 18.3%.
- The Village's residential proportion of the Village total EAV grew by 9.3% (an increase from 52.2% to 61.4%) for this time period; commercial and industrial EAV fell by 4.5% and 4.8% respectively.

### Principal Taxpayers

Figure 2.18 displays the 10 principal taxpayers of Mount Prospect. This includes commercial, industrial, and multi-family housing properties.

Figure 2.18 Principal Taxpayers of Mount Prospect 2005

| Taxpayer | Description of Business/Property | 2004 EAV |
|---|---|---|
| Randhurst Urban Retail | Randhurst Shopping Center | $62,206,223 |
| I' Industrial LP | Property Mgmt. (Multiple Properties) | $28,184,111 |
| Mount Prospect Plaza | Shopping Center | $25,037,707 |
| Home Properties Colony | Colony Square Apartments | $24,326,569 |
| Golf Plaza | Shopping Center | $16,879,909 |
| CRP Holdings | Real Estate | $15,658,338 |
| Cabot Industrial Properties | Property Mgmt. (Multiple Properties) | $10,957,639 |
| Washington Capital | Apartments | $10,045,189 |
| Wall Street Properties | Property Mgmt. (Multiple Properties) | $9,210,067 |
| Wal-mart | Commercial Sales Store | $8,622,918 |

Source: Finance Department, Office of the County Clerk



## Village of Mount Prospect Sales Tax and Revenue Sources

In recent years, the Village Board has made a conscious effort to diversify the Village's revenue base as a means of reducing its reliance on property taxes to finance Village services. One of the principal reasons for this strategy was to attempt to equalize the burden of financing these services between single-family property owners, multi-family residents, and business property owners. Additionally, a more diverse revenue base enables the Village to maintain its financial position during periods of economic change.

Figure 2.19 illustrates the diversification of the Village's revenue base. Although property tax has consistently been one of the largest single sources of revenue for the Village, other sources such as intergovernmental revenue (which includes sales tax) and charges for service (which includes water and sewer charges) make up large proportions of the Village revenues base further emphasizing the Village's policy of reducing its reliance on property taxes.

Figure 2.19 Village of Mount Prospect Revenue Sources (2005)

| Revenues | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|
| Property Taxes | $9,086,294 | $9,500,415 | $9,520,818 | $9,788,281 | $10,366,223 | $10,636,339 | $11,177,088 | $11,839,088 |
| Other Taxes | $16,042,768 | $17,048,196 | $17,880,884 | $10,180,223 | $9,690,216 | $10,538,637 | $13,040,975 | $14,621,028 |
| Licenses, Permits & Fees | $2,888,849 | $3,107,978 | $2,980,222 | $2,967,003 | $3,116,245 | $3,273,801 | $3,026,687 | $3,148,227 |
| Intergovernmental Revenue | $6,567,928 | $7,055,124 | $7,257,686 | $15,432,125 | $15,999,658 | $14,179,037 | $14,561,956 | $15,430,383 |
| Charges for Service | $11,715,262 | $12,084,334 | $12,080,083 | $12,804,435 | $13,085,235 | $13,999,212 | $14,976,941 | $16,597,244 |
| Fines and Forfeits | $562,027 | $561,647 | $436,806 | $553,687 | $583,521 | $626,247 | $609,118 | $610,451 |
| Investment Income | $7,174,141 | $11,717,442 | $8,460,839 | $7,517,698 | $9,025,198 | $9,230,308 | $6,401,585 | $7,216,999 |
| Reimbursements | $399,111 | $503,071 | $2,153,423 | $751,236 | $603,111 | $823,471 | $542,261 | $435,665 |
| Other Revenue | $2,600,814 | $2,769,824 | $3,109,687 | $3,307,920 | $3,514,297 | $3,934,587 | $4,159,627 | $4,673,038 |
| Interfund Transfers | $756,509 | $2,154,525 | $1,025,671 | $641,970 | $1,865,927 | $1,096,677 | $1,040,567 | $972,824 |
| Other Financing Sources | $4,144,250 | $8,650,902 | $3,590,653 | $5,789,236 | $6,288,067 | $13,612,310 | $784,014 | $2,198,954 |
| Village Total | $61,937,953 | $75,153,458 | $68,496,972 | $69,733,814 | $74,137,698 | $81,950,626 | $70,320,819 | $77,743,901 |

Source: Village of Mount Prospect Annual Budget



**Figure 2.20 Total Sales for the Village of Mount Prospect**
(based upon municipal tax receipts which equal 1% of total sales)

| Categories | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|
| General Merchandise | $109,264,741 | $122,418,089 | $117,329,517 | $131,031,714 | $118,141,121 | $116,339,189 | $119,181,414 |
| Food | $92,848,823 | $90,637,419 | $89,649,166 | $91,877,337 | $84,992,948 | $90,159,735 | $88,328,494 |
| Drinking and Eating Places | $89,159,396 | $52,126,338 | $47,466,745 | $48,676,647 | $49,878,852 | $54,768,085 | $56,662,669 |
| Apparel | $23,859,697 | $21,005,103 | $17,345,860 | $16,961,253 | $15,690,044 | $12,428,460 | $15,718,430 |
| Furniture & H.H. & Radio | $33,704,878 | $35,099,402 | $29,646,689 | $28,666,593 | $28,372,879 | $23,037,831 | $28,008,823 |
| Lumber, Bldg. Hardware | $81,323,341 | $82,265,584 | $87,178,600 | $86,933,597 | $91,638,832 | $90,795,376 | $86,994,381 |
| Automotive & Filling Stations | $68,773,571 | $72,421,412 | $68,075,398 | $70,960,241 | $75,626,065 | $118,556,286 | $126,763,624 |
| Drugs & Misc. Retail | $85,781,019 | $117,521,912 | $201,347,814 | $231,530,794 | $256,579,266 | $221,059,790 | $268,273,060 |
| Agriculture & All Others | $160,694,427 | $152,459,507 | $104,633,198 | $12,721,341 | $10,104,445 | $11,503,570 | $81,909,003 |
| Manufacturers | $48,257,490 | $26,953,723 | $12,141,450 | $12,721,341 | $10,104,445 | $11,503,570 | $10,570,381 |
| Total | $793,667,383 | $772,908,489 | $774,814,437 | $783,127,619 | $796,416,875 | $810,101,704 | $882,410,279 |

Source: State of Illinois Kind of Business (KOB) Index

Figure 2.20 illustrates the total sales in individual business categories, as collected by the State of Illinois. These figures are not the actual sales tax revenue returned to the Village. The actual sales tax revenues received by the Village is a combination of the municipal tax collected by the State (equal to 1% of total sale) plus the Home Rule tax levied by the Village.





## TRANSPORTATION & UTILITIES

Mount Prospect's location in the northwest suburbs is ideal for businesses and residents largely because of the variety of transportation modes and utilities. The following is a summary of Mount Prospect's transportation system linkages and utilities:

### Roadways

Mount Prospect is served by many Federal Interstates and State Highways. These include I-294, I-290, I-90, RT 12 (Rand Road), RT 14 (Northwest Highway), RT 45 (River Road), RT 58 (Golf Road), RT 62 (Algonquin Road), and RT 83 (Elmhurst Road).

Several intersections within the Village are characterized by traffic operational problems. Intersectional problems exist where north-south major arterial streets intersect with east-west major arterial streets and where Rand Road and Northwest Highway intersect with north-south and east-west major arterial streets. The most serious problems exist at the Northwest Highway/Main Street intersection, the Rand Road/Kensington/Elmhurst Roads intersection, and at the Mount Prospect/Rand/Central Roads intersection. Although rail service in Mount Prospect is an amenity for commuters, train activity at the many at-grade crossings disrupts traffic flow on the arterial system. This is most prevalent during the morning and evening peak traffic periods when both vehicular volumes and train activity are at their highest.

Since the last Comprehensive Plan was drafted in 1998, the Village Public Works Department has conducted studies of the known problematic intersections to determine what level of improvements could be made without the need to demolish significant structures. These reports concluded that significant intersection improvements (as measured by time needed for turning movements) are not possible without significant investment and may create negative impacts on surrounding businesses. The Engineering Division continues to monitor and make improvements where financially feasible.

In 1996 the Village Board approved an accelerated pavement improvement program that was intended to eliminate the backlog of streets needing resurfacing and reconstruction so that a 20 year resurfacing program could be established. In 2004 the program budget amounts were slightly reduced per year and the program was extended an additional 5 years to end in 2009 due to Village resources. Starting in 2010 a routine resurface program will resume with approximately 5% of the Villages streets being resurfaced each year.




## TRAFFIC COUNTS



Roadway Type:
- Expressway
- Major Arterial
- Secondary Arterial

*(Average Daily Traffic Counts)*

Source: Illinois Department of Transportation



# PUBLIC TRANSPORTATION







## Water and Storm Sewers

There are two municipal water deliverers in Mount Prospect:  Northwest Suburban Joint Action Water Agency (JAWA), and Illinois American Water Company.  Both of these deliverers draw water from Lake Michigan. Mount Prospect worked with several other communities to form JAWA and built a $120 million system to connect to Chicago's water supply. A system of storm sewers is constructed and maintained by the Village of Mount Prospect to accommodate stormwater drainage within the Village.

Portions of the water and sewer systems still need updating and replacement. In 2006 the Village completed the second year of a multi-year commitment to rehabilitate approximately 260,000 linear feet of combined sewer mains ranging in size from 8" to 72" in diameter.

The Village has hired a consultant to prepare a comprehensive final report assessing the overall condition of the existing Village water distribution system. The report will provide specific recommendations to mitigate any identified defects.  Recommendations will be ranked by priority and include an engineer's estimate of costs. Recommendations will also include a water distribution system improvement plan identifying all recommended improvements, including water main replacements, pump replacements, reservoir improvements, etc., according to priority and assigned timeline.

The need for storm sewer improvements in certain areas of the Village was identified by the Village staff and confirmed by a private engineering firm in 1990.  The resulting study recommended 14 projects as part of a stormwater management program that would reduce the magnitude and frequency of flooding in those areas.  The program was divided into two phases.  All but one of the projects in Phase 1 is now complete.  The only remaining project is the Hatlen Heights Relief Sewer Project.  This project involves the construction of a relief storm sewer from Hatlen Avenue and Hatlen Court to Crumley Detention Basin on Busse Road.  Phase 2 of the program includes bank stabilization for Weller Creek which is now complete and for McDonald Creek, which is anticipated for 2010.  Additional projects that have been identified include Prospect Meadows storm sewer and ditch improvements, Village creeks tree trimming and removal, and creek stabilization projects.

Levee 37, a flood control project is also underway.  This project will involve construction of flood control measures along the Upper Des Plaines River at Prospect Heights and northeast Mount Prospect.  Levee 37 construction started in 2006 and the project is estimated to be completed in 2009. When the construction of Levee 37 is completed in 2009, flooding will be less of an issue north of Euclid Avenue. However the Levee will have little impact on properties south of Euclid Avenue.





## Telecommunications

The Telecommunications Act of 1996 changed the way municipalities and states deal with the provision of telecommunications.  Prior to the act the placement of communication lines was primarily handled by utility companies, with limited supervision from local governments, since regulations were set at the state and federal levels.  Now local governments can control the siting, construction, and modification of cellular, wireless, and major fiber-optic systems.  Local government can also charge rents, taxes or fees for using the public rights-of-way.

## Other Utilities

The electric delivery company in Mount Prospect is Commonwealth Edison and the gas delivery company is Nicor Gas.

## COMMUNITY FACILITIES

## Schools

The quality of educational institutions has always been a major factor in the quality of life in the Village and serves a large role in economic growth and business attraction and retention.  Public and semi-public land areas, including public and private schools, municipal facilities and churches are distributed throughout the Village.  Most of these are in good condition and are well located to serve the community.  Several schools in the Village have had recent reinvestment and expansion within the last 10 years.  However, enrollment is near capacity for most public and privates schools in the Village.  Enrollment projections for each school can be found in Figure 2.21.  Residents of Mount Prospect are served by 7 different school districts.

- Mount Prospect Public School District 57
- Community Consolidated School District 59
- River Trails School District 26
- Community Consolidated School District 21
- Prospect Heights School District 23
- Arlington Heights School District 25
- Township High School District 214

According to the Illinois District Report Card (http://iirc.niu.edu), all 7 school districts serving Mount Prospect produced test results above the state average. Within Mount Prospect there are eight neighborhood elementary schools, three middle schools, one high school, and one early childhood center that opened for the 2006-2007 school year.




## Library

Since the early 1900's the Mount Prospect Public Library has been growing. The library has been located in a number of different sites throughout the century. In the 21st century the Mount Prospect Public Library faced space constraints and an increasing demand for audiovisual materials and internet access. In 2002 a $20.5 million library referendum was passed, enabling the Library Board and staff to design an expanded building. The expansion was completed in 2004 and today, the new Library is located at 10 S. Emerson Street, and has new amenities such as a new computer catalog and circulation system, and a larger collection.

## Parks and Recreation

Mount Prospect is served by the following five Park Districts:

- Mount Prospect Park District
- River Trails Park District
- Des Plaines Park District
- Prospect Heights Park District
- Arlington Heights Park District

Throughout the five districts there are over 550 acres of park and recreation space located within the Village of Mount Prospect. There are two indoor recreation complexes, three community centers, five outdoor pools and parks, two arts and visual arts studios, two golf courses, one driving range and miniature golf course, and a nature center in Mount Prospect.




## COMMUNITY FACILITIES






**Figure 2.21 Local School Inventory and Enrollment Projections**

| Name | Date Built | Site Size (Acres) | Available Recreation Area (Acres) | Number of Classrooms | School Capacity | Current Enrollment | Projected Enrollment 2007-08 | 2008-09 | 2009-10 | 2010-11 | 2011-12 | 2012-13 | 2013-14 | 2014-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TOWNSHIP HIGH SCHOOL DISTRICT 214** | | | | | | | | | | | | | | |
| Prospect High School | 1957 | 58.66 | 39.27 | 99 | 2,200 | 2,062 | 2,065 | 2,043 | 2,043 | 1,963 | 1,911 | 1,826 | 1,741 | N/A |
| | | | | | | | | | | | | | | |
| **SCHOOL DISTRICT 21** | | | | | | | | | | | | | | |
| Frost Elementary School | 1961 | 6.00 | 5.00 | 30 | 708 | 623 | | | | | | | | |
| | | | | | | | | | | | | | | |
| **SCHOOL DISTRICT 23** | | | | | | | | | | | | | | |
| No Facilities in Mount Prospect | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| **SCHOOL DISTRICT 25** | | | | | | | | | | | | | | |
| No Facilities in Mount Prospect | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| **RIVER TRAILS SCHOOL DISTRICT 26** | | | | | | | | | | | | | | |
| Euclid | 1961,1963,1990,2002 | 8.50 | 7.70 | 31 | 550 | 544 | 547 | 536 | 535 | 543 | 549 | 551 | 551 | 551 |
| Indian Grove | 1964,1965,1970,1991,2002 | 8.80 | 8.00 | 31 | 520 | 471 | 430 | 400 | 379 | 376 | 365 | 366 | 366 | 366 |
| River Trails Middle School | 1965,1967,1972,1991,2000 | 12.80 | 6.20 | 46 | 600 | 557 | 542 | 557 | 552 | 518 | 481 | 454 | 458 | 452 |
| | | | | | | | | | | | | | | |
| **SCHOOL DISTRICT 57** | | | | | | | | | | | | | | |
| Fairview | 1952,1955,1958,1973,1995 | 6.36 | 5.00 | 22 | 540 | 535 | 555 | 551 | 554 | 558 | 557 | 551 | 553 | 559 |
| Lincoln | 1949,1953,1956 | 19.38 | 16.00 | 41 | 760 | 730 | 696 | 692 | 677 | 696 | 706 | 733 | 738 | 716 |
| Lions Park | 1955,1958,1962,1996 | 2.85 | 1.00 | 22 | 540 | 540 | 551 | 547 | 560 | 561 | 544 | 549 | 551 | 558 |
| Westbrook | 1963,1964,2006 | 11.05 | 9.00 | 26 | 480 | 360 | 207 | 201 | 209 | 210 | 211 | 211 | 212 | 213 |
| | | | | | | | | | | | | | | |
| **SCHOOL DISTRICT 59** | | | | | | | | | | | | | | |
| Forest View | 1962,1965,1970,1997 | 11.20 | 8.00 | 26 | 600 | 365 | 318 | 317 | 327 | N/A | N/A | N/A | N/A | N/A |
| Holmes Junior High | 1967,1969,2000,2001,2002 | 5.10 | 2.00 | 30 | 650 | 428 | 406 | 446 | 451 | N/A | N/A | N/A | N/A | N/A |
| John Jay | 1967,1969,1991,1992,2006 | 5.50 | 3.00 | 22 | 500 | 359 | 318 | 317 | 327 | N/A | N/A | N/A | N/A | N/A |
| Robert Frost | 1964,1966,1987,1998 | 3.50 | 3.00 | 21 | 500 | 370 | 374 | 388 | 402 | N/A | N/A | N/A | N/A | N/A |
| | | | | | | | | | | | | | | |
| **SCHOOL DISTRICT 62** | | | | | | | | | | | | | | |
| No Facilities in Mount Prospect | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| **PRIVATE SCHOOLS** | | | | | | | | | | | | | | |
| St. Emily Catholic School | 1961 | 11.20 | 1.60 | 26 | 600 | 407 | 412 | 417 | 422 | 429 | 429 | N/A | N/A | N/A |
| St. Alphonsus Catholic School | 1955, 1957, 2004 | 20.00 | 8.00 | 22 | 350 | 294 | 285 | 283 | 285 | 284 | N/A | N/A | N/A | N/A |
| St. Paul Lutheran Chool | 1957, 1990 | 2.25 | 0.50 | 14 | 320 | 250 | 250 | 255 | 260 | 265 | 265 | N/A | N/A | N/A |
| St. Raymond Catholic School | 1953, 1954, 1957 | | | | | | | | | | | | | |
| Christian Life College | 1963, 1995 | 14.9 | 0.00 | 7 | 150 | 50 | 55 | 60 | 65 | 70 | 75 | N/A | N/A | N/A |
| ITT Technical Institute | 2000 | 4.5 | 0.00 | 19 | 1,200 | 503 | 500-600 | 500-600 | 500-600 | 500-600 | 500-600 | 500-600 | 500-600 | 500-600 |



CHAPTER 2: MOUNT PROSPECT – A 2006 SNAPSHOT

**Figure 2.22 Village of Mount Prospect Inventory of Existing Open Space and Park Facilities**

| NAME | Location | Acres | Playground | Baseball | Basketball | Football | Soccer | Tennis | Swimming | Shelter | Community Center | Ice Skating | Bike Path | Golf Course |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ARLINGTON HEIGHTS PARK DISTRICT** | | | | | | | | | | | | | | |
| Melas Park | 1500 W. Central | 35.00 | X | X | | | X | | | X | | | X | |
| **DES PLAINES PARK DISTRICT** | | | | | | | | | | | | | | |
| Bluett Park | Horner & Thayer | 4.33 | X | X | X | | | | | | | | | |
| **MOUNT PROSPECT PARK DISTRICT** | | | | | | | | | | | | | | |
| Busse Park | 101 N. Owen | 7.12 | X | | X | | | X | | X | | | X | |
| Central Community Center (Facility) | 1000 W. Central | 4.06 | | | X | | | | | | | X | X | |
| Clearwater Park | 1717 W. Lonquist | 25.87 | X | | | | | X | | X | | | X | |
| Countryside Park | 913 S. Emerson | 2.48 | X | | X | | | | | | | | X | |
| Emerson Park | 317 N. Fairview | 2.30 | X | | X | | | | | | | | | |
| Fairview Park | 703 W. Isabella | 3.00 | X | X | | | | | | | | | | |
| Frost Park | 1308 S. Cypress | 3.00 | X | X | X | | | | | | | | X | |
| Golf Course Clubhouse (Facility) | 600 S. See Gwun | | | | | | | | | | | | | |
| Gregory Park | 411 E. Rand | 8.00 | | X | | | | | | | | | | |
| High Lines West (Redwood) | Elmhurst to Interstate 90 | 46.15 | X | X | | | X | | | | | | X | |
| Hill Street Nature Center | 510 E. Rand | 4.53 | X | | | | | | | X | | | X | |
| Kopp Park | 420 W. Dempster | 25.72 | X | X | | | | | | | | | X | |
| Lincoln School Park | 700 W. Lincoln | | | X | | | | | | | | | | |
| Lions Memorial Park | 411 S. Maple | 20.77 | X | X | | X | X | X | X | X | | X | | |
| Lions Recreation Center (Facility) | 411 S. Maple | | | | X | | | | | | | X | | |
| Meadows Park | 1401 W. Gregory | 14.16 | | X | | | X | X | X | X | | | | |
| Melas Park | 1500 W. Central | 35.00 | | | | | X | | | X | | | X | |
| Mount Prospect Golf Course | 600 S. See Gwun | 115.00 | | | | | | | | X | | | | X |
| Owen Park | 100 S. Owen | 2.01 | X | X | X | | | | | | | | X | |
| Prospect Meadows Park | 1101 N. Forest | 3.50 | X | X | X | | | | | | | | | |
| RecPlex (Facility) | 420 W. Dempster | | X | | X | | | | | | | | | |
| Studio in the Park (Facility) | 1326 W. Central Rd. | 0.46 | | | | | | | | | | | | |
| Sunrise Park | 600 E. Sunset | 11.00 | X | X | | | X | | | | | | X | |
| Sunset Park | 603 S. Candota | 7.14 | X | X | | | X | | | | | | X | |
| Veterans Memorial Band Shell (Facility) | 411 S. Maple | | | | | | | | | | | | | |
| WeGo Park | 132 S. WeGo Trail | 1.30 | X | | X | | | | | | | | | |
| Weller Creek Park | 501 W. Council Trail | 12.00 | | | X | | | | | | | | X | |
| Westbrook Park | 1421 W. Central | | X | X | | | | | | | | | | |
| **PROSPECT HEIGHTS PARK DISTRICT** | | | | | | | | | | | | | | |
| East Edgewood | Wedgwood & Oxford | 0.50 | X | | X | | | | | | | | | X |
| Old Orchard Country Club | 700 W. Rand | 100.00 | | | | | | | | | | | | |
| **RIVER TRAILS PARK DISTRICT** | | | | | | | | | | | | | | |
| Aspen Trails Park | Aspen & Maya | 5.00 | X | X | X | | X | X | | | | X | X | |
| Burning Bush Trails Park | Burning Bush & Euclid | 10.00 | X | X | X | | X | X | | X | | X | X | |
| Clayground Art Studio (Facility) | 550 Business Center | 2.27 | | | | | | | | | | X | | |
| Evergreen Trails Park | Boxwood & Dogwood | 0.40 | X | | | | | | | | | | | |
| Maple Trails Park | Feehanville & Business Ctr. | 2.30 | X | | X | | | | | X | | | X | |
| Sycamore Trails Park | Wolf & Kensington | 6.40 | X | | | | | X | | X | | | X | |
| Tamarack Trails Park | Burning Bush & Kensington | 4.75 | X | X | X | | X | X | | | | | X | |
| Woodland Trails Park | Wolf & Euclid | 46.70 | X | X | X | | X | | | X | | X | X | |




## PUBLIC SAFETY

### Police

The Mount Prospect Police Department has a total of 105 Full-time Officers and 2 part-time Officers.   The number of arrests and traffic moving violations has decreased over the past 5 years; this is attributed to increased enforcement and education efforts.

### Fire and Emergency

The Mount Prospect Fire Department maintains 72 sworn firefighters, 11 civilian employees, 1 part-time civilian employee and 20 paid-on-call firefighters. Figure 2.23 shows that fire and EMS calls have maintained steady over the past five years.

Although emergency service calls have maintained steady over the past five years, the fire station located at Kensington and River Roads has been subjected to frequent flooding and was determined to be functionally obsolete.  A new fire station and location is desired.  There is also an agreement in place with the Prospect Heights Fire Protection District and the Mount Prospect's Fire Department requiring the Mount Prospect Fire Department to have three personnel assigned to the current station to provide reciprocal service.  The reciprocal arrangements include both fire and ambulance service.  The new fire station would need to be placed in the northeast area of the Village to provide a shorter response time to the Randhurst Shopping Center, Kensington Business Center and multi-family residential complexes in the area of Rand Road and Euclid.

**Figure 2.23 Fire and Emergency Activity of Mount Prospect**

|  | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
| **Emergency Calls** | | | | | |
| Fire Calls | 2.000 | 1,941 | 1,837 | 1,882 | 1,837 |
| EMS Calls | 3.197 | 3,160 | 3,412 | 3,229 | 3.443 |
| Total Emergency Calls | 5.197 | 5,101 | 5,249 | 5,111 | 5,280 |
| | | | | | |
| **Mutual Aid Calls** | | | | | |
| Given | 107 | 122 | 116 | 157 | 143 |
| Received | 426 | 220 | 236 | 297 | 223 |
| Total Mutual Aid Calls | 533 | 342 | 352 | 454 | 366 |
| | | | | | |
| **Automatic Aid Calls** | | | | | |
| Given | 395 | 375 | 388 | 362 | 200 |
| Received | 426 | 389 | 336 | 445 | 294 |
| Total Automatic Aid Calls | 821 | 764 | 724 | 807 | 494 |

Definitions:

1. Mutual Aid Calls- Given -- Calls for assistance from neighboring communities when their local/immediate emergency response capabilities are overwhelmed

2. Mutual Aid Calls- Received -- Calls for assistance to neighboring communities when our local/immediate emergency response capabilities are overwhelmed

3. Automatic Aid Calls- Given -- Responses from Mount Prospect Fire Department to surrounding communities because of the close proximity of city limits

4. Automatic Aid Calls- Received -- Responses from surrounding communities' fire departments to Mount Prospect because of the close proximity of city limits

Source: Mount Prospect Fire Department



## LAND USE, ZONING, & ANNEXATION

### Land Use

The Village of Mount Prospect has a land area of 10.28 square miles; it comprises a variety of residential, commercial, industrial, open space and institutional land uses.   Although Mount Prospect is near full development, infill and redevelopment opportunities exist throughout the Village. These development opportunities include vacant and underdeveloped parcels located primarily on arterial roadways including Northwest Highway, Rand Road, IL Route 83, Dempster, Algonquin, and Golf Roads.   Randhurst Mall, Downtown Mount Prospect, and the Kensington Business Park, all important commercial districts are recognized as important to the Village's fiscal sustainability.

**Figure 2.24 Mount Prospect's Zoning Composition**

| Zoning | Area (SF) | Area (Acres) | Percentage (Area/TG) |
|---|---|---|---|
| B1 (Office) | 1,250,906 | 28.72 | 0.44% |
| B2 (Neighborhood Shopping District) | 0 | 0.00 | 0.00% |
| B3 (Community Shopping District) | 15,769,904 | 362.03 | 5.51% |
| B4 (Commercial Corridor) | 2,932,092 | 67.31 | 1.02% |
| B5 (Central Commercial) | 2,319,905 | 53.26 | 0.81% |
| B5C (Central Commercial Core) | 955,728 | 21.94 | 0.33% |
| **Business Sub-Total** | **23,228,534** | **533.25** | **8.12%** |
| CR (Conservation Recreation) | 24,321,245 | 558.34 | 8.50% |
| **Conservation Sub-Total** | **24,321,245** | **558.34** | **8.50%** |
| I1 (Limited Industrial) | 27,222,800 | 624.95 | 9.51% |
| I2 (Railroad) | 1,206,343 | 27.69 | 0.42% |
| OR (Office Research) | 393,167 | 9.03 | 0.14% |
| **Office and Industrial Sub-Total** | **28,822,309** | **661.67** | **10.07%** |
| R1 (Single Family Residential) | 124,215,199 | 2,851.59 | 43.41% |
| R2 (Attached Single Family Residential) | 2,505,567 | 57.52 | 0.88% |
| R3 (Low Density Residential) | 2,081,897 | 47.79 | 0.73% |
| R4 (Multi-Family Development) | 11,518,348 | 264.42 | 4.03% |
| R5 (Senior Citizen Residence) | 113,716 | 2.61 | 0.04% |
| RA (Single Family Residential) | 51,029,018 | 1,171.47 | 17.83% |
| RX (Single Family Residential) | 18,309,689 | 420.33 | 6.40% |
| **Residential Sub-Total** | **209,773,435** | **4,815.74** | **73.31%** |
| **Total Geography (Corporate Boundary)(TG)** | **286,145,523** | **6,569.00** | **100.00%** |

Source: Village of Mount Prospect GIS data




## Zoning

Illinois communities were first granted the power to adopt zoning laws in 1921, although the Village of Mount Prospect did not formally prepare a zoning ordinance until 1923. Since then, the Zoning Ordinance has been updated and amended to meet the changing conditions in the Village and the Region. The zoning of Mount Prospect will continue to be based upon the recommendations of the adopted Comprehensive Plan. It is important that provisions of the zoning ordinance be based upon this Comprehensive Plan - which is designed to promote the public health, safety, and general welfare of the Village. Today, there are 18 separate zoning districts. There are multiple districts for single-family residential, multi-family residential and commercial uses. The purposes of the different zoning districts are outlined in the Village of Mount Prospect Zoning Ordinance. Figure 2.24 lists the current composition of the zoning districts within the Village:

## Annexations

Mount Prospect is contiguous to several unincorporated areas. An annexation can only occur when the property is contiguous to property within Village limits. Annexations can be 1) voluntary or 2) forced if the land is less than 60 acres and wholly surrounded. Recent annexations include:

- The Briarwood Development located at the intersection of Linneman and Algonquin Road (27.04 acres)
- 531 Douglas (0.80 acres)
- Commercial properties located at the intersection of Rand and Camp McDonald Road (7.10 acres)
- 1205 E. Central, Commercial property (0.90 acres)





## 2006 ZONING MAP






CHAPTER 3:

# VISION, GOALS, AND OBJECTIVES

To effectively attain the Vision for the Village, the Mount Prospect comprehensive planning program must respond to the special needs, values, and desires of local residents. Goals and objectives provide this specialized guidance, transforming collective community values into implementation strategies. Implementation strategies (Chapter 5) may be action items, coordination items, and/or require further study.

Goals and objectives each have a distinct and different purpose in the planning process:

- **Goals:** general aims of the community that describes desired end situations toward which planning efforts should be directed. They are broad and long-range. They represent an end to be sought, although they may never actually be fully attained.

- **Objectives:** describe more specific purposes which should be sought in order to advance toward the overall goals and ultimately the Vision of the Village. They provide more precise and measurable guidelines for planning action.

The following pages present the listing of goals and objectives broken down into the four general elements of the Plan:



**Vision Statement:** provides the foundation for the Comprehensive Plan. It identifies how Mount Prospect sees itself in the future.

### Mount Prospect Vision Statement

*The Village of Mount Prospect will offer a high quality of life to its residents and promote a vibrant, diverse business community that serves customers from a broad geographic base.*

*Residents will continue to live in attractive and well maintained homes. A mix of housing opportunities will be available to meet the needs of the wide range of individuals and families that make up our community.*

*Our successful business community will be highly valued because of the nature of products, services, vibrant customer base, and employment it offers and its strong relationships with the community. New businesses will be drawn to the Village because of its reputation for quality development, municipal cooperation, and ongoing improvements to the character and appearance of the commercial and industrial environment, with particular emphasis on the downtown area as the geographic and social center of the Village.*

*The Village will ensure a comprehensive infrastructure, parking, and traffic improvement program is in place to help further the goals and objectives of the Comprehensive Plan.*

*The Village will continue to be dedicated to excellence in governance and service, schools, parks, and community facilities.*

*The Village of Mount Prospect will be a community proud of the quality of life it helped create and the successes accomplished through comprehensive planning and continual evaluation of effectiveness.*





## HOUSING AND RESIDENTIAL AREAS

### A. Goal



To provide a diverse housing inventory and attractive living environment that supports the local population and accommodates a reasonable level of growth and change.

### Objectives

A.1  Maintain the attractive quality of all residential neighborhoods.

A.2  Protect residential areas from encroachment by land uses which are incompatible or which may create adverse impacts.

A.3  Promote the improvement and rehabilitation of deteriorating residential properties.

A.4  Encourage "infill" residential development which will provide a range of housing types, while maintaining appropriate transitions and compatibility in density and character with surrounding existing development.

A.5  Support the affordable housing needs of low and moderate-income residents of the Village.

A.6  Continue to promote and encourage developments, financial assistance programs, and supportive services throughout the Village for residents with disabilities (physical, developmental, or mental illness) and our seniors.



# ECONOMIC DEVELOPMENT



## B. Goal

To create viable commercial districts throughout the Village which provide employment opportunities, needed goods and services, and diversified tax revenues which are sufficient to sustain Village services and minimize the reliance on property tax.

## Objectives

B.1 Maintain Village services and facilities which assure the long-term economic strength of the various commercial centers and areas within the Village.

B.2 Maintain and attract retail and commercial services in the Village.

B.3 Initiate programs to encourage improvement of the condition of older existing commercial buildings and areas.

B.4 Ensure that commercial areas maintain the appearance of all buildings, grounds, and parking areas.

B.5 Encourage convenient access to, and adequate employee and patron parking in all shopping areas.

B.6 Maintain a progressive business climate with an understandable development process.

B.7 Design and implement strategies for attracting commercial opportunities to Mount Prospect in order to further strengthen and expand the Village's tax and economic base.





## ECONOMIC DEVELOPMENT (continued)

### C. Goal

To develop an industrial base which provides employment opportunities, and diversified tax revenues which are sufficient to sustain Village services and minimize the reliance on property tax.

### Objectives

C.1 Provide for the orderly expansion of existing industrial areas and activities.

C.2 Plan new industrial development in areas of similar or compatible use, close to major transportation routes.

C.3 Encourage the alignment and/or consolidation of access points for neighboring industrial properties along major thoroughfares, to minimize conflicts with the traffic movement.

C.4 Minimize the negative impact of industrial activities on neighboring land uses.

C.5 Ensure that industrial areas maintain the appearance of all buildings, grounds, and parking areas.

C.6 Encourage coordinated lot configuration, building design, access and parking, and overall environmental features, as well as compatible relationships between new and existing development in all industrial and office research developments.

C.7 Encourage new office and industrial developments to incorporate flexible spaces which can handle the changing needs of a variety of tenants such as future expansion, high ceilings, multiple loading capabilities, or sophisticated racking systems.

C.8 Encourage the development of new industry that maximizes use of the local labor force.

C.9 Design and implement strategies for attracting industrial opportunities to Mount Prospect in order to further strengthen and expand the Village's tax and economic base.





## TRANSPORTATION AND INFRASTRUCTURE



### D. Goal

To provide a balanced transportation system which provides for safe and efficient movement of vehicles and pedestrians, supports surrounding land development, and enhances regional transportation facilities.

### Objectives

D.1  Improve pedestrian and automobile traffic movements throughout the Village, reducing congestion where possible with particular emphasis on Downtown and the Randhurst Shopping Center and surrounding area.

D.2  Encourage convenient access to, and adequate employee and patron parking in all shopping areas with particular emphasis on Downtown.

D.3  Provide for safe bicycle movement within the Village through the development and improvement of bicycle routes and other facilities.

D.4  Promote and encourage safe and convenient public transportation within the Village and to other adjacent and nearby communities and destinations.

D.5  Increase usability to public transportation facilities by improving access to commuter parking facilities.

D.6  Ensure that new and existing developments are served by a safe and convenient circulation system with streets and roadways relating to and connecting with existing streets in adjacent areas.

D.7  Encourage the implementation of the CATS 2030 Regional Transportation Plan in Mount Prospect, specifically development complementary to the Suburban Transit Access Route (STAR Line).





## TRANSPORTATION AND INFRASTRUCTURE (continued)

### E. Goal

To maintain a public infrastructure system that efficiently provides utilities, public improvements and flood control required by the Community.



### Objectives

E.1  Maintain adequate public water, sanitary and storm sewer systems.

E.2  Maintain the Village's ability to plan and program public improvements as needed.

E.3  Protect natural water retention and drainage where possible and ensure development does not have adverse impact on flood control.

## COMMUNITY FACILITIES, PARKS, AND OPEN SPACE

### F. Goal

To provide a system of facilities that ensures for efficient delivery of public services and open space, enhancing the quality of life within the community.



### Objectives

F.1  Maintain a high quality level of fire and police protection throughout the Village.

F.2  Encourage the availability of high-quality primary and secondary education.

F.3  Ensure facilities and services are accessible to all people needing assistance.

F.4  Promote the viable reuse of schools and other public buildings that may be closed in the future for other uses such as day care centers, pre-school, teen activity, senior citizens centers and other similar facilities.

F.5  Support the goals of the Park Districts' and School Districts' strategic plans to maintain a local park and school system which meets the residents' needs.

F.6  Ensure that adequate open space is set aside as a part of new residential developments.

F.7  Encourage the linking of greenways, parks, and recreational facilities in neighborhoods, Village wide and regional levels.





CHAPTER 4:

# LAND USE MAP AND DESCRIPTIONS

The Land Use Map and descriptions provides a general framework for improvement and development in Mount Prospect over the next 20 years. It establishes long-term targets for development in the Village, which are consistent with the community's overall goals and objectives. These recommendations seek long term economic sustainability for the community, providing a land use mix which allows the Village to continue to provide quality services. It is specific enough to guide day-to-day development decisions, yet flexible enough to allow modification and continuous refinement.

The Land Use Map and descriptions contains five primary components: residential areas; commercial areas; industrial and office research areas; community facilities, parks, and open space; and a transportation thoroughfare plan. Planning recommendations for each of these components are discussed below. Implementation strategies for each area follow in Chapter 5.

## LAND USE

The Village of Mount Prospect covers an area of approximately ten square miles located 22 miles northwest of downtown Chicago. It is bordered on the north by Prospect Heights, on the east by the Cook County Forest Preserve and Des Plaines, on the south by Des Plaines and Elk Grove Village, and on the west by Arlington Heights. The Village is bisected by several major transportation corridors:

- Northwest Union Pacific Railroad, which runs diagonally through the Village from a southeast to a northwest direction with a station in the downtown;
- Canadian National Railroad, which runs diagonally through the northeast portion of the Village with a station at our border with Prospect Heights;
- Northwest Highway (Route 14), which runs parallel to Northwest Union Pacific Railroad;
- Rand Road (Route 12), which also runs diagonally through the Village from a southeast to a northwest direction in the north half of the Village;
- Central Road, which runs west and east through the center of the Village;
- Golf Road (Route 58), Dempster Street, and Oakton Street, which run west and east through the south portion of the Village; and
- Illinois Route 83 which runs north and south through the center of the Village moving along these different roadways: Busse Road, Oakton Street, Elmhurst Road, Lincoln Avenue, and Main Street.




Mount Prospect is an established, essentially developed community, with a healthy mix of residential, commercial, and industrial development. Since most of the community is already committed in terms of land use, the existing development pattern significantly influences the type and extent of new development which will be possible, and the extent to which redevelopment will be appropriate.

This chapter serves as a guide for future land use development decisions within the Village. It identifies which lands should be utilized for residential, commercial, industrial, and public land use activities. The Land Use Map and descriptions also describe interrelationships between various land use areas, and the types of projects and improvements desirable within each area. The Map and descriptions are consistent with the Mount Prospect Vision Statement, goals and objectives (Chapter 3), and provide the overall framework for specific land use recommendations.

## RESIDENTIAL AREAS

Mount Prospect has traditionally been a strong and desirable residential community. Existing residential neighborhoods represent one of the Village's most important assets. The Land Use Map and descriptions attempt to strengthen and reinforce existing residential areas and allow for quality new residential development in select locations.



### Single-Family Residential Development

Single-Family detached residential development should continue to be the predominant land use within the Village. Originally single-family homes were constructed in the central portion of the Village, conforming to the basic grid pattern of streets, at an overall density of five to eight units per net acre. Newer single-family homes were developed on somewhat larger lots in the northern and western portions of the Village primarily at densities of three to five units per net acre with neighborhoods characterized by curvilinear street patterns.

All existing single-family neighborhoods should be strengthened through a range of community facility and support service improvements, including expanded park and recreational facilities where needed. Transportation improvement projects should help reduce through traffic within certain neighborhoods, as well as improve operational conditions at problem intersections in other neighborhoods. This designation would allow for single family attached dwelling units along arterial roadways and adjacent to non-residential uses, where appropriate.





Single-Family Residential Development is for areas planned for single family detached and attached dwellings with a maximum density of 10 dwelling units per acre. This single family residential development category is consistent with the R-X, R-A, R-1, and R-2 Zoning Districts of the Village Zoning Ordinance.

## Multi-Family Residential Development

Multi-Family Residential Development is for areas planned primarily for apartment buildings and condominium complexes, with densities greater than 10 dwelling units per acre and typically three stories or higher. The design and development of new multi-family development should be carefully controlled to ensure compatibility with surrounding uses, adequate screening and buffering, and a high-quality living environment. Such multi-family residential development is consistent with the R-3, R-4, R-5, and B-5C Zoning Districts of the Village Zoning Ordinance.

## COMMERCIAL AREAS

The Land Use Map and descriptions strive to strengthen and reinforce the role and function of existing commercial areas in the Village and promote viable new commercial development in selected locations. The Central Road Corridor Plan, Rand Road Corridor Plan, and Downtown TIF District Strategic Plan provide further specific planning recommendations for each commercial area. The Map includes three general types of commercial areas, each with different characteristics and requirements.



### Neighborhood Commercial

Neighborhood Commercial areas contain a range of office, retail, and commercial service establishments. These areas include primarily linear developments on smaller sites. Residential areas often abut the rear of these commercial properties. Planned unit developments, including mixed use projects, should be encouraged to create a variety of uses, and to transition intensities to adjoining neighborhoods. The Neighborhood Commercial category is consistent with the B-1, B-2, B-4 and B-5 Zoning Districts of the Village Zoning Ordinance.

### Community Commercial

Typically located in a high visibility area that offers convenient access and parking, Community Commercial areas contain a wide range of office, retail, and commercial service establishments. These areas include developments on large sites that include large-scale "big box" and "mixed-use" type developments that could include smaller scale "outlot" parcels. The Community Commercial category is consistent with the B-3 Zoning Districts of the Village Zoning Ordinance.




## Central Commercial

The Central Commercial area should contain a dense, intensive land use pattern focusing on an urban style of development and architecture. Pedestrian, bicycle, and transit access should be emphasized to ensure areas are walkable. The Central Commercial areas should contain a mix of land uses ranging from retail, high-density residential, office, and institutional. Typical of a downtown environment – "mixed-use" development should include first-floor retail, dining, and commercial service establishments with above first-floor residential and office. The Central Commercial development category is consistent with the B5C Districts of the Village Zoning District.

# INDUSTRIAL AND OFFICE RESEARCH AREAS

The Land Use Map differentiates between two basic types of industrial uses: Light Industrial and Office Research, which could include a wide range of office, warehousing, and light manufacturing uses; and General Industrial, which would include heavy industrial and manufacturing uses.



## Light Industrial and Office Research

Light Industrial and Office Research areas are intended for uses that typically do not generate the intensity of heavy industrial land uses. It may include professional and business services, light assembly plants, warehousing, research and development facilities, and distributions centers. Industrial and office research development, as characterized by the Kensington Center for Business, represents a significant land use component within the Village. Several land areas in the southwestern portion of the Village have potential for similar development in the future. If carefully designed and developed, industrial and office research uses could create a strong new identity for the Village. This area is consistent with the I-1 and O-R Zoning Districts of the Village Zoning Ordinance.

## General Industry

General Industry areas contain intensive land uses with a strong dependence on transportation facilities such as major roadways, rail or air. This land use typically requires significant amounts of land and can often create conditions that are generally incompatible with residential uses. Heavy manufacturing, truck terminals, construction equipment and material storage are common uses in General Industry areas. This area is consistent with the I-1 Zoning District of the Village Zoning Ordinance.




## COMMUNITY FACILITIES, PARKS, AND OPEN SPACE



### Institutional

Institutional uses generally include public, quasi-public, and private uses, such as governmental, educational, medical, religious, or university facilities as well as cemeteries. Public and semipublic land areas, including public and private schools, municipal facilities and churches are distributed throughout the Village.

### Open Space

Open Space areas are intended to include all active and passive parklands, public recreation centers and golf courses when not associated with a residential development. Park and recreational areas are also scattered throughout the community.

The Open Space system consists of sites, facilities, and programs which perform several important functions. The most basic function is the provision of recreational services to local residents. An effective system can also create opportunities for a wide range of leisure time experiences, help define and delineate neighborhood areas, and be an important visual feature in the community. An effective parks and recreation system is particularly important in a traditionally strong residential community like Mount Prospect.

The Village also has several other public land resources. Cook County Forest Preserve land borders the Village on the northeast and is a significant visual and recreational resource available to Village residents. Additionally, there are numerous golf courses in and adjacent to the Village and several others within a short driving distance. In addition to the public recreational resources, private recreational facilities also play a key role in Mount Prospect. The Village contains numerous privately operated swimming pools, tennis courts, club rooms, and playgrounds which help supplement the public system.



## TRANSPORTATION

The transportation system consists of various categories of streets, parking facilities, and public transit services. The overall system provides for access to Mount Prospect from the surrounding area and movement of people and vehicles within and around the Village. The efficiency and convenience of this system significantly affects the quality of life within the community.



### Thoroughfare Plan

The major street system in Mount Prospect is well defined, but little hierarchy is apparent for other streets in the Village. A functional classification of all streets is a necessary step in identifying problem areas and prescribing improvements.

Streets and related traffic control devices must all be considered as elements of an inter-related system. This approach requires that the decision to install traffic engineering measures (e.g., street closure, left turn restrictions, traffic signals, etc.) be considered in terms of their impact on adjacent streets, intersections, and neighborhoods. Without a systematic approach to this problem, the result is a mixture of traffic control devices, policies and operational practices which creates confusion, inconvenience, accidents, and a myriad of other secondary problems.

The currently accepted approach to "sorting out" the complex inter-relationship between these elements is first to classify each street in the Village according to the function it should perform. Each street should fit into a category or functional classification. Decisions regarding traffic control devices and restrictive measures can then be prescribed in a relatively straightforward manner to assure that the functions are achieved. In addition, this procedure permits the identification of deficiencies in the street system and facilitates the analysis of street system needs.

Four separate street classifications are identified below. The titles given to these classifications describe the orientation of traffic expected to use the streets.

- **Major Arterial Streets:** A major arterial street is intended to serve vehicle trips oriented beyond the Village boundaries and adjacent communities. The section of the street within the Village should serve a significant portion of trips generated by land uses within the Village. This type of street has regional importance because of its alignment, continuity, capacity, and its connection with other regional traffic carriers.

- **Secondary Arterial Streets:** A secondary arterial street is intended to serve vehicle trips generated by land uses within the Village and within adjacent communities. This type of street should not serve long distance trips (i.e., greater than five miles) but has community importance in terms of traffic capacity and serving abutting land use.





- **Collector Streets:** A collector street is intended to serve only vehicle trips generated to and from the neighborhood it serves. The function of this type of street is to collect and distribute traffic between the neighborhoods and community and regional streets.

- **Local Streets:** All other streets within the Village could be classified as local streets. A local street is intended to serve only vehicle trips generated by land use abutting the street. The function of this type of street is providing local access within a neighborhood.

One of the primary benefits derived from creating a functionally classified street system is designating "neighborhoods" inside the areas of the network of major and secondary arterial streets. If these streets are properly designed with adequate capacity and proper traffic control devices, the traffic in the neighborhood "cells" can be controlled to exclude through traffic.

In determining the functional classification of streets within the Village, the following factors were considered:

- Length which the street extends continuously beyond the Village boundaries.
- Width of pavement.
- Type and density of abutting land use.
- Spacing relative to the prevailing grid network of streets in the surrounding communities.

The functional classification of the proposed street system is presented in Figure 5.1. In general, the desired design characteristics for the streets should reflect these classifications. The major arterial streets should have the highest design standards (normally four-lane divided roadways with separate turn lanes at intersections) and should have priority in terms of traffic control over the other streets in the system. The secondary arterial streets also require high design standards and should usually have four lanes for travel. A median may be necessary on some community streets if the volume of traffic is anticipated to be significant because of the intensity of abutting development or the condition of parallel streets. Collector streets will usually provide satisfactory service as two-lane facilities unless they provide primary access to high traffic generating land uses.

Figure 5.1: Functional Classification of Area Streets

| Classification | Street |
|---|---|
| **Major Arterial:** | Algonquin Road |
| | Central Road |
| | Des Plaines/River Road |
| | Elmhurst Road/Main Street |
| | Euclid Avenue |
| | Golf Road |
| | Northwest Highway |
| | Oakton Street |
| | Rand Road |
| | Wolf Road |
| **Secondary Arterial:** | Busse Road |
| | Camp McDonald Road |
| | Dempster Street |
| | Kensington Road |
| | Mount Prospect Road |
| **Collector:** | Burning Bush Lane |
| | (from Seminole Lane to Kensington Road) |
| | Business Center Drive |
| | Cardinal Lane |
| | (from Eric Avenue to Westgate Road) |
| | Council Trail |
| | Elmhurst Road |
| | (from Central Road to Kensington Road) |
| | Emerson Street |
| | (from Golf Road to Highland Road) |
| | Feehanville Drive |
| | Huntington Commons Drive |
| | (from Elmhurst Road to Linneman Road) |
| | Lincoln Street |
| | Linneman Road |
| | Lonnquist Boulevard |
| | (west of Emerson) |
| | Meier Road |
| | (from Golf Road to Lincoln Street) |
| | Owen Street |
| | (from Central Road to Gregory Street) |
| | Prospect Avenue |
| | Shoenbeck Road |
| | (from Rand Road to Camp McDonald Road) |
| | See-Gwun Avenue |
| | Seminole Lane |
| | Westgate Road |
| | (from Kensington Road to Camp McDonald Road) |
| | Wheeling Road |
| | (from Kensington Road to Business Center Drive) |
| | William Street |
| | (from Golf Road to Prospect Avenue) |
| | Willow Lane |



# FUTURE LAND USE MAP



**FUTURE LAND USE CATEGORY**

Single Family Residential
Multi-Family Residential
Neighborhood Commercial
Community Commercial
Central Commercial
Light Industrial and Office Research
General Industrial
Open Space
Institutional
Village Boundary

**THOROUGHFARE PLAN**

Expressway
Major Arterial
Secondary Arterial
Collector Street





# CHAPTER 5:

# IMPLEMENTATION PROGRAM

Over the coming months and years, a number of specific steps can be taken to help realize the vision for the community as outlined in Chapter 3 of this Plan. The Implementation Program offers a means to achieve the goals and objectives identified in the four elements of the Plan:







Implementation strategies will vary in scope depending on the intended result. For example, an implementation strategy can be very specific, such as "plant trees and undertake other beautification projects to improve the appearance of commercial corridors" or it can be more general, such as "maintain close contact and continue to cooperate and help all local school districts to ensure that the needs of Mount Prospect students continue to be met."

The Implementation Program also prioritizes the strategies and identifies responsibility for achieving them.

## Type of Strategies

Implementation Strategies are categorized into four different types:

**Action:** Can be acted upon to produce a result

**Village Board Action:** Reflects a policy which must be adopted by the Village Board

**Special Study Needs:** Additional study to determine best course of action

**Coordination:** Requires ongoing coordination with other parties outside Village Staff

## Related Goals/Objectives

Indicates from which goals and objectives the strategy is derived

## Timing

Indicates whether the strategy should occur in the short term (within 3 years), long term (4 - 5 years), or is an ongoing activity of the Village.

## Responsible Village, Agencies and other Entities

Lists the Village department as well as other agencies/groups that will lead implementation of the strategy.





 **Goal A:** To provide a diverse housing inventory and attractive living environment that supports the local population and accommodates a reasonable level of growth and change.

| | Strategy | Type of Strategy | Related Objectives (A.X) | Timing | Responsibility |
|---|---|---|---|---|---|
| 1 | Monitor property maintenance conditions in all neighborhoods within the Village through a systematic housing code enforcement program. | Action | 1.3 | Ongoing | Community Development |
| 2 | Continue to encourage a range of housing types, while maintaining the overall density requirements of the Zoning Code, when reviewing development proposals. | Action | 1.4 | Ongoing | Community Development |
| 3 | Continue to implement housing rehabilitation financial assistance programs for low- and moderate-income families. | Action, Coordination | 5.6 | Ongoing | Community Development, HUD (CDBG Program) |
| 4 | Pursue additional funding sources to expand the Village's first-time home buyers program. | Action, Coordination | 5.6 | Ongoing | Community Development, HUD (CDBG Program), IHDA |
| 5 | Update and adopt the Village of Mount Prospect 5 Year Consolidated Plan for Community Development Block Grant (CDBG) programming. | Action | 5.6 | Ongoing | Community Development |
| 6 | Promote development opportunities in the Village for a full range of housing for our seniors: active, independent, assisted living, and convalescent care. | Action | 6 | Ongoing | Community Development |
| 7 | Revise the Zoning Code to ensure it will allow for a full range of housing for our seniors: active, independent, assisted living, and convalescent care. | Action, Village Board Action | 6 | Short Term | Community Development |



000429



 **Goal B: To create viable commercial districts throughout the Village which provide employment opportunities, needed goods and services, and diversified tax revenues which are sufficient to sustain Village services and minimize the reliance on property tax.**

| | Strategy | Type of Strategy | Related Objectives B.X | Timing | Responsibility |
|---|---|---|---|---|---|
| 1 | Utilize the Land Use Plan and Zoning Code to prevent expansion of residential uses in areas most suited to commercial development. | Action, Village Board Action | 1 | Ongoing | Community Development |
| 2 | Continue to enforce sign control regulations in commercial areas. | Action | 4 | Ongoing | Community Development |
| 3 | Undertake beautification projects to improve the appearance of commercial corridors. | Action | 4 | Ongoing | Public Works |
| 4 | Continue to actively market development opportunities throughout the community and recruit amenities for businesses, such as restaurants and hotels. | Action | 2,6,7 | Ongoing | Community Development |
| 5 | Continue to serve as a clearinghouse for collecting and disseminating information about funding sources and assistance available to businesses. | Action | 1,6 | Ongoing | Community Development |
| 6 | Review development trends and revise the Zoning Code to ensure regulations are conducive to encourage quality redevelopment of aging commercial properties. | Action, Village Board Action | 3,6 | Short Term | Community Development |
| 7 | Review the landscaping ordinance to ensure aesthetic goals are balanced with the visibility needs of the business community. | Action, Village Board Action | 4 | Short Term | Community Development |
| 8 | Review the development process to ensure the internal review process and Village Code create a positive business climate. Continue efforts to streamline the development review process while maintaining the integrity of the Village development regulations. | Action, Village Board Action | 1,6 | Short Term | Community Development |
| 9 | Amend the zoning code to allow for mixed use development outside the downtown district. | Action, Village Board Action | 7 | Short Term | Community Development |
| 10 | Review the sign code to ensure current regulations allow effective signage for the businesses downtown, but do not detract from the general appearance and architectural character of their surroundings including streets, buildings and other signs in the area. | Action, Village Board Action | 4 | Short Term | Community Development |
| 11 | Implement a Village wide financial assistance program for the rehabilitation of commercial buildings including the Downtown Facade Improvement and the Corridor Improvement Programs. | Action, Village Board Action | 1,3,4 | Short Term | Community Development |
| 12 | Construct new sidewalks and other pedestrian conveniences where needed. | Action | 3,4,5 | Short Term | Public Works |
| 13 | Continue redevelopment of downtown by implementing recommendations detailed in the Downtown TIF District Strategic Plan. | Action, Village Board Action | 4,5,7 | Long Term | Community Development, Public Works |





CHAPTER 5: IMPLEMENTATION PROGRAM



**(CONTINUED)**
**Goal B: To create viable commercial districts throughout the Village which provide employment opportunities, needed goods and services, and diversified tax revenues which are sufficient to sustain Village services and minimize the reliance on property tax.**

| | Strategy | Type of Strategy | Related Objectives B.X | Timing | Responsibility |
|---|---|---|---|---|---|
| 14 | Develop a strategic plan for the River Road Corridor, north of Kensington Road to promote the area for redevelopment as a mixed residential and commercial corridor complemented by potential recreational uses of the Cook County Forest Preserve. | Special Study Needs | 1,2,3,7 | Long Term | Community Development, Property Owners |
| 15 | Develop a strategic plan for Randhurst Shopping Center and its surrounding area. Study the feasibility of a tax increment finance district immediately south of the shopping center. | Special Study Needs | 1,2,3,7 | Long Term | Community Development, Property Owners |
| 16 | Develop a strategic plan for the Northwest Highway and Prospect Avenue Corridor to promote the area as a commercial corridor for redevelopment. | Special Study Needs | 1,2,3,7 | Long Term | Community Development, Property Owners |
| 17 | Develop a strategic plan for the Dempster, Algonquin, Busse Road intersection to enhance this commercial corridor. Strategies for better pedestrian circulation should be a high priority. | Special Study Needs | 1,2,3,7 | Long Term | Community Development, Property Owners |



**Goal C: To develop an industrial base which provides employment opportunities and diversified tax revenues, which are sufficient to sustain Village services and minimize the reliance on property tax.**

| | Strategy | Type of Strategy | Related Objectives C.X | Timing | Responsibility |
|---|---|---|---|---|---|
| 1 | Maintain zoning standards and incentives designed to encourage planned industrial and office research development. Provisions should encourage coordinated lot configuration, building design, access and parking, and overall environmental features, as well as compatible relationships between existing and new development. | Action | 1,2,3,6,7 | Ongoing | Community Development |
| 2 | Utilize the Land Use Plan and Zoning Code to prevent expansion of residential uses in areas most suited to industrial development. | Action, Village Board Action | 1,4 | Ongoing | Community Development |
| 3 | Continue programs to actively promote and recruit desired types of industry throughout the Village. | Action | 8,9 | Ongoing | Community Development |
| 4 | Develop a comprehensive marketing plan for attracting desirable businesses and redevelopment opportunities at Kensington Business Center. | Action | 9 | Short Term | Community Development |
| 5 | Review development trends and revise the Zoning Code to ensure regulations adequately provide for new industrial needs. | Action | 7,9 | Short Term | Community Development |





 **Goal D: To provide a balanced transportation system which provides for safe and efficient movement of vehicles and pedestrians, supports surrounding land development, and enhances regional transportation facilities.**

| | Strategy | Type of Strategy | Related Objectives D.X | Timing | Responsibility |
|---|---|---|---|---|---|
| 1 | Continue to evaluate where street lighting is deficient, and upgrade to current standards. | Special Study Needs | 6 | Ongoing | Public Works |
| 2 | Continue to evaluate and take advantage of technological enhancements that address traffic operational and intersectional problems and determine potential economically feasible solutions. | Special Study Needs | 1 | Ongoing | Public Works |
| 3 | Continue to pursue expanding the public transportation options throughout the Village, including funding for programs benefiting income eligible residents. | Action | 4 | Ongoing | Community Development, Human Services |
| 4 | Study the public transportation system in Mount Prospect evaluating the current level of service, usage, and access to transit, pedestrian, and bicycle traffic. The study should provide recommendations for improving the Village's public transportation system and connections to multiple modes of transportation. | Special Study Needs | 1,3,4,5,7 | Short Term | Community Development, Public Works, RTA |
| 5 | Continue the neighborhood traffic studies, reviewing neighborhood speed limits and intersection traffic controls. | Special Study Needs | 1,6 | Short Term | Public Works, Police Department |
| 6 | Evaluate opportunities for better linkages between parks, schools, Village destinations, and neighboring communities. Study the feasibility of constructing a regional bike path along the Union Pacific Metra line. | Special Study Needs | 3 | Short Term | Community Development, Public Works |
| 7 | Develop a parking management plan for Downtown. | Special Study Needs | 2 | Short Term | Community Development |
| 8 | Evaluate widening Busse Road between Golf and Central, and Mount Prospect Road between Northwest Highway and Central Road. | Special Study Needs | 1 | Long Term | Public Works |
| 9 | Study the feasibility of jurisdictional transfer of County and Township roads throughout the Village. | Special Study Needs | 1 | Long Term | Public Works |
| 10 | Evaluate the improvement of vehicular and pedestrian crossings across the Union Pacific Railroad where economically feasible, which will also serve as an opportunity to better connect the downtown, improve pedestrian circulation and safety in downtown. | Special Study Needs | 1 | Long Term | Community Development, Public Works |
| 11 | Evaluate the improvement of pedestrian circulation and safety in downtown. | Special Study Needs | 1 | Long Term | Community Development, Public Works |





 **Goal E: To maintain a public infrastructure system that efficiently provides utilities, public improvements and flood control required by the Community.**

| | Strategy | Type of Strategy | Related Objectives E.X | Timing | Responsibility |
|---|---|---|---|---|---|
| 1 | Continue to monitor the stormwater management system ensuring that the system is built to a capacity which minimizes flooding throughout town. | Action | 1,2,3 | Ongoing | Public Works |
| 2 | Continue to monitor all future plans for expansion of telecommunications facilities in the Village. Replacement of obsolete infrastructure consistent with updated technology standards should be encouraged, with infrastructure placed underground where opportunities arise. | Action, Coordination | 2 | Ongoing | Community Development, Public Works, Tele-communication Providers |
| 3 | Continue to support the construction of Levee 37 and other regional flood control projects. | Coordination | 3 | Short Term | Village Wide, Army Corps of Engineers |
| 4 | Assess the overall condition of the existing Village water distribution system. | Special Study Needs | 1,2 | Short Term | Public Works |
| 5 | Initiate the routine roadway resurface program. This is expected to begin when the backlog of roadways needing resurfacing and reconstruction is completed in 2009. | Action | 1,2 | Long Term | Public Works |
| 6 | Evaluate the impact of potential annexation areas on the existing transportation and public infrastructure systems. | Special Study Needs | 1,2 | Long Term | Village Wide |
| 7 | Complete Phase 1 and Phase 2 of the flood control program. The only remaining project in phase 1 is the Hatlen Heights Relief Sewer Project. Phase 2 of the program includes bank stabilization for Weller Creek which is now complete and for McDonald Creek, which is anticipated for 2010. | Action | 1,2,3 | Long Term | Public Works |
| 8 | Evaluate locations throughout the Village that require stream bank stabilization. | Special Study Needs | 1,2,3 | Long Term | Public Works |





 **Goal F: To provide a system of facilities that ensures for efficient delivery of public services and open space, enhancing the quality of life within the community**

| Strategy | | Type of Strategy | Related Objectives F.X | Timing | Responsibility |
|---|---|---|---|---|---|
| 1 | Support the individual school districts delivery of high quality educational services. When necessary the Village should work with district officials to find viable new uses for vacant school facilities which can be of maximum benefit to the community. | Coordination | 1,2 | Ongoing | Community Development, School Districts |
| 2 | Support efforts by the local park districts to secure funds for the purchase or lease of open space for recreational use. | Coordination | 4,5 | Ongoing | Village Wide, Park Districts |
| 3 | Utilize CDBG funds for accessibility improvements to public buildings. | Action | 3 | Ongoing | Community Development |
| 4 | Continue to cooperate with all local park districts to ensure that the recreational needs of Mount Prospect residents continue to be met. | Coordination | 5 | Ongoing | Village Wide, Park Districts |
| 5 | Investigate the need for a neighborhood resource center to serve the growing foreign born population. | Special Study Needs | 4 | Short Term | Human Services, Police Department |
| 6 | Monitor the need for additional fire and police stations on a regular basis. Several existing Village facilities and services may require expansion or relocation in the future as planned and new development occurs. If Railroad traffic increases, it may be necessary for the Police Department to create and maintain a substation in the Village's south side, perhaps in the Fire Station at Golf and Busse. | Special Study Needs, Village Board Action | 1 | Long Term | Community Development, Fire Department, Police Department |
| 7 | Evaluate opportunities for recreational use of the Cook County Forest Preserve property to compliment the residential neighborhoods and commercial corridor located along River Road. | Special Study Needs | 7 | Long Term | Community Development, Cook County Forest Preserve |





## APPENDIX A:

# Additional Demographics

The following tables further answer the questions of "Where have we come from?" and "How do we compare to the region, the State, and the Country?" The demographic information that was found in the tables of Chapter 2 are further compared with the Village's neighbors.

**Figure A.1 Characteristics of population**

| | United States | Illinois | Cook County | Mount Prospect | Arlington Heights | Des Plaines | Elk Grove | Prospect Heights |
|---|---|---|---|---|---|---|---|---|
| Total Population | 281,421,906 | 12,419,293 | 5,376,741 | 56,706 | 76,098 | 58,695 | 34,758 | 17,541 |
| Median Age | 35.3 | 34.7 | 33.6 | 37.2 | 39.7 | 37.5 | 36.4 | 33.3 |
| Average Household Size | 2.59 | 2.63 | 2.68 | 2.61 | 2.45 | 2.57 | 2.61 | 2.73 |
| In Family Household* | 82.61% | 83.10% | 82.59% | 86.73% | 83.54% | 84.20% | 86.16% | 86.74% |
| Education – Bachelor's Degree or Above Attained | 15.80% | 16.73% | 18.02% | 24.43% | 32.99% | 17.50% | 21.58% | 19.00% |
| | | | | | | | | |
| Median Household Income | $41,994 | $46,590 | $45,922 | $57,165 | $67,807 | $53,638 | $62,132 | $55,641 |
| Per Capital Income | $21,587 | $23,104 | $23,227 | $26,464 | $33,544 | $24,146 | $28,515 | $28,200 |
| Population below the Poverty Level in 1999 | 12.38% | 10.68% | 13.90% | 4.62% | 2.50% | 4.59% | 1.98% | 4.33% |
| | | | | | | | | |
| Number of Housing Units | 115,904,641 | 4,885,615 | 2,096,121 | 22,081 | 31,713 | 22,959 | 13,457 | 6,622 |
| Percent of Housing Owner Occupied | 60% | 63% | 55% | 70% | 74% | 78% | 75% | 71% |
| Housing Owner Occupied | 69,816,513 | 3,089,124 | 1,142,743 | 15,483 | 23,565 | 17,907 | 10,136 | 4,691 |
| Housing Renter Occupied | 35,663,588 | 1,502,655 | 831,438 | 6,235 | 7,167 | 4,567 | 3,090 | 1,737 |
| Owners living in same home 5 years prior to census | 54.13% | 47.47% | 57.00% | 59.30% | 60.62% | 62.56% | 63.08% | 50.82% |

\* Householder living with one or more individuals related to him or her by birth, marriage, or adoption.

Source: U.S. Census 2000  Summary File 1  Table P-13; Summary File 3, Tables P-1, P-9, P-37, P-53, P-82, P-87, H-1, H-6, H-7, H-18, PCT-21

**Figure A.2:  Housing Occupancy and Tenure (2000)**

| HOUSING OCCUPANCY | Mount Prospect | Arlington Heights | Des Plaines | Elk Grove | Prospect Heights |
|---|---|---|---|---|---|
| Total housing units | 22,081 | 31,713 | 22,959 | 13,457 | 6,622 |
| % Occupied housing units | 98.36% | 96.91% | 97.89% | 98.28% | 97.07% |
| % Vacant housing units | 1.64% | 3.09% | 2.11% | 1.72% | 2.93% |
| | | | | | |
| HOUSING TENURE | | | | | |
| Total occupied housing units | 21,718 | 30,732 | 22,474 | 13,226 | 6,428 |
| % Owner-occupied housing units | 71.29% | 76.68% | 79.68% | 76.64% | 72.98% |
| % Renter-occupied housing units | 28.71% | 23.32% | 20.32% | 23.36% | 27.02% |

Source: US Census 2000 Summary File 3, Tables H-1, H-7, H-8



Village of Mount Prospect Comprehensive Plan

000435



APPENDIX A: ADDITIONAL DEMOGRAPHICS

**Figure A.3 Hispanic or Latino By Race**

| | United States | Illinois | Cook County | Mount Prospect | Arlington Heights | Des Plaines | Elk Grove | Prospect Heights |
|---|---|---|---|---|---|---|---|---|
| Total: | 281,421,906 | 12,419,293 | 5,376,741 | 56,265 | 76,031 | 58,720 | 34,727 | 17,081 |
| % Not Hispanic or Latino: | 87.45% | 87.68% | 80.07% | 88.23% | 95.54% | 85.99% | 93.77% | 72.42% |
| % White | 69.13% | 67.83% | 47.59% | 73.84% | 87.61% | 76.01% | 82.35% | 65.21% |
| % Black or African American | 12.06% | 14.95% | 25.86% | 1.74% | 0.93% | 0.95% | 1.39% | 1.59% |
| % American Indian and Alaska Native | 0.74% | 0.15% | 0.13% | 0.14% | 0.05% | 0.12% | 0.07% | 0.11% |
| % Asian | 3.60% | 3.38% | 4.80% | 11.15% | 5.96% | 7.59% | 8.74% | 4.37% |
| % Native Hawaiian & Other Pacific Islander | 0.13% | 0.03% | 0.03% | 0.04% | 0.03% | 0.02% | 0.04% | 0.04% |
| % Some other race | 0.17% | 0.11% | 0.14% | 0.08% | 0.09% | 0.11% | 0.11% | 0.04% |
| % Two or more races | 1.64% | 1.24% | 1.53% | 1.30% | 0.87% | 1.18% | 1.07% | 1.07% |
| % Hispanic or Latino: | 12.55% | 12.32% | 19.93% | 11.77% | 4.46% | 14.01% | 6.23% | 27.58% |
| % White | 6.01% | 5.65% | 8.69% | 6.74% | 2.95% | 8.43% | 3.67% | 12.20% |
| % Black or African American | 0.25% | 0.17% | 0.28% | 0.08% | 0.03% | 0.06% | 0.03% | 0.16% |
| % American Indian and Alaska Native | 0.14% | 0.10% | 0.16% | 0.12% | 0.03% | 0.13% | 0.03% | 0.14% |
| % Asian | 0.04% | 0.03% | 0.04% | 0.03% | 0.02% | 0.06% | 0.05% | 0.00% |
| % Native Hawaiian & Other Pacific Islander | 0.02% | 0.01% | 0.02% | 0.01% | 0.01% | 0.01% | 0.00% | 0.01% |
| % Some other race | 5.29% | 5.71% | 9.74% | 4.07% | 1.10% | 4.54% | 2.18% | 13.79% |
| % Two or more races | 0.79% | 0.65% | 1.00% | 0.72% | 0.32% | 0.79% | 0.28% | 1.28% |

Source: US Census 2000 Summary File 1 Table P 8

**Figure A.4: Language Capability, Ages 5 Years and Over**

| | United States | Illinois | Cook County | Mount Prospect | Arlington Heights | Des Plaines | Elk Grove | Prospect Heights |
|---|---|---|---|---|---|---|---|---|
| Total Population: | 262,375,152 | 11,547,505 | 4,991,310 | 53,049 | 71,417 | 55,387 | 32,575 | 16,259 |
| % Speak Another Language (Total) | 17.89% | 19.23% | 30.91% | 34.94% | 17.67% | 32.42% | 20.01% | 45.16% |
| % and English "very well" | 9.77% | 10.10% | 15.53% | 16.87% | 10.67% | 16.70% | 12.25% | 17.03% |
| % and English "well" | 3.94% | 4.44% | 7.41% | 8.21% | 4.10% | 8.57% | 4.61% | 10.48% |
| % and English "not well" | 2.90% | 3.36% | 5.61% | 6.66% | 2.14% | 5.40% | 2.40% | 12.47% |
| % and English "not at all" | 1.28% | 1.33% | 2.26% | 3.20% | 0.76% | 1.74% | 0.75% | 5.18% |

Source: U.S. Census, Summary File 3 Table - PCT12

**Figure A.5: Origin of Foreign Born by Continent**

| | United States | Illinois | Cook County | Mount Prospect | Arlington Heights | Des Plaines | Elk Grove | Prospect Heights |
|---|---|---|---|---|---|---|---|---|
| Total Foreign Born: | 31,107,889 | 1,529,058 | 1,064,703 | 15,159 | 10,546 | 14,010 | 4,964 | 6,399 |
| % Europe: | 15.80% | 25.50% | 27.06% | 34.39% | 43.04% | 39.60% | 28.75% | 34.24% |
| % Asia: | 26.44% | 23.53% | 21.78% | 35.00% | 36.83% | 24.99% | 53.00% | 9.10% |
| % Africa: | 2.83% | 1.71% | 1.74% | 1.22% | 1.69% | 0.38% | 1.27% | 0.11% |
| % Oceania: | 0.54% | 0.17% | 0.12% | 0.23% | 0.15% | 0.11% | 0.18% | 0.33% |
| % Americas: | 54.38% | 49.09% | 49.30% | 29.16% | 18.29% | 34.92% | 16.80% | 56.23% |
| % Born at sea: | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

Source: US Census Summary File 3 Table - PCT19



Village of Mount Prospect Comprehensive Plan



APPENDIX A: ADDITIONAL DEMOGRAPHICS

**Figure A.6: Year of Entry for the Foreign-Born Population**

|  | United States | Illinois | Cook County | Mount Prospect | Arlington Heights | Des Plaines | Elk Grove | Prospect Heights |
|---|---|---|---|---|---|---|---|---|
| Total Foreign Born: | 31,107,889 | 1,529,058 | 1,064,703 | 15,159 | 10,546 | 14,010 | 4,964 | 6,399 |
| % 1995 to March 2000 | 24.37% | 25.63% | 24.89% | 32.69% | 32.64% | 17.16% | 18.51% | 35.41% |
| % 1990 to 1994 | 17.99% | 19.34% | 19.56% | 18.52% | 12.61% | 17.59% | 18.76% | 23.86% |
| % 1985 to 1989 | 15.08% | 13.93% | 13.91% | 12.18% | 9.73% | 15.28% | 11.48% | 11.77% |
| % 1980 to 1984 | 12.14% | 9.89% | 10.27% | 7.43% | 6.51% | 12.18% | 11.12% | 8.16% |
| % 1975 to 1979 | 8.64% | 9.15% | 9.53% | 7.98% | 7.88% | 9.67% | 11.08% | 5.91% |
| % 1970 to 1974 | 6.43% | 7.12% | 7.39% | 5.24% | 6.68% | 6.99% | 7.45% | 4.52% |
| % 1965 to 1969 | 4.77% | 4.52% | 4.49% | 4.35% | 5.48% | 5.69% | 6.73% | 2.69% |
| % Before 1965 | 10.59% | 10.43% | 9.95% | 11.61% | 18.47% | 15.43% | 14.87% | 7.69% |

Source: U.S. Census 2000 Summary File 3, Table - P22

**Figure A.7: Construction Date of Housing Stock**

|  | Illinois | Cook County | Mount Prospect | Arlington Heights | Des Plaines | Elk Grove | Prospect Heights |
|---|---|---|---|---|---|---|---|
| Total Units | 4,591,779 | 1,974,181 | 21,718 | 30,732 | 22,474 | 13,226 | 6,428 |
| % Built 1999 to March 2000 | 1.39% | 0.72% | 0.35% | 0.54% | 0.89% | 0.30% | 0.22% |
| % Built 1995 to 1998 | 5.34% | 2.59% | 2.10% | 2.15% | 3.50% | 2.90% | 3.89% |
| % Built 1990 to 1994 | 5.65% | 3.10% | 4.02% | 6.23% | 5.49% | 6.47% | 3.52% |
| % Built 1980 to 1989 | 9.86% | 7.27% | 10.72% | 17.72% | 7.45% | 20.57% | 18.82% |
| % Built 1970 to 1979 | 16.51% | 13.66% | 26.12% | 22.85% | 14.91% | 29.33% | 32.84% |
| % Built 1960 to 1969 | 14.61% | 16.30% | 29.69% | 24.81% | 26.54% | 28.15% | 20.01% |
| % Built 1950 to 1959 | 15.22% | 18.49% | 19.90% | 16.90% | 23.19% | 11.01% | 15.56% |
| % Built 1940 to 1949 | 9.07% | 11.14% | 4.50% | 4.52% | 8.63% | 0.76% | 3.67% |
| % Built 1939 or earlier | 22.35% | 26.73% | 2.61% | 4.30% | 9.40% | 0.50% | 1.48% |

Source: US Census 2000 Summary File 3, Table H-36

**Figure A.8: Total Sales (based upon municipal tax receipts which equal 1% of total sales)**

| Categories | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | % Change 00 - 06 |
|---|---|---|---|---|---|---|---|---|
| Mount Prospect | $793,667,383 | $772,908,489 | $774,814,437 | $783,127,619 | $796,416,875 | $810,101,704 | $882,410,279 | 10.06% |
| Arlington Heights | $1,145,716,651 | $1,114,686,453 | $1,130,731,591 | $1,116,284,113 | $1,107,752,443 | $1,117,681,816 | $1,133,462,183 | -1.08% |
| Des Plaines | $755,160,650 | $750,156,728 | $744,254,513 | $784,571,457 | $780,613,245 | $810,442,478 | $838,723,369 | 9.96% |
| Elk Grove | $872,784,483 | $803,866,924 | $755,558,161 | $680,963,973 | $752,345,244 | $777,424,888 | $840,904,676 | -3.79% |
| Prospect Heights | $98,410,671 | $95,596,532 | $93,519,302 | $90,914,354 | $82,095,222 | $86,395,988 | $91,233,067 | -7.87% |

Source: State of Illinois King of Business (KOB) Index



000437

APPENDIX A: ADDITIONAL DEMOGRAPHICS

Figure A.9: Employment by Industry

| Industry (SIC) | United States | Illinois | Cook County | Mount Prospect | Arlington Heights | Des Plaines | Elk Grove | Prospect Heights |
|---|---|---|---|---|---|---|---|---|
| Total Employment: | 129,721,512 | 5,833,185 | 2,421,287 | 29,617 | 39,845 | 28,638 | 19,451 | 8,785 |
| % Agriculture, forestry, fishing and hunting, and mining: | 1.87% | 1.14% | 0.10% | 0.07% | 0.17% | 0.06% | 0.05% | 0.17% |
| % Construction | 6.78% | 5.73% | 4.93% | 4.55% | 4.58% | 6.66% | 5.34% | 9.65% |
| % Manufacturing | 14.10% | 15.96% | 14.14% | 17.74% | 14.26% | 17.48% | 18.73% | 23.39% |
| % Wholesale trade | 3.60% | 3.82% | 3.83% | 5.70% | 5.83% | 5.43% | 7.11% | 6.61% |
| % Retail trade | 11.73% | 11.03% | 10.09% | 11.79% | 10.51% | 11.90% | 12.71% | 7.97% |
| % Transportation and warehousing, and utilities: | 5.20% | 6.04% | 6.71% | 6.52% | 4.96% | 6.90% | 8.36% | 2.80% |
| % Information | 3.08% | 2.96% | 3.42% | 4.02% | 4.18% | 2.87% | 4.13% | 2.34% |
| % Finance, insurance, real estate and rental and leasing: | 6.89% | 7.92% | 9.08% | 9.02% | 10.57% | 7.72% | 7.96% | 7.06% |
| % Professional, scientific, management, administrative, and waste management services: | 9.30% | 10.13% | 12.66% | 12.31% | 15.76% | 11.25% | 10.33% | 14.84% |
| % Educational, health and social services: | 19.92% | 19.41% | 18.79% | 14.99% | 17.95% | 14.91% | 13.86% | 12.23% |
| % Arts, entertainment, recreation, accommodation and food services | 7.87% | 7.16% | 7.42% | 6.94% | 4.88% | 5.77% | 5.47% | 8.05% |
| % Other services (except public administration) | 4.97% | 4.73% | 4.97% | 4.10% | 3.93% | 5.70% | 3.58% | 4.08% |
| % Public administration | 4.79% | 3.97% | 3.87% | 2.24% | 2.42% | 2.34% | 2.36% | 0.81% |

Source: US Census 2000 Summary File 3, Table P-49





## APPENDIX B:

# Large Scale Maps

(Will be available when published)

Large scale maps will include:

- **Future Land Use Map**
- **Public Transportation**
- **Community Facilities**





# Downtown TIF District
# Strategic Plan



Prepared by the Downtown Strategic Plan Ad Hoc Committee

**EXHIBIT**

tabbies

2

## TABLE OF CONTENTS

INTRODUCTION ....................................................... 1
   Plan Purpose and Contents ............................. 2
EXISTING CONDITIONS................................. 4
   Land Use ......................................................... 4
      Residential Development in the Study Area..... 4
      Commercial Development in the Study Area .. 5
      Surrounding Land Use ................................... 5
   Tax Increment Finance District ....................... 7
   Zoning ........................................................... 10
   Traffic/Parking ............................................. 10
   Downtown Status Report ............................... 10
   Population..................................................... 14
   Downtown Characteristics.............................. 14
      Building Heights ........................................ 14
      Transportation........................................... 14
      Visual and Aesthetic Elements...................... 14
   Market Study ................................................ 16
      General Findings ........................................ 16
      Residential................................................ 16
      Retail ....................................................... 17
      Office ....................................................... 17
A VISION FOR DOWNTOWN ......................... 17
   Land Use Priorities ....................................... 18
   Public Participation ....................................... 18
   Vision Statement .......................................... 19
   Plan Objectives ............................................ 19
STRATEGIC PLANNING ISSUES...................... 20
   Development Phasing..................................... 20
   Property Acquisition...................................... 20
   Business Relocation....................................... 21
   Pedestrian Scale and Transportation Network.... 21
   Design Guidelines ......................................... 22
      Architectural Style...................................... 22
      Mid or Low Building Height......................... 23
      Building Pedestrian-Friendly Streets............. 23
   Development Guidelines ................................. 23
      Street System Guidelines............................. 23
      Open Space Guidelines ............................... 24
      Residential Guidelines................................. 24
      Commercial/Office Guidelines...................... 24
      Building Placement & Setbacks .................... 25
      Parking ..................................................... 25
      Public Buildings Guidelines.......................... 25
      Signage System Guidelines .......................... 25
   Management and Promotion............................ 26
DEVELOPMENT CONCEPT PLAN ................... 26
   Phase I ......................................................... 30
      Description................................................ 30
      Development Issues..................................... 30
      Development Details .................................... 31
      Development Process ................................... 31

      Action Steps .............................................. 32
   Phase II........................................................ 32
      Description................................................ 32
      Development Issues..................................... 32
      Development Details .................................... 33
      Tax Increment Financing Analysis ................ 33
      Development Process ................................... 33
      Action Steps .............................................. 33
   Phase III....................................................... 33
      Description................................................ 34
      Development Issues..................................... 34
      Development Details .................................... 35
      Tax Increment Finance District .................... 35
      Development Process ................................... 35

## FIGURES

| 1 | Study Area Map | 3 |
| 2 | Existing Land Use Map | 6 |
| 3 | TIF District Map | 8 |
| 4 | Existing Zoning Map | 9 |
| 5 | Traffic Counts | 11 |
| 5a | Parking Map | 12 |
| 6 | Status Map | 13 |
| 7 | Development Phase Plan | 28 |
| 8 | Concept Plan | 29 |
| Table I | Demographic Trends | 15 |

## APPENDICES

Recent Downtown Planning & Development History
May 31st Workshop Summary
Ad Hoc Committee Schedule/Agenda
Comments – October 22 Open House
Downtown Survey and Results Summary
Land Use Priorities
Ad Hoc Committee Preferred Land Uses
Comments December 6 Workshop
Downtown Streetscape Program

000441

Downtown Strategic Plan
December 23, 1997                                                    Page 1

## INTRODUCTION

The intent of this strategic plan for Downtown Mount Prospect is to guide revitalization of the community's Central Business District. As in many established towns, this is not an easy or necessarily straightforward process. In fact, downtown planning in Mount Prospect has been going on for many years. Those efforts, which are summarized in the appendix, have generated a number of successful projects. Conversely, the Village's downtown presents challenges that have made extensive improvements by either the public or private sectors difficult. Not surprisingly, the positive improvements in the downtown result from a shared effort by the public and private sectors. Recognizing these realities, this plan builds on past planning for downtown and establishes a program to foster downtown revitalization.

This plan was prepared by an ad hoc committee that included representatives from the Village's Plan Commission, Business District Development and Redevelopment Commission, Economic Development Commission, Board of Trustees, and Village residents. In this way, the committee reflected a community-wide perspective, in addition to insights and experiences of those whose attention is regularly on the downtown. The committee met twice a month on predetermined mornings to prepare the plan. As the need to cover issues in greater depth arose, the committee also met on additional mornings. Those meetings were open to all and included time for public comment. The agenda for each meeting was established at the outset of the project to help maintain the tight schedule. A short time frame was important in order to take advantage of growing or increased interest in downtown revitalization, and to maximize use of funding available through the Downtown Tax Increment Finance (TIF) District.

The study area (see Figure 1) was limited to the portion of downtown that presented the greatest need and opportunity for enhancement. That area is bounded by Central Road on the north, Wille Street on the west, Northwest Highway on the south, Emerson (between Northwest Highway and Busse Avenue) and the mid block between Emerson and Maple (from Busse to Central) on the east. However, the targeted study area is not considered in a vacuum. The plan considers the needs and impacts of properties and businesses throughout the downtown.

**This plan builds on past planning for downtown and establishes a program to foster downtown revitalization.**

**Plan Purpose and Contents**

The purpose of this strategic plan is to identify consensus on the most appropriate redevelopment alternatives in the study area, as well as to outline the process for that redevelopment to occur. Therefore, the plan focuses on three topics: land use, development guidelines (such as height and bulk regulations), and design guidelines (such as architecture and streetscape). The plan also prioritizes sites for redevelopment (see Figure 7). The last item is important because one of the ultimate purposes of this strategic plan is to create a request for proposals from developers for redevelopment of certain parcels in the downtown.

To accomplish this charge, the plan is in four sections. The first outlines existing conditions pertinent to the plan. The second section presents a vision for the downtown that has been created by Village residents, officials, and the Ad Hoc Committee in preparing the plan. The third section describes the strategic plan issues in the study area. The final section details a development concept plan for each block in the area.

**The purpose of this strategic plan is to identify consensus on the most appropriate redevelopment alternatives in the study area.**

Downtown Strategic Plan
December 23, 1997

Page 3



FIGURE 1
STUDY AREA

prepared 12/23/97

000444

## EXISTING CONDITIONS

### Land Use

Downtown Mount Prospect was the original commercial and civic center of the Village. A mix of uses, including municipal/civic uses, retail stores, and commercial uses characterizes the area (see Figure 2). Downtown continues to be a highly accessible area, influenced by the heavy volume of vehicular traffic on its three major arterial streets. These roads have a significant impact on the land use patterns and character of the downtown. Although Mount Prospect has an active commuter rail station, nearly all downtown businesses are primarily dependent on auto traffic rather than pedestrian traffic.

The physical conditions of buildings in the downtown vary. Some buildings were renovated within the last ten years and are well maintained, while other buildings continue to deteriorate and have numerous building code violations. With a few exceptions, the buildings are not architecturally significant. Most are "box-type" buildings constructed in the 1950's and 1960's. It is important to note that past facade improvement projects have held up better on Prospect Avenue than on the north side of the tracks. Also, there are very few new buildings in the study area.

### *Residential Development in the Study Area*

Residential development in the study area includes recently constructed Shires at Clocktower Place Condominiums. Currently, there are 89 units completed, and once the third and final building is completed, there will be 139 units. In addition to condominiums, the downtown area also contains town homes. The Village Commons Subdivision, also known as the Hemphill Townhome Development, is located in the TIF district. It is east of the study area, and consists of 51 townhouse units. The development is relatively new and provides a good transition from the single-family residences east of downtown, to the commercial uses west of the Village Commons Subdivision. There are four single-family residences in the study area. Northwest Electric rents out two houses on Wille Street and the other two are located on the northeast corner of Emerson Street and Busse Avenue. In addition to these four houses, there are several apartment units located above commercial uses on Busse Avenue. These units were part of the original construction of the buildings, and vary in age.



The newest commercial development adjacent to the study area is the Clocktower Development.

Downtown Strategic Plan
December 23, 1997                                    Page 5

### Commercial Development in the Study Area

The newest commercial development adjacent to the study area is the Clocktower Development, located at the intersection of Wille and Northwest Highway. This strip mall includes a coffee shop (Starbucks), a bread store (Montana Gold), a hair stylist and a dry cleaner. Until recently, Busse Avenue, between Main/Elmhurst Road and Wille Street, was characterized by numerous vacancies. To date, several new businesses have opened, or are scheduled to open soon. These new businesses, which have filled most previous vacancies, include a clothing resale shop and an art gallery.



**Until recently, Busse Avenue, between Main/Elmhurst Road and Wille Street, was characterized by numerous vacancies.**

Other commercial uses found in the study area are not considered appropriate for a traditional downtown. Although these auto-intensive and wholesale types of businesses in the study area may do well financially, they are not components of a downtown striving to create a pedestrian friendly, community-orientated environment. From a land use stand point, these heavy commercial businesses are more appropriate in an industrial area. Their move would allow more suitable uses to occupy these highly visible, prime locations.

### Surrounding Land Use

The study area, located within the downtown core, is surrounded by several different land uses. In some directions, the land use character of the surrounding areas reflects that of the study area; it also is commercial. In other cases, the areas quickly change to residential in character.

Land uses directly west of the study area, from Wille Street to the corner of Central Road and Northwest Highway, are commercial uses and condominiums. These commercial uses include two restaurants as well as a gas station, an electronics store, and small business service operators. These types of businesses reflect the types of uses found in the study area.

Land uses south of the study area are separated by the Union Pacific Railroad tracks. Although this area is a part of Downtown Mount Prospect, the tracks create a visual and physical separation from the study area. Beyond the tracks is a small group of commercial uses that include service-oriented businesses, medical offices, and some retail businesses. Beyond those uses, the character of the area quickly becomes residential.

Downtown Strategic Plan
December 23, 1997



**FIGURE 2**
**EXISTING LAND USE MAP**

prepared 12/23/97

| | | | | |
|---|---|---|---|---|
| G | Government | Gp | Parking Lot (Government) | |
| C | Commercial | Cp | Parking Lot (Commercial) | |
| Hc | Heavy Commercial | | | |
| R | Residential | | | |
| V | Vacant | | | |

Downtown Strategic Plan
December 23, 1997                                          Page 7

Immediately east of the study area are single family residences, a municipal use (the Public Safety Building) as well as retail businesses along Northwest Highway. Further east on Northwest Highway is a townhome development (Village Commons Subdivision) and numerous, smaller retail businesses such as a flower store, a comic book store, a bicycle store, and an insurance company.    While these businesses continue the commercial character along Northwest Highway, they do not have a strong connection to the downtown core.

North of Central Road, the land uses are primarily single-family residences.  The multi-family housing at the northeast corner of Central and Main Street provides a transition to the neighboring single-family residences. As a result of this residential character, the downtown area generally is not considered to extend north of Central Road. However, Central Plaza and the yet to be constructed Mount Prospect National Bank serve as an entryway into the downtown, and are used as if part of the downtown.

**Tax Increment Finance District**

The original TIF District was established in August of 1985.  It has since been amended and expanded.  Currently, the TIF District is bounded by Central Road to the north, Northwest Highway to the south, and Owen Street to the east.  The TIF boundaries do not form a complete triangle as the boundary lines jog around and exclude First Chicago and the vast majority of the single-family residences. East of Emerson, the north boundary is Busse Avenue, but then continues south to Evergreen and ends at Northwest Highway and Owen Street.  Figure 3 shows the boundaries of the TIF District.

To date, TIF funds have been used to finance the Streetscape Program, the Facade Rebate Program, property acquisition, infrastructure, and the Interior Remodel Program. Potential uses of TIF funds include property acquisition, infrastructure improvement, consultant fees and demolition.  The TIF expires in the year 2008, leaving only ten years for the Village to utilize TIF revenues to fund eligible activities in the district, and to retire bonds used in support of downtown redevelopment.

**To date, TIF funds have been used to finance the Streetscape Program, the Facade Rebate Program, property acquisition, infrastructure, and the Interior Remodel Program.**

Downtown Strategic Plan
December 23, 1997



**North**

| | |
|---|---|
| T.I.F. Boundary | |
| ① | Village Hall |
| ② | Senior Citizen Center |
| ③ | Public Safety Building |
| ④ | Library |

**FIGURE 3**
**TAX INCREMENT FINANCE DISTRICT**

prepared 12/23/97

000449

Downtown Strategic Plan
December 23, 1997                                                    Page 9



R-1    Single Family Residence District

R-A    Single Family Residence District

B-5    Central Commercial District

B-5c    Central Commercial Core District

**FIGURE 4**
**EXISTING ZONING MAP**

prepared 12/23/97

000450

Page 10

## Zoning

The Downtown area is zoned B-5, Central Commercial, with the center zoned B-5C, Central Commercial Core, (see Figure 4). The two homes at the northeast corner of Busse and Emerson are zoned R-1. The most significant bulk regulation established in the Zoning Code for these districts is the maximum permitted height. Code permits 30' or three stories in the B-5 district, or six stories or 70' in the B-5C district.

## Traffic/Parking

Traffic volumes from Northwest Highway, Main/Elmhurst and Central Roads are desirable for attracting retailers.

The downtown area is accessible from three major roads, Northwest Highway, Central Road and Main Street/Elmhurst Road (Route 83). The high traffic volume and multiple access points make it difficult to establish a focal point or a pedestrian friendly environment in the downtown area. Figure 5 shows traffic counts for the study area. The three major roads in the downtown area, Main/Elmhurst Road, Northwest Highway, and Central Road have traffic counts of 26,000 vehicles per day (vpd), 20,000 vpd, and 16,000 vpd respectively. This volume is desirable for attracting retailers, and the counts are comparable to Arlington Heights and Rand Roads.

There is a perception that the downtown area does not have adequate parking. A parking study conducted by Rich and Associates in April 1990 found there was a deficit of 40 spaces in the downtown. Given the size of the downtown, this is not considered a significant deficit in the number of parking spaces. Figure 5a provides the location and number of spaces available. Rich and Associates recommended that additional parking be developed in the core area, and that parking along Prospect Avenue and behind businesses be promoted with better signage.

## Downtown Status Report

The amount of vacant buildings in the downtown area is common for the age and type of structures in the downtown. More importantly, though, is the location of the vacancies along the highly visible Northwest Highway and Central Road. The pattern of uses in the study area is currently segregated, and underutilized, with a wide mix of uses. Figure 6 shows the location of vacancies, properties for sale and Village owned properties.

Downtown Strategic Plan
December 23, 1997



FIGURE 5
TRAFFIC COUNTS (1995)

prepared 12/23/97

000452

Downtown Strategic Plan
December 23, 1997



FIGURE 5a
PARKING MAP

prepared 12/23/97

000453

Downtown Strategic Plan
December 23, 1997

Page 13



 Property Owned by Village of Mount Prospect

 Vacant Property Owned by Village of Mount Prospect

 Vacant Storefront

Property for Sale

 Vacant Property for Sale

**FIGURE 6**
**STATUS MAP**

prepared 12/23/97

## Population

Demographic information on Mount Prospect and surrounding areas is shown in Table 1. The table provides detailed information but general trends suggest a decrease in household size, while NIPC anticipates the addition of 39,000 additional households for the Near North and Northwest communities, including 2,356 in Mount Prospect.

Since 1990, the population within a half-mile of the downtown area has declined 3.2%, although it has increased 3.2% within a three-mile radius. The average age within a half-mile of downtown is estimated to exceed 40 years. However, School District 57 reported an increase in enrollment for the last three years and projections show this trend will continue for the next five years and then level off.

## Downtown Characteristics

### Building Heights
Most of the buildings in the downtown are less than three stories tall. The few exceptions include the First Chicago building, which is 93' tall, and the Shires at Clocktower Place, standing six stories tall.

### Transportation
The Union Pacific Railroad train station is located in downtown Mount Prospect. Mount Prospect's stop is the second busiest on the northwest line, having 1,900 - 2,000 boardings each day. In addition, four Pace bus routes service the downtown area. Routes 234, 209, 226, and 223 link commuters to Buffalo Grove, Wheeling, Woodfield Mall, Elk Grove and Des Plaines.

### Visual and Aesthetic Elements
Completion of the Village's Streetscape Program will help unite and identify the downtown area. The new paver sidewalks, trash receptacles, benches, and entry sign will help distinguish the downtown from other commercial areas in the community. These changes will improve and enhance the general appearance.



**Completion of the Village's Streetscape Program will help unite and identify the downtown area.**

Downtown Strategic Plan
December 23, 1997

| | | | | | | |
|---|---|---|---|---|---|---|
| **Northeastern Illinois** | 6,974,755 | | 7,262,176 | 7,855,784 | 8,450,392 | 9,045,000 | |
| | | | | | | |
| **Northwest Suburban** | | | | | | |
| Arlington Heights | 65,058 | 66,116 | 75,460 | 77,105 | 78,749 | 80,394 | 3.82% |
| Mount Prospect | 34,995 | 52,634 | 53,170 | 53,390 | 53,609 | 53,829 | 0.42% |
| Palatine | 26,050 | 32,166 | 39,253 | 45,780 | 52,306 | 58,833 | 47.14% |
| Prospect Heights | 13,333 | 11,808 | 15,239 | 15,346 | 15,453 | 15,560 | -0.48% |
| Rolling Meadows | 19,478 | 20,167 | 22,591 | 22,699 | 22,808 | 22,916 | -0.16% |
| Wheeling | 13,243 | 23,266 | 29,911 | 31,740 | 33,570 | 35,399 | 14.70% |
| Subtotal | 172,157 | 206,157 | 235,624 | 246,060 | 256,495 | 266,931 | 11.00% |
| | | | | | | |
| **Near North Suburban** | | | | | | |
| DesPlaines | 57,239 | 53,568 | 53,223 | 58,884 | 64,546 | 70,207 | 32.73% |
| Evanston | 80,113 | 73,706 | 73,233 | 75,066 | 76,899 | 78,732 | 7.22% |
| Lincolnwood | 12,929 | 11,921 | 11,365 | 12,098 | 12,832 | 13,565 | 11.48% |
| Morton Grove | 26,369 | 23,747 | 22,408 | 22,682 | 22,955 | 23,229 | 4.15% |
| Niles | 31,432 | 30,363 | 28,284 | 32,976 | 37,668 | 42,360 | 43.83% |
| Park Ridge | 42,614 | 38,704 | 36,175 | 35,612 | 35,048 | 34,485 | -5.40% |
| Skokie | 68,322 | 60,278 | 59,432 | 60,883 | 62,334 | 63,765 | 8.15% |
| Subtotal | 319,018 | 292,287 | 284,120 | 298,201 | 312,282 | 326,363 | 14.24% |
| | | | | | | |
| **Total North Suburban** | 491,175.00 | 498,444.00 | 519,744.00 | 544,261.00 | 568,777.00 | 593,294.00 | 12.76% |

**TABLE 1**
**DEMOGRAPHIC TRENDS**

prepared 11/20/97
Source: Clarion Associates, Inc.

000456

**Market Study**

Understanding the market potential in downtown is important to making wise land use decisions. To that end, a detailed market study was an integral part of the planning process. The study helped the plan reflect market realities for downtown. The findings of the market study are summarized below.

*General Findings*



The pattern of land uses on the south side of the railroad tracks is cohesive, in terms of both physical structures and land uses.

- Given the accessibility and amenities of the area, together with demographic, economic, and competitive conditions in the surrounding market area, downtown Mount Prospect can support substantial new residential and commercial development over the next several years.
- In spite of an active commuter rail station, most of the downtown businesses are primarily dependent on automobile-oriented traffic, rather than pedestrian traffic. This automobile-dependency is likely to continue even if more sites in the downtown area are developed for residential use.
- Downtown Mount Prospect is smaller than other downtowns. From a market perspective, this will influence the scale of potential development, both for individual projects and in terms of the area's potential to develop critical mass as a destination point. At the same time, it presents the opportunity significantly to transform the downtown's image as a community center with a few essential projects.
- The pattern of land uses on the south side of the railroad tracks is cohesive, in terms of both physical structures and land uses. However, the pattern of uses on the north side is more complex and currently somewhat disjointed, with a wider mix of uses, more vacant or underutilized sites and no clear and consistent orientation to the major arterials. From a market perspective, this is confusing for both potential customers and potential developers.

*Residential*

- Demographics for the Village and the region are supportive of new mid-rise condominiums in the downtown over both the short and long terms.
- Residential infill projects are becoming increasingly popular in both urban and suburban locations, particularly in the north and northwest suburbs.
- Given its location, access, and demographics of the surrounding area, downtown Mount Prospect can compete in the residential market with virtually any other medium density residential location in the northwest suburban area.

000457

Downtown Strategic Plan
December 23, 1997                                    Page 17

### Retail

- Due to cyclical impacts of the economy and ongoing technological changes, the traditional retail market is more volatile than in the past. For downtown development, this means that retail space might be harder to rent than in the past, and that the spaces must be flexible enough to accommodate small offices or other uses.
- National tenants in the comparison goods field would be desirable for the downtown in terms of attracting new customers from the entire three-mile market area and beyond. However, these tenants, in most cases, will focus on the automobile-oriented traffic moving through the downtown. In addition, they require a field of highly visible and readily accessible parking.
- To date, TIF funds have been used to finance the Streetscape Program, the Facade Rebate Program, property acquisition, infrastructure, and the Interior Remodel Program. However, these tenants will not support a substantial new construction program. Retaining these tenants will require an ongoing effort on the part of the property owners and the Village.

### Office

- Small businesses providing professional service should continue to find downtown to an attractive location. In this setting, however, most will need first floor visibility, easy access, and close, surface parking. In these respects, their market needs are similar to those of various small local retailers and personal service providers.
- The most appropriate locations for office uses are in the retained commercial spaces along Busse Avenue west of Main Street, and in flexible retail/office spaces on the first floor of residential/retail buildings fronting Main Street or Northwest Highway.

## A VISION FOR DOWNTOWN

The most important part of the planning process is first to decide the Village's vision for downtown. Without this step, the area could develop as a collection of buildings and businesses with little or no cohesiveness. It requires that many questions be resolved: What types of activities should be located in the downtown? Should government functions be located downtown? Who should downtown serve? Should downtown be a place to live? The answers to these types of questions really become the Village's collective goals for its downtown. More to the point, they direct the findings and recommendations of this plan.



**Include businesses that go beyond the most basic day to day needs of residents.**

Page 18

## Land Use Priorities

The process of establishing a vision for downtown and this planning effort began in late spring of this year. A Village Board workshop was held on May 31, 1997 to discuss the status of the downtown and establish a direction for its future. The meeting included the Village Board, representatives of various Village commissions, residents, and representatives of the development community. An initial list of the *land use priorities* evolved from a survey conducted during the workshop. The survey results (shown in the Appendix) indicated the desire for a downtown that included a wide range of services, activities, stores, and living opportunities. The results also showed a need for Downtown Mount Prospect to serve residents from all over the Village, downtown employees, and commuters.

The Ad Hoc Committee for Downtown Redevelopment, at their initial meeting, focused this list into a description of favorable downtown businesses. This list (shown in the Appendix) included a range of businesses, but also began to draw a desired picture of downtown. It suggested a need for downtown to include businesses that go beyond the most basic day to day needs of residents (dry cleaners, video rental, etc.), to also include specialty retail businesses (a toy store, hardware store, etc.) and the types of places that encourage residents meeting and visiting with one another at night and on weekends (ice cream store, sit down restaurants, etc.).

## Public Participation

The input of Village residents was incorporated into the process of developing the vision and plan for downtown Mount Prospect. In addition to the May 31st Village Board workshop, a number of other steps were taken to secure public input, both in general and as a reaction to the preliminary and final recommendations of this plan:

- Each of the Ad Hoc Committee meetings was open to the public, and included time for comments by those in attendance.
- An open house was held at Village Hall on October 22 to display draft development concepts, and to hear initial findings of the market study. About 100 downtown property owners, business owners, and Village residents, took the opportunity to visit the display, talk with Ad Hoc Committee members, and ask questions of staff. That input, as well as their written comments, was considered in drafting this plan.
- A computer survey was located downtown over parts of October and November. The survey, which was similar to that conducted at the May 31 workshop, was available to residents and visitors at the Village Hall and Library. The computer

---

**Results of the Downtown Survey (shown in the Appendix) indicated the desire for downtown to include a wide range of services, activities, stores, and living opportunities.**

---

survey was at each of these places for about one week. The results of this survey are found in the appendix.

- A workshop to review a draft of this plan was held by the Ad Hoc Committee on December 6. That meeting was open to the public and allowed residents the opportunity to give the Committee opinions on the plan before its adoption.

## Vision Statement

The community's values and priorities for Downtown are summarized by this Vision Statement for its future:

*Downtown Mount Prospect should be a vibrant social and visual focal point for the community. The downtown should be an active, pedestrian-friendly place, providing opportunities for living, dining, entertainment, shopping and personal services. It should provide areas for hosting community events and be the central location for cultural and civic facilities. It should be a source of pride for both residents and businesses in the community.*



**Downtown should serve as a place for residents to congregate.**

## Plan Objectives

For the purposes of this plan, the intent of the land use priorities and vision statement are best understood through three strategic plan objectives. These very straightforward objectives were used as benchmarks in deliberations over the land use plan. They represent the intent of this strategic plan, and its prescribed future for downtown.

1) Downtown should serve as a place for Village residents to congregate. This includes outdoor dining, community events, formal and informal gathering spaces, and Village Hall and other government facilities.

2) How downtown "feels" to pedestrians should be considered in design of the downtown and its buildings. This means Downtown should be attractive and comfortable for pedestrians to use. Building sizes should be carefully coordinated with their locations. A system of small open spaces should be located downtown, and open spaces should be connected visually and physically, where possible.

3) Downtown should have an attractive character based on architectural guidelines setting the standard for the entire community. The architectural guidelines do not need to set a specific theme but should build upon architectural characteristics of existing downtown buildings. The Clocktower development and the Public Safety building are good examples of this approach.

Downtown should have an attractive character that sets the standard for the entire community.

4) The implementation of the Downtown Streetscape Program should continue.

## STRATEGIC PLANNING ISSUES

Before presenting the land use plan for downtown, it is important to consider the underlying issues relevant to that development plan. Those issues include development phasing, property acquisition, business relocation, pedestrian scale and transportation network, and design guidelines.

### Development Phasing

The plan shows development of the downtown in three phases. Those plans show detailed development objectives and recommendations in Phases I, II, and III. This phased approach to downtown redevelopment serves the Village in a number of ways:

- Identifying a target area for initial development allows the Village to focus available TIF resources for redevelopment needs.
- Beginning the process with a manageable portion of the downtown (rather than the entire area) will help the Village create a development success downtown. A positive start will make future phases and developments more feasible.
- The more complex (and potentially costly) decisions related to downtown redevelopment require more deliberation. Phase I of the plan allows for downtown revitalization to begin in an area with clearer redevelopment potential. As described later, Phases II and III require that certain issues are resolved. In addition, Phase III is flexible to reflect possible changes in market conditions.

### Property Acquisition

Accumulating parcels from multiple property owners for large-scale redevelopment will be among the most difficult aspects of downtown redevelopment. The realities of modern development require larger parcels than are held by most single owners in the downtown. In addition, the process of purchasing these properties typically discourages private sector developers from undertaking a project. Therefore, property acquisition often is conducted by the public sector. The Village of Mount Prospect has played this role in past projects, and will have to take a leadership role to make this plan a reality.

Downtown Strategic Plan
December 23, 1997                                        Page 21

It is the intent of the Village to secure any property through a negotiated sale with the owners. Acquiring property through the Village's right of eminent domain is an option. However, as a matter of established public policy, it is a tactic of last resort. Only in cases where an agreement acceptable to both parties cannot be reached will the Village consider condemnation.

> **It is the intent of the Village to secure any property through a negotiated sale with the owners. Only in cases where an agreement acceptable to both parties cannot be reached will the Village consider condemnation.**

### Business Relocation

Many downtown properties include businesses that have been operated for some time by a single owner. They represent years of hard work and contribution to the community. Beyond purchasing those properties, it is in the best interest of the Village for those businesses that support the plan's objectives and vision statement to remain in the downtown. The challenge here is that those businesses cannot simply wait the year or more that will be needed to develop modern retail space. In addition, the rents typically paid in older structures do not support development. That is, businesses in existing older structures (whether they rent or own) may not be able to afford the cost of new retail space. Therefore, a series of business relocation actions are a part of this strategic plan:

- There is vacant space in existing downtown retail centers. The Village will work with displaced retail and convenience service business owners to find space in those centers.
- Virginia Court retail center located at the southwest corner of Central Road and Wille Street presents a specific opportunity for relocation of business in the Phase I area. It currently stands vacant, sits at a high visibility corner, and could accommodate several of the existing businesses. Unfortunately, this is an older structure that does not reflect the quality or character of recent development in downtown, which has been adopted as a standard for this plan. Any Village effort to relocate businesses to that site would require significant upgrades to the facade and interior of the building.
- The Village will consider contributing to the cost of relocating displaced businesses. The decision of whether to assist with those costs will be made on a case by case basis. This applies to both those retail businesses that would remain downtown, as well as businesses that would relocate outside the downtown.

### Pedestrian Scale and Transportation Network

The notion of creating Transit Oriented Developments (TODs) has received a great deal of attention lately in the development world. A TOD is a mixed-use community within walking distance of a transit stop and core commercial area. TODs mix residential, retail, office, open space and public uses in a walkable environment, making it

convenient for residents and employees to travel by transit, bicycle, foot or car. It is the idea that careful design and development can create a positive relationship between people and the transportation network. A pedestrian friendly environment and major roadways may seem an odd combination in downtown Mount Prospect. In fact, from a TOD perspective, this is clearly a positive situation. In fact, many developments long for the combination of roads, buses, sidewalks, parking lots, and commuter rail that already are essential elements of downtown Mount Prospect. The challenge is to make them work together. To that end, it is the intent of this plan to incorporate the notions of TOD into the development project, so that the downtown may continue to take advantage of its existing pedestrian scale and transportation network.

## Design Guidelines

The design guidelines presented here are intended to reinforce the ongoing redevelopment work of the downtown area and guide the design of specific upcoming development projects. The design guidelines express the character and quality needed to make Mount Prospect a special place to live, work and play.

The redevelopment of the downtown area offers the unusual opportunity and challenge of building a larger scale, mixed use community that is surrounded by a fully developed existing village. The community will grow from land which has a previous development history, and some important visual cues to mark or influence the direction of this new community. This document serves as a guide for the design efforts that will start the building process, and for future projects which will carry the plan to completion. There are three key ideas that have influenced the guidelines. They are architectural style, mid and low building height, and building pedestrian-friendly streets.

### *Architectural Style*

Architectural diversity is strongly encouraged throughout the redevelopment project and should be pursued by using varied building materials and architectural styles. Within this concept, the residential and retail/commercial areas should strive for diversity in design. The intersection corners at either end of Main Street and the Village Hall and Village Green mark areas that shall incorporate common design elements exhibiting unity in scale, building material and color. These areas will be the gathering places for the redevelopment project and will serve as 'gateways' from the surrounding neighborhoods. Projects should display a unified image and create gracious pedestrian environments of walkways, courts, or other gathering places. The gateway and public buildings should be predominantly brick buildings with possibly arcaded bases, and sloping roofs.



**Residential and commercial buildings should be six to eight story height limit, and should be further limited in height where appropriate to be compatible with adjacent neighborhoods.**



Downtown Strategic Plan
December 23, 1997                                    Page 23



The buildings and landscape in the redevelopment area should be complementary to create distinctive, pedestrian-friendly streets.

### Mid or Low Building Height

In general, buildings of no more than 2-1/2 stories in height can meet the projected uses for the low-rise 'row house' neighborhood. Residential and commercial buildings are encouraged to stay at six to eight story height limit, and should be further limited in height where appropriate to be compatible with adjacent neighborhoods. Such a height restriction allows the landscape, rather than the architecture, to create the dominant image for the downtown redevelopment plan. The tree canopy and the street environment currently unify the Mount Prospect community. These buildings will collectively form a backdrop to a larger streetscape with trees. The height restrictions proposed will help unify various building types (i.e. building across from train station can be no more than four to five stories tall).

### Building Pedestrian-Friendly Streets

The streets within the redevelopment area consist of a hierarchy of 'addressing' streets and 'service' streets. Along 'addressing' streets, the siting and orientation of all buildings are encouraged to face the street in a strong, straightforward and welcoming manner, similar to the existing retail on the north side of Busse Avenue. Street orientation of front doors, windows to major work and living spaces, and minimal building setbacks are all suggested to create a friendly and active street environment. The buildings and landscape in the redevelopment area should be complementary to create distinctive, pedestrian-friendly streets.

## Development Guidelines

This plan for downtown Mount Prospect presents not just a program for new buildings, but also a vision of downtown's image. The structures within the downtown (building, infrastructure, open spaces, etc.) will be key in creating its character. Therefore, these sections describe recommendations for downtown streets, open spaces, residential uses, commercial areas, public buildings, and signs.

### Street System Guidelines

The street system guidelines encourage gracious, walkable streets that reflect a commonality of landscape, lighting and pavement design. A commitment to well-designed streetscapes will bring higher property value and will unify the new developments with the existing Village. The guidelines are based on the following objectives:

a.  Streetscapes should be designed to accommodate pedestrians with ample, shaded sidewalks, clearly marked crosswalks and lighting.

000464

b. On-street parking is encouraged on all non-arterial residential and commercial streets.
c. Tree planting, consistent with the Streetscape Program, is encouraged for all streets.
d. Any modifications or restrictions to the traffic pattern should be reviewed for compatibility with the overall development concept.
e. Pedestrian crossings, specifically those across Main Street, should be enhanced through distinctive paving of crosswalks and possible pedestrian islands at Busse Avenue and Main Street.

### Open Space Guidelines

The open spaces proposed for the downtown redevelopment consist of a large community space, referred to as the Village Green, and smaller open spaces found in the commercial and row house developments. The open spaces are linked by the street parkway landscapes. The connectivity of the open spaces will encourage pedestrian activity, increase the value of each area, and insure that the downtown is a highly desirable place to live, work and play. This character would be emphasized through application of the Village's Streetscape Program, and incorporating public art into the downtown area.

### Residential Guidelines

Much of the downtown redevelopment area will be devoted to housing. Residential densities will range from two and one-half story row homes to three floors of housing over retail, to six to eight story residential developments. A mix of condominium, rental and possible senior housing development is encouraged. The guidelines encourage the development of residential areas that reflect the character and density of the specific site area.

### Commercial/Office Guidelines

The character of development in the Village Center is encouraged to build on the history of early Mount Prospect, taking into consideration the single-unit development style of the existing retailers on the north edge of Busse Avenue. The commercial development is encouraged to supplement the ground floor retail with office, residential and other program uses for the remaining floors.

The development of this area should respond to the following objectives:
a. To create a mixed-use development that defines an important commercial center;
b. To integrate suitable existing buildings, where possible, into the development of this area;



Pedestrian crossings, specifically those across Main Street, should be enhanced through distinctive paving of crosswalks.



Buildings along the streets should be encouraged to build to the property line per the Village's Streetscape Program.

000465

**Management and Promotion**

The new stores, residents, and office workers who will accompany redevelopment are critical to revitalizing downtown Mount Prospect. However, to remain competitive over time, issues such as management and promotion of the downtown must be addressed. In this context, downtown is much more than the five blocks in the Strategic Plan study area. It includes the remainder of the triangle area, shops and businesses along Prospect Avenue, and the Central Plaza/Mount Prospect National Bank development at Central Road and Main Street. The Main Street approach developed by the National Trust for Historic Preservation is a proven strategy for creating a marketable identity for the business district. This strategy is based on four key principles:

- Organization
- Promotion
- Design
- Economic Restructuring

> To remain competitive over time, issues such as management and promotion of the downtown must be addressed. In this context, downtown is much more than the five blocks in the Strategic Plan study area.

The Village clearly has an important role in the implementation of this strategy, given the location of Village Hall and the potential tax revenue generated by redevelopment. However, most successful downtowns have an independent organization, comprised of merchants, bankers, chamber of commerce members, concerned citizens and civic leaders. This group, which can be developed with existing downtown organizations, builds partnerships that can create a consistent long-term revitalization effort. This group can sponsor joint promotions and special events, bring in experts on small business management and marketing, coordinate store hours, and generally do all of the things which malls have traditionally done for their tenants. A group called "Do-it-Downtown" has been formed by local downtown merchants for just this purpose.

Activities such as retaining and expanding existing business, recruiting new businesses to provide a balanced mix, converting underutilized space into productive property, and sharpening the competitiveness of downtown's traditional merchants, are all a part of economic restructuring. While Village staff can assist in these efforts through their overall economic development activities, a downtown organization would be able to focus more attention and effort on this important part of the community.

**DEVELOPMENT CONCEPT PLAN**

A development concept has been formed by the Ad Hoc Committee reflecting the vision for downtown and outlining how the Village plans to implement the framework for redevelopment. The land use plans that detail this concept are described in the sections that

follow. The proposed redevelopment of downtown is described by
development phase (See Figure 7). Each of the three phases
includes a description of the proposed development, consideration
of primary development issues, and an outline of design and
development guidelines for that area.

The Concept Plan illustrated on Figure 8 is truly a concept. The Ad
Hoc committee has spent considerable time discussing and refining
the concept as a graphic tool to communicate one way in which
redevelopment could achieve the community's vision for
downtown. In fact, at one meeting, twelve separate concept plans
were discussed and reviewed before reaching a consensus on the
plan contained in this document. However, the committee also
realizes the need to allow developers room for creativity and
flexibility in their redevelopment efforts. It is critical that
redevelopment efforts follow the guidelines noted above regarding
both design and development issues. The Concept Plan portrays
one approach, which follows these guidelines, creating a strong
pedestrian environment with convenient parking located at the side
and rear of buildings, opportunities for public events, and a variety
of housing opportunities. The Committee and the Village realize
that many other physical plans can be developed within the context
of the established guidelines. Developers will be encouraged to
expand on the development concept portrayed in Figure 8 to create a
unique core area for downtown Mount Prospect.

Downtown Strategic Plan
December 23, 1997



FIGURE 7
DEVELOPMENT PHASE PLAN

prepared 12/23/97

000468

Downtown Strategic Plan
December 23, 1997

Page 29



North
0 50 100    200    400

Government (Proposed)
Government (Existing)
Commercial (Proposed)
Commercial (Existing)
Gateway Area
Pedestrian Crossing

Attached Single Family
Residential (Proposed)
Multi-Story Mixed Use (Proposed)
[6-8 stories]
First Floor - Retail/Flexible Space
Above - Residential
Multi-Story Mixed Use (Proposed)
[4-5 stories]
First & 2nd Floors - Retail/Flexible Space
Above - Residential

**FIGURE 8**
**CONCEPT PLAN**

prepared 12/23/97

000469

### Phase I

Phase I would be initiated upon the plan's adoption by the Village Board. The first step would be to send out a formal request for proposals for a developer to redevelop this portion of the downtown.

#### Description

This phase corresponds to the area bounded by Central Road, Main Street, Northwest Highway, and Wille Street (see Figure 8). It includes a mix of residential and retail/commercial uses, and combines redevelopment with preservation and renovation of essential structures. The plan envisions the area as including a multi-story mixed use development, which would complement the condominium development to the west (Shires at Clocktower Place), the retail development to the north (Central Plaza Shopping Center) and the existing 'historic' developments along Busse Avenue.

#### Development Issues

Several issues related to development in the Phase I area required special consideration, and are described below:

##### Size of the Area

This area clearly is larger than a single development parcel. The size of this phase allows a large development parcel to be established at its north end, one that can accommodate a modern mixed use development. It also allows the needs and potentials of the rest of the area (the existing uses on Busse and the triangle shaped parcel on Northwest Highway) to be incorporated into the initial development stage.

##### Northwest Electrical Supply

This business has long been located in downtown. It is a successful operation and an asset to the Village of Mount Prospect. However, a significant component of the operation, warehousing, detracts greatly from the desired pedestrian orientation of downtown. In addition, its sales are geared more toward contractors than consumers, making it a poor match with the established vision of downtown. Finally, the business sits on one of the few sites in downtown large enough to accommodate large-scale redevelopment. Therefore, it is the intention of this plan to relocate the warehousing function of Northwest Electrical to another location in the Village; one that would be appropriate for that activity. If possible, the businesses' showroom would be incorporated into one of the developments or relocation sites in the downtown.

##### Busse Avenue Businesses

The buildings and businesses on the north side of Busse Avenue combine to create an area that enhances the downtown, and supports the vision of this plan. Its pedestrian scale, historic character, and



Busse Ave.

**Phase I**

000470

Downtown Strategic Plan
December 23, 1997                                                    Page 31

unique businesses should be maintained. However, many of the
buildings do not meet building code standards. They will require
significant facade and interior improvements to keep them viable in
the long term. The buildings have been included in this larger
development site so that their improvement can be considered as
part of the larger development, and so that surrounding development
can be designed to protect and support the properties.

> **Businesses on the north side of Busse Avenue create an area that enhances the downtown. Its pedestrian scale, historic character, and unique businesses should be maintained.**

### *Development Details*
The development depicted for Phase I include:

- Four condominium buildings with 160 new residential units.
  The buildings would be six to eight stories high, 72' to 93'. The
  required 280 parking spaces would be located in enclosed
  and/or first level parking areas.

- A common parking court of 100 cars is located in the center of
  the four buildings to accommodate visitors and parking for
  commercial uses.

- 12,500 square feet of existing retail space along Busse Avenue

- 13,500 square feet of commercial space in new two-story
  buildings along Busse Avenue.

- Between 15,500 and 60,000 square feet of new flexible
  commercial/office space on the ground floor of the residential
  buildings. It is anticipated that this space would be clustered
  near gaps in the four buildings in order to keep it close to
  visible and accessible parking.

- Approximately 7,500 square feet of commercial space between
  Northwest Highway and Busse Avenue, with sufficient parking.

### *Tax Increment Financing Analysis*
The development concept for Phase I is supportable given the
current status of the downtown tax increment finance (TIF) district.
TIF funds are assumed to be used for property acquisition, site
clearance, and necessary infrastructure.

### *Development Process*
The process described below represents the steps to be taken by the
Village in bringing about Phase I redevelopment. Although they are
presented in a clear order, they are not necessarily sequential. In
fact, several of the steps could more accurately be described as
overlapping. It is the intent of this plan that Phase I construction
would commence in 1999.

### Action Steps

- Acquire essential parcels of land in Phase I area.
- Prepare RFP to solicit developer interest in the area.
- Select and negotiate with developer to initiate development process.
- Work with downtown landlords to identify space for relocated businesses.

### Phase II

#### Description

Having more people living downtown is important to increasing activity in the area. That issue is addressed in Phase I through development of condominium dwellings. As a way to diversify the type of living options in the downtown, and add to its overall character, this area (the eastern face of Emerson Street between Busse and Central) would be enhanced by the addition of high quality row homes. See Figure 8.

#### Development Issues

Several issues related to development in the Phase II areas required special consideration, and are described below.



Central Rd.

Emerson St.

Busse Ave.

Phase II

#### Bank parking

The largest single use of this block currently is parking for the First Chicago Bank building. The parking serves employees of the bank and tenants of the building. From a redevelopment standpoint, the parking being located in the center of the block makes redevelopment of other parts of the block impractical. To facilitate redevelopment on the block, the parking is recommended to be relocated to another site in the downtown on either a temporary or permanent basis. Several locations have been considered for the temporary placement of the First Chicago Bank parking lot. Options for a permanent parking location are described in Phase III.

#### Existing Residential

The two homes at the corner of Busse and Emerson would need to be removed to accommodate the proposed redevelopment. It is recommended that if a prospective developer or the Village are unable to reach an agreement to purchase the properties, that a right of first refusal is negotiated. This would provide the developer (or Village) with the option to buy the properties when the residents wish to sell.

#### Residential to the East

The impact on adjacent residential properties will be a primary concern of redevelopment on this site. Careful attention should be given to adequately screening the adjacent homes from the site. This

Downtown Strategic Plan
December 23, 1997                                    Page 33

would be best accomplished through a combination of fencing and landscaping.

### Development Details
The development depicted for Phase II includes:

- Eighteen new row homes with alley access from Central Road and Busse Avenue.
- The site currently is zoned B-5 and R-1. Development of the row homes should be done with R-2 (Attached Single Family Residences) as the base-zoning district.
- Buildings should be oriented to the street with garages orientated to the rear.
- Building materials and architectural design should reflect the high quality character and image envisioned for the downtown.
- A small open space to break up the mass of the row home buildings.

### Tax Increment Financing Analysis
The development concept for Phase II is supportable given the status of the downtown tax increment finance (TIF) district. TIF funds are assumed to be used for property acquisition, site clearance, and necessary infrastructure.

### Development Process
The process described below represents steps to be taken by the Village in bringing about Phase II redevelopment.

### Action Steps
- Prepare RFP to solicit interest from residential/town home developers.
- Begin negotiations with property owners to acquire land in Phase II area.
- Select and negotiate with developer to initiate development process.

## Phase III

Phase III redevelopment is anticipated to occur after Phase I is well underway, or perhaps even completed. A primary assumption of this phase is that the Village Hall and Senior Center are redeveloped on the north side of Busse Avenue between Emerson and Main Streets. This determination has yet to be finalized by the Village Board. In fact, part of the logic behind identifying this area as a later phase is to provide the Village an opportunity to make a well considered decision on how to proceed with Village Hall and Senior Center, as well as the other development issues described below. This phase will also accommodate the expansion of the library.

---

*Building materials and architectural design should reflect the high quality character and image envisioned for the downtown.*

---





---

**Phase III**

---

000473

*Description*

This scenario envisions a mix of retail, residential, and public uses on the area bounded by Central Road, Emerson Street, Northwest Highway, and Main Street (See Figure 8). The area would include a parking structure. That parking structure would be designed to serve the Village Hall, Senior Center, Library, First Chicago Bank and bank building employees, and Metra commuters. The parking structure also could be designed to accommodate retail or office uses on the first level, and should be designed expanding upon the library's existing below grade parking lot.

*Development Issues*

Several issues related to development in the Phase III areas required special consideration, and are described below.

*Location of Village Hall*

The current Mount Prospect Village Hall requires extensive rehabilitation work in order to remain a functional facility. The question facing the Village at this time is whether the cost of that rehabilitation is a good investment. Alternatively, a new Village Hall could be constructed. Obviously, that cost would be higher than the cost of rehabilitating the existing building. This plan works under the assumption that the Village Hall will be combined with the Senior Center and moved to the north side of Busse Avenue between Emerson and Main Streets. Village Hall would be designed within a village green, also located at that site. If the Village Hall and Senior Center remain at their current locations, the redevelopment plans for this phase clearly would require amendment.

*Existing Businesses*

This area includes three of the downtown's most active and viable retailers: Fannie May Candy, The Sakura Restaurant, and Central Bakery. In addition, the medical facility located just west of the Senior Center would be relocated to a new site. It is the intent of this plan that these businesses remain in the downtown. The businesses could be relocated into new structures in the downtown.

*Library Expansion*

Expansion of the existing Mount Prospect Library has been considered for several years. The most likely plans show the facility adding a second floor, and would require additional parking. From a land use planning point of view, the upward expansion is not an issue. However, the need for additional parking should be addressed. As the plan shows, those parking needs would be met through joint use of the parking structure.

Downtown Strategic Plan
December 23, 1997                                                    Page 35

*Parking Deck*
The idea of a multiple story parking deck in the downtown presents
both opportunities and challenges. The study area of this plan is
relatively small. When Phase III development takes place, it will
consume most or the entire available surface parking in the
downtown. Clearly, this will generate the need for a parking
structure. While the notion of the deck is rather straightforward, its
use must be shared by a number of users to make it fiscally possible.
Those users may include First Chicago, Library, Metra, and area
business employees.

### Development Details
The development depicted for Phase III includes:

- The anticipated character and style of the buildings and
  infrastructure of Phase III would match that described in Phase
  I.
- Three residential buildings with 120 new residential units. The
  required 180 parking spaces would be located in below grade
  parking. These buildings should be four to five stories high
  (30-65 feet).
- A common parking court located in the center of the buildings,
  visible at grade level from Main Street and Northwest Highway,
  to accommodate visitors and parking for commercial uses.
- Between 15,000 and 45,000 square feet of new flexible
  commercial/office space on the ground floor of the residential
  buildings. It is anticipated that this space would be clustered
  near gaps in the three buildings in order to keep it close to
  visible and accessible parking.
- The library could be expanded to include a second story
  addition of 50,000 square feet.
- A two story Municipal Center of 35,000 square feet would
  include current Village Hall and Senior Center functions.
- A four story parking structure with 425 parking spaces.

### Tax Increment Finance District
Use of TIF funds for this phase depends in large part of when the
work begins. Currently the TIF district will expire within ten years.
It is essential that Phase III take place in the very near future in
order for the Village to effectively use the revenue generated by the
Downtown TIF district. It is anticipated that TIF funds will be
available to support the residential/commercial aspects of this phase.

### Development Process
The development process recommended for Phase III would mirror
that described in Phase I. However, as noted above issues related to
the future location of the Village Hall and Senior Center must first
be addressed.



**The idea of a multiple story parking
deck in the downtown presents both
opportunities and challenges.**

**It is essential that Phase III take place in
the very near future in order for the
Village to effectively use the revenue
generated by the Downtown TIF district.**

**The Downtown Strategic Plan Ad Hoc Committee**

| | |
|---|---|
| Michael Hoffman, Chairman | (Plan Commission Chairman) |
| William Reddy | (Plan Commission Member) |
| Norman Kurtz | (Economic Development Chairman) |
| David Lindgren | (Economic Development Member) |
| Harold Predovich | (BDDRC Chairman) |
| Keith Youngquist | (BDDRC Member) |
| Richard Lohrstorfer | (Village Trustee) |
| Daniel Nocchi | (Village Trustee) |
| Jean Reibel | (Resident) |
| William Tucker | (Resident) |

**Staff**

| | |
|---|---|
| William Cooney, Jr., AICP | Director of Community Development |
| Michael Blue, AICP | Deputy Director of Community Development |
| Daniel Ungerleider, AICP | Planning Coordinator |
| Judy Connolly | Long Range Planner |
| Barbara Swiatek | Planning Division Secretary |
| Brian Caputo, CPA | Director of Finance |

**Clarion Associates, Inc.**

| | |
|---|---|
| Richard Roddewig, MAI, CRE | President |
| Gary Papke, AICP | Sr. Vice President |
| Daniel Gardner | Analyst |







000477

FROM :LAW OFFICE                FAX NO. :312-829-3729          Apr. 01 2008 10:53AM P2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

2008 MAR 31  PM 4:21

CIRCUIT COURT OF COOK
COUNTY, ILLINOIS
CHANCERY DIV.
_____ CLERK
DOROTHY BROWN

| | |
|---|---|
| TOD CURTIS, individually and as beneficiary, FIRST UNITED TRUST COMPANY, as Trustee under Trust No. 10510, and ELTO RESTAURANT CORPORATION, an Illinois Corporation, <br><br> *Plaintiffs,* <br><br> v. <br><br> IRVANA K. WILKS, Village of Mount Prospect Mayor and Local Liquor Control Commissioner, MICHAEL E. JANONIS, Village Manager, WILLIAM COONEY, Village Economic Director, WILLIAM SCHROEDER, Village Building Commissioner, ROBERT ROELS, Village Environmental Health Manager, CHERYL SCHERBAUM, Village Environmental Health Inspector, FRANK KRUPA, Village Environmental Health Inspector, and OZ DEVELOPMENT, LLC, <br><br> *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  NO.  08CH12059 <br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

NOW COME the plaintiffs, TOD CURTIS, individually and as beneficiary, FIRST UNITED TRUST COMPANY, as Trustee under Trust No. 10510, and ELTO RESTAURANT CORPORATION, an Illinois Corporation, by and through their attorneys, KENNETH M. SULLIVAN, RICHARD S. JALOVEC & DANIEL G. AUSTIN, and complain of Defendants as follows:

EXHIBIT
3

## A
### Venue and Jurisdiction

1.  Tod Curtis is the sole stockholder and President of Elto Restaurant Corporation. He is the owner and operator of Ye Olde Town Inn, a restaurant located in Mount Prospect, Illinois. The liquor license for this establishment is held by Elto Restaurant Corporation. The establishment is located at 6-18 W. Busse Road, Mount Prospect, Illinois. The legal title to the property is in a land trust at First United Trust Co., Trust No. 10510. Tod Curtis is the beneficiary of this land trust.

2.  The defendants are the Village of Mount Prospect, an Illinois Municipal Corporation, Irvana K. Wilks, the Village Mayor and Local Liquor Control Commissioner, Michael Janonis, Village Manager, William Schroeder, Building Commissioner, Cheryl Scherbaum, Environmental Health Inspector, Robert Roels, Environmental Health Manger, Frank Krupa, Environmental Health Inspector, and Oz Development, LLC.

3.  Venue is proper since all transactions occurred within in Cook County Illinois.

4.  This Court has jurisdiction over this action because Defendants village officials of the Village of Mount Prospect, a village located in the State of Illinois.

### B
### Facts Common to All Counts

5.  This is an action to curb widespread and continued attempts to turn an ill-advised, if not illegal, condemnation action by the Village of Mount Prospect into a crusade by the Village of Mount Prospect, its Mayor, who is also the Local Liquor Control Commissioner, the Village Manager, and various Village Inspectors to immediately obtain possession of plaintiffs' property and prevent plaintiff, Tod Curtis, from developing his own property. Subsequent to

filing its condemnation action in September 2007, the Village of Mount Prospect recently sought an ex parte petition on March 4, 2008, in Case No. 08MC3001171, pending in the Circuit Court of Cook County for the issuance of an Administrative Search Warrant through the Affidavit of Mount Prospect's Environmental Health Manager. This Administrative Search Warrant was issued on March 4, 2008.

6.     This Affidavit listed areas of alleged violations of the Codes of Mount Prospect, some of which have already been cured by plaintiffs.

7.     The Village has also recently refused to accept or modify plans of development prepared by plaintiffs' architect. Rather than accept or modify said plans the Village has launched an ongoing barrage on plaintiffs' property including more than five (5) inspections of plaintiffs' property in the last thirty (30) days, including an inspection by twelve (12) inspectors on March 5, 2008, which can only be characterized as official misconduct and must immediately cease. Defendants' harassment of plaintiffs can only serve one purpose, that being to lower the value of plaintiffs' property for purposes of the pending condemnation proceeding.

**Parties**

8.  Plaintiff, Tod Curtis, is the owner of record of the property commonly known as 6-18 West Busse in Mount Prospect, Illinois.

9.  Plaintiff, Elto Restaurant Corporation, is the current operator of Ye Olde Town Inn in Mount Prospect, Illinois. Plaintiff Elto Restaurant Corporation is also the holder of the liquor license at Ye Olde Town Inn. Plaintiff, Tod Curtis, is the sole stockholder of Elto Restaurant Corporation and the President of said corporation.

10. Village of Mount Prospect is an Illinois Municipal Corporation.

11. Defendant, Irvana K. Wilks, is the Mayor of the Village of Mount Prospect.

12. Defendant Michael Janonis is the Village Manager of the Village of Mount Prospect.

13. Defendant William Schroeder is the Building Commissioner of the Village of Mount Prospect.

14. Defendants Cheryl Scherbaum, Robert Roels, and Frank Krupa are Inspectors for the Village.

15. Defendant, Oz Development, LLC, is an Illinois limited liability company, and the owner of certain property located at 2 West Busse Road in Mount Prospect, Illinois, which adjoins plaintiffs' property.

### Facts Common to All Counts

16. Since 2005, the Village of Mount Prospect, through its multiple departments has uncharacteristically utilized the efforts of multiple departments of the Village and its staff to conduct repeated inspections of plaintiffs' properties.

17. In March 2007, the Village of Mount Prospect's Building Commissioner, William Schroeder, allegedly observed that the floor of the subject property was no longer stable Thereafter the Village conducted multiple inspections to determine the cause of the floor problem, its seriousness and the effect on the subject property.

18. In April 2007, the Village of Mount Prospect's Environmental Health Inspectors inspected the subject property and purportedly found problems with the exterior of the building, including loose wood, loose conduit and missing mortar in the building's chimney.

19. In May 2007, the Village inspected the property for alleged maintenance issues of the exterior of the building as well as alleged licensing issues relating to the property's residential dwellings.

20. Any and all maintenance issues dating back to last spring related to the exterior of the subject property have been remedied.

FROM :LAW OFFICE                    FAX NO. :312-829-3729            Apr. 01 2008 10:56AM  P6

21. In September 2007, the Village filed a condemnation action against Tod Curtis, the owner of the subject property.

22. In early 2008, the Village's Community Development Department conducted multiple inspections at the subject property to observe both the exterior and interior condition of the property.

23. Specifically, on January 15, 2008, the Environmental Health Manager alleged that soffit and fascia problems existed, cedar shingle roof problems existed, brick foundation problems were present and that extension cords were improperly used on the exterior of the building.

24. On January 21, 2008, Inspector Scherbaum declared the exterior rear stairway "unsafe" and demanded that same be repaired on or about January 28, 2008. A contractor has been contacted and is applying for building permits.

25. On January 28, 2008, the Village's Environmental Health Manager again inspected the subject property's exterior including alleged loose wood, loose conduit and purported mortar issues.

26. In 2007 and 2008, Fire Prevention Officers of the Village of Mount Prospect at the request of the Village inspected the property at issue for Fire Code violations.

27. In 2007 and 2008, the Village's Health Inspector inspected the subject property unannounced on multiple occasions. Specifically on January 18, 2008, Frank Krupa, Village Health Inspector, conducted an inspection of the property and prepared a Retail Food Sanitary Inspection Report noting twenty-six (26) alleged violations.

28. On January 27, 2008, the Village attempted to conduct an "electrical Hazard Inspection."

29. Any resulting electrical hazard issues have been remedied by plaintiffs.

30. On February 13, 2008, the Village cited subject property for falling shingles from the roof and demanded that said condition be remedied in six (6) hours or else the property would be immediately condemned.

31. On February 13, 2008, plaintiffs immediately remedied the falling shingles by removing all shingles within the time period specified by the Village.

32. Since March 1, 2008, the Village of Mount Prospect has conducted numerous inspections and reinspections (some with up to 12 members of the Village staff) in search of Code violations on the subject property.

33. These inspections, reinspections and promises of further inspection have resulted in plaintiffs immediately engaging general electrical and plumbing contractors to immediately remedy the alleged Code issues.

34. On March 4, 2008, the ongoing harassing conduct took a new twist. On March 4, 2008, the village petitioned the Circuit Court of Cook County for an Administrative Search Warrant including a 9 page Petition. This warrant was sought ex parte and supported by the Affidavit of Robert Roels, Environmental Health Manager of the Village of Mount Prospect. Roels' Affidavit set forth for the Circuit Court of Cook County alleged "potential" Code violations going back to 2007, most of which had already been remedied by plaintiffs.

35. On March 4, 2008, based on Roel's representations under oath, the Circuit Court of Cook County granted the Village's Petition and on March 5, 2008, the village conducted further exterior and interior inspections of the subject property for hours on end, with a dozen persons storming the property.

FROM :LAW OFFICE                    FAX NO. :312-829-3729              Apr. 01 2008 10:58AM P8

36. These inspections, involving over a dozen inspectors, resulted in dozens of alleged violations, formal reports from the Village, and numerous color photos shared with plaintiffs, of the alleged violations.

37. Plaintiffs have filed a Motion to Quash the results of the Village's March inspections, which alleged violations are being used to support the liquor violation hearing now set for April 3, 2008, by the Mayor, who is also the local Liquor Control Commissioner.

38. Plaintiffs' Motion to Quash is currently pending before the Circuit Court of Cook County.

### Plaintiffs' Development of Subject Property

39. The plaintiffs made a decision to develop the subject property well before the village filed any condemnation action. In so doing, plaintiffs engaged architectural and engineering firms to develop said plans. Plaintiffs' plans included the complete renovation of the subject property and creation of Gateway Center. Plaintiffs also engaged an architect.

40. Subsequent to engaging their architect and engineer, plaintiffs submitted informal plans to the Village of Mount Prospect's Building Department.

41. Thereafter, plaintiffs' initial building plans were redrawn, supplemented and tendered to the Village of Mount Prospect as a formal development proposal containing architectural, engineering and landscape architectural plans.

42. Plaintiffs tendered their formal building plans to the Village of Mount Prospect's Building Department on March 5, 2008.

43. Since said date, the Village of Mount Prospect has created a hostile environment that makes it impossible to consider, approve, revise and conduct requested meetings with plaintiffs regarding the formal plans submitted to the Village concerning the subject property.

44. Plaintiffs are currently in the process of engaging a developer to implement the plans developed by plaintiffs' architect. Recently, Richard S. Jalovec, one of plaintiffs' attorneys, was informed by the Village Attorney of Mount Prospect that under no circumstance would the Village approve plaintiffs' redevelopment plans.

### Liquor Violation Hearing

45. On March 21, 2008, the Village, once again, changed course and attacked the plaintiffs and the subject property from yet another direction. On said date, the Local Liquor Control Commissioner, defendant, Irvana K. Wilks (who is also the Mayor of Mount Prospect), reinstituted formal proceedings against plaintiff, Elto Restaurant Corporation to revoke its liquor license, the lifeline of the subject business. This is the same person who as the Mayor, authorized the filing of the condemnation action and is also the Local Liquor Control commissioner who will conduct the license hearing. The basis of the liquor violation hearing are the alleged Building Code violations found during the many inspections of plaintiffs' property in 2007 and 2008.

46. On March 25, 2008, plaintiffs filed a Motion for Change of Venue before the Local Liquor Control Commission. The grounds of said motion including the undeniable direct conflict of defendant, Irvana K. Wilks, as a result of her being both the prosecuting entity of the condemnation action and the finder of fact with respect to the Local Liquor Control Commission proceedings initiated by the Village.

47. Plaintiffs' Motion for Change of Venue is currently pending before the Local Liquor Control Commissioner.

48. Recently, at 9:00 p.m. on March 21, 2008, Good Friday, the Village of Mount Prospect attempted to perform another unannounced inspection of the subject property.

49. The defendants again attempted to conduct an inspection on March 25, 2008.

50. Subsequent to this inspection, plaintiffs were informed by agents of the Village that the village would shortly initiate proceedings to revoke plaintiffs' business license. Plaintiffs were also informed by agents of the Village that no matter what remedial measures are performed by plaintiffs to the subject property, plaintiffs will never pass any prior or future inspection by the Village of the subject property.

## COUNT ONE—EQUAL PROTECTION

In and for Count One of this Complaint, Plaintiffs complain of the Defendants, as follows:

51. Plaintiffs restate and re-allege paragraphs 1 through 51 inclusive, as paragraph 52 of this Count One.

52. The Mount Prospect Village Code, as amended, requires that Plaintiffs as business owners run their business and maintain their property according to the Village Code.

53. The Defendants for purposes of Equal Protection are required to uniformly enforce the regulations of the Village Code.

54. The Defendants, when enforcing the Village Code, have wholly failed to do so in that the Village Code is being selectively enforced and the Plaintiffs are not being treated as similarly situated business owners.

55. More specifically, and as incorporated by reference and described in detail above, Plaintiffs are made subject to repeated inspections during the thirty (30) day response period Moreover, even though the Village Manager/Community Director is fully aware through its attorneys as to the repair status of any alleged violation, reinspections are occurring for the sole purpose of harassment and diminution in value of the subject property for condemnation purposes

56. There is in fact no rational basis for the selective enforcement being utilized by the defendants herein.

57. The direct, proximate and predictable result of the selective enforcement of the Village Code, as amended, is that the value of Plaintiffs property will be diminished by the repetitive issuance of alleged Code violations for condemnation purposes.

58. By reason of the above and foregoing, the Defendants deny Plaintiffs equal protection of the law as guaranteed by the Illinois Constitution and the Constitution of the United States.

**WHEREFORE,** Plaintiffs pray that this Court enter judgment on their behalf and against the Defendants, as follows:

A.    Make a binding declaration that defendants' enforcement of the Village Code, as amended and as applied, violates the equal protection provisions of the Illinois Constitution and the Constitution of the United States;

B.    Preliminarily and permanently enjoin the Defendants from selective enforcement of the Village Code, as amended, as it relates to Plaintiff versus other business owers; and,

C.    Grant Plaintiffs such other relief, as this Court deems just and equitable.

## COUNT TWO—INVERSE CONDEMNATION AND DUE PROCESS

In and for Count Two of this Complaint, Plaintiffs complain of the Defendants, as follows:

59. Plaintiffs restate and re-allege paragraphs 1 through 58, inclusive, as paragraph 59 of this Count Two.

60. Plaintiff owns the Property on which it conducts business for which it holds both a valid business and liquor license, the "Licensed Premises."

61. The Licensed Premises is improved with a building, the first floor of which is improved and outfitted for the single purpose of serving food and selling alcohol for consumption thereon. Accordingly, the highest and best use of the Licensed Premises is for its licensed use as restaurant and pub.

62. The Licensed Premises has a market value based upon its highest and best use as aforesaid.

63. Factors in determining the highest and best use of the Licensed Premises and their market value include, but are not limited to, the zoning classification and licensing of each.

64. With the selective enforcement of the Village Code, the Defendants have effected a damaging of Plaintiffs' Property in that the market value has been and continues to depreciate.

65. While the Village of Mount Prospect has initiated eminent domain proceedings, it has chosen a course that attempts to significantly discount any potential resulting price adjudicated in such condemnation action by the repetitive and malicious manufacture of alleged Village Code violations pertaining to the Licensed Premises.

66. The actions of the Defendants, in effect, reduce or freeze the market value of Plaintiffs' Property in anticipation of the Village of Mount Prospect's purchasing of the Licensed Premises, using its power or the threat of its power of eminent domain in an illegal and unlawful manner.

67. The Defendants' actions, as set forth above, violate Plaintiffs' constitutional protected rights to due process and the payment of just compensation upon the taking and/or damaging of their property by the City.

WHEREFORE, Plaintiffs pray that this Court enter judgment on their behalf and against the Defendants, as follows:

A.    Make a binding declaration that Defendants selective enforcement of the Village Code, violates the due process and eminent domain provisions of the Illinois Constitution and the Constitution of the United States;

B.    Preliminarily and permanently enjoin the Defendants from selectively enforcing the provisions of the Village Code, as amended, as it relates to Plaintiff's Property; and

C.    Grant Plaintiffs such other relief, as this Court deems just and equitable.

## COUNT THREE—1983 ACTION

In and for Count Three of this Complaint, Plaintiffs complain of the Defendants, as follows:

68. Plaintiffs restate and re-allege paragraphs 1 through 67, inclusive, as paragraph 68 of this Count Three.

69. The Defendants, being the Mayor, and Village Officials, are "persons" as defined under 42 U.S.C. Section 1983.

70. Defendants, acting under "color of law" as defined under 42 U.S.C. Section 1983, through their actions, continue to wrongfully enforce the provisions of the Village Code against Plaintiffs.

71. Defendants actions as incorporated by reference herein and described above, amount to "official misconduct" and thereby criminal acts as defined under Section 5/33-3 of the Illinois Criminal Code, 720 ILCS 5/33-3.

72. Reasonable public officials should have known that their personal actions and course of conduct as described above violated Plaintiffs' constitutional rights.

73. Such actions, as set forth in detail above and incorporated into this count three by reference, are violations of the Plaintiffs' constitutional rights to due process of law, just

compensation for the taking and damaging of private property, and equal protection of the laws as guaranteed by the Constitution of the United States.

74. Defendants' actions were and are taken with reckless indifference to the constitutionally protected rights of Plaintiffs, as aforesaid.

75. Defendants' actions were and are objectively unreasonable in light of the facts and circumstances at the time.

76. As a direct and proximate result of Defendants' violations of Plaintiffs' constitutional rights, as aforesaid, Plaintiffs are being damaged and suffering loss of income and face the imminent threat of losing their livelihood and real property.

77. Defendants' actions were and are malicious and recklessly indifferent to plaintiffs' constitutional rights.

**WHEREFORE,** Plaintiffs pray that judgment be entered in their favor individually and against Defendants jointly and severally in an amount in excess of $50,000.00 as and for compensatory damages, the costs of this suit, their attorney fees pursuant to 42 U.S.C. Section 1988 and such other relief as this Court deems just and proper. In addition, Plaintiffs pray that punitive damages be entered in their favor and against the individually named Defendants in their individual capacities, jointly and severally.

## COUNT FOUR—CIVIL RICO

In and for Count Four of this Complaint, Plaintiffs complain of the Defendants, as follows:

78. Plaintiffs restate and re-allege paragraphs 1 through 77, inclusive, as paragraph 78 of this Count Four.

79. The Village of Mount Prospect is an enterprise as that term is used under 18 U.S.C. 1961(4).

80. Defendants Michael Janonis, Mount Prospect Village Manager, William Cooney Mount Prospect Village Economic Director, Mount Prospect Village Inspector Roels, and Oz Development Group and unnamed others are persons and participants as these terms are used under section 18 U.S.C. 1961(3).

81. These defendants have participated in the conduct of the Village of Mount Prospect.

82. Defendants have committed more than two acts of racketeering activity within the last ten years and therefore have engaged in a pattern of racketeering activity as that term is defined in 18 U.S.C. 1961(5).

83. Beginning in 2006, Defendant Building Commissioner approved the permits for Defendant Oztekin.

84. The defendants have engaged in racketeering activity and in furtherance of their intent to deprive plaintiffs of their constitutionally protected property rights.

85. The aforementioned racketeering activity of defendants is ongoing and by its nature projects into the future with a threat of repetition.

86. Through defendants control of the Village of Mount Prospect defendants effect interstate commerce in violation of 18 U.S.C. 1962(c).

87. Plaintiffs have been damaged and continue to be damaged as a proximate result of defendants acts of racketeering because among other things, plaintiff is blocked from developing and utilizing his property.

FROM : LAW OFFICE                    FAX NO. :312-829-3729          Apr. 01 2008 11:09AM P16

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor individually and against Defendants jointly and severally in an amount in excess $3,000,000.00, treble damages, attorneys' fees, and such other relief as to the Court appears just and proper.

Respectfully submitted,

_____
One of Plaintiffs' Attorneys

Kenneth M. Sullivan
Kenneth M. Sullivan & Associates, LLC
30 North LaSalle Street
Suite 2900
Chicago, Illinois  60602
(312) 499-3797
Attorney No.

Richard S. Jalovec
Daniel G. Austin
1021 W. Adams Street
Suite 102
Chicago, Illinois  60607
(312) 829-2300
Attorney Nos. 91143, 39769

FROM :LAW OFFICE          FAX NO. :312-829-3729          Apr. 01 2008 04:27PM P2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
MUNICIPAL DEPARTMENT, THIRD MUNICIPAL DISTRICT

In the Matter of the                                    )
Administrative Search of:                               )
                                                        )
The Premises, including all interior and                )    NO. 08 MC3 001171
Exterior areas located at 6-18 (6, 8, 10,               )
12, 14, 16, 18) W. Busse Avenue,                        )
Mount Prospect, Illinois.                               )

**MOTION TO SUPPRESS ALL EVIDENCE OBTAINED AS
A RESULT OF AN ADMINISTRATIVE SEARCH WARRANT
ISSUED ON MARCH 4, 2008, AND TO QUASH THE WARRANT**

NOW COMES the defendant, TOD CURTIS, owner of the above premises, by

and through his attorneys, RICHARD S. JALOVEC, DANIEL G. AUSTIN and

KENNETH M. SULLIVAN, and moves this Honorable Court to suppress all evidence

obtained as a result of an Administrative Search Warrant issued on March 4, 2008, and to

quash the warrant. In support of this motion, defendant states as follows:

**Background**

1. The Village of Mount Prospect and the defendant have engaged in

negotiations on various alleged Building Code violations for several years prior to the

date of March 4, 2008.

2. The defendant has repaired a number of the alleged code violations, and

retained construction experts to either review and offer recommendations on other

alleged violations, or repair the same expeditiously.

3. Due to the long history of the aforesaid negations, there was no reason for the

Village to apply ex parte for the Administrative Search Warrant on March 4, 2008. The

defendant's general counsel, Richard Valentino, met and spoke regularly with Village

officials and inspectors during the past year regarding this entire matter and the alleged

code violations.

1

EXHIBIT

4

FROM :LAW OFFICE                    FAX NO. :312-829-3729          Apr. 01 2008 04:27PM  P3

4.   The Village, as it mentioned in its petition, conducted inspections on March 22, 2007, April 30, 2007, January 15, 2008, and January 28, 2008, among other dates. Because of the ongoing conversations with Richard Valentino, and the repeated inspections, there was no reason to petition this Court for an ex parte Administrative Search Warrant on March 4, 2008.

5.   In the affidavit of Robert Roels, attached to the Petition for Administrative Search Warrant, Mr. Roels admits that he inspected the property on March 22, 2007, April 30, 2007, and in early 2008.

6.   He admits that health inspectors have been permitted to inspect the restaurant, but only upon giving prior notice to the property owner.   Many of the items addressed by the health inspector have already been corrected, and a plan is in effect to remedy the other items.

7.   The affidavit states "...I believe that additional code violations exist on the Subject Property." And it speaks of "...potential code violations..." Petitioner submits that such belief of potential code violations is not sufficient to justify the issuance of an Administrative Search Warrant, which is a drastic action.  There is no "probable cause" when the basis is "potential" violations.

8.   Attached hereto is the affidavit of Paul Rozycki regarding the corrections and addressing the various alleged code violations. ⟨ EX, A.⟩

9.   The Village has filed an eminent domain action in the Circuit Court of Cook County on September 7, 2007, as Case No. 07 L 050940 to condemn defendant's property under its eminent domain power.

FROM :LAW OFFICE            FAX NO. :312-829-3729       Apr. 01 2008 04:27PM  P4

10. The actions of the Village and its inspectors are directly related to this eminent domain action, as they are seeking to reduce the value of defendant's property in this condemnation action by finding any alleged possible violations of the Village Code.

11. Further, the Village has utilized the various alleged Building and Health Code violations to seek to revoke or suspend defendant's liquor license by scheduling a hearing for April 3, 2008, based in part upon a number of the alleged violations found on an inspection held on March 5, 2008, held pursuant to the Administrative Search Warrant.

12. There was no reason for the Village to seek an Administrative Search Warrant in this matter, except to accelerate a proposed plan of development which the Village has approved, which includes defendant's building and property, by seeking to suspend or revoke defendant's liquor license based upon alleged code violations.

13. Further, the search conducted pursuant to the Administrative Search Warrant on March 5, 2008, was conducted by twelve (12) persons, who stormed the premises utilizing Gestapo-like tactics in their zeal to find any possible violations, which would form the basis to suspend or revoke defendant's liquor license. (See copies of business cards attached hereto as Ex. "B" of all persons who were present during said inspection.)

WHEREFORE, for the foregoing reasons, defendant respectfully requests that his Motion be allowed and all evidence be suppressed.

Respectfully submitted,

TOD CURTIS

by Richard S. Jalovec,
one of his attorneys

Richard S. Jalovec
1021 W. Adams Street
Suite 102
Chicago, Illinois 60607
312-829-2300
Attorney No. 91143

3

AFFIDAVIT OF PAUL F. ROZYCKI IN RESPONSE TO LIQUOR
COMMISSION CHARGES AGAINST ELTO RESTAURANT
CORP. d/b/a YE OLDE TOWN INN, Class B Liquor Lic. No. 2780.

I, Paul F. Rozycki, on oath state the following:

I am been an employee of the property owner at 6-18 W. Busse Ave., Mt.
Prospect, Il. 60056.

I have been an employee for over 10 years continuously.

My duties include assisting the owner in building maintenance, repairs and
Village inspections. In the course of my duties I have become familiar with all
aspects of the exterior and interior of the entire property.

I have the following  responses to report with regards to the pending Notice of
Charges Before the Local Liquor control Commissioner dated March 20, 2008
alleging that this License has filed to comply with the regulations of the Village
Code, including but not limited to, those relating to the storage of food, sanitary
conditions and safety conditions, as follows:

a.   On or about January 15, 2008, to wit:

   i.   2000 International Property Maintenance Code ("PM Code")
        section 303.2, 303.6, 303.7, 303.8, 303.13: exterior of building in
        despair.

   ii.  PM Code 303.7: exterior of building in despair- shingle fell onto
        public sidewalk on January 28, 2008;

        Answer: All loose or fallen shingles referred to were
        immediately removed from the public sidewalk and all loose
        shingles were removed.

   iii. PM Code section 303.5 crumbling brick at foundation of west
        and north walls;

        Answer: It appears to be only the exterior face of the
        common brick that exhibits weathering. It is a wall that was
        originally constructed and paid for by the Village with
        contractor's selected by the Village as a result of a previous
        Village action. A contractor was contracted to correct the
        problem, but I was told by the contractor that it that it was not an
        urgent problem, and that it was probably the Village's
        responsibility to repair it if repair was necessary.

1

iv.   PM Code section 303.4 Collapsing fiberglass panels indicating structural failure in northwest corner of roof;

    Answer: The panels in question is in a place up n the roof where it is no immediate danger to anyone. A contractor has been contracted to correct and repair if necessary.

v.   Village Code section 14.1905: outside storage of restaurant equipment not permitted (freezers, walk-ins, and refrigerators);

    Answer: The outside freezers in question were not used for the Restaurant. The are now all empty and no longer in use and have been disconnected. They will be removed as soon as possible.

vi.   Village Code section 23.1401.B: garbage containers on Village right of way;

    Answer: There has been a lot of snow this winter. When the Village plows the alleyway adjoining our parking lot, it blocks the garbage removal company from having access to the Garbage containers for removal of garbage. The garbage containers are in an area that allows for convenient access for garbage removal during the winter. The garbage containers were not knowingly left on Village right of way, and they are not blocking foot or vehicle traffic in any way. They are on rollers and they can be moved so that they are no longer in the Village right of way as soon as weather permits.

vii.   PM Code section 605.1: deteriorated conduit and connection at point of service drop;

    Answer: The conduit in question shows sign of wear but it is functional and safe. A contractor has been contracted to correct and repair if necessary.

viii.   PM Code section 604.3: use of extension cords on exterior of building, so as to replace permanent electrical wiring;

    Answer: All identified exterior extension cords have been disconnected. There are various cords that are on the roof to keep ice from accumulating. If necessary, they will he removed as soon as weather permits.

ix.   PM Code section 605.1: abandoned conduit and light fixtures on south side of building;

FROM :LAW OFFICE                    FAX NO. :312-829-3729          Apr. 01 2008 04:28PM P7

Answer: This is nothing more than an old nonfunctional light fixture. A contractor has been contracted to correct and repair or remove if necessary.

x.    PM Code section 303.11: chimney deteriorating;

Answer: There is evidence of some wear and tuck pointing that may be required. A contractor has been contracted to correct and repair if necessary.

xi.    PM Code section 302.3: parking lot, driveway, and concrete walks and docks in despair;

Answer: There is ordinary wear and tear but there are no serious potholes. A contractor has been contracted to correct and repair if necessary.

See Notice of Violation attached hereto and incorporated herein as Exhibit 1.

b.  On or about January 17, 2008, and continuing to the present:

i.    Fire Prevention Code of the Village Code (the "Fire Prevention Code"): section 304.2: kitchen floor is collapsing in the area of walk-in and the sub-flooring is black with rot and water damage;

Answer: The kitchen floor was damaged as a result of a flooding that was caused by a previous inspection by a Village Fire inspector who "accidentally" broke a sprinkler nozzle in the kitchen during a previous Village fire inspection. It will be expensive to repair the floor because to do it properly it would require putting in a new floor for the entire kitchen, but the actual damage is isolated to a small area of about 3ft. by 3 ft. and it does not appear to be an immediate danger.

ii.    Fire Prevention Code section 304.2: sub-flooring is black with rot and water damage in basement on northwest side, outside of storerooms;

Answer: The sub flooring may need to be replaced. A contractor has been contracted to correct and repair if necessary

See Notice of Violation attached thereto and incorporated herein as Exhibit 2.

c.  On or about January 22, 2008, and continuing to the present, to wit:

3

i.  Fire Prevention Code section 24.202.F: sprinkler system flow switches and tamper switches are not monitored;

Answer: We recently installed a new radio transmitter alarm system in 2007 with Arlington Security Systems. Our alarms are monitored by an outside company, Infinity Monitoring. Documentation from our new sprinkler system and tamper switches were provided to the Village when requested. The documentation was rejected. We then made requests upon our sprinkler system provider, Arlington Security Systems, to provide the necessary documentation to the Fire Department. I was then told that the Village was unable to monitor our system because they were not set up to monitor our new system, and we were told that we would have to remove our new system and replace it with the older, telephone line system.

ii.  Fire Prevention Code section 24.201.B: documentation of the automatic sprinkler system certification was not provided to the Fire Department;

Answer: Documentation from our sprinkler system was provided when requested. The documentation was rejected. I have made requests upon our sprinkler system provider, K& S Sprinkler Systems to provide the necessary documentation to the Fire Department as requested. The documentation was once again submitted to the Village.

iii.  International Fire Code (the "IFC") section 605.1: electrical hazards exists in the basement as an electrical box is badly rusted;

Answer: This box was cleaned up and painted. An electrician has been contracted to make the necessary evaluation and repairs to all of our electrical systems, to correct and repair if necessary.

iv.  IFC section 605.5, per Code: extension cords are present in multiple locations as substitute for permanent wiring;

Answer: Most, if not all illegal extension cords have been removed, and if they have not been removed, they will be removed as soon as they are identified. Some may still be up on the roof that were used for heating the roof so that ice would not accumulate, but they are now disconnected and will be removed as soon as weather permits. All extension cords used for permanent wiring have been removed.

4

v.    Fire Prevention Code section 24.106: an internally illuminated exists sign is not provided in the basement;

Answer: An electrician has been contacted to install illuminated signs, but the basement is old and small and has two exits, one in the rear and one in the front. The Exit signs existing had been found to be acceptable in the past. Putting in additional Exit signs is impracticable because the ceilings are low, and it would create a greater hazard by obstructing the walkthrough areas.

vi.   Fire Prevention Code section 24.202.O. Hydraulic calculations for the new backflow prevention device were not provide to the Fire Department;

Answer: The system is in good working order. I contacted our sprinkler system, K&S Sprinkler System and requested that they provide the hydraulic calculations to the Village as was requested. K&S informed me that the requested documentation was not necessary and they it was not something that they routinely provided. The owner is unaware of what the Village is requesting, or why, but is not unwilling to comply if it is necessary.

vii.  Fire Prevention Code section 24.105.A: fire extinguisher was not installed behind the bar;

Answer: It was properly mounted installed on the same day of the inspection and remains properly installed.

viii. Fire Prevention Code section 24.204.A: radio transmitted fire alarm is present.

Answer: A radio-transmitted fire alarm is present and in good working order. The Village has requested that a different kind be installed, and although it will be unduly burdensome to require it of the owner, efforts have been made to install a new system that conforms to the Village's specifications. A request for exception was made to the Fire Chief through our attorney. (See Fax attached.)

See Notice of Violation attached hereto and incorporated herein as Exhibit 3.

d.  On or about March 6, 2008, the following unsafe and hazardous conditions[1] were found at the licensed establishment:

i.    PM Code section 303.4: cracked and water damaged floor joist in basement under bar area; deteriorated and water damaged floor sheathing in the basement under bar area; deteriorated and uneven floor in kitchen area; deteriorated and structural failure of floor area of kitchen floor;

Answer: A contractor has been contracted to correct and repair as needed.

ii.   PM Code section 303.10: deteriorated rear stairway, porch and deck;

Answer: A contractor has been contracted to correct and repair as needed.

iii.  PM Code section 303.7, 303.9, and 304.2:  Collapse of soffit, roof section and fiberglass panel;

Answer: A contractor has been contracted to correct and repair if necessary.

iv.   PM Code section 604.3: electrical hazards- rusted disconnect box with knock out fillers missing and door does not close properly; circuit breaker with foreign breaker, double mini-breakers and doubled up 15 amp breaker; double tapped main lugs of circuit breaker; feeder conductors with incorrect colors and not marked; rust on most circuit panels, junction boxes, conduit and armor cables; improperly supported conduits and excess number of bends; stock and debris in front of all electrical meters, panels and disconnects; emergency light wired with a cord and plug ; improper colors on ungrounded conductors at two disconnect switches; panel (A4) has downsized neutral and foreign breakers; panel (A3) has downsized neutral, 4 mini breakers and foreign breakers, panel (A2) has 7 mini breakers and the interior of panel was replaced in violation of UL rating; disconnects switches mounted on floor known to take on water; sump pump plugged into triple tap; conductors replaced at 400 amp 1 phase main disconnect switch and not properly marked; 400 amp 3 phase main disconnect has undersized service ground; secured; exist sign glass broken; various open junction boxes;

6

transformer tapped into a fluorescent fixture; extension cord to connect sump pump; florescent fixture with open writing compartment; undersized jumper wire for water meter; exterior outlets in kitchen not GFCI protected or have protective bubble covers; outlets in the kitchen not GFCI protected; reverse polarity at outlet to let of triple basin sink; knockout filler missing in switch box to right of mixer; circuit breaker panel does not have proper clearance; improper use of extension cords and in non-weather tight connection (See also PM section 605.1, installation); improper splice/repair of extension cord/wiring; loose electrical outlet and conduit.

Answer: An electrician has been contracted to make the necessary evaluation and repairs to all of our electrical systems, to correct and repair if necessary.

v.    PM Code section 108.1.1: unsafe structure: kitchen floor, joists and sub floor under bar area; rear staircase, and second floor west porch roof and soffit;

Answer: See above. A contractor has been contracted and steps are being taken to correct and repair if necessary

vi.    PM Code section 108.1.2: improper use of numerous extension cords, some being frayed or spliced, electrical boxes with splices and without proper connectors, double lugged wire taps in boxes, electrical panels with foreign breakers and contrary to UL rating for safe use and operation;

Answer: Most, if not all illegal extension cords have been removed, and if they have not been removed, they will be removed as soon as they are identified. An electrician has been contracted to make the necessary evaluations, and to repairs any and all items of our electrical systems that are in need of repair.

vii.    Food Code section 750.100: Health inspection critical item #1: spoiled food and found improperly kept;

Answer:  All spoiled or expired food has been removed.

viii.    Food Code section 750.140: Health inspection critical item #3: food improperly cooled and kept beyond storage date.

Answer: All old food has been removed as requested.

vii.   Food Code section 750.100: Health inspection critical item #1: spoiled food and found improperly kept;

Answer: All spoiled or expired food has been removed.

viii.  Food Code section 750.140: Health inspection critical item #3: food improperly cooled and kept beyond storage date.

Answer: All old food has been removed as requested.

ix.    Food Code 750.1300, 1310: Health inspection critical item #41: improperly labeled chemicals, and known and unknown toxic chemicals above bar sink in bar area;

Answer: All chemicals above the bar and sink area have either been properly labeled or removed.

x.     Food Code section 750.1060: Health inspection critical item #30: discharge pipes below flood level of open site drain in bar area, which permits cross contamination permitting sewage to backflow into bar sinks.

Answer: This has been evaluated for repair by a plumber and to correct and repair if necessary.

xi.    Food code section 750.830: Health inspection critical item #20: dishwasher has improper final rinse temperature.

Answer: I have had our dishwasher maintenance company, Rescor, come out to inspect the dishwasher on two separate occasions in the last year. The most recent one was in January of 2008. They checked for rinse water temperature and reported that it was functioning at the proper temperature.

The affiant makes these statements based upon his own personal knowledge and if called on to testify as a witness, can testify competently on the matters and facts set forth herein..

*Paul F. Rozycki*

Paul F. Rozycki

Signed and sworn to before me this

31 day of March , 2008        *Laura A. Dunning*

"OFFICIAL SEAL"
LAURA A. DUNNING
Notary Public, State of Illinois
My Commission Expires 03/18/10

E.X.A

FROM :LAW OFFICE                FAX NO. :312-829-3729        Apr. 01 2008 04:30PM P13

**J. David Strahl**
Assistant Village Manager

Phone: 847.392.600
Fax: 847.392.60
TDD: 847.392.6064
E-mail: dstrahl@mountprospect.org

**Lester Hanneman**
Plumbing Inspector
License #PL15909

Phone: 847.870.5675
Direct Line: 847.818.5293
Fax: 847.870.6620
Village Fax: 847.818.5329
TDD: 847.392.6064
Email: lhanneman@mountprospect.org

Village of Mount Prospect
Community Development Department
50 S. Emerson Street
Mount Prospect, IL 60056-3218
Web Site: www.mountprospect.org

**Andrew M. Skic**
Building Inspector

Phone: 847.870.5675
Direct Line: 847.818.5296
Fax: 847.870.6620
TDD: 847.392.6064
E-mail: askic@mountprospect.org

Village of Mount Prospect
Community Development Department
50 S. Emerson Street
Mount Prospect, IL 60056-3218
Web Site: www.mountprospect.org

**John Wagner**
Commander

Phone: 847.870.5656
Direct: 847.818.5223
Fax: 847.818.5228

Village of Mount Prospect
Police Department
112 E. Northwest Highway
Mount Prospect, IL 60056

**Rafaela Garcia**
Housing Inspector

Phone: 847.870.5668
Direct: 847.818.5295
Fax: 847.818.5329
TDD: 847.392.6064
Email: rgarcia@mountprospect.org

Village of Mount Prospect
Community Development Department
50 South Emerson Street
Mount Prospect, IL 60056
Web Site: www.mountprospect.org

**Frank M. Krupa, L.E.H.P.**
Environmental Health Inspector

Phone: 847.870.5668
Direct Line: 847.818.5292
Fax: 847.818.5329
TDD: 847.392.6064
Email: fkrupa@mountprospect.org

Village of Mount Prospect
Community Development Department
50 S. Emerson Street
Mount Prospect, IL 60056-3218
Web Site: www.mountprospect.org

**Rafaela Garcia**
Housing Inspector

Phone: 847.870.5668
Direct: 847.818.5295
Fax: 847.818.5329
TDD: 847.392.6064
Email: rgarcia@mountprospect.org

Village of Mount Prospect
Community Development Department
50 South Emerson Street
Mount Prospect, IL 60056
Web Site: www.mountprospect.org

**William Schroeder, MCP**
Building Commissioner

Phone: 847.870.5675
Direct Line: 847.818.5389
Village Fax: 847.870.6620
TDD: 847.392.6064
Email: bschroed@mountprospect.org

Village of Mount Prospect
Community Development Department
50 S. Emerson Street
Mount Prospect, IL 60056-3218
Web Site: www.mountprospect.org



**KOSTAK ASSOCIATES, P.C.**

55 E. EUCLID, SUITE 430
MT. PROSPECT, IL 60056

FAX: 847/394-9445
wkostak@aol.com
kostakarchitects.com

**Warren J. Kostak, AIA**

**Robert Roels, L.E.H.P.**
Environmental Health Manager

Phone: 847.870.5668
Direct Line: 847.818.5296
Fax: 847.870.6620
TDD: 847.392.6064
E-Mail: broels@mountprospect.org

Village of Mount Prospect
Community Development Department
50 S. Emerson Street
Mount Prospect, IL 60056-3218
Web Site: www.mountprospect.org

MOUNT PROSPECT POLICE
COOK COUNTY, ILLINOIS

Case # 08-4543

Officer F. CORNEJO #745

112 E. NORTHWEST HWY.
MT. PROSPECT, IL 60056

NON-EMERGENCY: 847-870-8565
EMERGENCY: 911

**Larry Heinrich**
Electrical Inspector

Phone: 847.870.5675
Direct Line: 847.818.5209
Village Fax: 847.870.6620
TDD: 847.392.6064
Email: lheinric@mountprospect.org

Village of Mount Prospect
Community Development Department
50 S. Emerson Street
Mount Prospect, IL 60056-3218
Web Site: www.mountprospect.org

EX.
B

EXHIBIT

tabbies®    5

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

|  |  |  |
|---|---|---|
| THE VILLAGE OF MOUNT PROSPECT an Illinois municipal corporation, | ) ) | |
| Plaintiff, | ) | No.   08CH12821 |
| v. | ) ) | |
| | ) | |
| TOD CURTIS, FIRST UNITED TRUST COMPANY, as Trustee under Trust Agreement dated June 23, 1989, Trust No. 10510 and ELTO RESTAURANT INC., a/k/a ELTO RESTAURANT CORPORATION, | ) ) ) ) ) | |
| Defendants. | ) ) | |

### VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

NOW COMES Plaintiff, the VILLAGE OF MOUNT PROSPECT, by its attorneys, Lance C. Malina and George A. Wagner of Klein, Thorpe and Jenkins, Ltd., and complaining of the Defendant states as follows:

1. Plaintiff, the Village of Mount Prospect (hereinafter the "*Village*"), is a home rule municipal entity, incorporated under the laws of the State of Illinois, and located within the County of Cook, Illinois.

2. Tod Curtis (hereinafter "*Defendant Curtis*") is the sole stockholder, president and registered agent of Elto Restaurant Inc., a/k/a Elto Restaurant Corporation (hereinafter "*Elto Restaurant*"). He is the owner and operator of Ye Olde Town Inn, which is located at 18 W. Busse Avenue, Mount Prospect, Illinois, on the Subject Property as hereinafter described. The liquor license for Ye Olde Town Inn is held by Elto Restaurant. The legal title to the property at 6-18 West Busse Avenue, Mount Prospect, Illinois, PIN 08-12-102-062-0000 (hereinafter the "*Subject Property*"), is in a land trust at First United Trust Company, as Trustee under Trust Agreement dated June 23, 1989, Trust No. 10510 (hereinafter the "*Trust*"), of which Defendant Curtis is a beneficiary. (Tod Curtis, Elto Restaurant, and the Trust hereinafter "*Defendants*" collectively).

3. The Subject Property consists of two (2) attached buildings, having two (2) stories and a second

story rear porch area. The first floor consists of storefronts, including a restaurant, known as Ye

Olde Town Inn (hereinafter the "*Restaurant*"), a dance studio, and a vacant business space. The

Restaurant serves customers prepared foods and beverages at the Restaurant and caters functions

throughout Northeastern Illinois. The second floor consists of six (6) residential dwelling units

and six (6) office suites. An exterior rear stairway leads to the second floor porch area and the

interior hallway. A basement consists of storage for the Restaurant and the mechanicals for the

buildings. At least one (1) of the residential dwelling units and one (1) of the office suites on the

second floor are occupied. (The front elevations and second floor layout sketch is attached as

*Exhibit A.)*

4. This Complaint is brought pursuant to various provisions of the Mount Prospect Village Code

("Code"), including Section 21.220, Dangerous Or Incomplete Buildings And Nuisances, Section

23.1403, Enumeration Of Nuisances, and Section 23.1404: Abatement Procedure, described in

pertinent part below:

A. Section 21.220, Dangerous Or Incomplete Buildings And Nuisances, of the Mount Prospect
Village Code provides, as follows:

A. Any building or parts thereof which have been allowed to deteriorate to a
dangerous condition . . . are hereby to be declared public nuisances.

B. If, after the director of community development or his duly authorized agent has served a
notice on the owner of the property to remedy the condition or nuisance, he fails to take the
necessary action within ten (10) days to correct the nuisance, the village will pursue remedies
under this code and law.

B. Section 23.1403, Enumeration Of Nuisances, of the Mount Prospect Village Code provides:

In addition to those actions which are elsewhere in this code declared to be and
constitute a nuisance, it is a nuisance for any person within the territorial jurisdiction
of the village and within one-half (1/2) mile of the corporate limits:

K. To keep or maintain any structure that is in violation of any life safety regulation or any
structure that is in violation of more than one of any other structure, safety, property
maintenance or land use regulation of the village.

M. To keep or maintain any structure which is structurally unsound or the exterior of which
is not in good repair as required by this code.

Section 23.1404: Abatement Procedure, of the Mount Prospect Village Code
provides:

An abatement action under this section is a remedy cumulative to other remedies at
law and equity. Injunctive relief may be sought to prevent or restrain violations of

this article. An abatement action in no way preempts, supersedes or bars civil or criminal prosecution for violation of this article or any other applicable building, fire prevention or public safety regulation. The commencement of an abatement action is not a condition precedent to the initiation of criminal prosecution or any other remedy. Failure to adhere to the procedure prescribed in this section shall not bar relief or remedy if such failure causes no prejudice and merely constitutes harmless error.

5.  This Complaint is also brought pursuant to the Illinois Municipal Code, which provides as follows:

    A.  Section 11-31-1 allows the corporate authorities of each municipality to apply to the circuit court in the county in which a dangerous and unsafe building is located for an order requiring the owner or owners of record to repair the unsafe and dangerous building. 65 ILCS 5/11-31-1.

    B.  The Illinois Municipal Code also provides that after a determination by the appropriate municipal official that any building or structure fails to conform to the minimum standards of health and safety as set forth in the applicable municipal ordinances, and the owner or owners of such building or structure fails, after due notice, to cause such property to conform to such ordinances, the municipality may apply to the circuit court for an injunction requiring compliance with such minimum standards of health and safety set forth in the applicable municipal ordinances. 65 ILCS 5/11-31-2.

    C.  The Illinois Municipal Code further provides that in the event that any building or structure is maintained by the owner in violation of any local building and/or maintenance ordinance, the local authorities of the municipality may institute any appropriate action or proceeding to restrain, correct or abate such ordinance violation(s). 65 ILCS 5/11-13-15.

6.  Extensive and dangerous Building, Property Maintenance, Fire Prevention and Health Code violations (collectively "Code Violations[1]") have been identified on the Subject Property. Defendant has been given notice and reasonable time to remedy such Violations, but has failed to comply, causing a danger to the safety of Defendants' customers, employees and tenants, as well as the public. In addition, Defendant Curtis, through his agents, has been extremely uncooperative, denying inspections and refusing to remedy those Violations unless the Village suspends all hearings and suspensions and provides financial assistance.

7.  Code violations on the Subject Property were first discovered in early 2007. During an April 30, 2007, inspection, structural deterioration of the rear porch was noted, as well as loose rotting wood, conduit hanging over the public sidewalks and building entrance, and a deteriorated chimney with extensive areas of missing mortar and a broken cap. Defendant Curtis was given notice to correct those conditions by June 30, 2007, and was advised that a Rental Dwelling Operators License was required for all rental dwellings. *(See May 29, 2007, letter to Tod Curtis/ Ye Olde Town Inn*, which is attached hereto and incorporated herein as *Exhibit B)*  The

---

1 The Code Sections cited for violations are attached hereto as *Exhibit T.*

deteriorating rear porch and loose rotting wood have not been corrected, and a Rental Dwelling Operators License has not been obtained, as of the filing date of this Complaint.

8.  Follow up inspections by Village inspectors discovered the following Code violations in 2008:

A.  Exterior inspection (Roof and soffit; Electrical Hazards):

    i.  On or about January 15 and 28, 2008, the exterior of the Subject Property was found to be in serious disrepair, as follows:

        1.  On the south side, building trim, soffits and fascia had holes and loose wood, holes and rotting were wood covered by sheet metal, and extensive areas of unpainted wood and peeling paint existed.

        2.  The cedar shingle roof had holes and missing; loose and rotten shingles, loose shingles having blown onto the public sidewalk on January 28, 2008;

        3.  The roof on the north side was curling and cracking, permitting water to pool and penetrate roof;

        4.  Bricks were crumbling at the foundation of the west and north walls;

        5.  The overhang of the northwest corner of the roof appears to have sistered structural members that trap moisture and may not support roof loads – fiberglass panels were collapsing, flexed and broken; and

        6.  Extension cords were used extensively on the exterior of the building and in unsafe conditions (in PVC pipe on roof).

Defendant was given notice to correct these deficiencies by February 25, 2008 (See February 13, 2008, letter to Tod Curtis/Ye Olde Town Inn, pages 28, 31-36, a copy of which is attached hereto as *Exhibit C*). Items 1, and 3-6 have not been corrected as of the filing date of this Complaint.

B.  Rear Stairway Inspection:

    i.  On January 21, 2008, Village Environmental Health Inspector Cheryl Scherbaum declared the exterior rear stairway and porch "unsafe", and posted the Field Inspection Report, which required correction within seven (7) days, on the stairway. (See Field Inspection Report, attached hereto and incorporated herein *as Exhibit D*.)

    ii.  On January 29, 2008, Mr. Valentino and the Restaurant's manager, Paul Rozycki ("Mr. Rozycki"), refused to permit an inspection to determine if the condition of the rear stairway had been corrected, despite direction to complete repairs on or before January 28, 2008.

    iii.  Defendant Curtis, through his attorney, Richard Valentino (hereinafter "Mr. Valentino") appealed the determination of the unsafe stairway (see Mr. Valentino's 2/4/08 facsimile, attached hereto and incorporated herein as *Exhibit E*). A hearing is pending in the Village's Administrative Adjudication program, and has been

continued twice by Defendant Curtis' attorney.

iv.  On March 13, 2008, the Village placarded the rear stairway and porch, pursuant to PM § 108.4 which provides as follows: "Placarding. Upon failure of the owner or person responsible to comply with the notice provisions within the time given, the code official shall post on the premises or on defective equipment a placard bearing the word "Condemned" and a statement of the penalties provided for occupying the premises, operating the equipment or removing the placard." A copy of the placard is attached hereto and incorporated herein as *Exhibit F*.

C.  Health Inspection:

i.  On January 18, 2008, the Village conducted a health inspection of the Restaurant, resulting in an unacceptable Sanitation Score of 68 out of 100. (See Inspection Report, a copy of which is attached hereto as *Exhibit G*) Numerous violations were noted on that report as "CRITICAL ITEMS REQUIRING <u>IMMEDIATE</u> ATTENTION." (Emphasis added.)

ii.  On February 2, 2008, Mr. Valentino cancelled a reinspection, which was scheduled to insure that the Critical Items were corrected. (See Mr. Valentino's 2/2/08 facsimile, a copy of which is attached hereto as *Exhibit H*)

iii.  On February 22, 2008, Mr. Valentino, in a meeting with Environmental Health Manager Robert Roels (hereinafter "Environmental Health Manager Roels"), Environmental Health Inspector Frank Krupa, and Assistant Village Attorney George Wagner, refused to address any of the uncorrected issues or provide a timeline for their correction, and instead stated that these issues could be easily corrected if the Village gives his client the money to do so. On February 25, 2008, Mr. Valentino confirmed that his client would correct those critical items only if "the Village was willing to suspend all hearings and inspections and provide the financial assistance needed to accomplish those repairs and/or remodeling." (See Mr. Valentino's 2/25/08 facsimile, a copy of which is attached hereto as *Exhibit I*.)

iv.  On February 28, 2008, Mr. Valentino and Mr. Rozycki denied Inspectors access to conduct a follow up health inspection at the Restaurant, despite the following Village Code requirements that require unannounced inspections to insure the validity of those inspections:

Section 10-202 Access of Food Service Sanitation Manual, by the U.S. Food and Drug Administration, adopted pursuant to Section 12.304 of the Village Code:

"10-202 Access:  Representatives of the regulatory authority, after proper identification, shall be permitted to enter any food service <u>at any reasonable time</u> for the purpose of making inspections to determine compliance with this ordinance. The representatives shall be permitted to examine records of the establishment to obtain

information pertaining to food and supplies purchase, received or used."

Section 750.20, Inspections and Inspection Report, of the 1989 Edition of the Rules and Regulations Pertaining to the Sanitation of Food Service Establishments adopted by the Illinois Department of Health, pursuant to Section 12.102 of the Village Code, states:

"All food service establishments are subject to inspection <u>at all times</u>."

D. <u>Electrical Hazard Inspection</u>: On January 22, 2008, Mr. Valentino denied the Village's Building Commissioner, William Schroeder, access to inspect an electrical box in the basement of the Restaurant, which box was previously identified by Fire Prevention Officers as possibly being unsafe due to rusting conditions.

9. Since Defendants failed to correct the violations described above and was uncooperative in permitting inspections, the Village began formal action to enforce the numerous known Code Violations. In that regard, the Property Owner has been cited for the following violations, which are pending in administrative proceedings pursuant to the Village's Administrative Adjudication System, Ch. 8, Article 21 of the Village Code:

A. On or about January 15, 2008, and continuing to the present:

    i. 2000 International Property Maintenance Code[2] ("PM Code") §, 303.2, 303.6, 303.7, 303.8, 303.13: exterior of building in disrepair;

    ii. PM Code § 303.7: exterior of building in disrepair – shingle fell onto public sidewalk on January 28, 2008;

    iii. PM Code § 303.5: crumbling brick at foundation of west and north walls;

    iv. PM Code § 303.4: collapsing fiberglass panels indicating structural failure in northwest corner of roof;

    v. Village Code § 14.1905: outside storage of restaurant equipment not permitted (freezers, walk-ins and refrigerators);

    vi. Village Code § 23.1401.B: garbage containers on Village right of way;

    vii. PM Code § 605.1: deteriorated conduit and connection at point of service drop (this violation will be withdrawn);

    viii. PM Code § 604.3: use of extension cords on exterior of building, so as to replace permanent electrical wiring;

    ix. PM Code § 605.1: abandoned conduit and light fixtures on south side of building;

---

2 The 2000 International Property Maintenance Code was adopted by Village Code § 21.603.

    x.  PM Code § 303.11: chimney deteriorating;

   xi.  PM Code § 302.3: parking lot, driveway and concrete walks and truck docks in disrepair.

See Notice of Violation attached hereto and incorporated herein as *Exhibit J.*

B.  On or about January 17, 2008, and continuing to the present:

    i.  PM Code § 304.2: kitchen floor is collapsing in the area of walk-in and the sub-flooring is black with rot and water damage;

   ii.  PM Code § 304.2: sub-flooring is black with rot and water damage in basement under kitchen.

See Notice of Violation attached hereto and incorporated herein as *Exhibit K.*

C.  On or about January 22, 2008, and continuing to the present (the "*Fire Code Violations*"):

    i.  Fire Prevention Code of the Village Code (the "Fire Prevention Code") § 24.202.F: sprinkler system flow switches and tamper switches are not monitored;

   ii.  Fire Prevention Code § 24.201.B: documentation of the automatic sprinkler system certification was not provided to the Fire Department;

  iii.  International Fire Code (the "IFC")[3] § 605.1: electrical hazards exists in the basement as an electrical box is badly rusted;

  iv.  IFC § 605.5, per Code § 24.102: extension cords are present in multiple locations as substitute for permanent wiring;

   v.  Fire Prevention Code § 24.106: an internally illuminated exists sign is not provided in the basement;

  vi.  Fire Prevention Code § 24.202.O: hydraulic calculations for the new backflow prevention device were not provide to the Fire Department;

  vii.  Fire Prevention Code § 24.105.A: fire extinguisher was not installed behind the bar;

 viii.  Fire Prevention Code § 24.204.A.4: radio transmitted fire alarm is present.

See Notice of Violation attached hereto and incorporated herein as *Exhibit L.*

All of the above charges are pending, as Defendants have continued the proceedings on two occasions.

---

3 The International Fire Code was adopted by Village Code § 24.102.

D. In addition to the charges pending in the Administrative Adjudication System, on March 20, 2008, Defendant Curtis, through his attorney, was served with a Notice of Charges, which was entered by the Village's Liquor Control Commissioner for failing to comply with Village Code regulations, including but not limited to, those related to the storage or food, sanitary conditions and safety conditions. (See Notice of Charges, a copy of which (excluding exhibits) is attached hereto as *Exhibit M*) Said charges are pending and a hearing has been continued by Defendant Curtis' attorney.

10. As a result of Defendants' failure to remedy the continuing Code Violations described in paragraphs 7, 8, and 9A, B, and C, Defendants' refusal to permit further inspections for compliance, and Defendants' refusal to correct the Code Violations unless the Village suspended all hearings and inspections and financed the repairs, the Village filed a Petition for Administrative Search Warrant to authorize Village inspectors to inspect the interior and exterior of the Subject Property for Code Violations. Said Petition was granted. (See Order, a copy of which is attached hereto and incorporated herein as *Exhibit N*) An inspection was then conducted pursuant to the Search Warrant on March 6, 2008, which discovered the following Code Violations[4]:

A. Unsafe Structures not corrected as of filing date of Complaint (hereinafter the "*Unsafe Structures*"):

   i. Kitchen Floor: sagging, settling and collapsing in violation of PM Code § 108.1.1, 303.4;

   ii. Bar Floor: cracked and water damaged floor joist in basement under bar area; deteriorated and water damaged floor sheathing in the basement under bar area; deteriorated and uneven floor in kitchen area; deteriorated and structural failure of floor area of kitchen floor in violation of PM Code § 108.1.1, 303.4;

   iii. Rear Stairway, porch and deck: deteriorated rear stairway, porch and deck in violation of PM Code § 108.1.1, 303.10;

   iv. Soffit, roof and fiberglass panel: collapse of soffit, roof section and fiberglass panel in violation of PM Code § 108.1.1, §303.7, 303.9, and 304.2.

   v. As a part of the March 6, 2008, inspection, an independent assessment was requested by the Village. Warren J. Kostak, AIA, architect, of Kostak Associates, P.C., 55 E.

---

4 Some of the conditions set forth in this subsection are the same as those cited above, because they were never corrected.

Euclid, Suite 430, Mount Prospect, conducted that inspection and made the following determinations, in summary, which are contained in his report attached hereto and incorporated herein as *Exhibit O*:

1.  The rear porch and stairs:

    a.  "It is my opinion that the railing system presents a hazardous condition and should be immediately repaired or replaced in accordance with current building code requirements."

    b.  "The wood stairway between grade level and the second floor porch, in my opinion, is structurally unsound."

    c.  "It is my opinion, because of the hazardous conditions cited, that this stairway should be demolished."

2.  Behind Bar: "...the wood floor boards, if subjected to foot traffic or point loadings, appear likely to collapse."

3.  Kitchen Floor: "The floor structure has failed, although not collapsed. It was not possible to inspect these areas from the basement since these areas appear to be inaccessible. We cannot therefore speculate on the structural system of the floor. However, the visible existing conditions alone constitute a hazardous working environment and we recommend that he kitchen should be shut down."

4.  Roof/soffit at northwest corner: "A wood soffit has failed at the above location and has caused crushing of a vertical fiberglass wall panel. This minor failure may be indicative of more serious problems in this area of the roof. The soffit and wall panel should be replaced and a thorough inspection of the roof members in this area should be conducted and corrective action instituted."

B.  Electrical Hazards not corrected as of filing date of Complaint (hereinafter the "*Electrical Hazards*"):

    i.  Electrical hazards on Subject Property, as more specifically noted in the March 6, 2008, inspection report and Attachment B of Exhibit P: rusted disconnect box with knock out fillers missing and door does not close properly; circuit breaker with foreign breakers, double mini-breakers and doubled up 15 amp breaker; double tapped main lugs of circuit breaker; feeder conductors with incorrect colors and not marked; rust on most circuit panels, junction boxes, conduit and armor cables; improperly supported conduits and excess number of bends; stock and debris in front of all electrical meters, panels, and disconnects; emergency light wired with a cord and plug; improper colors of ungrounded conductors at two disconnect switches; panel (A4) has downsized neutral and foreign breakers; panel (A3) has downsized

neutral, 4 mini breakers and foreign breakers; panel (A2) has 7 mini breakers and the interior of panel was replaced in violation of UL rating; disconnect switches mounted on floor known to take on water; sump pump plugged into triple tap; conductors replaced at 400 amp 1 phase main disconnect switch and not properly marked; 400 amp 3 phase main disconnect has undersized service ground; armored cable runs through basement and is rusted and not properly secured; exit sign glass broken; various open junction boxes; transformer tapped into a fluorescent fixture; extension cord to connect sump pump; fluorescent fixture with open writing compartment; undersized jumper wire for water meter; exterior outlets are not GFCI protected or have protective bubble covers; outlets in kitchen not GFCI protected; reversed polarity at outlet to left of triple basin sink; knockout filler missing in switch box to right of mixer; circuit breaker panel does not have proper clearance; improper use of extension cords and in non-weather tight connection (See also PM § 605.1, Installation); improper splice/repair of extension cord/wiring; loose electrical outlet and conduit, in violation of PM Code § 604.3, 605.1, § 108.1.2.

C. Health Code Violations not corrected as of filing date of Complaint (the "Health Code Violations"):

   i.  Health inspection critical item #30: discharge pipes are below flood level of open site drain in bar area, which permits cross contamination permitting sewage to backflow into bar sinks in violation of Food Code5 § 750.1060 ("*Drain Violation*" - not corrected as of filing date of Complaint); and

   ii. Health inspection critical item #20: dishwasher has improper final rinse temperature in violation of Food Code § 750.830 ("*Dishwasher Violation*").

See the March 13, 2008, letter of Environmental Health Manager Roels and March 6, 2008, inspection report, which is attached hereto and incorporated herein as *Exhibit P*. Unsafe Structures are more thoroughly described in Attachment A; Electrical Hazards in Attachment B; Health Code Violations in Attachment C.

D. Prohibited Cross Connection not corrected as of filing date of Complaint (the "*Prohibited Cross Connection*"):

   i.  Connection prior to water meter, which may allow the use of water prior to the Village's water meter in violation of Village Code § 16.407(B), Meters.

   ii. Connection prior to water meter may facilitate the introduction of contaminants or nonpotable water into the Village water system – serious backflow risk to Village water system in violation of Village Code § 9.414(C), Cross Connections Prohibited;

---

5 §12.103 of the Food Code, Chapter 12 of the Village Code, adopts the 1987 Edition of the Rules and Regulations Pertaining to the Sanitation of Retail Food Store Establishments promulgated by the State Department of Public Health, together with all appendices thereto, and all subsequent editions or amendments. The Food Code citations cited are found in Title 77: Public Health, Chapter I: Department Of Public Health, Subchapter M: Food, Drugs And Cosmetics, Part 750, Food Service Sanitation Code.

      iii.   Connection prior to water meter is leaking in violation of Village Code § 9.405(D).

See March 19, 2008 and March 20, 2008, Notices to Tod Curtis/Ye Olde Town Inn to Abate Improper Condition (and extension), attached hereto and incorporated herein as *Exhibit Q*.

11. On March 13, 2008, the Village served notice on Defendant Curtis regarding the Violations in

    paragraph 10 and required compliance within the following reasonable periods of time:

    A. Unsafe Structures
        i.   Rear stairway and porch: comply by March 27, 2008 ,
           Previously ordered to comply, and failed to do so (see para. 19)

        ii.   Kitchen and bar floors: comply by March 27, 2008
           Previously ordered to comply (kitchen floor), and failed to do so (see para. 19)

        iii.   Roof and soffit: comply by March 27, 2008
           Previously ordered to comply, and failed to do so (see para. 19)

    B. Electrical Hazards – comply by March 21, 2008;
           Previously ordered to comply, and failed to do so (see para. 19)

    C. Drain and Dishwasher Violations – comply by March 23, 2008.
           Previously ordered to comply, and failed to do so (see para. 19)

12. On March 19, 2008, the Village served notice on Defendant Curtis to correct the Prohibited Cross Connection by March 21, 2008; later extended to April 4, 2008. (Exhibit Q) Those notices warned that the water would be shut off if the Prohibited Cross Connection was not repaired by April 4, 2008 (more than 2 weeks). An appeal process was provided, which required notice of an appeal by March 31, 2008; however, Defendant Curtis failed to request an appeal until April 3, 2008, after the deadline. Defendant Curtis' failure to correct this violation and failure to appeal by the deadline further demonstrate his intentional refusal to comply with Village requirements.

13. On March 25, 2008, a health reinspection for the Health Code Violations was denied by Mr. Rozycki. A reinspection was permitted by Mr. Valentino on March 27, 2008 (see Health Inspection Report. attached hereto as *Exhibit R)* and the following Health Inspection Critical Items were not corrected: Drain Violation and Dishwasher Violation.

14. On March 25 and 27, 2008, a Fire Prevention reinspection was attempted, but refused by Mr. Rozycki and Mr. Valentino. As of the filing date of this Complaint, Fire Prevention Officers have been unable to verify compliance with the Fire Code Violations in paragraph 9C.

15. On March 26, 2008, an electrical inspection was scheduled but not conducted to determine if the Electrical Hazards had been corrected, in light of the representation of Defendant's Attorney, Richard Jalevec ("Mr. Jalovec"), that electrical work had not been performed.[6]

16. On March 28, 2008, an inspection of Unsafe Structures was scheduled but not conducted based upon Mr. Jalevec's representation that the work had not been performed.

17. On April 1, 2008, the Village placarded the kitchen and bar floor areas of Ye Olde Town Inn pursuant to PM § 108.4, as follows:

> CONDEMNED AS DANGEROUS AND UNSAFE
> THE STRUCTURE KNOWN AS
> 1) Kitchen and Bar floor
> 2) Unsafe Electrical Equipment
> at 6-18 W. Busse Avenue
> DANGER – KEEP OUT

(See actual placard attached hereto and incorporated herein as *Exhibit S*.)

18. On April 2, 2008, despite the presence of the placards described in paragraph 17, the Restaurant was open for business and the bar was occupied by an employee in violation of PM § 108.5, which states:

> Prohibited occupancy. Any person who shall occupy a placarded premises or shall operate placarded equipment, and any owner or any responsible person for the premises who shall let anyone occupy a placarded premises or operate placarded equipment shall be liable for the penalties provided by this code.

19. The following chart (next page) is a summary of the Village's efforts to obtain compliance:

---

6 As of April 7, 2008, there have been inquiries made at the Village's Building Department regarding the work which must be performed, but no permits have been applied for.

## SUMMARY OF NOTICES AND INSPECTIONS

| Violation | Notice Date | Compliance Date | Inspections |
|---|---|---|---|
| Rear stairway and porch | 3/29/07 | 6/30/07 | |
| | 1/21/08 | 1/28/08 | 1/29/08 Denied |
| | 2/25/08: Mr. Valentino says Defendant Curtis will make repairs if Village suspends hearings and suspensions and provides financial assistance. | | |
| | 3/6/08 administrative search warrant executed | | |
| | 3/13/08 | 3/27/08 | 3/28/08 attorney said not corrected |
| | | | |
| Kitchen and bar floors | 1/21/08  Cited for collapsing kitchen floor | | |
| | 2/25/08: Mr. Valentino says Defendant Curtis will make repairs if Village suspends hearings and suspensions and provides financial assistance. | | |
| | 3/6/08 administrative search warrant executed | | |
| | 3/13/08 | 3/27/08 | 3/28/08 attorney said not corrected |
| | 4/2/08 employee in bar area despite placard | | |
| | | | |
| Roof and soffit | 2/13/08 | 2/25/08 | |
| | 2/25/08: Mr. Valentino says Defendant Curtis will make repairs if Village suspends hearings and suspensions, and provides financial assistance. | | |
| | 3/6/08 administrative search warrant executed | | |
| | 3/13/08 | 3/27/08 | 3/28/08 attorney said not corrected |
| | | | |
| Electrical hazards | 2/13/08 | 2/25/08 | 1/22/08 Denied |
| | 2/25/08: Mr. Valentino says Defendant Curtis will make repairs if Village suspends hearings and suspensions, and provides financial assistance. | | |
| | 3/6/08 administrative search warrant executed | | |
| | 3/13/08 | 3/21/08 | 3/26/08 attorney said not corrected |
| | | | |
| Drain Violation | 1/18/08 | 2/2/08 | 2/2/08 Denied |
| | 2/25/08: Mr. Valentino says Defendant Curtis will make repairs if Village suspends hearings and suspensions, and provides financial assistance. | | |
| | | | 2/28/08 Denied |
| | 3/6/08 administrative search warrant executed | | |
| | 3/13/08 | 3/23/08 | 3/25/08 Denied; 3/27 Permitted |
| | | | |
| Dishwasher Violation | 1/18/08 | 2/2/08 | 2/2/08 |
| | 2/25/08: Mr. Valentino says Defendant Curtis will make repairs if Village suspends hearings and suspensions and provides financial assistance | | |
| | 3/6/08 administrative search warrant executed | | |
| | 3/13/08 | 3/23/08 | 3/25/08 Denied; 3/27/08 Permitted |
| | | | |
| Prohibited Cross Connection | 3/6/08 administrative search warrant executed | | |
| | 3/19/08 | 3/21/08; 4/4/08 | 4/3/08 late appeal |
| | | | |
| Fire Prevention Violations | 2/12/08 | 2/25/08: Mr. Valentino says Defendant Curtis will make repairs if Village suspends hearings and suspensions, and provides financial assistance. | |
| | | | 3/25/08 Denied; 3/27/08 Denied |
| | | | |
| Rental Dwelling Operators License | 5/29/07 | 6/30/07 | Noncompliance |

20. As of the filing date of this Complaint, Defendants continue to operate as usual, though the Unsafe Structures, Electrical Hazards, Drain and Dishwasher Violations, and Prohibited Water Connection have not been corrected. The exterior of building is in disrepair. There is

crumbling brick at the foundation of the west and north walls. The chimney is deteriorating. The parking lot, driveway and concrete walks and truck docks are in disrepair. The Defendants have not obtained a Rental Dwelling Operators License, pursuant to Section 23.1815 of the Village Code. Defendants have not cooperated so as to allow Fire Prevention Officers to determine if the fire alarm system and fire sprinkler system function or meet Village Code, or if the Fire Code Violations have been corrected.

21. The Village has expended significant time and effort attempting to obtain the compliance of the Property Owner, who has been uncooperative. Despite the Village's efforts, Defendant has failed to correct these serious Code Violations, which jeopardize the health and safety of Defendant's customers, employees and occupants, as well as the health and safety of neighboring occupants and the public.

22. The Village has a clear and ascertainable right to protect the public, Defendants and their customers, employees and occupants, as well as the public.

23. The hearing on Code Violations in Administrative Adjudication has been continued twice by Defendants and is pending. The hearing before the Liquor Control Commissioner has been continued by Defendants and is pending. Both proceedings are subject to appeal, such that immediate correction of the Code Violations is not possible administratively.

24. There is a strong likelihood that the Village will prevail on the merits of this issue.

25. Given the risks to public health and safety, and the willful and unreasonable defiance by the Defendants, the balance of hardships weigh in favor of granting the injunctive relief sought by the Village herein.

WHEREFORE, Plaintiff, the Village of Mount Prospect, respectfully prays that this Court enter an injunction, as follows:

    A.    An Order requiring the Defendants to abate the Code Violations within seven (7) days; and

    B.    In the event that Defendants fail to so abate the Code Violations, an Order directing Defendants to vacate the Subject Property, including the Restaurant, storefronts, offices and apartments, and to keep all persons, who are not involved in the remediation of the Code Violations, off the Subject Property until such time as the Code Violations have been corrected to the satisfaction of the Village; and

    C.    An Order granting the Village such other and further relief as the Court deems just

and equitable under the circumstances.

VILLAGE OF MOUNT PROSPECT

By: _____

One of its Attorneys

Lance C. Malina
George A. Wagner
Klein, Thorpe and Jenkins, Ltd.
20 North Wacker Drive - Suite 1660
Chicago, Illinois 60606-2903
(312) 984-6400
Attorney No. 90446

STATE OF ILLINOIS     )
                             )   SS

COUNTY OF COOK     )

## VERIFICATION

I, Robert Roels, being first duly sworn on oath, depose and state that I am the duly authorized Environmental Health Manager of the Village of Mount Prospect, and the duly authorized agent of the Village for purposes of making this Affidavit; that I have read the foregoing VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, that I have personal knowledge of the content thereof and that the matters set forth therein are true and correct in substance and in fact to the best of my knowledge.

By: _____

Robert Roels
Environmental Health Manager
Village of Mount Prospect

SUBSCRIBED AND SWORN TO
before me on this 7th day of
April _____, 2008.

_____
Notary Public

OFFICIAL SEAL
MARIE T JOHNSON
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/05/11

### EXHIBITS (bound separately)

A.    Front elevations and layout sketch

B.    Manager Roels' May 29, 2007, letter to Tod Curtis

C.    February 13, 2008, letter to Tod Curtis

D.    January 21, 2008, Field Inspection Report

E.    Mr. Valentino's February 4, 2008 facsimile appealing determination of an unsafe stairway

F.    Placard of rear stairway

G.    January 18, 2008, Health Inspection report

H.    Mr. Valentino's 2/2/08 facsimile

I.    Mr. Valentino's 2/25/08 facsimile

J-K-L. Notices of Violation

M.    Liquor Control Commissioner's Notice of Charges

N.    March 4, 2008, Order of Judge Jill Cerone-Marisie for Search Warrant

O.    Warren J. Kostak's inspection report.

P.    Environmental Health Manager Roels March 13, 2008, letter

Q.    March 19, and March 20, 2008, Notice (and extension) to Abate Improper Condition,

R.    March 27, 2008 Health Inspection Report.

S.    Placard: Condemned as Dangerous and Unsafe

T.    Code Sections cited in Complaint.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

FILED 8 - 15
CLERK OF THE CIRCUIT COURT
DOMESTIC RELATIONS
DOROTHY BROWN    CLERK

THE VILLAGE OF MOUNT PROSPECT          )
an Illinois municipal corporation,     )
                          Plaintiff,   )
                                       )    No.  08 CH 12821
v.                                     )
                                       )
TOD CURTIS, FIRST UNITED TRUST         )
COMPANY, as Trustee under Trust Agreement )
dated June 23, 1989, Trust No. 10510 and )
ELTO RESTAURANT INC., a/k/a ELTO       )
RESTAURANT CORPORATION,                )
                                       )
                          Defendants.  )

**VILLAGE OF MOUNT PROSPECT'S MOTION
FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

NOW COMES the Plaintiff, the Village of Mount Prospect (hereinafter the "*Village*"), by

and through its attorneys, Klein, Thorpe and Jenkins, Ltd., and moves this Court for a Temporary

Restraining Order and Preliminary Injunction against Tod Curtis, First United Trust Company, as

Trustee under Trust Agreement dated June 23, 1989, Trust No. 10510, and Elto Restaurant Inc.,

a/k/a, Elto Restaurant Corporation (hereinafter "Elto Restaurant"), an Illinois corporation,

(hereinafter "*Defendants*" collectively). In support of this motion, the Village states as follows:

I.      **Temporary Restraining Order/Preliminary Injunction:**

1-25.   The Village has filed its Verified Complaint for Injunctive Relief against the Defendants

(hereinafter the "*Complaint*") simultaneously with this Motion. Defendants, Tod Curtis

(hereinafter "*Defendant Curtis*") and Elto Restaurant (Defendant Curtis is its registered agent),

through Mr. Curtis' attorney, Richard Jalovec, have been notified of this motion by telephone,

facsimile and messenger. Paragraphs 1-25 of the Verified Complained and all Exhibits filed

therein are adopted as paragraphs 1 through 25 of this Motion.

26.    Defendant Curtis is the sole stockholder, president and registered agent of Elto Restaurant. He is the owner and operator of Ye Olde Town Inn, which is located at 18 W. Busse Avenue, Mount Prospect, Illinois, on the Subject Property as hereinafter described.    Elto Restaurant holds the liquor license for Ye Olde Town Inn.  The legal title to the property at 6-18 West Busse Avenue, Mount Prospect, Illinois, PIN 08-12-102-062-0000 (hereinafter the *"Subject Property"*), is in a land trust at First United Trust Company, as Trustee under Trust Agreement dated June 23, 1989, Trust No. 10510, of which Defendant Curtis is a beneficiary.

27    The Subject Property consists of two (2) attached buildings, having two (2) stories and a second story rear porch area. The first floor consists of storefronts, including a dance studio, a vacant business space, and a restaurant known as Ye Olde Town Inn (the *"Restaurant"*), which serves customers prepared foods and beverages at the Restaurant and caters functions throughout Northeastern Illinois. The second floor consists of six (6) residential dwelling units and six (6) office suites. An exterior rear stairway leads to the second floor porch area and the interior hallway. A basement consists of storage for the Restaurant and the mechanicals for the buildings. At least one (1) of the residential dwelling units and one (1) of the office suites on the second floor are occupied. (See Complaint, Exhibit A, for front elevation and second floor layout)

28.    The Complaint is based upon extensive and dangerous Building, Property Maintenance, Fire Prevention and Health Code violations (collectively "Code Violations") on the Subject Property, of which Defendant Curtis has been given notice and reasonable time to remedy, but has failed to do so.  This Motion for a Temporary Restraining Order and Preliminary Injunction is focused on those Code Violations, which the Village reasonably believes will result in immediate and irreparable injury to Defendants' customers, employees and tenants, and the

public, if the Restaurant remains open and the rear porch and stairway are not securely

barricaded (hereinafter the "Life Safety Violations").

29.    The following Life Safety Violations exist on the Subject Property:

    A.    <u>Unsafe Structures (hereinafter collectively the "Unsafe Structures")</u>:

        a.    <u>Rear Stairway, porch and deck</u>:

            i.    On January 21, 2008, the exterior rear stairway and rear porch were found to be structurally unsound in violation of § 108.1, 303.12 and 303.4 of the International Property Maintenance Code[1] ("PM Code"). It was then declared " unsafe" and posted as such, requiring correction within seven (7) days. (See Complaint, Exhibit D.)

            ii.    On March 6, 2008, an inspection[2] determined that the rear stairway had not been repaired and the rear porch and deck had also deteriorated. The condition of the rear stairway, porch and deck violates § 108.1.1, 303.4, 303.7, 303.9, 303.10, 303.12, and 304.2 of the PM Code.

           iii.    On March 6, 2008, an independent inspection was performed for the Village by Warren J. Kostak, AIA, architect, of Kostak Associates, P.C., 55 E. Euclid, Suite 430, Mount Prospect (hereinafter the "*Architect*"), who made the following determination regarding the rear stairway, porch and deck:

              "It is my opinion that the railing system presents a <u>hazardous condition</u> and should be immediately repaired or replaced in accordance with current building code requirements."

              "The wood stairway between grade level and the second floor porch, in my opinion, is <u>structurally unsound</u>."

              "It is my opinion, because of the hazardous conditions cited, that this stairway <u>should be demolished</u>."
(See Complaint, Exhibit O) (emphasis added)

           iv.    On March 13, 2008, the Village placarded the rear stairway and porch as "Condemned as Dangerous and Unsafe" (See Complaint, Exhibit F). In addition, Defendant Curtis was given notice of the extent of the violations and ordered to correct them within seven (7) days. (See the March 13, 2008, letter of Environmental Health Manager Roels,

---

1 The 2000 International Property Maintenance Code was adopted by Village Code § 21.603.
2 The March 6, 2008, inspection was pursuant to an administrative search warrant. (See Complaint, Exhibit N)

March 6, 2008, inspection report, and Attachment A in Complaint, Exhibit P)

b.    <u>Kitchen and Bar Floors</u>:

    i.    The kitchen floor of the Restaurant has deteriorated and is collapsing in the area of the walk-in cooler and the sub-flooring is black with rot and water damage.

    ii.    Under the floor in the bar area of the Restaurant are cracked and water damaged floor joists in danger of collapse.

    iii.    On March 6, 2008, as part of the Architect's inspection, he made the following finding regarding the kitchen and bar floors:

Behind Bar: "…the wood floor boards, if subjected to foot traffic or point loadings, appear <u>likely to collapse</u>."

Kitchen Floor: "The floor structure has failed, although not collapsed. It was not possible to inspect these areas from the basement since these areas appear to be inaccessible. We cannot therefore speculate on the structural system of the floor. However, the visible existing conditions alone constitute a hazardous working environment and we recommend that he <u>kitchen should be shut down</u>."

(See Complaint, Exhibit O) (emphasis added)

On March 6, 2008, the kitchen and bar floors were declared "Unsafe". These conditions are in violation of § 303.4, § 304.2, § 108.1.1 of the PM Code.

c.    Soffit, roof and fiberglass panel:

    i.    The March 6, 2008, inspection verified the collapse of soffit, roof section and fiberglass panel in the northwest corner of the building violation PM Code § 108.1.1, 303.4, 303.7, 303.9, 303.10, 303.12, and 304.2.

    ii.    On March 6, 2008, Architect made the following finding regarding the roof and soffit at the northwest corner of the building:

"A wood soffit has failed at the above location and has caused crushing of a vertical fiberglass wall panel. <u>This minor failure may be indicative of more serious problems in this area of the roof</u>. The soffit and wall panel should be replaced and a thorough inspection of the roof members in this area should be conducted and corrective action instituted."

See Complaint, Exhibit O) (emphasis added)

B.    Electrical Hazards (hereinafter the "Electrical Hazards")

a.    Electrical hazards exist on the Subject Property, as more specifically described in the March 6, 2008, inspection report and Attachment B of Exhibit P of Complaint. Those hazards include the following: rusted disconnect box with knock out fillers missing and door does not close properly; circuit breaker with foreign breakers, double mini-breakers and doubled up 15 amp breaker; double tapped main lugs of circuit breaker; feeder conductors with incorrect colors and not marked; rust on most circuit panels, junction boxes, conduit and armor cables; improperly supported conduits and excess number of bends; stock and debris in front of all electrical meters, panels, and disconnects; emergency light wired with a cord and plug; improper colors of ungrounded conductors  at two disconnect switches; panel (A4) has downsized neutral and foreign breakers; panel (A3) has downsized neutral, 4 mini breakers and foreign breakers; panel (A2) has 7 mini breakers and the interior of panel was replaced in violation of UL rating; disconnect switches mounted on floor known to take on water; sump pump plugged into triple tap; conductors replaced at 400 amp 1 phase main disconnect switch and not properly marked; 400 amp 3 phase main disconnect has undersized service ground; armored cable runs through basement and is rusted and not properly secured; exit sign glass broken; various open junction boxes; transformer tapped into a fluorescent fixture; extension cord to connect sump pump; fluorescent fixture with open writing compartment; undersized jumper wire for water meter; exterior outlets are not GFCI protected or have protective bubble covers; outlets in kitchen not GFCI protected; reversed polarity at outlet to left of triple basin sink; knockout filler missing in switch box to right of mixer; circuit breaker panel does not have proper clearance; improper use of extension cords and in non-weather tight connection (See also PM § 605.1, Installation); improper splice/repair of extension cord/wiring; loose electrical outlet and conduit, all in violation of PM Code §604.3, §605.1, and §108.1.2.

C.    Health Violations (hereinafter the "*Health Violations*"):

a.    Unsafe drain in bar area: the discharge pipes of the sink are below the flood level of an open site drain in bar area, which permits cross contamination permitting sewage to backflow into the bar sinks in violation of Food Code § 750.1060 (hereinafter the "*Drain Violation*").

b.    Dishwasher Violation: Health inspection critical item #20: the dishwasher has improper final rinse temperature in violation of Food Code §750.830 ("*Dishwasher Violation*").

(See March 6, 2008, Inspection and Attachment C attached to the March 13, 2008, letter of Environmental Health Manager Roels, in Exhibit P of Complaint.

D.    Prohibited Cross Connection (hereinafter the "*Prohibited Cross Connection*"):

    a.    A connection exists in the water line prior to the water meter, which allows the use of water prior to the Village's water meter in violation of Village Code § 16.407(B), Meters;

    b.    A connection prior to the water meter may facilitate the introduction of contaminants or nonpotable water into the Village water system, which is a serious backflow risk to the Village water system in violation of Village Code § 9.414(C), Cross Connections Prohibited; and

    c.    The connection prior to the water meter is leaking in violation of Village Code § 9.405(D), Water Leaks.

30.    The Village served notices (in some cases on several occasions) on Defendant Tod Curtis regarding the Life Safety Violations described in paragraph 29 and required compliance within the following reasonable periods of time:

A.  Unsafe Structures

    i.   Rear stairway and porch: comply by March 27, 2008 ,
       Previously ordered to comply, and failed to do so (see para. 34)

    ii.  Kitchen and bar floors: comply by March 27, 2008
       Previously ordered to comply (kitchen floor), and failed to do so (see para. 34)

    iii. Roof and soffit: comply by March 27, 2008
       Previously ordered to comply, and failed to do so (see para. 34)

B.  Electrical Hazards – comply by March 21, 2008;
       Previously ordered to comply, and failed to do so (see para. 34)

C.  Drain and Dishwasher Violations – comply by March 23, 2008.
       Previously ordered to comply, and failed to do so (see para. 34)

D.  Prohibited Cross Connection: - comply by March 21, then April 4, 2008

31.    None of the Live Safety Violations described in Paragraphs 29 have been corrected. No permits have been issued, or even applied for, to correct these Violations.

32.     The Village has also attempted to obtain Defendants' compliance through issuance of Notices of Code Violations under the Village's Administrative Adjudication process and Notice of Charges regarding this liquor licensee's operation in violation of Village Codes and regulations[3] pending before the Local Liquor Control Commissioner.  Defendants have twice continued the Administrative Adjudication hearing, including its appeal of declaring the rear stairway "unsafe", and continued the hearing before the Local Liquor Control Commissioner. Both proceedings are subject to appeal, such that immediate correction of the Life Safety Violations, let alone all of the Code Violations, is not possible.

33.     Defendants have not only failed to cooperate in complying with the Life Safety Violations, but has acted affirmatively to prevent their discovery.  As noted in the chart in paragraph 34, Defendants have denied the Village's inspections on numerous occasions.  In addition, Defendant Curtis, through his attorney, Mr. Richard Valentino, has clearly stated Defendant Curtis' intention not to correct any violations unless the Village suspends its hearings and inspection and provides financial assistance, as follows:

> To summarize our position, my client was willing to make or allow whatever repairs or remodeling that the Village would like to see done on whatever timetable that the Village would like, provided that the Village was willing to suspend all hearings and inspections and provide the financial assistance needed to accomplish those repairs and/or remodeling. See Complaint, Exhibit I..

Such a position clearly demonstrates that Defendants will not correct the Life Safety Violations unless this Court orders them to do so.

34.     The following chart is a summary of the Village's efforts to obtain compliance, as described in the Complaint:

---

3  Section 13.120 of the Village Code prohibits a liquor licensee from operating in violation of building, sanitary, safety and other regulations of the Village Code.

## SUMMARY OF NOTICES AND INSPECTIONS OF LIFE SAFETY VIOLATIONS

| Violation | Notice Date | Compliance Date | Inspections |
|---|---|---|---|
| Rear stairway and porch | 3/29/07 | 6/30/07 | |
| | 1/21/08 | 1/28/08 | 1/29/08 Denied |
| | 2/25/08: Mr. Valentino says Defendant Curtis will make repairs if Village suspends hearings and suspensions and provides financial assistance. | | |
| | 3/6/08 administrative search warrant executed | | |
| | 3/13/08 | 3/27/08 | 3/28/08 attorney said not corrected |
| | | | |
| Kitchen and bar floors | 1/21/08  Cited for collapsing kitchen floor | | |
| | 2/25/08: Mr. Valentino says Defendant Curtis will make repairs if Village suspends hearings and suspensions and provides financial assistance. | | |
| | 3/6/08 administrative search warrant executed | | |
| | 3/13/08 | 3/27/08 | 3/28/08 attorney said not corrected |
| | 4/2/08 employee in bar area despite placard | | |
| | | | |
| Roof and soffit | 2/13/08 | 2/25/08 | |
| | 2/25/08: Mr. Valentino says Defendant Curtis will make repairs if Village suspends hearings and suspensions, and provides financial assistance. | | |
| | 3/6/08 administrative search warrant executed | | |
| | 3/13/08 | 3/27/08 | 3/28/08 attorney said not corrected |
| | | | |
| Electrical hazards | 2/13/08 | 2/25/08 | 1/22/08 Denied |
| | 2/25/08: Mr. Valentino says Defendant Curtis will make repairs if Village suspends hearings and suspensions, and provides financial assistance. | | |
| | 3/6/08 administrative search warrant executed | | |
| | 3/13/08 | 3/21/08 | 3/26/08 attorney said not corrected |
| | | | |
| Drain Violation | 1/18/08 | 2/2/08 | 2/2/08 Denied |
| | 2/25/08: Mr. Valentino says Defendant Curtis will make repairs if Village suspends hearings and suspensions, and provides financial assistance. | | |
| | | | 2/28/08 Denied |
| | 3/6/08 administrative search warrant executed | | |
| | 3/13/08 | 3/23/08 | 3/25/08 Denied; 3/27 Permitted |
| | | | |
| Dishwasher Violation | 1/18/08 | 2/2/08 | 2/2/08 |
| | 2/25/08: Mr. Valentino says Defendant Curtis will make repairs if Village suspends hearings and suspensions, and provides financial assistance | | |
| | 3/6/08 administrative search warrant executed | | |
| | 3/13/08 | 3/23/08 | 3/25/08 Denied |
| | | | 3/27/08 Denied |
| | | | |
| Prohibited Cross Connection | 3/6/08 administrative search warrant executed | | |
| | 3/19/08 | 3/21/08; 4/4/08 | 4/3/08 late appeal |

35.     Pursuant to Section 11-13-15 of the Illinois Municipal Code, municipal authorities are permitted to institute any action or proceeding to prevent the unlawful maintenance of property

that is in violation of the standards set forth in the Village or City's municipal code. 65 ILCS 5/11-13-15.

36.    In addition, Section 11-31-2 of the Illinois Municipal Code also permits municipal authorities to initiate proceedings in the circuit court to require a property owner's compliance with the minimum standards of health and safety as set forth in the village or city's municipal code. 65 ILCS 5/11-31-2.

37.    Further, Sections of the Mount Prospect Village Code permit the Village to use such legal remedies as may be available to remedy, as a public nuisance, any building or parts thereof which have been allowed to deteriorate to a dangerous condition, such as that described herein, pursuant to legal remedies available. Section 21.220, Dangerous Or Incomplete Buildings or Nuisances.

38.    The Village Code specifically permits injunctive relief to restrain nuisances, such as keeping or maintaining a structure that is in violation of any life safety regulation, or that is structurally unsound or the exterior of which is not in good repair. Section 23.1403, Enumeration Of Nuisances, and Section 23.1404: Abatement Procedure of the Mount Prospect Village Code.

39.    The International Fire Code, International Property Maintenance Code, and Village Code violations set forth above constitute continuing and ongoing violations of the Mount Prospect Village Code that represent a threat of immediate and irreparable injury to the health, safety and welfare of Defendants' customers, employees and tenants, as well as the public.

40.    For the reasons set forth above, it is necessary that a statutory injunction (both a temporary restraining order and a preliminary and permanent injunction) be issued in order to ensure that the Subject Property is caused to comply with the minimum standards of health, sanitation, and safety required under the aforementioned Village Code provisions.

40.    Sections 11-13-15, 11-31-1, and 11-31-2 of the Municipal Code, 65 ILCS 5/11-13-15, 5/11-31-1 and 5/11-31-2, provide this Court with Jurisdiction and the power to issue a statutory injunction, including a temporary restraining order and a preliminary injunction, as well as a permanent injunction, upon such terms and under such conditions as will do justice, in order to remedy the aforementioned Life Safety violations and to cause Defendants to maintain the Property in a manner consistent with the minimum standards of health, sanitation, and safety as provided for in the aforementioned provisions of the International Property Maintenance Code, International Fire Code, and the Village Municipal Code.

**WHEREFORE,** the Plaintiff, Village of Mount Prospect, respectfully requests that this Court:

A.    Issue an order, requiring the Defendants to do the following:

a.    Cease doing business at Ye Olde Town Inn Restaurant;

b.    Abate all Life Safety Violations within seven (7) days;

c.    Keep all persons, who are not involved in the remediation of the Life Safety Violations, off the premises of the Ye Olde Town Inn Restaurant;

d.    Securely barricade any doorways leading onto the rear porch, and securely barricade the entrance to the rear stairway; and

i.    An Order granting the Village such other and further relief as the Court deems just and equitable under the circumstances.

Respectfully Submitted,

VILLAGE OF MOUNT PROSPECT

By: _____
One of its Attorneys

Lance C. Malina
George A. Wagner
Klein, Thorpe and Jenkins, Ltd.
20 North Wacker Drive - Suite 1660
Chicago, Illinois 60606-2903
(312) 984-6400
Attorney No. 90446

Order                               CCG N002-300M-2/24/05

EXHIBIT
6

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

PAGE 1
OF 3

VILLAGE OF MOUNT PROSPECT

v.                                   No. 08 CH 12821

CURTIS ET AL.

## ORDER

THIS CAUSE COMING TO BE HEARD UPON PLAINTIFFS
MOTION FOR TRO AND PRELIMINARY INJUNCTION, DUE NOTICE
BEING GIVEN, AND THE COURT BEING DULY ADVISED, IT IS
HEREBY ORDERED THAT:

(1) THE COURT HEREBY ENTERS A TEMPORARY RESTRAINING
ORDER WHICH PROHIBITS THE DEFENDANTS' OPERATION OF
YE OLD TOWN INN; PERMITTING ACCESS AND USE OF THE REAR
STAIRWAY/PORCH; REMOVAL OF EXISTING VILLAGE WARNING PLACARDS FOR
10 DAYS. AN ASCERTAINABLE CLAIM FOR RELIEF ARISES FROM THE BUILDING CODE
VIOLATIONS UNDER THE ILLINOIS MUNICIPAL CODE

(2) THE COURT HEREBY FINDS THAT MULTIPLE CODE VIOLATIONS EXIST
ON THE PROPERTY INCLUDING: DISHWASHER, ROOF BLEW OFF, CRUMBLING
BRICKS, WATER METER ALLOWS BACKFLOW, ELECTRICAL VIOLATIONS, FLOOR
AND THAT THESE VIOLATIONS HAVE EXISTED FOR 6, 9 & 12 MONTHS
SUCH THAT THE VILLAGE HAD TO GAIN AN ADMINISTRATIVE WARRANT,
AND THAT (COLLECTIVELY) IRREPARABLE HARM AND INADEQUATE REMEDY
AT LAW EXISTS, THOUGH NOT REQUIRED
UNDER VILLAGE OF RIVERDALE, 334 ILL APP 3Q 22

Atty. No.: 91663

Name: RICHARD S.
JARVEC & ASSOC., LTD.

Atty. for: DEFENDANTS

Address: 1021 W ADAMS, STE 102

City/State/Zip: CHGO, IL 60607

Telephone: 312 829 2300

ENTERED:

Dated: _____, _____

_____      _____
Judge                          Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Order                                    CCG N002-300M-2/24/05 (                    )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

PAGE 2
OF 3

Village of Mount Prospect

v.

Curtis, et al

} No. 08 CH 12821

## ORDER

(3) THE COURT FINDS THAT THE VILLAGES ADMINISTRATIVE REMEDIES ARE NOT SUFFICIENT BECAUSE ADMINISTRATIVE PROCESSES MOVE SLOWLY AND LEVEL OF FINES AVAILABLE ARE NOT A SUFFICIENT DETERENT.

(4) THE COURT FINDS THAT BECAUSE THE RESTURANT IS OPEN TO THE GENERAL PUBLIC, UNSANITARY CONDITIONS PLACE THE PUBLIC AT RISK AND THE ~~BACK~~ REAR STAIRS WHILE ON PRIVATE PROPERTY ARE PUBLIC BECAUSE OF TENANT AND VISITOR CONCERNS.

(5) THE TEMPORARY RESTRAINING ORDER EXPIRES AT 12:01 A.M. ON APRIL 21, 2008

(6) THE COURT DENIES THE DEFENDANTS MOTION TO STAY PENDING APPEAL.

Atty. No.: 91143

Name: RICHARD S. TROVEC' ASSOC, LTD

Atty. for: DEFENDANTS

Address: 1821 W ADAMS STE 102

City/State/Zip: CHGO IL 60607

Telephone: 312 824 2300

ENTERED:

Dated: _____, _____

_____
Judge                    Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Order                    CCG N002-300M-2/24/05 (                    )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS



VILLAGE OF MOUNT PROSPECT

v.

CURTIS, ET AL

PAGE 3
OF 3

No. 08 CH 12821

## ORDER

7) THE COURT FINDS THERE EXISTS A LIKLIHOOD OF SUCCESS ON THE MERITS.

8) THE COURT DENIES DEFENDANTS MOTION FOR IMPOSITION OF INJUNCTION AN VBOND UPON THE PLAINTIFF VILLAGE.

9) THE COURT GRANTS DEFENDANTS' MOTION FOR EXPEDITED DISCOVERY AS GOOD CAUSE HAS BEEN SHOWN, PLAINTIFF TO PROVIDE TO DEFENDANTS A WITNESS LIST ON OR BEFORE APRIL 11, 2008.

10) PLAINTIFF SHALL RESPOND TO THE PENDING MOTION TO DISMISS ON OR BEFORE APRIL 15, 2008, DEFENDANT TO REPLY ON OR BEFORE APRIL 17, 2008, HEARING IS SET ON APRIL 18, 2008 AT 9:30 A.M.

11) THIS CAUSE IS SET FOR PRELIMINARY INJUNCTION HEARING ON APRIL 24, 2008 AT 1:30 P.M.

Atty. No.: 9N43

Name: RICHARD S. JALOVEC ASSOC LTD      **ENTERED:**

Atty. for: DEFENDANTS

Address: 1021 W ADAMS STE 102

City/State/Zip: CHGO, IL 60607

Telephone: 312 829 2300

Dated:

JUDGE RITA M. NOVAK
APR 10 2008
Circuit Court-1741

Judge                    Judge's No.

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Order

CCG N002-300M-2/24/05 (

EXHIBIT

7

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

VILLAGE OF MOUNT PROSPECT,

v.

CURTIS, ET AL.

No. 08 CH 12821

### ORDER

THIS CAUSE COMING TO BE HEARD UPON DEFENDANTS VERIFIED MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER, DUE NOTICE BEING GIVEN AND THE COURT BEING DULY ADVISED IN THE PREMISES, IT IS HEREBY ORDERED:

(1) DEFENDANTS MOTION TO DISSOLVE IS DENIED.

(2) THE COURT FINDS THERE EXIST NO GROUNDS TO DISSOLVE THE INJUNCTION EITHER ON THE FACTS OR THE ~~STATUTE~~ PERTINENT STATUTES.

(3) THE COURT FURTHER FINDS THAT THE VIOLATIONS HAVE BEEN GOING ON A LONG-LONG TIME AS THE PRIMARY BASIS OF THE TEMPORARY RESTRAINING ORDER IS THE RISK OF HARM TO THE PUBLIC AND NO EFFORTS TO CORRECT THE CONDITION.

Atty. No.: 91143

Name: RICHARD S. JALOVEC

Atty. for: DEFENDANTS

Address: 1821 W ADAMS STE 102

City/State/Zip: CHLO IL 60607

Telephone: (312) 829 - 2300

ENTERED:

JUDGE RITA M. NOVAK

APR 11 2008

Circuit Court 1741

Dated:

FILED
CH-2408
APR 11 2008
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

Judge

Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Order      CCG N002-300M-2/24/05 (          )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

CURTIS, ET AL, V.
WILKS, ET AL.

VILLAGE OF MOUNT PROSPECT,
v.

CURTIS, ET AL,

No. 08 CH 12059
(CONSOLIDATED WITH
08 CH 12821)

**EXHIBIT**
**8**

## ORDER

THIS CAUSE COMING TO BE HEARD UPON CLERKS STATUS, ALL BRIEFS HAVING BEEN SUBMITTED TO THE COURT CLERK, DUE NOTICE BEING GIVEN AND THE COURT BEING DULY ADVISED, IT IS HEREBY ORDERED THAT:

AFTER TAKING ORAL ARGUMENT AND CONSIDERING THE BRIEFS, THE COURT FINDS THAT THE ELEMENTS NECESSARY TO GAIN A 2-619(a)(3) ~~DISMISSAL~~ WHILE SATISFIED, GIVEN THE FACTS AND CASELAW, DOES NOT MANDATE DISMISSAL BECAUSE THE COURT FINDS THE CONSOLIDATION OF THE CASE WITH 08 CH 12059 HAS THE SAME EFFECT, THEREFORE THE 2-619(a)(3) MOTION OF CURTIS AS TO 08CH 12821 IS DENIED AS IS WITHIN THE DISCRETION OF THE COURT.

Atty. No.: 41143

Name: RICHARD S. TADVEC & ASSOC, LTD.

Atty. for: CURTIS

Address: 1021 WEST ADAMS, STE 112

City/State/Zip: CHGO IL 60607

Telephone: (312) 829-2300

ENTERED:

Dated: _____

**ENTERED**
APR 18 2008

Judge
4/17

JUDGE **Judge's No.**
RICHARD J. BILLIK 1585

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Order                              CCG N002-300M-2/24/05 (                    )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Village of Mount Prospect

**EXHIBIT**

**9**

v.

Tod Curtis, First United Trust Company, as Trustee under Trust Agreement dated June 23, 1989, Trust No. 10510 and Elte Restaurant Inc. a/k/a Elte Restaurant Corporation

No. 08 CH 12821
(Consolidated as 08 CH 12059

### ORDER

This matter coming before the court on the Village of Mount Prospect's Motion to Extend Temporary Restraining Order, counsel for the parties present, and the court advised upon the premises, it is hereby ordered that:

The motion to extend the temporary restraining order entered by the Court on April 10, 2008 that was to expire on April 21, 2008 at 12:01 a.m. with the terms contained therein shall be extended for a period of time until this Court rules on the Village's motion for a preliminary injunction after a hearing.

Atty. No.: 90446

Name: Allen Wall

Atty. for: Village of Mt. Prospect

Address: 20 N. Wacker Dr. Ste 1660

City/State/Zip: Chicago / IL / 60606

Telephone: (312) 984-6400

**ENTERED:**

**ENTERED**

APR 18 2008

JUDGE
RICHARD J. BILLIK. 1585

Dated:

Judge                              Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - LAW DIVISION

| | | |
|---|---|---|
| VILLAGE OF MOUNT PROSPECT,<br>an Illinois Municipal corporation, | ) ) ) | CONDEMNATION<br>ADDRESS: 6-18 W. Busse Avenue<br>Mount Prospect, Illinois 60056 |
| Plaintiff, | ) ) | |
| v. | ) ) | PINS: 08-12-102-062-0000 |
| TOD CURTIS, and FIRST UNITED<br>TRUST COMPANY, as Trustee under<br>Trust Agreement dated June 23, 1989<br>and known as Trust Number 10510,<br>NON-RECORD CLAIMANTS, and<br>UNKNOWN OWNERS, | ) ) ) ) ) ) ) | PLAINTIFF DEMANDS<br>TRIAL BY JURY |
| Defendant. | ) | |

## AMENDED COMPLAINT FOR CONDEMNATION

NOW COMES the PLAINTIFF, the VILLAGE OF MOUNT PROSPECT, AN ILLINOIS MUNICIPAL CORPORATION, by and through its attorneys, KLEIN, THORPE AND JENKINS, LTD., complaining of DEFENDANTS TOD CURTIS, FIRST UNITED TRUST COMPANY, as Trust Number 10510, NON-RECORD CLAIMANTS and UNKNOWN OWNERS, states as follows:

1.    PLAINTIFF is a municipal corporation duly organized and existing under and by virtue of the laws of the State of Illinois.

2.    PLAINTIFF is authorized by the provisions of 65 ILCS 5/11-61-1 to exercise the right of eminent domain by condemnation proceedings to acquire private property useful, advantageous or desirable for municipal purposes or public welfare.

EXHIBIT

10

3.      Pursuant to the Tax Increment Allocation Redevelopment Act (hereinafter the "Act"), 65 ILCS 5/11-74.4-1 *et seq.*, municipal authorities, by ordinance, may approve redevelopment plans and redevelopment projects and designate redevelopment project areas to eradicate and encourage the development or redevelopment of certain blighted areas within the municipality.

4.      The Act also empowers municipal authorities to acquire by purchase, donation, lease or eminent domain, land within the redevelopment area as reasonably necessary to achieve the objectives of the redevelopment project.

5.      Pursuant to the authority granted under the Act, the President and the Board of Trustees for the PLAINTIFF have adopted a Redevelopment Plan and Redevelopment Project Area for a certain area within Mount Prospect pursuant to the adopted Ordinances: No. 5582, No. 5583 and No. 5584 copies of which are attached and referred to as *Exhibit A*.

6.      In order to achieve the objectives of the Redevelopment Plan and Project Area, it is necessary for the PLAINTIFF to acquire the real property commonly known as 6-18 W. Busse Avenue, Mount Prospect, Illinois (the "Subject Property") and legally described in paragraph 10.

7.      The President and the Board of Trustees of the PLAINTIFF have authorized the purchase of the Subject Property pursuant to the adoption of Ordinance No. 5640 entitled, *"An Ordinance Authorizing The Acquisition Of Property Through Condemnation Or Otherwise In The Tax Increment Redevelopment Project."* A copy of Ordinance No. 5640 is attached and referred to as *Exhibit B*.

8.    The Subject Property is private, and the persons named are, so far as appears of record and so far as PLAINTIFF has been able to ascertain with diligence, the owner or owners, or person(s) interested in the Subject Property or who claim some interest in it.

9.    PLAINTIFF has been unable to agree with the named parties as to the just compensation to be paid for the fee simple title to the Subject Property, although PLAINTIFF has attempted to do so. *See Letters dated January 25, 2007 and July 31, 2007*, attached and referred to as *Exhibit C.* PLAINTIFF, therefore, is authorized to proceed to acquire the Subject Property under the eminent domain laws of the State of Illinois.

10.    PLAINTIFF now seeks to acquire for the uses and purposes stated above the fee simple title in and to the Subject Property, legally described as follows:

> That part of Lot 4 in Mount Prospect Central District Subdivision of part of the west half of Section 12, Township 41 North, Range 11 East of the Third Principal Meridian according to the plat thereof recorded December 23, 1949 as document 1275902, lying southerly of the westerly extension of the southernmost line of Lot 2 in said Mount Prospect Central District Subdivision, all in Cook County Illinois.
>
> COMMON ADDRESS: 6-18 W. Busse Avenue, Mount Prospect, IL
> PERMANENT TAX INDEX NUMBER: 08-12-102-062-0000

11.    That in addition to the persons or parties named in this Complaint for Condemnation, there are or may be other persons or parties who are interested in this action and who have or claim some right, title, interest or lien in, to or upon the Subject Property, or some part thereof; that the name of each such other person or party is unknown to the PLAINTIFF and on due diligent inquiry cannot be ascertained, and all

such persons or parties are, therefore, made party DEFENDANTS to this action by the name and description of "Unknown Owners."

      12.    PLAINTIFF demands trial by jury.

**WHEREFORE,** the PLAINTIFF prays that:

    I.    the usual process of summons be issued against each and all of the above-described DEFENDANTS according to law, commanding them to be and appear before this Court on the return day of said summons, and that due notice according to the law may be given to the owners of and parties interested in said real property aforesaid; and

    II.    the Court cause just compensation to be ascertained and determined according to statute for the fee simple title to the Subject Property and adjudge and make such orders as to which right and justice shall pertain; and

    III.    that just compensation be made according to the law to the owner(s) of the fee simple title in and to the Subject Property and/or person(s) interested in the Subject Property and to each of them; and

    IV.    the Court orders that fee simple title in and to the Subject Property be vested in the PLAINTIFF, free and clear of (i) all interest of DEFENDANTS and other persons; (ii) all liens (including mortgages) and encumbrances, including the release of all rights under and by virtue of the Homestead Exemption Law of the State of Illinois and possession of the Subject Property be delivered to PLAINTIFF free and clear of all parties in possession of the Subject Property upon payment of full just compensation to the party or parties entitled thereto by depositing such just compensation with the Cook County Treasurer within a reasonable time period to be fixed by the Court; and

    V.    the Court retain jurisdiction of this cause and enter such further orders as may be necessary in this cause, including such orders as may be necessary to put PLAINTIFF into possession and fee simple title ownership of the Subject Property; and

    VI.    PLAINTIFF be granted such other and further relief as may be required.

Respectfully submitted,

VILLAGE OF MOUNT PROSPECT

By: *Allen Wall*

Everette M. Hill, Jr.
Lance C. Malina
Allen Wall
KLEIN, THORPE AND JENKINS, LTD.
20 North Wacker Drive, Suite 1660
Chicago, Illinois 60606
(312) 984-6400
Attorney No. 90446

Imanage 201002

ORDINANCE NO. 5582

AN ORDINANCE OF THE VILLAGE OF MOUNT PROSPECT, COOK COUNTY,
ILLINOIS AMENDING A TAX INCREMENT REDEVELOPMENT PLAN
AND REDEVELOPMENT PROJECT OF THE DOWNTOWN TIF NO.1
(AMENDMENT #3) REDEVELOPMENT PROJECT AREA

Passed and approved by
the President and Board of Trustees
the 15TH day of August, 2006

Published in pamphlet form by
authority of the corporate
authorities of the Village of
Mount Prospect, Illinois,
the 16th day of August, 2006


PLAINTIFF'S
EXHIBIT
A

Ordinance No. 5582

## AN ORDINANCE OF THE VILLAGE OF MOUNT PROSPECT, COOK COUNTY, ILLINOIS, AMENDING A TAX INCREMENT REDEVELOPMENT PLAN AND REDEVELOPMENT PROJECT FOR THE DOWNTOWN TIF NO. 1 (AMENDMENT #3) <u>REDEVELOPMENT PROJECT AREA</u>

WHEREAS, it is desirable and in the best interest of the citizens of the Village of Mount Prospect, Cook County, Illinois (the "Village"), for the Village to implement tax increment allocation financing pursuant to the Tax Increment Allocation Redevelopment Act, Division 74.4 of Article 11 of the Illinois Municipal Code, as amended (the "Act"), for proposed Amendments #3 to the Downtown TIF No. 1 redevelopment and redevelopment project (the "Plan and Project") within the municipal boundaries of the Village within the redevelopment project area (the "Area") described in Section 1(a) of this Ordinance, which Area constitutes in the aggregate more than one and one-half acres; and

WHEREAS, pursuant to Section 11-74.4-5 of the Act, the Village President and Board of Trustees of the Village (the "Corporate Authorities") called a public hearing relative to the Plan and Project and the designation of the Area as a redevelopment project area under the Act for December 6th, 2005; and

WHEREAS, due notice with respect to such hearing was given pursuant to Section 11-74.4-5 of the Act, said notice being given to taxing districts and to the Department of Commerce and Economic Opportunity of the State of Illinois by certified mail on December 19, 2005, by publication on January 18, 2006, and January 21, 2006, and by certified mail to taxpayers and residents within the Area on January 18, 2006; and

WHEREAS, the Village has heretofore convened a joint review board as required by and in all respects in compliance with the provisions of the Act; and

WHEREAS, the Corporate Authorities have reviewed the information concerning such factors presented at the public hearing and have reviewed other studies and are generally informed of the conditions in the proposed Area that could cause the Area to be a "conservation area" as defined in the Act; and

WHEREAS, the Corporate Authorities have reviewed the conditions pertaining to lack of private investment in the proposed Area to determine whether private development would take place in the proposed Area as a whole without the amendment of the proposed Plan; and

WHEREAS, the Corporate Authorities have reviewed the conditions pertaining to real property in the proposed Area to determine whether contiguous parcels of real property and improvements thereon in the proposed Area would be substantially benefited by the proposed Project improvements; and

WHEREAS, the Corporate Authorities have reviewed the proposed amendments to the Plan and Project and also the existing comprehensive plan for development of the Village as a whole to determine whether the proposed amendments to the Plan and Project conform to the comprehensive plan of the Village.

NOW, THEREFORE, BE IT ORDAINED by the Village President and Board of Trustees of the Village of Mount Prospect, Cook County, Illinois, as follows:

Section 1.    Findings.    That the Corporate Authorities hereby make the following findings:

a.    The Area is legally described in Exhibit A attached hereto and incorporated herein as if set out in full by this reference. The general street location for the Area is described in Exhibit B attached hereto and incorporated herein as if set out in full by this reference. The map of the Area is depicted on Exhibit C attached hereto and incorporated herein as if set out in full by this reference.

b    There exist conditions that cause the Area to be subject to designation as a redevelopment project area under the Act and to be classified as a conservation area as defined in Section 11-74.4-3(b) of the Act.

c.    The proposed Area on the whole has not been subject to growth and development through investment by private enterprise and would not be reasonably anticipated to be developed without the amendments to the Plan.

d.    The Plan and Project as amended, conform to the comprehensive plan for the development of the Village as a whole, as reflected in the Village's zoning map.

e.    As set forth in the Plan it is anticipated that all obligations incurred to finance redevelopment project costs, if any, as defined in the Plan shall be retired within twenty-three (23) years after the Area is designated, or thirty-five (35) years after the Area is designated, if the Act is so amended to allow for an additional twelve (12) year extension of the term.

f.    The parcels of real property in the proposed amended Area are contiguous, and only those contiguous parcels of real property and improvements thereon that will be substantially benefited by the proposed Project improvements are included in the proposed Area.

Section 2.    Plan and Project Approved.    That the amended Plan and Project, which were the subject matter of the public hearing held on February 7, 2006, are hereby adopted and approved. A copy of the amended Plan and Project is set forth in Exhibit D attached hereto and incorporated herein as if set out in full by this reference.

Section 3.    Invalidity of Any Section.    That if any section, paragraph, or provision of this Ordinance shall be held to be invalid or unenforceable for any reason, the invalidity or unenforceability of such section, paragraph, or provision shall not affect any of the remaining provisions of this Ordinance.

Section 4.    *Superseder and Effective Date*. All ordinances, resolutions, motions, or orders in conflict herewith shall be, and the same hereby are, repealed to the extent of such conflict; and this Ordinance shall be in full force and effect immediately upon its passage by the Corporate Authorities and approval as provided by law.

ATTACHMENTS:

EXHIBIT A – Legal Description

EXHIBIT B – General Street Location

EXHIBIT C – Map of Redevelopment Project Area

EXHIBIT D – Redevelopment Plan and Project

PASSED this 15th day of August, 2006.

AYES 6   NAYS 0   ABSENT 0

## LEGAL DESCRIPTION

Legal Description of Downtown TIF No. 1 Redevelopment Project Area, As Amended is as follows:

Beginning at the intersection of the east right-of-way line of Main Street, State of Illinois Route 83, with the north right-of-way line of Central Road, thence easterly along said north right-of-way line to a point of intersection with the extension of the west property line of Lots 1 through 11 of Block 5 in Busse and Wille's Resubdivision in Mount Prospect, thence southerly along the extension of the west property line of Lots 1 through 11 of Block 5 in Busse and Wille's Resubdivision in Mount Prospect to the north right-of-way line of Busse Avenue, thence easterly along the north right-of-way line of Busse Avenue to a point of intersection with the extension of the east property line of Lots 1 through 8 of Block 11 of Busse and Wille's Resubdivision in Mount Prospect, thence southerly along the extension of the east property line of Lots 1 through 8 of Block 11 of Busse and Wille's Resubdivision in Mount Prospect to the southeast corner of Lot 8 of Block 11 of Busse and Wille's Resubdivision in Mount Prospect; thence easterly along the south property line of Lot 17 of Block 11 of Busse and Wille's Resubdivision in Mount Prospect extended to a point of intersection with the east right-of-way line of Elm Street, thence southerly along the east right-of-way line of Elm Street to the north right-of-way line of Evergreen Avenue; thence easterly along the north right-of-way line of Evergreen Avenue to a point of intersection with the extension of the west property line of Lots 1 through 21 of Block 20 of Mount Prospect Subdivision in Section 12-41-11, recorded September 2, 1874, thence southerly along the extension of the west property line of Lots 1 through 21 of Block 20 of Mount Prospect Subdivision in Section 12-41-11, recorded September 2, 1874 to the northwest corner of Lot 1 of Bruce's Resubdivision in Mount Prospect, thence easterly along the north property line of Lot 1 of Bruce's Resubdivision in Mount Prospect extended to a point of intersection with the east right-of-way line of Owen Street, thence southerly along the east right-of-way line of Owen Street extended to a point of intersection with the southerly right-of-way line of Northwest Highway, US Rode 14, thence northwesterly along the southerly right-of-way line of Northwest Highway, US Route 14 to a point of intersection with the north right-of-way line of Central Road; thence easterly along the north right-of-way line of Central Road to the southwest corner of Lot 1 of Trapani's Resubdivision in Mount Prospect, thence northerly along the west property line of Trapani's Resubdivision in Mount Prospect to the northwest corner of Lot 1 of Trapani's Resubdivision in Mount Prospect, thence easterly along the north property line of Lot 1 of Trapani's Resubdivision in Mount Prospect extended to a point of intersection with the east right-of-way line of Main Street, State of Illinois Route 83; thence southerly along the east right-of-way line of Main Street, State of Illinois Route 83 to the point of beginning at the point of intersection of the east right-of-way line of Main Street, State of Illinois Route 83, with the north right-of-way line of Central Road, all located in part of the Northeast Quarter and the Northwest Quarter of Section 12, and the Northeast Quarter of Section 11 all in Township 41 North, Range 11 East of the Third Principal Meridian, and in part of the Southwest Quarter and the Southeast Quarter of Section 34, Township 42 North, Range 11 East of the Third Principal Meridian all in Cook County, Illinois.

## EXHIBIT C

### MAP OF AMENDED REDEVELOPMENT PROJECT AREA



Exhibit 1:
Tax Increment Finance District #1
As Amended
Boundary Map

# EXHIBIT D

## AMENDED REDEVELOPMENT PLAN AND PROJECT

**(Amendment #3)**

<u>DRAFT dated April 5, 2006</u>

AMENDMENT #3 TO:

## VILLAGE OF MOUNT PROSPECT

## DOWNTOWN TIF NO. 1
## REDEVELOPMENT PROJECT AREA

## <u>REDEVELOPMENT PLAN AND PROJECT</u>

Prepared Jointly By:

**Village of Mount Prospect**
**and**
**Kane, McKenna and Associates, Inc.**

Original Plan and Project:
First Amendment to Plan and Project:
Second Amendment to Plan and Project:
Third Amendment to Plan and Project:

April, 1985
December, 1988
January, 1993
_____, 2006

The Village of Mount Prospect (the "Village") Downtown TIF No. 1 Redevelopment Project and Plan, is amended as follows:

1.    The "List of Tables and Exhibits" is amended to include: Exhibit 8 - Legal Description Amendment #3. Exhibit 9 - Amendment #3 TIF Eligibility Report.

2.    The "Introduction" section 3, second paragraph is amended to include the following last sentences at the end of the page.

      The Amendment #3 to the Redevelopment Area was prepared by the Village with the assistance of Kane, McKenna and Associates, Inc.   The Amendment #3 area includes new parcels contiguous to the initial redevelopment project area, as amended, and includes properties located at the northwest section and at the north east section.   (See Exhibit 1 Amended Boundary Map).

3.    The "Conservation Area Conditions Existing in the Redevelopment Project Area" section, last paragraph of page 7 is amended to include the following language:

      The property included in the area of the Amendment #3 meets the eligibility requirements of the Act.   The proposed amended boundaries are described in Exhibit 1 of the Redevelopment Plan and such eligibility findings are included in Exhibit 9, attached hereto.

4.    The "Redevelopment Plan and Project Objectives" section, page 8 is amended to include the following paragraph:

      It is found, and certified by the Village, in connection to the process required for the amendment of this Plan and Project pursuant to 65 ILSC Section 5/11-74.4.3(n)(5) of the Act, that this Plan and Project will not result in the displacement of 10 or more inhabited residential units.   Therefore, this Plan and Project does not include a housing impact study. If at a later time the Village does decide to dislocate more than ten (10) inhabited residential units, this Plan would have to be amended and a housing impact study would be completed.

5.    The "Redevelopment Activities" section, page 8 is amended to include an amended Exhibit 2, Development Program.

6.    The "General Land Use Plan section" page 9 is amended to include the following changes in the first paragraph.

      This Redevelopment Plan and Amendments #1, #2, and #3 and the proposed projects described herein conform to the Comprehensive Plan for the municipality as a whole.

1

7.    The "General Land-Use Plan" section, pages 9 to 11, is hereby deleted and replaced by the following section.

Exhibit 3, "Land-Use Plan", is hereby amended and attached hereto.

## General Land-Use Plan

The Redevelopment Plan and Amendments #1, #2, #3 and the proposed projects described herein conform to the Comprehensive Plan for the municipality as a whole.

The amended Generalized Land-Use Plan, Exhibit 3, attached hereto and made a part hereof, identifies land-uses and public rights-of-way to be in effect upon adoption of this Plan. The major land-use categories included within the Redevelopment Project Area are office/governmental, central commercial, mixed-use, low-density residential, and moderate-density residential.

All major thoroughfares and street right-of-way are shown on the Generalized Land-Use Plan map. Their locations are subject to minor modification.

The following land-use provisions are established for the Redevelopment Project Area as designated in Exhibit 3, amended Generalized Land Uses Map.

### Office/Governmental

The office/governmental area is intended to provide for high-quality office and related development within the heart of the downtown. Permitted uses include business and professional offices, governmental offices, financial institutions, parking and business services. Under certain conditions, multifamily residential may be permitted with other compatible and special uses as approved by the Village.

### Central Commercial

The central commercial area is intended to accommodate small scale commercial and office development such as retail and specialty shops, and business, professional, and civic uses characteristic of a traditional downtown area. In contrast to the Office/ Governmental and the Mixed-Use development areas located in the center of the Redevelopment Project Area, these areas should be characterized by lower intensity development which is compatible with nearby residential areas. Other compatible and special uses as approved by the Village may also be permitted.

### Mixed-Use

This land-use is intended to allow for a high-quality mixed use developments in the downtown. Mixed use refers to the combining of retail/commercial, and/or service uses, and/or residential uses in the same building or on the same site.

2

## Low-Density Residential

The low-density residential area is intended to serve as a high-quality residential area adjoining the downtown. Permitted uses include single-family attached or detached houses, townhouses or similar housing types, provided they are compatible with existing nearby resident development. Other compatible and special uses as approved by the Village may also be permitted.

## Moderate-Density Residential

The moderate density residential area is intended to serve as an attractive residential area with limited concentrations of medium to higher density apartment and multi-family developments. This area is appropriate because a high level of transit service is present and employment and commercial centers are located nearby. Although intended primarily for residential uses, other compatible and special uses approved by the Village may also be permitted.

## OTHER AREA-SPECIFIC OBJECTIVES

In addition to the objectives in the Plan, which apply to the overall Project Area, several other design and development objects which apply to specific land-use areas are listed below:

## Office/Governmental

A.    Vehicular access to the area along Northwest Highway could be provided from Northwest Highway and from Emerson Street; however, this area includes both office and residential development, separate access systems should be provided for the two land uses.

B.    High-quality design and construction is important because of this high-visibility location along Northwest Highway, near Main Street.

C.    The Northwest Highway edge should be attractively and generously landscaped.

## Mixed-Use Retail and Residential Area

A.    Below grade parking for residential units should be provided to the extent feasible, surface parking lots shall be consolidated between buildings.

B.    Setbacks and landscaping along Central Road and Northwest Highway shall be areas of design emphasis because of high-visibility locations.

3

8.    The "Estimated Redevelopment Project Costs" section, pages 11 to 12 is deleted and replaced by the following section.

Estimated Redevelopment Project Costs

Redevelopment project costs mean and include the sum total of all reasonable or necessary costs incurred or estimated to be incurred, as provided in the TIF statute, and any such costs incidental to this Redevelopment Plan and Project. Private investments, which supplement "Redevelopment Project Costs", are expected to substantially exceed such redevelopment project costs. Eligible costs permitted under the Act which may be pertinent to this Redevelopment Plan and Project include:

1.    Costs of studies and survey, development of plans and specification, implementation and administration of the redevelopment plan including, but not limited to, staff and professional service costs for architectural, engineering, legal, marketing, financial, planning, other special services, provided, however, that no charges for professional services may be based on a percentage of the tax increment collected; no contracts for professional services, excluding architectural and engineering services, may be entered into if the terms of the contract extend beyond a period of three (3) years. In addition, "redevelopment project costs" shall not include lobbying expenses;

      1.1    Annual administrative costs shall not include general overhead or administrative costs of the municipality that would still have been incurred by the municipality if the area or approved a redevelopment plan;

      1.2    The cost of marketing sites within the redevelopment project area to prospective businesses, developers, and investors;

2.    Property assembly costs, including, but not limited to, acquisition of land and other property, real or persona, or rights or interest therein, demolition of buildings, site preparation, site improvements that serve as an engineered barrier addressing ground level or below ground environmental contamination, including, but not limited to, parking lots and other concrete or asphalt barriers, and the clearing and grading of land;

3.    Costs of rehabilitation, reconstruction or repair or remodeling of existing public or private buildings, fixtures and leasehold improvements; and the costs of replacing an existing public building if pursuant to the implementation of a redevelopment project the existing public building is to be demolished to use the site for private investment or devoted to a different use requiring private investment;

4.    Costs of the construction of public works or improvements, and redevelopment project costs shall not include the cost of constructing a new municipal public building principally used to provide offices, storage space, or conference facilities or vehicle storage, maintenance, or repair for administrative, public safety, or

public works personnel and that is not intended to replace an existing public building as provided under paragraph (3) of subsection (q) of Section 11-74.4-3 unless either (i) the construction of the new municipal building implements a redevelopment project that was included in a redevelopment plan that was adopted by the municipality prior to the effective date of this amendatory Act of the 91st General Assembly or (ii) the municipality makes a reasonable determination the redevelopment plan, supported by information that provided that basis for that determination, that the new municipal building is required to meet an increase in the need for public safety purposes anticipated to result from the implementation of the redevelopment plan;

5.    Costs of job training and retraining projects including the costs of 'welfare to work" programs implemented by businesses located within the redevelopment project area;

6.    Financing costs, including but not limited to all necessary and incidental expenses related to the issuance of obligations and which may include payment of interest on any obligations issued pursuant to the Act accruing during the estimated period of construction of any redevelopment project for which such obligations are issued and for not exceeding 36 months thereafter and including reasonable reserves related thereto;

7.    To the extent the municipality by written agreement accepts and approves the same, all or a portion of a taxing district's capital (and additional student tuition) costs resulting from the redevelopment project necessarily incurred or to be incurred within a taxing district in furtherance of the objectives of the redevelopment plan and project;

8.    Relocation costs to the extent that the Village determines that relocation costs shall be paid or is required to make payment of relocation costs by federal or state law;

9.    Costs of job training, advanced vocational education or career education, including but not limited to courses in occupational, semi-technical or technical fields leading directly to employment, incurred by one or more taxing districts, provided that such costs (i) are related to the establishment and maintenance of additional job training, advanced vocational education or career education programs for persons employed or to be employed by employers located in the Redevelopment Project Area; and (ii) when incurred by a taxing district or taxing districts other than the Village, are set forth in a written agreement by or among the Village and the taxing district or taxing districts, which agreement describes the program to be undertaken, including but not limited to the number of employees to be trained, a description of the training and services to be provided, the number and type of positions available or to be available, itemized costs of the program and sources of funds to pay for the same, and the term of agreement. Such costs include, specifically, the payment by community college districts of

costs pursuant to Section 3-37, 3-38, 3-40 and 3-40.1 of the Public Community College Act and by school districts of costs pursuant to Section 10-22.20a and 10-23.3a of the School Code.

10.  Interest costs incurred by a redeveloper related to the construction, renovation or rehabilitation of a redevelopment project provided that:

   a)  such costs are to be paid directly from the Special Tax Allocation Fund established pursuant to the Act;

   b)  such payments in any one-year may not exceed 30% of the annual interest costs incurred by the developer with regard to the redevelopment project during that year;

   c)  if there are not sufficient funds available in the Special Tax Allocation Fund to make the payment pursuant to this paragraph (11) then the amounts so due shall accrue and be payable when sufficient funds are available in the Special Tax Allocation Fund; and

   d)  the total of such interest payments paid pursuant to the Act may not exceed 30% of the (i) cost paid or incurred by the redeveloper for the redevelopment project plus (ii) redevelopment project costs excluding any property assembly costs and any relocation costs incurred by a municipality pursuant to the Act.

11.  Unless explicitly stated herein the costs of construction of new privately owned buildings shall not be an eligible redevelopment project cost.

12.  None of the redevelopment project costs enumerated in this subsection shall be eligible redevelopment projects if those costs would provide direct financial support to a retail entity initiating operations in the redevelopment project area while terminating operations at another Illinois location within 10 miles of the redevelopment project area but outside the boundaries of the redevelopment project area municipality. For purposes of this paragraph, termination means a closing of a retail operation that is directly related to the opening of the same operation or like retail entity owned or operated by more than 50% of the original ownership in a redevelopment project area, but it does not mean closing an operation for reasons beyond the control of the retail entity, as documented by the retail entity, subject to a reasonable finding by the municipality that the current location contained inadequate space, has become economically obsolete, or was no longer a viable location for the retailer or serviceman.

13.  The Village may, pursuant to the TIF Act, provide school tuition reimbursement costs.

Estimated costs are shown in the next section. Adjustments to these cost items may be made without amendment to the Redevelopment Plan.

9.    The "Redevelopment Project Estimated Redevelopment Project Cost Schedule" page 13, Table 1 - is deleted and replaced with the amended Table 1 found below.

## VILLAGE OF MOUNT PROSPECT
## DOWNTOWN - TIF NO. 1 REDEVELOPMENT PROJECT
## ESTIMATED PROJECT COSTS

| Program Actions/Improvements | Estimated Costs (A) |
|---|---|
| 1. Land Acquisition and Assembly Costs and Relocation Costs | $15,000,000 |
| 2. Demolition, Site Preparation, Environmental Cleanup and Related Costs | 3,500,000 |
| 3. Utility Improvements including, but not limited to, water, storm, sanitary sewer, the service of public facilities, and road improvements | 10,500,000 |
| 4. Rehabilitation | 1,000,000 |
| 5. Interest Costs Pursuant to the Act | 500,000 |
| 6. Planning, Legal, Engineering, Administrative and Other Professional Service Costs | 1,000,000 |
| 7. Job Training | 250,000 |
| 8. Estimated School Tuition Costs | 750,000 |
| **TOTAL ESTIMATED PROJECT COSTS** | **$32,500,000** |

(A)    All project cost estimates are in year 2005 dollars. In addition to the above stated costs, any bonds issued to finance a phase of the Project may include an amount sufficient to pay customary and reasonable charges associated with the issuance of such obligations as well as to provide for capitalized interest and reasonably required reserves. Adjustments to the estimated line item costs above are expected. Each individual project cost will be reevaluated in light of the projected private development and resulting tax revenues as it is considered for public financing under the provisions of the Act. The totals of line items set forth above are not intended to place a total limit on the described expenditures as the specific items listed above are not intended to preclude payment of other eligible redevelopment project costs in connection with the redevelopment of the Proposed RPA, provided the total amount of payment for Eligible Redevelopment Project Costs shall not exceed the overall budget amount outlined above. Adjustments may be made in line items within the total, either increasing or decreasing line item costs for redevelopment.

10. The section, "Sources of Funds to Pay Redevelopment Project Costs" page 14, the following paragraph is to be included as a new third paragraph.

Any surplus Special Tax Allocation Funds, to the extent any surplus exists, will be proportionately shared, based on the appropriate tax rates for a given year, with the various taxing districts, including the Village, after all TIF eligible costs either expended or incurred as an obligation by the Village have been duly accounted for through administration of the Special Tax Allocation Fund established by the Village as provided by the Act. The exception to this provision will be to the extent that the Village utilizes TIF funding to assist in the redevelopment of residential units. In such cases, the Village will provide for the cost incurred by eligible school districts in the manner prescribed by 65 ILCS Section 5/11-74.4.3(q)(7.5) of the Act.

11. The section "Issuance of Obligations" page 14, is amended in order to delete the first section with the following sentence.

It is anticipated that the Village will obtain an extension to the term of this Redevelopment Plan and Project. Once the term is extended by the State of Illinois, all obligations issued by the Village pursuant to the Redevelopment Plan and Project shall be retired within thirty-five (35) years from the date of the initial adoption of the Redevelopment Plan and Project.

The actual date for such completion and retirement of obligations shall not be later than December 31 of the year in which the payment to the municipal treasurer pursuant to the Act is to be made with respect to ad valorem taxes levied in the thirty-fifth calendar year in which the ordinance approving the Proposed RPA is adopted. (Note: this would occur to the extent that the Village is successful in obtaining the extension of the term of this Redevelopment Plan and Project. In the event that no such extension is obtained, the completion date would be twenty-three (23) calendar years after the adoption of the ordinance described above).

12. The section, "Most Recent Equalized Assessed Valuation of Properties in the Redevelopment Project Area", page 14 is amended to include the following language as a new paragraph.

The total estimated equalized assessed valuation for the Amendment #3 to the Redevelopment Project Area is $6,152,577 (2004 EAV).

13. The section "Anticipated Assessed Valuation" page 15, is deleted and replaced by:

Upon completion of the anticipated private development of the Redevelopment Project Area over a thirty-five (35) year period (subject to State of Illinois approval) it is estimated that the equalized assessed valuation (EAV) of the property within the Redevelopment Project Area will be approximately $65,000,000.

14.   The section, "Phasing and Scheduling of Redevelopment Project" pages 18 to 20, is hereby deleted and replaced with the following section.

## PHASING AND SCHEDULING OF REDEVELOPMENT PROJECT

Target Area 1a of the Redevelopment Project was the first phase of construction within Block 115. Private development in the area resulted in the construction of fifty-one townhome units.

Target Area 1b of the Redevelopment Project will include limited construction of single family homes within Block 110 as lots become available. It is possible that six units could be constructed on this block.

Target Area 1c of the Redevelopment Project will include redevelopment activity within Block 104. This redevelopment will consist of private development of high quality "rowhomes" with all garages/driveways to be located on the rear (east) side of the buildings. A small open space is also planned to compliment the open space that was incorporated into the new Village Hall/parking deck development across the street.

Target Area 1d of the Redevelopment Project will include initiation of redevelopment activity within Block 108. Private development in this area will provide a mixed use development which could include residential, office, and/or retail/commercial use.

Target Area 1e of the Redevelopment Project included the construction of a parking garage, new Village Hall with incorporated open space, and the renovation of the Mount Prospect Library. The garage is used for parking for employees and customers of nearby businesses and the Village.

Target Area 1f of the Redevelopment Project included the construction of the Residences at Village Centre, a 205 unit condominium. Further redevelopment activities within Block 102 could include residential, office, and/or retail/commercial use.

Target Area 1g of the amended Redevelopment Project included the construction of the Shires of Clocktower, a 139 unit condominium. Further redevelopment activities within Block 101 included specialty retail and service shops that provided convenience items for residents in the area.

Target Area 1h of the Redevelopment Project will include activity in Blocks 100 and 204. Private development in this area will provide mixed use development which could include residential, office, and/or retail/commercial use.

Target Area 1i of the amended Redevelopment Project will include redevelopment activity within Block 109. Private development in this area will provide mixed use development which could include residential, office, and/or retail/commercial use.

Target Area 1j of the amended Redevelopment Project will include redevelopment activity within Block 331. Private development in this area will provide mixed use development which could include residential, office, and/or retail/commercial use.

15.    A new section "Assessment of Fiscal Impact on Affected Taxing Districts" is included at the end of page 20, and is found below:

Assessment of Fiscal Impact on Affected Taxing Districts

It is anticipated that the implementation of this Redevelopment Plan and Project will have a minimal financial impact on most of the affected taxing districts. In fact, the action taken by the Village to stabilize and encourage growth of its tax base through the implementation of this Redevelopment Plan and Project will have a positive impact on the affected taxing districts by arresting inflation adjusted declines in assessed valuations.

Given that there is the potential for new development, the Village may permit new residential development to occur within the RPA. As such, there could be an increased burden placed on the area's school districts. To the extent that such development does occur, and school age children result from new community arrivals, the elementary and high school taxing districts could potentially be affected. The Village has made allowances in this plan and project for revenue distributions to such taxing districts and will follow the guidelines provided by the Act to compensate the district at levels dictated by the precise increase in students. Additionally, should the Village achieve success in attracting private investment which does result in the demonstrated need for increased services from any other taxing district, the Village would consider declaring sufficient TIF related surpluses, which funds are neither expended or obligated for redevelopment activities, as provided by the Act, to assist such taxing districts in paying the costs for any increased services.

Though strategies will be encouraged to promote growth via private investment within the area, specific objectives are geared to stabilize the RPA's existing strengths and revitalize the RPA's redevelopment potential. Should the Village achieve success in attracting private investment which does result in the need for documented increased services from any taxing districts, the Village will consider the declaration of sufficient surplus funds (as long as those funds are not already obligated to the TIF), to assist affected taxing districts in paying the costs for the increased services.

16.    Exhibit 4 is amended and attached hereto.

17.    A new Exhibit 8, Legal Description - Amendment #3, is attached hereto.

18.    The TIF eligibility report for parcels included in Amendment #3 is attached hereto as a new Exhibit 9.



Exhibit 1:
Tax Increment Finance District #1
As Amended
Boundary Map

Key

New Development With Or Without Acquisition

No Acquisition

Exhibit 2:
Tax Increment Finance District #1
As Amended
Development Program

0  150  300  450  600  750  Feet

Key

Governmental/Office
Central Commercial
Mixed Use
Low Density Residential
Moderate Density Residential

Exhibit 3:
Tax Increment Finance District #1
As Amended
Generalized Land Uses

0   150   300   450   600   750
Feet



Key
- Governmental/Office
- Central Commercial
- Mixed Use
- Low Density Residential
- Moderate Density Residential

Exhibit 4:
Tax Increment Finance District #1
As Amended
Redevelopment Target Areas

0   150   300   450   600   750
Feet

Exhibit 8 – as amended
LEGAL DESCRIPTION

The legal description of the Redevelopment Area as hereby amended is as follows:

Beginning at the intersection of the east right-of-way line of Main Street, State of Illinois Route 83, with the north right-of-way line of Central Road; thence easterly along said north right-of-way line to a point of intersection with the extension of the west property line of Lots 1 through 11 of Block 5 in Busse and Wille's Resubdivision in Mount Prospect; thence southerly along the extension of the west property line of Lots 1 through 11 of Block 5 in Busse and Wille's Resubdivision in Mount Prospect to the north right-of-way line of Busse Avenue; thence easterly along the north right-of-way line of Busse Avenue to a point of intersection with the extension of the east property line of Lots 1 through 8 of Block 11 of Busse and Wille's Resubdivision in Mount Prospect; thence southerly along the extension of the east property line of Lots 1 through 8 of Block 11 of Busse and Wille's Resubdivision in Mount Prospect to the southeast corner of Lot 8 of Block 11 of Busse and Wille's Resubdivision in Mount Prospect; thence easterly along the south property line of Lot 17 of Block 11 of Busse and Wille's Resubdivision in Mount Prospect extended to a point of intesection with the east right-of-way line of Elm Street; thence southerly along the east right-of-way line of Elm Street to the north right-of-way line of Evergreen Avenue; thence easterly along the north right of-way line of Evergreen Avenue to a point of intersection with the extension of the west property line of Lots 1 through 21 of Block 20 of Mount Prospect Subdivision in Section 12-41-11, recorded September 2, 1874; thence southerly along the extension of the west property line of Lots 1 through 21 of Block 20 of Mount Prospect Subdivision in Section 12-41-11, recorded September 2, 1874 to the northwest corner of Lot 1 of Bruce's Resubdivision in Mount Prospect; thence easterly along the north property line of Lot 1 of Bruce's Resubdivision in Mount Prospect extended to a point of intersection with the east right-of-way line of Owen Street; thence southerly along the east right-of-way line of Owen Street extended to a point of intersection with the southerly right-of-way line of Northwest Highway, US Route 14, thence northwesterly along the southerly right-of-way line of Northwest Highway, US Route 14 to a point of intersection with the north right-of-way line of Central Road; thence easterly along the north right-of-way line of Central Road to the southwest corner of Lot 1 of Trapani's Resubdivision in Mount Prospect; thence northerly along the west property line of Trapani's Resubdivision in Mount Prospect to the northwest corner of Lot 1 of Trapani's Resubdivision in Mount Prospect; thence easterly along the north property line of Lot 1 of Trapani's Resubdivision in Mount Prospect extended to a point of intersection with the east right-of-way line of Main Street, State of Illinois Route 83; thence southerly along the east right-of-way line of Main Street, State of Illinois Route 83 to the point of beginning at the point of intersection of the east right-of-way line of Main Street, State of Illinois Route 83, with the north right-of-way line of Central Road; all located in part of the Northeast Quarter and the Northwest Quarter of Section 12, and the Northeast Quarter of Section 11 all in Township 41 North, Range 11 East of the Third Principal Meridian, and in part of the Southwest Quarter and the Southeast Quarter of Section 34, Township 42 North, Range 11 East of the Third Principal Meridian all in Cook County, Illinois.

DRAFT Dated 10/18/05

## Exhibit 9

# VILLAGE OF MOUNT PROSPECT
# TIF QUALIFICATION/DESIGNATION REPORT
# AMENDMENT #3 TO DOWNTOWN TIF NO. 1

A study to determine whether all or a portion of an area located in the Village of Mount Prospect qualifies as a conservation area as set forth in the definition in the Tax Increment Allocation redevelopment Act of 65 ILCS Section 5/11-74.4-3, et seq. of the Illinois Compiled Statutes, as amended.

Prepared For:  Village of Mount Prospect, Illinois

Prepared By:  Kane, McKenna and Associates, Inc.

OCTOBER, 2005

**VILLAGE OF MOUNT PROSPECT**
**TIF QUALIFICATION REPORT**
**AMENDMENT #3 TO DOWNTOWN TIF NO. 1**

## TABLE OF CONTENTS

| SECTION | TITLE | PAGE |
|---------|-------|------|
| I. | Introduction and Background | 1 |
| II. | Qualification Criteria Used | 3 |
| III. | The Study Area | 6 |
| IV. | Methodology of Evaluation | 7 |
| V. | Qualification of Proposed RPA Findings of Eligibility | 8 |
| VI. | Summary of Findings and Overall Assessment of Qualification | 10 |

MAP

Proposed Third Amendment to the Downtown TIF

EXHIBIT 1

Parcel Descriptions

‡ØP-20-06  12:28pm   From-MP CLERKS OFFICE                      +13473326954           T-231   P 43/71   F-601

## I.    INTRODUCTION AND BACKGROUND

In the context of considering the amendment ("Amendment #3") of the Downtown Redevelopment Project Area ("TIF No. 1"); the Village of Mount Prospect (the "Village") has authorized the study of the amended areas to determine whether it qualifies for consideration as an amendment to the existing Tax Increment Financing (the "TIF") District. Kane, McKenna and Associates, Inc. ("KMA"), has agreed to undertake the study of the amended area. The properties (the "Proposed Amendments") are located adjacent to the Downtown TIF No. 1 and would be included as part of the Amendment #3 to TIF No. 1.

The Proposed Amendments include two parcels as described above, a commercial retail center on Main Street and a six story office building (the Bank One building) on Busse Avenue.

The Village has undertaken ongoing review of the properties located within the Downtown TIF No. 1, as well as the Proposed Amendments for several years. In conjunction with past and current redevelopment activities, the Village has also undertaken efforts to allow for the extension of the existing TIF term by an additional twelve (12) years, in order to continue the viable redevelopment of the downtown area on a comprehensive basis. The 12-year extension request is currently under review by the Illinois State legislature, and is expected to be considered in late 2005 or the first part of 2006.

The Proposed Amendments will serve to continue redevelopment activities and to include several key properties as part of the Downtown TIF No. 1.

Due in part to their age, the structures and site improvements within the Proposed Amendments were found to have varying degrees of deterioration due to the age of the structures. Ongoing vacancies and functional obsolescence have also contributed to underutilization.

The Proposed Amendments also suffers from a lack of community planning. That is, the area did not have the benefit of developing under the modern construction and land use guidelines under either a comprehensive plan or an economic development plan. The limited parking within the area, the minimal buffering between buildings and the limited loading/unloading provisions are indications of this factor. The majority of the Downtown TIF No. 1 buildings are over thirty-five (35) years in age including the Proposed Amendments. In conjunction with the qualification factors discussed above, and within other sections of this report, these qualify the area as a "conservation" area, as that term is hereinafter defined pursuant to Illinois State statute as amended.

*Tax Incremental Financing Qualification/Designation Report – Third Amendment to Downtown TIF No. 1*
*Mount Prospect, Illinois*

Page 1

Sep-20-06  12:23pm    From-MP CLERKS OFFICE                    +13473926954              T-291   P.44/71   F-501

## OBJECTIVES

The Village's redevelopment objectives propose to enhance commercial, retail and mixed use residential opportunities. To achieve this objective the Village proposes the following guidelines:

- To redevelop the area in relation to transportation facilities (including coordination with the existing Metra station) and infrastructure network for improved accessibility use to the wider market area.

- To attract market driven residential and retail/commercial redevelopment.

- To assemble properties in a traditional manner in order to assist area redevelopment objectives.

- To assist site preparation in order to provide for the reuse of properties.

- To assist and provide services to businesses and enterprises that seek locations within the Village.

Given Village goals under its comprehensive planning process and the conditions briefly summarized above, the Village has made a determination that it is highly desirable to promote the redevelopment of the Proposed Amendments. The Village intends to create and implement such a plan in order to increase tax revenues associated with the Proposed Amendments and to increase the community's tax base.

Given the conditions into which the Proposed Amendments has required coordination for a variety of uses, the Village is favorably disposed toward supporting redevelopment efforts. However, the Village is determined that redevelopment takes place through the benefit and guidance of comprehensive economic planning by the Village. Through this coordinated effort, the area is expected to improve. Development barriers, inherent with current conditions within the Village's Downtown area, which impede economic growth under existing market standards, are expected to be eliminated.

The Village has determined that redevelopment currently planned for the Proposed Amendments may only be feasible with public finance assistance. The creation and utilization of a TIF redevelopment plan is intended by the Village to help provide the assistance required to eliminate conditions detrimental to successful redevelopment of the Village central core area.

The use of TIF relies upon induced private redevelopment in the Proposed Amendments creating higher real estate value that would otherwise decline or stagnate without such investment, leading to increased property taxes compared to the previous land-use (or lack of use). In this way the existing tax base for all tax districts is protected and a portion of future increased taxes are pledged to attract the needed private investment.

*Tax Incremental Financing Qualification/ Designation Report – Third Amendment to Downtown TIF No. 1*
*Mount Prospect, Illinois*

Page 2

## II.    QUALIFICATION CRITERIA USED

With the assistance of Village staff, Kane, McKenna and Associates, Inc. examined the Proposed RPA in July to August of 2005, and reviewed information collected for the area to determine the presence or absence of appropriate qualifying factors listed in the Illinois "Real Property Tax Increment Allocation Act" (hereinafter referred to as "the Act") Ch. 65 ILCS Section 5/11-74.4-1 et. seq. of the Illinois Compiled Statutes, as amended. The relevant sections of the Act are found below.

The Act sets out specific procedures, which must be adhered to in designating a redevelopment project area. By definition, a "Redevelopment Project Area" is:

"an area designated by the municipality, which is not less in the aggregate than 1 ½ acres and in respect to which the municipality has made a finding that there exist conditions which cause the area to be classified as a blighted area or a conservation area, or a combination of both blighted area and conservation area."

## CONSERVATION AREA

The Act defines a "conservation area" as follows:

"Conservation area" means any improved area within the boundaries of a redevelopment project area located within the territorial limits of the municipality in which 50% or more of the structures in the area have an age of 35 years or more. Such an area is not yet a blighted area, but because of a combination of 3 or more of the following factors may be considered as a "conservation area".

(1)    If improved, industrial, commercial and residential buildings or improvements are detrimental to the public safety, health or welfare because of a combination of five (5) or more of the following factors, each of which is (i) present, with that presence documented, to a meaningful extent so that a municipality may reasonably find that the factor is clearly present within the intent of the Act and (ii) reasonably distributed throughout the improved part of the redevelopment project area:

(A)    Dilapidation:  An advanced state of disrepair or neglect of necessary repairs to the primary structural components of building or improvements in such a combination that a documented building condition analysis determines that major repair is required or the defects are so serious and so extensive that the buildings must be removed.

(B) Obsolescence:  The condition or process of falling into disuse.  Structures become ill-suited for the original use.

*Tax Incremental Financing Qualification/ Designation Report – Third Amendment to Downtown TIF No. 1
Mount Prospect, Illinois*

Page 3

(C)    Deterioration:  With respect to buildings, defects including, but not limited to major defects in the secondary building components such as doors, windows, porches, gutters and downspouts and fascia.  With respect to surface improvements, that the condition of roadways, alleys, curbs, gutters, sidewalks, off-street parking and surface storage areas evidence deterioration, including, but limited to, surface cracking, crumbling, potholes, depressions, loose paving material and weeds protruding through paved surfaces.

(D)  Presence of Structures Below Minimum Code Standards:  All structures that do not meet the standards of zoning, subdivision, building, fire and other governmental codes applicable to property, but not including housing and property maintenance codes.

(E)    Illegal Use of Individual Structures:  The use of structures in violation of applicable federal, State, or local laws, exclusive of those applicable to the presence of structures below minimum code standards.

(F)  Excessive Vacancies:  The presence of buildings that are unoccupied or under-utilized and that represent an adverse influence on the area because of the frequency, extent or duration of the vacancies.

(G)  Lack of Ventilation, Light, or Sanitary Facilities:  The absence of adequate ventilation for light or air circulation in spaces or rooms without windows, or that require the removal of dust, odor, gas, smoke or other noxious airborne materials. Inadequate natural light and ventilation means the absence of skylights or windows for interior spaces or rooms and improper window sizes and amounts by room area to window area ratios.  Inadequate sanitary facilities refer to the absence or inadequacy of garbage storage and enclosure, bathroom facilities, hot water and kitchens and structural inadequacies preventing ingress and egress to and from all rooms and units within a building.

(H)  Inadequate Utilities:  Underground and overhead utilities such as storm sewers and storm drainage, sanitary sewers, water lines and gas, telephone and electrical services that are shown to be inadequate.  Inadequate utilities are those that are: (i) of insufficient capacity to serve the uses in the redevelopment project area; (ii) deteriorated, antiquated, obsolete or in disrepair; or (iii) lacking within the redevelopment project area.

*Tax Incremental Financing Qualification/ Designation Report – Third Amendment to Downtown TIF No. 1*
*Mount Prospect, Illinois*

Page 4

(I) Excessive Land Coverage and Overcrowding of Structures and Community Facilities: The over-intensive use of property and the crowding of buildings and accessory facilities onto a site. Examples of problem conditions warranting the designation of an area as one exhibiting excessive land coverage are: (i) the presence of buildings either improperly situated on parcels or located on parcels of inadequate size and shape in relation to present-day standards of development for health and safety and (ii) the presence of multiple buildings on a single parcel. For there to be a finding of excessive land coverage, these parcels must exhibit one or more of the following conditions: insufficient provision for light and air within or around buildings, increased threat of spread of fire due to the close proximity of buildings, lack of adequate or proper access to a public right-of-way, lack of reasonably required off-street parking or inadequate provision for loading service.

(J) Deleterious Land-Use or Layout: The existence of incompatible land-use relationships, buildings occupied by inappropriate mixed-uses or uses considered to be noxious, offensive or unsuitable for the surrounding area.

(K) Environmental Clean-Up: The Proposed redevelopment project area has incurred Illinois Environmental Protection Agency or United States Environmental Protection Agency remediation costs for, or a study conducted by an independent consultant recognized as having expertise in environmental remediation has determined a need for the clean-up of hazardous waste, hazardous substances or underground storage tanks required by State or federal law, provided that the remediation costs constitute a material impediment to the development or redevelopment of the redevelopment project area.

(L) Lack of Community Planning: The Proposed redevelopment project area was developed prior to or without the benefit or guidance of a community plan. This means that the development occurred prior to the adoption by the municipality of a comprehensive or other community plan or that the plan was not followed at the time of the area's development. This factor must be documented by evidence of adverse or incompatible land-use relationships, inadequate street layout, improper subdivision, parcels of inadequate shape and size to meet contemporary development standards or other evidence demonstrating an absence of effective community planning.

(M) The total equalized assessed value of the proposed redevelopment project area has declined for three (3) of the last five (5) calendar years prior to the year in which the redevelopment project area is designated, or is increasing at an annual rate that is less than the balance of the municipality for three (3) of the last five (5) calendar years, for which information is available or increasing at an annual rate that is less than the Consumer Price Index for All Urban Consumers published by the United States Department of Labor or successor agency for three (3) of the last five (5) calendar years prior to the year in which the redevelopment project area is designated.

*Tax Incremental Financing Qualification/Designation Report – Third Amendment to Downtown TIF No. 1 Mount Prospect, Illinois*

Page 5

## III.    THE STUDY AREA

The Study Area which is located adjacent to the Village's Downtown TIF No. 1 and includes two parcels located at the northwest portion and the northeast portion of the existing TIF district.

The northwest parcel includes a single story retail center (Central Plaza) and the northeast parcel includes a six story office building (Bank One Building).

In evaluating the properties within the area, KMA completed its analysis based on the "conservation area" criteria cited in 65 ILCS 5/11-74-3(a)(1) (the "Conservation Area Definition"). The Conservation Area Definition states that at least fifty percent (50%) of the area's buildings must be thirty-five (35) years of age or older and there must be three (3) or more qualification factors present. Fifty-eight percent (58%) of the Downtown TIF No. 1 buildings are over thirty-five (35) years in age including the two parcels described above, and the Proposed Amendments contains five (5) additional qualification factors (a minimum of three (3) is required).

*Tax Incremental Financing Qualification/Designation Report – Third Amendment to Downtown TIF No. 1*
*Mount Prospect, Illinois*

Page 6

Sep-20-06  12:38pm  From-MP CLERKS OFFICE                    +13473925954              T-291  P.43/71  F-601

## IV.    METHODOLOGY OF EVALUATION

In evaluating the Proposed Amendments potential qualification as a TIF District, the following methodology was utilized:

1)    Site surveys of the Proposed Amendment were undertaken by representatives from KMA. site surveys were completed from each tract of land (based upon Sidwell blocks), within the area.

2)    Exterior evaluation of structures, noting such conditions as deterioration, obsolescence and deleterious layout and land-use was completed. Additionally, 1998 through 2004 tax information from the Cook County Clerk's Office, Sidwell parcel tax maps, site data, local history (discussions with Village staff), and an evaluation of area-wide factors that have affected the area's development (e.g., lack of community planning). KMA reviewed the area in its entirety. Village redevelopment goals and objectives for the area were also reviewed with Village officials. A photograph analysis of the area was conducted and was used to aid this evaluation.

3)    Existing structures and site conditions were initially surveyed only in the context of checking, to the best and most reasonable extent available, criteria factors of specific structures and site conditions on the parcels.

4)    The Proposed Amendment was examined to assess the applicability of the different factors, required for qualification for TIF designation under the Act. Evaluation was made by reviewing the information and determining how each measured when evaluated against the relevant factors. The Study Area was examined to determine the applicability of the thirteen (13) different conservation area factors for qualification for TIF designation under the TIF Act.

*Tax Incremental Financing Qualification/Designation Report – Third Amendment to Downtown TIF No. 1*
*Mount Prospect, Illinois*

Page 7

## V.    QUALIFICATION OF PROPOSED RPA/FINDINGS OF ELIGIBILITY

As a result of KMA's evaluation of each parcel in the Proposed Amendments, and analysis of each of the eligibility factors summarized in Section II, the following factors are presented to support qualification of the Proposed Amendments as a "conservation area".

## THRESHOLD FACTORS

1.    Age (Downtown TIF No. 1 and Proposed Amendments parcels)

Based upon site surveys and County assessor data fifty-eight percent (58%) (or thirty-nine (39) out of sixty-seven (67) structures) were found to be thirty-five (35) years of age or greater.

## OTHER CONSERVATION AREA FACTORS (MUST INCLUDE THREE OR MORE ADDITIONAL FACTORS) *Note: Conservation factors apply only to Proposed Amendments*

2.    Lack of Community Planning

According to the Act, an area suffers from a lack of community planning if the area was developed prior to or within the benefit of a community plan.

The absence of coordinated parking for sites, the lack of buffering between uses, and the coordinated loading/unloading provisions as well as access and circulation issues residential housing to commercial and retail sites all reinforce the fact that the area was developed without benefit of modern, comprehensive community planning.

Also lacking until recent years has been effective and sustained economic development plans and strategies intended to address the coordinated redevelopment of the Proposed Amendments. This is not to necessarily say that improvements did not take place over the years, but that they were implemented without the inclusion within the Downtown TIF No. 1 District. Amendment to the existing TIF will serve to improve overall coordination redevelopment for these parcels.

*Tax Incremental Financing Qualification/Designation Report – Third Amendments to Downtown TIF No. 1*
*Mount Prospect, Illinois*

Page 8

SEP-20-06  12:41pm  From-MP CLERKS OFFICE                    +18473925354          T-231   P.51/71   F-901

3.    Obsolescence

Obsolescence is defined as the condition or process of falling into disuse. This can also be defined as a structure(s) that has become ill-suited for its original use.

Functional obsolescence is present at the retail center due to poor layout and building orientation as well as its age and physical condition. Front parking is limited and internal circulation is also limited at the frontage to a north bound direction. The office building also exhibits characteristics of functional obsolescence due to its age and special purpose design and characteristics. As a whole, the area suffers from poor design and layout which is manifested in several instances, one of which being a lack of (or positioning of parking in relation to street traffic). The parking buildings lack adequate loading and buffering provisions. Because of these factors, the area's overall usefulness and desirability for redevelopment is significantly limited for modern day redevelopment.

Economic obsolescence is illustrated by the decline in EAV for the Proposed Amendments in relation to the high point of 2002 (refer to Exhibit 1).

4.    Deterioration of Site Improvements and Structures

Deterioration can be evidenced in major or secondary building defects. For example, such defects include but are not limited to, defects in building components such as windows, porches, gutters, doors, brick, mortar and stucco. Many of the structures and site improvements within the Proposed RPA exhibited various degrees of deterioration which require repairs, upgrades and replacement.

Many of the parcels displayed deteriorated conditions. The conditions were characterized by occurrences that included the following:

- Rotten wood and eaves
- Deterioration of brick and mortar
- Buckled asphalt and concrete

5.    Excessive Vacancies

The retail center has exhibited vacancy factors over 60% since 2000, and the office building has exhibited a 25% to 30% vacancy factor since 2000. Both factors are excessive for commercial properties.

*Tax Incremental Financing Qualification/ Designation Report – Third Amendment to Downtown TIF No. 1*
*Mount Prospect, Illinois*

Page 9

## VI.  SUMMARY OF FINDINGS AND OVERALL ASSESSMENT OF QUALIFICATION

The following is a summary of relevant qualification findings as it relates to potential designation of the Proposed Amendment by the Village as a TIF District:

1.  The area is contiguous and is greater than 1½ acres in size, including the adjacent Downtown TIF No. 1 area.

2.  The area qualifies as a "conservation area". A more detailed analysis of the qualification findings is outlined in this report.

3.  All property in the area would substantially benefit by the proposed redevelopment project improvements.

4.  The sound growth of taxing districts applicable to the area, including the Village, has been impaired by the factors found present in the area.

5.  The area would not be subject to redevelopment without the investment of public funds, including property tax increments.

These findings, in the judgment of KMA, provide the Village with sufficient justification to consider designation of the Proposed Amendments as a TIF District.

The area has not benefited from coordinated planning efforts by either the public or private sectors. There is a need to focus redevelopment efforts relating to business attraction as well as the coordination of redevelopment efforts for modern uses. These efforts will be important to the area's continued improvement and preservation of tax base.

*Tax Incremental Financing Qualification/Designation Report – Third Amendment to Downtown TIF No. 1*
*Mount Prospect, Illinois*

Page 10

**PROPOSED AMENDMENT #3 TIF BOUNDARY MAP**



Exhibit 1:
Tax Increment Finance District #1
As Amended
Boundary Map

**PRELIMINARY**
**Village of Mount Prospect**
**Proposed Downtown TIF Amendment**

| PIN | TAX CODE | CLASS | 2004 EAV ESTIMATED | 2003 EAV | 2002 EAV | 2001 EAV | 2000 EAV | 1999 EAV | 1998 EAV |
|---|---|---|---|---|---|---|---|---|---|
| 03-34-331-013 | 34020 | 3-17 | 976,681 | 1,139,589 | 1,427,041 | 744,386 | 787,393 | 1,881,410 | 1,228,194 |
| 08-12-109-023 | 16010 | 5-91 | 5,173,506 | 4,006,878 | 6,232,165 | 4,830,554 | 4,758,103 | 4,815,881 | 5,346,480 |
| Total Parcels | | | 6,163,077 | 5,146,448 | 7,669,206 | 5,574,940 | 5,526,496 | 6,697,291 | 6,571,577 |
| Pct. Change to past year | | | 19.85% | -32.91% | 16.65% | 0.86% | -17.49% | 1.91% | |

Note : new parcel in 2000, -018 divided per
03-34-331-012,-018,-017

Total Village EAV         1,491,177,145   1,321,888,843   1,358,201,118   1,265,360,568   1,089,103,863   1,050,816,836   1,018,024,680

Balance of Village EAV    1,485,024,868   1,316,740,400   1,347,641,912   1,248,785,618   1,083,576,497   1,050,918,845   1,051,452,013
Pct. Change to past year      12.76%          -2.29%          7.82%          18.27%           0.51%           2.37%
Source: Cook County Clerk

Mount Prospect TIF.xls tab DB 03

+13473926954                    T-291   P.55/71   F-601

ORDINANCE NO. 5583

AN ORDINANCE OF THE VILLAGE OF MOUNT PROSPECT, COOK COUNTY, ILLINOIS, DESIGNATING THE AMENDMENT #3 TO THE DOWNTOWN TIF NO. 1 REDEVELOPMENT PROJECT AREA OF SAID VILLAGE A REDEVELOPMENT PROJECT AREA PURSUANT TO THE TAX INCREMENT ALLOCATION REDEVELOPMENT ACT

Passed and approved by
the President and Board of Trustees
the 15TH day of August, 2006

Published in pamphlet form by
authority of the corporate
authorities of the Village of
Mount Prospect, Illinois,
the 16th day of August, 2006

Sep-20-06  12:47pm  From-MP CLERKS OFFICE                    +18473925954              T-291  P.57/71  F-601

Ordinance No. 5583

## AN ORDINANCE OF THE VILLAGE OF MOUNT PROSPECT, COOK COUNTY, ILLINOIS, DESIGNATING THE AMENDMENT #3 TO THE DOWNTOWN TIF NO. 1 REDEVELOPMENT PROJECT AREA OF SAID VILLAGE A REDEVELOPMENT PROJECT AREA PURSUANT TO THE TAX INCREMENT ALLOCATION REDEVELOPMENT ACT

WHEREAS, it is desirable and in the best interest of the citizens of the Village of Mount Prospect, Cook County, Illinois (the "Village"), for the Village to implement tax increment allocation financing pursuant to the Tax Increment Allocation Redevelopment Act, Division 74.4 of Article 11 of the Illinois Municipal Code, as amended (the "Act"), for proposed amendment #3 to the redevelopment plan and redevelopment project (the "Plan and Project") within the municipal boundaries of the Village and within a proposed redevelopment project area (the "Area") described in Section 1 of this Ordinance; and

WHEREAS, the Corporate Authorities have heretofore by ordinance amended the Plan and Project, which Plan and Project were identified in such ordinance and were the subject, along with the Area designation hereinafter made, of a public hearing held on February 7, 2006; and it is now necessary and desirable to designate the Area as a redevelopment project area pursuant to the Act.

NOW, THEREFORE, BE IT ORDAINED by the Village President and Board of Trustees of the Village of Mount Prospect, Cook County, Illinois, as follows:

Section 1.    Area Designated.    That the Area, as legally described in Exhibit A attached hereto and incorporated herein as if set out in full by this reference, is hereby designated as a redevelopment project area pursuant to Section 11-74.4-4 of the Act. The general street location for the Area is described in Exhibit B attached hereto and incorporated herein as if set

out in full by this reference.  The map of the Area is depicted on Exhibit C attached hereto and incorporated herein as if set out in full by this reference.

Section 2.    Invalidity of Any Section.  That if any section, paragraph, or provision of this Ordinance shall be held to be invalid or unenforceable for any reason, the invalidity or unenforceability of such section, paragraph, or provision shall not affect any of the remaining provisions of this Ordinance.

Section 3.    Superseder and Effective Date.  That all ordinances, resolutions, motions, or orders in conflict herewith shall be, and the same hereby are, repealed to the extent of such conflict, and this Ordinance shall be in full force and effect immediately upon its passage by the Corporate Authorities and approval as provided by law.

ATTACHMENTS:

EXHIBIT A – Legal Description

EXHIBIT B – General Street Location

EXHIBIT C – Map of Redevelopment Project Area

PASSED this 15th day of August, 2006.

AYES 6    NAYS  0    ABSENT  0

# LEGAL DESCRIPTION

Legal Description of Downtown TIF No. 1 Redevelopment Project Area, As Amended is as follows:

Beginning at the intersection of the east right-of-way line of Main Street, State of Illinois Route 83, with the north right-of-way line of Central Road, thence easterly along said north right-of-way line to a point of intersection with the extension of the west property line of Lots 1 through 11 of Block 5 in Busse and Wille's Resubdivision in Mount Prospect, thence southerly along the extension of the west property line of Lots 1 through 11 of Block 5 in Busse and Wille's Resubdivision in Mount Prospect to the north right-of-way line of Busse Avenue, thence easterly along the north right-of-way line of Busse Avenue to a point of intersection with the extension of the east property line of Lots 1 through 8 of Block 11 of Busse and Wille's Resubdivision in Mount Prospect, thence southerly along the extension of the east property line of Lots 1 through 8 of Block 11 of Busse and Wille's Resubdivision in Mount Prospect to the southeast corner of Lot 8 of Block 11 of Busse and Wille's Resubdivision in Mount Prospect; thence easterly along the south property line of Lot 17 of Block 11 of Busse and Wille's Resubdivision in Mount Prospect extended to a point of intersection with the east right-of-way line of Elm Street, thence southerly along the east right-of-way line of Elm Street to the north right-of-way line of Evergreen Avenue; thence easterly along the north right-of-way line of Evergreen Avenue to a point of intersection with the extension of the west property line of Lots 1 through 21 of Block 20 of Mount Prospect Subdivision in Section 12-41-11, recorded September 2, 1874, thence southerly along the extension of the west property line of Lots 1 through 21 of Block 20 of Mount Prospect Subdivision in Section 12-41-11, recorded September 2, 1874 to the northwest corner of Lot 1 of Bruce's Resubdivision in Mount Prospect, thence easterly along the north property line of Lot 1 of Bruce's Resubdivision in Mount Prospect extended to a point of intersection with the east right-of-way line of Owen Street, thence southerly along the east right-of-way line of Owen Street extended to a point of intersection with the southerly right-of-way line of Northwest Highway, US Rode 14, thence northwesterly along the southerly right-of-way line of Northwest Highway, US Route 14 to a point of intersection with the north right-of-way line of Central Road; thence easterly along the north right-of-way line of Central Road to the southwest corner of Lot 1 of Trapani's Resubdivision in Mount Prospect, thence northerly along the west property line of Trapani's Resubdivision in Mount Prospect to the northwest corner of Lot 1 of Trapani's Resubdivision in Mount Prospect, thence easterly along the north property line of Lot 1 of Trapani's Resubdivision in Mount Prospect extended to a point of intersection with the east right-of-way line of Main Street, State of Illinois Route 83; thence southerly along the east right-of-way line of Main Street, State of Illinois Route 83 to the point of beginning at the point of intersection of the east right-of-way line of Main Street, State of Illinois Route 83, with the north right-of-way line of Central Road, all located in part of the Northeast Quarter and the Northwest Quarter of Section 12, and the Northeast Quarter of Section 11 all in Township 41 North, Range 11 East of the Third Principal Meridian, and in part of the Southwest Quarter and the Southeast Quarter of Section 34, Township 42 North, Range 11 East of the Third Principal Meridian all in Cook County, Illinois.

# EXHIBIT B

The existing Downtown TIF No. 1 is generally bounded by Northwest Highway on the south and west, Central Road, Busse Avenue and Evergreen Avenue to the north, and Maple Street and Owen Street to the east.

The proposed amendments (amendment #3) include property generally located at the southeast corner of Emerson Street and Busse Avenue, and property generally located at northwest corner of Main Street and Central Road.

## EXHIBIT C

### MAP OF REDEVELOPMENT PROJECT AREA

ORDINANCE NO. 5584

AN ORDINANCE OF THE VILLAGE OF MOUNT PROSPECT, COOK COUNTY,
ILLINOIS, CONFIRMING TAX INCREMENT ALLOCATION FINANCING FOR
THE DOWNTOWN TIF NO. 1 REDEVELOPMENT PROJECT AREA

Passed and approved by
the President and Board of Trustees
the 15TH day of August, 2006

Published in pamphlet form by
authority of the corporate
authorities of the Village of
Mount Prospect, Illinois,
the 16th day of August, 2006

# Ordinance No. 5584

## AN ORDINANCE OF THE VILLAGE OF MOUNT PROSPECT, COOK COUNTY, ILLINOIS, CONFIRMING TAX INCREMENT ALLOCATION FINANCING FOR THE DOWNTOWN TIF NO. 1 REDEVELOPMENT PROJECT AREA

WHEREAS, it is desirable and in the best interest of the citizens of the Village of Mount Prospect, Cook County, Illinois (the "Village"), for the Village to implement tax increment allocation financing pursuant to the Tax Increment Allocation Redevelopment Act, Division 74.4 of Article 11 of the Illinois Municipal Code, as amended (the "Act"); and

WHEREAS, the Village has heretofore amended a redevelopment plan and project (the "Plan and Project") as required by the Act by passage of an ordinance and has heretofore amended a redevelopment project area (the "Area") as required by the Act by the passage of an ordinance and has otherwise complied with all other conditions precedent required by the Act.

NOW, THEREFORE, BE IT ORDAINED by the Village President and Board of Trustees of the Village of Mount Prospect, Cook County, Illinois, as follows:

Section 1.    Tax Increment Financing Confirmed.    That tax increment allocation financing is hereby confirmed to pay redevelopment project costs as defined in the Act and as set forth in the Plan and Project within the Area as legally described in Exhibit A attached hereto and incorporated herein as if set out in full by this reference. The general street location for the Area is described in Exhibit B attached hereto and incorporated herein as if set out in full by this reference. The map of the Area is depicted in Exhibit C attached hereto and incorporated herein as if set out in full by this reference.

Section 2.    Allocation of Ad Valorem Taxes.  That pursuant to the Act, the ad valorem taxes, if any, arising from the levies upon taxable real property in the Area by taxing districts and tax rates determined in the manner provided in Section 11-74.4-9(c) of the Act each year after the effective date of this Ordinance until the Project costs and obligations issued in respect thereto have been paid shall be divided as follows:

a.    That portion of taxes levied upon each taxable lot, block, tract, or parcel of real property that is attributable to the lower of the current equalized assessed value or the initial equalized assessed value of each such taxable lot, block, tract, or parcel of real property in the Area shall be allocated to and when collected shall be paid by the county collector to the respective affected taxing districts in the manner required by law in the absence of the adoption of tax increment allocation financing.

b.    That portion, if any, of such taxes that is attributable to the increase in the current equalized assessed valuation of each lot, block, tract, or parcel of real property in the Area shall be allocated to and when collected shall be paid to the municipal treasurer, who shall deposit said taxes into a special fund, hereby created, and designated the "Downtown TIF No. 1" Redevelopment Project Area Special Tax Allocation Fund" of the Village and such taxes shall be used for the purpose of paying Project costs and obligations incurred in the payment thereof. This subsection (b) shall relate back to any subsequent reduction in the equalizes assessed valuation for the tax year 2005, the same, as if the reduction had occurred prior to the adoption of this Ordinance.

Section 3.    Invalidity of Any Section.  That if any section, paragraph, or provision of this Ordinance shall be held to be invalid or unenforceable for any reason, the invalidity or unenforceability of such section, paragraph, or provision shall not affect any of the remaining provisions of this Ordinance.

Section 4.    Superseder and Effective Date.  That all ordinances, resolutions, motions, or orders in conflict herewith shall be, and the same hereby are, repealed to the extent of such conflict, and this Ordinance shall be in full force and effective immediately upon its passage by the Corporate Authorities and approval as provided by law.

ATTACHMENTS:

EXHIBIT A – Legal Description

EXHIBIT B – General Street Location

EXHIBIT C – Map of Redevelopment Project Area

PASSED this 15th day of August, 2006.

AYES 6  NAYS 0  ABSENT 0

# LEGAL DESCRIPTION

Legal Description of Downtown TIF No. 1 Redevelopment Project Area, As Amended is as follows:

Beginning at the intersection of the east right-of-way line of Main Street, State of Illinois Route 83, with the north right-of-way line of Central Road, thence easterly along said north right-of-way line to a point of intersection with the extension of the west property line of Lots 1 through 11 of Block 5 in Busse and Wille's Resubdivision in Mount Prospect, thence southerly along the extension of the west property line of Lots 1 through 11 of Block 5 in Busse and Wille's Resubdivision in Mount Prospect to the north right-of-way line of Busse Avenue, thence easterly along the north right-of-way line of Busse Avenue to a point of intersection with the extension of the east property line of Lots 1 through 8 of Block 11 of Busse and Wille's Resubdivision in Mount Prospect, thence southerly along the extension of the east property line of Lots 1 through 8 of Block 11 of Busse and Wille's Resubdivision in Mount Prospect to the southeast corner of Lot 8 of Block 11 of Busse and Wille's Resubdivision in Mount Prospect; thence easterly along the south property line of Lot 17 of Block 11 of Busse and Wille's Resubdivision in Mount Prospect extended to a point of intersection with the east right-of-way line of Elm Street, thence southerly along the east right-of-way line of Elm Street to the north right-of-way line of Evergreen Avenue; thence easterly along the north right-of-way line of Evergreen Avenue to a point of intersection with the extension of the west property line of Lots 1 through 21 of Block 20 of Mount Prospect Subdivision in Section 12-41-1 1, recorded September 2, 1874, thence southerly along the extension of the west property line of Lots 1 through 21 of Block 20 of Mount Prospect Subdivision in Section 12-41-1 1, recorded September 2, 1874 to the northwest corner of Lot 1 of Bruce's Resubdivision in Mount Prospect, thence easterly along the north property line of Lot 1 of Bruce's Resubdivision in Mount Prospect extended to a point of intersection with the east right-of-way line of Owen Street, thence southerly along the east right-of-way line of Owen Street extended to a point of intersection with the southerly right-of-way line of Northwest Highway, US Rode 14, thence northwesterly along the southerly right-of-way line of Northwest Highway, US Route 14 to a point of intersection with the north right-of-way line of Central Road; thence easterly along the north right-of-way line of Central Road to the southwest corner of Lot 1 of Trapani's Resubdivision in Mount Prospect, thence northerly along the west property line of Trapani's Resubdivision in Mount Prospect to the northwest corner of Lot 1 of Trapani's Resubdivision in Mount Prospect, thence easterly along the north property line of Lot 1 of Trapani's Resubdivision in Mount Prospect extended to a point of intersection with the east right-of-way line of Main Street, State of Illinois Route 83; thence southerly along the east right-of-way line of Main Street, State of Illinois Route 83 to the point of beginning at the point of intersection of the east right-of-way line of Main Street, State of Illinois Route 83, with the north right-of-way line of Central Road, all located in part of the Northeast Quarter and the Northwest Quarter of Section 12, and the Northeast Quarter of Section 11 all in Township 41 North, Range 11 East of the Third Principal Meridian, and in part of the Southwest Quarter and the Southeast Quarter of Section 34, Township 42 North, Range 11 East of the Third Principal Meridian all in Cook County, Illinois.

+18473925954    T-291  P.68/71  F-601

## EXHIBIT B

### GENERAL STREET LOCATION

## EXHIBIT B

The existing Downtown TIF No. 1 is generally bounded by Northwest Highway on the south and west, Central Road, Busse Avenue and Evergreen Avenue to the north, and Maple Street and Owen Street to the east.

The proposed amendments (amendment #3) include property generally located at the southeast corner of Emerson Street and Busse Avenue, and property generally located at northwest corner of Main Street and Central Road.

+18473926954    T-281   P.70/71   F-601

## EXHIBIT C

### MAP OF AMENDED REDEVELOPMENT PROJECT AREA

Exhibit 1:
Tax Increment Finance District #1
As Amended
Boundary Map

ORDINANCE NO. 5640


AN ORDINANCE AUTHORIZING THE ACQUISITION OF PROPERTY
THROUGH THE CONDEMNATION OR OTHERWISE IN
THE TAX INCREMENT REDEVELOPMENT PROJECT AREA

———————

Passed and approved
by the President and Board of Trustees
the 24th day of July, 2007


Published in pamphlet form
by authority of the corporate authorities
of the Village of Mount Prospect, Illinois,
the 25th day of July, 2007.



PLAINTIFF'S
EXHIBIT
B

ORDINANCE NO.  5640

AN ORDINANCE AUTHORIZING THE ACQUISITION OF
PROPERTY THROUGH CONDEMNATION OR OTHERWISE IN
THE TAX INCREMENT REDEVELOPMENT PROJECT AREA

WHEREAS, the Village of Mount Prospect, Cook County, Illinois has heretofore
adopted Ordinance Number 3554 adopting the District No. 1 Tax Increment
Redevelopment Plan and Redevelopment Project, and Ordinance Number 3555 entitled
"An Ordinance Designating District No. 1 Tax Increment Redevelopment Project Area in
the Village of Mount Prospect, Illinois", and Ordinance Number 3556 entitled "An
Ordinance Adopting Tax Increment Financing for the District No. 1 Tax Increment
Redevelopment Project in the Village of Mount Prospect, Illinois all of which are
incorporated herein in their entirety.

WHEREAS, the Village of Mount Prospect has determined that the above-mentioned
Tax Increment Redevelopment Plan and Redevelopment Project which were the subject
matter of the public hearings is in the best interests of the residents of the Village of
Mount Prospect and is a public purpose; and

WHEREAS, the Village of Mount Prospect is empowered, pursuant to the Real Property
Tax Increment Allocation Redevelopment Act, P/S/ 79-1525, appearing as Section 11-
74.4-1 et. seq., of Chapter 65, Illinois Compiled Statutes 2003, (hereinafter the "Act") to
acquire by purchase, donation, lease or eminent domain real property within the
redevelopment project area; and

WHEREAS, the implementation of the aforementioned Tax Increment Redevelopment
Plan and Project would attract to the Village of Mount Prospect additional commercial
ventures, increase business for commercial ventures currently established within the
Village, strengthen the property and non-property tax and income bases, and would
provide jobs for the Village residents.

NOW, THEREFORE, BE IT ORDAINED BY THE PRESIDENT AND BOARD
OF TRUSTEES OF THE VILLAGE OF MOUNT PROSPECT, COUNTY OF
COOK, STATE OF ILLINOIS ACTING IN THE EXERCISE OF THEIR HOME
RULE POWERS, as follows:

SECTION 1:    That it is hereby determined that the Tax Increment
Redevelopment Plan and Redevelopment Project previously adopted be established,
maintained, controlled, managed and operated within the corporate limits of the Village
of Mount Prospect within the District Number 1 Tax Increment Redevelopment Project
Area as described in Ordinance Nos. 3554, 3555 and 3556 and that said Tax Increment
Redevelopment Plan and Redevelopment Project be occupied, improved, used and
developed in a manner necessary and convenient for public use.

**SECTION 2:**  That under the authority vested in the corporate authorities of the Village of Mount Prospect, through the statutes of the State of Illinois and the home rule power and ordinances of the Village, it is hereby determined that pursuant to the Tax Increment Redevelopment Plan and Redevelopment Project it is necessary and desirable that the Village shall acquire title to and possession of certain real property commonly known as 6-18 West Busse Avenue, Mount Prospect, Illinois, Permanent Index 08-12-102-062-0000, and legally described in the Exhibit which is attached hereto and made a part hereof  and hereinafter referred to as the "Subject Property", which property is within the foregoing Tax Increment Redevelopment Project Area and is necessary, required and needed to achieve the objectives of the foregoing Tax Increment Redevelopment Plan and Redevelopment Project, and which property lies wholly within the limits of the Village of Mount Prospect.

**SECTION 3:**  That the Village Attorney or such other persons as he may designate are hereby authorized, empowered and directed to negotiate personally or through its representatives for and on behalf of said Village with the owner or owners of the Subject Property for the purchase and acquisition thereof by said Village.

**SECTION 4:**  That in the event the said Village Attorney or his designee are unable to agree with the owner or owners of said real property as to the compensation thereof, then title to and possession of the Subject Property shall be acquired by the Village of Mount Prospect through condemnation, and authorization is hereby given to institute proceedings in any court of competent jurisdiction to acquire title to and possession of the Subject Property for the Village in accordance with the Act, the eminent domain laws of the State of Illinois and the ordinances of the Village of Mount Prospect.

**SECTION 5:**  That this ordinance shall be in full force and effect from and after its passage, approval and publication in pamphlet form as provided by law.

Passed by the Board of Trustees of the Village of Mount Prospect, Illinois and approved by the President thereof this 24th day of  July, 2007 .

| Ayes: | Corcoran, Juracek, Korn, Lohrstorfer, Zadel |
|---|---|
| Nays: | None |
| Absent: | Hoefert |

**Exhibit "A"**

Legal Description for parcel 08-12-102-062-0000

That part of Lot 4 in Mount Prospect Central District Subdivision of part of the west half of Section 12, Township 41 North, Range 11 East of the Third Principal Meridian according to the plat thereof recorded December 23, 1949 as document 1275902, lying southerly of the westerly extension of the southernmost line of Lot 2 in said Mount Prospect Central District Subdivision, all in Cook County Illinois.

LAW OFFICES

# KLEIN, THORPE AND JENKINS, LTD.

SUITE 1660
20 NORTH WACKER DRIVE
CHICAGO, ILLINOIS 60606-2903

JOSHUA S. ABERN
RINDA Y. ALLISON
TERRENCE M. BARNICLE
JAMES P. BARTLEY
THOMAS P. BAYER
GERARD E. DEMPSEY
MICHAEL J. DUGGAN
JAMES V. FEROLO
E. KENNETH FRIKER
BRIAN M. FUNK
CYNTHIA S. GRANDFIELD
KATHLEEN T. HENN
EVERETTE M. HILL, JR.
MICHAEL T. JURUSIK
JACOB H. KARACA
PATRICK A. LUCANSKY

TELEPHONE (312) 984-6400
FACSIMILE  (312) 984-6444
FACSIMILE  (312) 606-7077

ORLAND PARK OFFICE
15010 S. RAVINIA AVE., SUITE 17
ORLAND PARK, IL 60462-3162
TELEPHONE (708) 349-3888
FACSIMILE  (708) 349-1506

LANCE C. MALINA
MICHAEL A. MARRS
THOMAS M. MELODY
JANET N. PETSCHE
DONALD E. RENNER, III
SCOTT F. UHLER
GEORGE A. WAGNER
ALLEN WALL
DENNIS G. WALSH
JAMES G. WARGO
BRUCE A. ZOLNA

OF COUNSEL
JAMES A. RHODES
RICHARD T. WIMMER

WRITER'S DIRECT DIAL
(312) 984-6520

WRITER'S E-MAIL
emhill@ktjnet.com

January 25, 2007

**VIA FACSIMILE NO.**
**(847) 577-9045**

Richard Valentino, Esq.
18 North Bothwell Street
Suite 100
Palatine, Illinois 60067

Re:   Village of Mount Prospect Acquisition of
      Ye Olde Town Inn Property

Dear Mr. Valentino:

As you know, this law firm represents the Village of Mount Prospect. We are aware that you are counsel to Mr. Tod Curtis, the owner of the property upon which Ye Olde Town Inn is located. The Village of Mount Prospect is in the process of considering the redevelopment of the property to the east, south and west of Mr. Curtis' property. You have previously made the Village aware that Mr. Curtis is considering the redevelopment of his own property and it intends to do so.

On behalf of the Village, I am extending a good faith offer of $1,265,000 to acquire the entire fee interest of the property at 18 West Busse Avenue upon which Ye Olde Town Inn is located. This offer is based upon an appraisal obtained by the Village within the past 30 days. Please respond to this offer not later than 4:00 p.m., on January 31, 2007.



PLAINTIFF'S
EXHIBIT
C

Richard Valentino, Esq.
January 25, 2007
Page two. . . . .

I can be reached at 847/732-9137 or you may contact Allen Wall from our law firm.  His number is 312/984-6450.

Sincerely,

KLEIN, THORPE AND JENKINS, LTD.
Attorneys for the Village of Mount Prospect

By:_____
Everette M. Hill, Jr.

EMHjr/rcc
c:    Village Manager Michael Janonis
       Mr. Allen Wall

Aug 24 07 02:58p    Holly McDonald    (847)615-9606    p.2

LAW OFFICES

## KLEIN, THORPE AND JENKINS, LTD.

JOSEPH O. AJIBESIN,
RINDA Y. ALLISON
TERRENCE M. BARNICLE
JAMES P. BARTLEY
THOMAS P. BAYER
GERARD E. DEMPSEY
MICHAEL J. DUGGAN
JAMES V. FEROLO
JAMES W. FESSLER
E. KENNETH FRIKER
BRIAN M. FUNK
CYNTHIA S. GRANDFIELD
KATHLEEN T. HENN
EVERETTE M. HILL, JR.
HOWARD C. JABLECKI
MICHAEL T. JURUSIK
JACOB H. KARACA

SUITE 1660
20 NORTH WACKER DRIVE
CHICAGO, ILLINOIS 60606-2903

TELEPHONE (312) 984-6400
FACSIMILE (312) 984-6444
FACSIMILE (312) 606-7077

ORLAND PARK OFFICE
15010 S. RAVINIA AVE., SUITE 17
ORLAND PARK, IL 60462-3162
TELEPHONE (708) 349-3888
FACSIMILE (708) 349-1506

PATRICK A. LUCANSKY
LANCE C. MALINA
MICHAEL A. MARRS
THOMAS M. MELODY
JANET N. PETSCHE
DONALD E. RENNER, III
SCOTT F. UHLER
GEORGE A. WAGNER
ALLEN WALL
DENNIS G. WALSH
JAMES G. WARGO
BRUCE A. ZOLNA

OF COUNSEL
JAMES A. RHODES
RICHARD T. WIMMER

WRITER'S DIRECT DIAL
(312) 984-6420

WRITER'S E-MAIL
emhill@ktjnet.com

July 31, 2007

**VIA E-MAIL**

Mr. Richard Valentino
18 N. Bothwell Street
Suite 100
Palatine, IL   60067

Dear Mr. Valentino:

Attached please find the Resolution of the Village of Mount Prospect to acquire your client, Tod Curtis', Olde Town Inn property by eminent domain. Obviously, it is in everybody's best interest to avoid actual eminent domain litigation. The Village sincerely desires to enter into good faith discussions for its acquisition of this property. It wishes to do so as expeditiously as possible. We have had the property appraised and have previously made an offer to you based on that appraisal. Please contact me as soon as possible so that we may start those discussions. The Village would like to avoid the recriminations and issues that have plagued the parties in the recent past. Let's do both of our clients a favor and try to get this done in a fair, non-accusatory and amicable manner.

Thank you for your consideration.

Sincerely,

Everette M. Hill, Jr.

EMHjr/hm
Enclosure

iManage:198379_1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

TOD CURTIS, individually and as beneficiary,        )
FIRST UNITED TRUST COMPANY, as Trustee              )
under Trust No. 10510, and ELTO                      )
RESTAURANT CORPORATION, an Illinois                  )
corporation,                                         )
                                                     )
                    Plaintiffs,                      )
                                                     )   Case No.:  08 CH 12059
v.                                                   )
                                                     )   (Consolidated with 08 CH 1284)
IRVANA K. WILKS, Village of Mount Prospect           )
Mayor and Local Liquor Control Commissioner,         )
MICHAEL E. JANONIS, Village Manager,                 )
WILLIAM COONEY, Village Economic Director,           )
WILLIAM SCHROEDER, Village Building                  )
Commissioner, ROBERT ROELS, Village                  )
Environmental Health Manager, CHERYL                 )
SCHERBAUM, Village Environmental Health              )
Inspector, FRANK KRUPA, Village                      )
Environmental Health Inspector, and OZ               )
DEVELOPMENT, LLC,                                    )
                                                     )
                    Defendants.                      )

## MOTION FOR VOLUNTARY DISMISSAL OF ACTION

Plaintiffs, Tod Curtis, individually and as beneficiary, First United Trust Company, as

Trustee under Trust No. 10510, and Elto Restaurant Corporation, an Illinois corporation, by its

attorneys, Barnes & Thornburg LLP, moves this Court to dismiss, without prejudice, its

Complaint against Irvana K. Wilks, Michael E. Janonis, William Cooney, William Schroeder,

Robert Roels, Cheryl Scherbaum, Frank Krupa, and Oz Development, LLC, pursuant to 735

ILCS 5/2-1009.

EXHIBIT

11

Respectfully submitted,

**Tod Curtis, First United Trust Company,
as Trustee under Trust No. 10510, and
Elto Restaurant Corporation**

By: _____

_One of Their Attorneys_

William M. McErlean
David T. Ballard
Ted J. Koerth
BARNES & THORNBURG LLP
One North Wacker Drive
Suite 4400
Chicago, Illinois 60606
Atty. No.:  32715

CHDS01 DTB 469926v1

Order                                    CCG N002-300M-2/24/05 (                    )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Curtis, et al

v.

Wilks, et al.

}

EXHIBIT

12

No. 08 CH 12059
(consolidated with 08
CH 1284)

ORDER

This cause coming to be heard on Curtis, et al's Motion for
Voluntary Dismissal, due notice having been given and the
Court having been fully advised on the premises, IT IS HEREBY
ORDERED:

1)   The Motion for Voluntary Dismissal is GRANTED;

2)   The Complaint for Injunctive Relief and Other Relief filed by
Tad Curtis and ETO Restaurant against Wilks, Jarosis, Cooney, Schroeder,
Roets, Scherbaum, Krupa, and Oz Development, LLC in case number 08 CH
12059 is hereby dismissed without prejudice pursuant to 735 ILCS 5/2-1009

3)   Curtis et al. shall tender a payment of costs
to Defendants in an amount to reimburse
appearance costs within seven days

Atty. No.: 32715

Name: David Ballard / Barnes & Thornburg         ENTERED:

Atty. for: Curtis, et al.

Address: 1 N. Wacker 4400                         Dated: _____, _____

City/State/Zip: Chicago IL 60606                 ENTERED

Telephone: 312 357 1313

Judge          JUDGE                  Judge's No.
               RICHARD J. BILLIK

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

ORIGINAL - COURT FILE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TOD CURTIS, individually and as beneficiary, FIRST UNITED TRUST COMPANY, as Trustee under Trust No. 10510, and ELTO RESTAURANT INC., an Illinois corporation, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| IRVANA K. WILKS, Village of Mount Prospect Mayor and Local Liquor Control Commissioner, MICHAEL E. JANOIS, Village of Mount Prospect Manager, WILLIAM COONEY, Village of Mount Prospect Economic Director, WILLIAM SCHROEDER, Village of Mount Prospect Building Commissioner, ROBERT ROELS, Village of Mt. Prospect Environmental Health Manager, FRANK KRUPA, Village of Mount Prospect Environmental Health Inspector, OZ DEVELOPMENT, LLC and the Village of Mount Prospect, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

No.

FILED: JUNE 19, 2008
08CV3527
JUDGE GUZMAN
MAGISTRATE JUDGE NOLAN
AEE

## COMPLAINT FOR RELIEF OF CIVIL RIGHTS AND RICO VIOLATIONS

Plaintiffs, Tod Curtis ("Curtis"), individually and as a beneficiary, First United Trust Company, as Trustee under Trust No. 10510, and Elto Restaurant Inc., an Illinois Corporation ("Elto"), for their Complaint against the Village of Mount Prospect Mayor and Local Liquor Control Commissioner Irvana K. Wilks ("Wilks"), Village of Mount Prospect Manager Michael E. Janonis ("Janonis"), Village of Mount Prospect Economic Director William Cooney ("Cooney"), Village of Mount Prospect Building Commissioner William Schroeder ("Schroeder"), Village of Mount Prospect Environmental Health Manager Robert Roels

EXHIBIT

13

("Roels"), Village of Mount Prospect Environmental Health Inspector Frank Krupa ("Krupa"),[1]

Oz Development, LLC ("Oz Development") and the Village of Mount Prospect, allege as

follows:

### Nature of Action

1.      This case arises out of an ongoing enterprise and scheme initiated by

representatives of the Village of Mount Prospect nearly a decade ago, which eventually included

the developer Oz Development, that is aimed at ousting Plaintiffs from their ownership, use and

enjoyment, and ability to develop the property located at 6-18 W. Busse Ave., Mount Prospect,

Illinois (the "Property"), where Curtis owns and operates the Ye Olde Town Inn ("YOTI")

restaurant and bar.  The enterprise against Plaintiffs is a concerted effort by Defendants to drive

Plaintiffs from the Property and violate their constitutional rights perpetuated by, among other

things:

    i)      A prior partial condemnation of the Property where the Village caused extensive damage to the Property while deconstructing the condemned property. The Village first agreed to pay for the damages under Mayor Skip Farley, but then, under new Mayor Irvana Wilks, the Village chose to ignore the Village's prior Mayor's representation that the Village would repair the damage it caused to the Property as a result of the partial condemnation;

    ii)     The Village ignored an Agreed Order of court in the partial condemnation and refused to pay to Plaintiffs $40,000.00 for restorative repairs that it had agreed to;

    iii)    The Village initiated a fraudulent meeting called with Curtis ostensibly, and on the pretense, to discuss acquisition of the Property, but in reality the closed meeting was to intimidate the Plaintiff for the benefit of the Village's favored developer, Oz Development;

    iv)     The Village employed endless harassing inspections of the Property (including litigation related to the inspections involving administrative warrants and temporary restraining orders);

---

[1]   Collectively, Wilks, Janonis, Cooney, Schroeder, Roels, and Krupa will be referred to as the "Village Defendants."

2

v)     The Village Defendants included Oz Development in their scheme by allowing it to acquire and demolish property that was joined to the Plaintiff's Property and restaurant by a common wall for the purpose of developing a competing business commonly known as "The Blues Bar". The Village allowed the demolition to occur even though they were repeatedly warned that significant damage would result to Curtis' restaurant during the demolition and construction, and the Village allowed Oz Development to build it's Blues Bar even though there was not sufficient parking to accommodate its customers, and that it would have the effect of using up all of the available parking that YOTI had previously enjoyed, and they allowed OZ Development, to build it's new Blues Bar all the all the way up to the lot line and east wall of Curtis' building with full knowledge that the Blues Bar construction would not be possible without continuous trespasses upon the Plaintiffs' Property.

vi)     During the course of the Blues Bar Construction various means were employed by the Defendants, and they acted in concert together towards the same end, injuring Plaintiffs and depriving them of their property rights and their actions were calculated to harm and harass the Plaintiffs, and to send a clear message to Curtis that he was to leave the Village, and that his property rights were of no consequence to the Village. Actions included a variety of trespasses, harassments, intentional damage to the Property, bogus emergencies staged by the Village at great burden and expense to the Plaintiffs, and actions ostensibly caused by Oz Development and\or it's contractors that resulted in business disruptions and needless expense and hardship to the Plaintiffs;

vii)     The Village announced on several occasions its public support for a fraudulent plan for redevelopment that they coined "The Entertainment District". This was touted as a plan for redevelopment proposed by Oz Development that the Village supported even though Oz Development did not own the property that it proposed to develop, and even though the Village knew that the plan was not consistent with the Village's own comprehensive master plan, and was unrealistic and unworkable. The plan was touted only for the purpose of sending a false message to the Plaintiffs that the Village had no interest in seeing Curtis' Property be redeveloped, or even allowing Curtis to redevelop his own Property, and to induce him to sell out to Oz Development at an outrageously low price;

viii)     The Village showed obvious favor to the "Blues Bar" built, owned and operated by Oz Development, and used the establishment in a variety of ways to promote and facilitate it's ongoing scheme calculated to harass and harm the Plaintiffs;

ix)     The Village also employed a variety of fraudulent means, using bad faith negotiating schemes involving manipulated proposed purchase prices for the Property from the Village and Oz Development to force a sale of the

3

Property at an artificially low price, initiating an ongoing bad faith condemnation proceeding at the Property, and refusing to accept Curtis' proposal to redevelop the Property, even though Curtis' proposal requires no use of public funds, and instead the Village has accepted a redevelopment proposal from Oz Development and another developer that will require $10 million in public tax increment financing ("TIF") funds, use of a public parking garage that had been denied to the Plaintiffs, and a successful condemnation of the Curtis' Property.

2.    The Defendants' conspiracy has caused serious injury to Plaintiffs, and continues to cause Plaintiffs to incur ongoing costs for defending against the continued enterprise aimed to expel Plaintiffs from the Property.

3.    Tod Curtis is a pilot and former Marine who for nearly forty years has owned the Property and operated YOTI and has been and continues to be heavily involved in civic, community and philanthropic activities benefiting the Village of Mount Prospect and its citizens. He is well known and well respected in the community, and he speaks his mind and opposes municipal actions that he does not view in the best interests of the Village. He also speaks and communicates freely and honestly to the press, making his views visible and noticeable to the community and the Village officials and staff. As a result, Curtis has often been viewed as a thorn in the side of local politicians and their cronies and staff. As the Village's long-time attorney, Everett ("Buzz") M. Hill told one of Curtis' attorneys in the spring of 2008, Curtis "has been on the Village's radar for nearly 30 years" and "the end is near" for Curtis' continued status as a business and property owner and employer in the Village. Hill has helped orchestrate and implement the scheme of the Village Defendants, which has become increasingly malicious over time and is designed to drive Curtis out of the Village, shutting down his restaurant and seizing the Property to benefit the Village's favored developer, Oz Development, whose principal is a crony of Village officials, all at an enormous and capricious waste of Village taxpayers' funds. The scheme has been implemented by the Village damaging and destroying the Property and

failing to pay for the damages, encouraging and acquiescing in the developer's intentional

destruction and damage to Curtis' Property and interference with his business, approving and

sponsoring a proposed redevelopment plan for an entertainment district that was never intended

to come to fruition but was a charade only intended to try to force Curtis out of his Property to

benefit the Village officials' favored developer, Oz Development, a bad faith and unnecessary

condemnation of the Property, to again benefit the Village's favored developer and waste public

funds, refusing to fairly consider Curtis' plan to redevelop his Property, which would be without

cost to the Village's taxpayers and would realize the supposed goal for redevelopment, and

which plan received popular support.  Instead, Village officials, over many objections by Village

residents, approved a plan by a development team, including the favored developer, that will cost

taxpayers an unnecessary $10 million even though the likelihood of the development ever

occurring or obtaining financing is unlikely. The Village Defendants conduct pursuant to this

scheme has not only been arbitrary, capricious and irrational, it has also been malicious and

motivated to injure Curtis and deprive him of his constitutional and property rights.  Each time

Curtis takes a public stand and exercises his right to free speech, or files a suit to protect his

rights, Village officials lash out and abuse their authority and taxpayer's funds by a spiral of

increasing harassing and needless inspections, citing conditions in the restaurant and Property,

many of which were longstanding and caused by the Village's conduct and refusal to pay for the

damages that it caused, and more still that were nothing more than nonconforming but legal uses

that often exist in older buildings.  The Village undertakes these inspections as a result of Curtis'

unwillingness to buckle under to the Village's demands and to turn over his property, as well as

in retaliation for Curtis' communications with the press, in which Curtis criticizes the Village's

acts against him.  The harassment pursuant to the Defendants' scheme culminated in the spring

of 2008 with the Village, without notice, obtained an ex parte emergency inspection search warrant and in Gestapo-like fashion invaded the restaurant with twelve inspectors. The Village went into court "ex parte" to obtain the administrative search order by design, when they became frustrated in their inability to drive Curtis out from the Village. The Village could and should have given notice to Plaintiffs, but it chose not to do so because they knew that they would have to misrepresent the facts to obtain their administrative search. Moreover, the Village knew that there was no true emergency, and had Plaintiff been given notice and been allowed to respond, the fact that no emergency existed would have been shown, because the Village already had all of the information that it claimed it needed from previous inspections. Moreover, there was no point or reason whatsoever why the inspection needed to be done by surprise, except to harass and intimidate the Plaintiffs and YOTI's employees and patrons because after all, this was not a search for evidence where the need for surprise is necessary to avoid the possibility of removing or destroying evidence, but an inspection of a building and its fixtures.

    4.    After the search warrant was executed, Plaintiffs filed a state court civil rights and RICO suit against these Defendants. Defendants retaliated by obtaining a temporary restraining order without notice and a hearing that has shut down YOTI even though no true public safety issues were presented and the conditions in the restaurant had not changed over several years. Hill may be right that "the end is near", but the end that is sought by this suit is the cessation of the Defendants' scheme and enterprise designed to deprive Curtis of his constitutional rights and his business and Property through the use of the instrumentalities of interstate commerce, including the wires and the mails.

**Parties**

5.    Plaintiff Tod Curtis is the sole beneficial owner of the Property, as the sole beneficiary with the power of direction of Trust No. 10510, for which First United Trust Company acts as Trustee, and in which Trust title to the Property is held.  Curtis resides in Arlington Heights, Illinois.

6.    Plaintiff Elto is both incorporated and has its principal place of business in Illinois.  Elto is the current operator of YOTI in Mount Prospect, Illinois.  Elto is also the holder of the liquor license at YOTI.  Tod Curtis is the sole stockholder and President of Elto.

7.    Defendant Wilks is the Mayor and Liquor Control Commissioner for the Village of Mount Prospect, and upon information and belief she resides in Mount Prospect, Illinois.

8.    Defendant Janonis is the Village Manager of the Village of Mount Prospect, and upon information and belief he resides in Mount Prospect, Illinois.

9.    Defendant William Schroeder is the Building Commissioner of the Village of Mount Prospect, and upon information and belief he resides in Arlington Heights, Illinois.

10.    Defendant Robert Roels is the Environmental Health Manager of the Village of Mount Prospect, and upon information and belief he resides in McHenry, Illinois.

11.    Defendant Frank Krupa is a Health inspector for the Village of Mount Prospect, and upon information and belief he resides in Chicago, Illinois.

12.    Defendant William Cooney is the Economic Director of the Village of Mount Prospect, and upon information and belief he resides in Arlington Heights, Illinois.

13.    Defendant, Oz Development, is an Illinois limited liability company, and the owner of property located at 2 West Busse Avenue in Mount Prospect, Illinois, which is immediately adjacent to the Property to the east.  Oz Development's principal place of business

7

is in Illinois. Oz Development is owned by Errol Oztekin, a dentist by trade, whose controlled substance license was suspended in July or August of 2002 as a result of prescribing medications to patients at his father's weight loss clinic after identifying himself as "Dr. Oztekin" without informing patients that he was a dentist and not a medical doctor, and who dabbles in real estate development. Oztekin, Janonis and Cooney are associates who frequently and regularly communicate with each other about the Defendants' scheme and the Village's redevelopment plan and efforts to favor Oztekin and his business with Village munificence.

14.    The Village of Mount Prospect is an Illinois municipal corporation.

### Jurisdiction and Venue

15.    This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the United States Constitution, the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 *et seq.*), and 42 U.S.C. §§ 1983 and 1985.

16.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because all of the Defendants reside in Illinois, all of the events and omissions giving rise to Plaintiffs' claims are in Illinois, and the Property that is involved in this action is located in Illinois.

### The Conspiracy and Scheme to
### Drive Curtis Out of the Village Begins in 1999.

17.    For approximately forty years, Plaintiffs owned and operated YOTI as a restaurant and bar on the Property.

18.    In the late 1990s a developer submitted a proposal to the Village to redevelop the property directly behind YOTI to the north of the Property with a building containing 340 condominium units.

19.    As part of the proposal, the Village was required to pave a new road for access to the condominiums over a large portion of the north side of the Property, requiring a partial condemnation of the Property, reducing its size by approximately one-third. The Village saw a way to get at least one-third of Curtis' Property off its "radar screen" and in 1999, the Village initiated partial condemnation proceedings of the north portion of the Property so that it could build a private road to access the new condominium development.

20.    On September 27, 2000, the Plaintiffs and the Village entered into an Agreed Final Judgment Order in the partial condemnation case. The Agreed Order provided that the Village would match Plaintiffs' costs dollar-for-dollar to upgrade the exterior façade of the front and rear of the building on the Property, in an amount not to exceed $40,000. This provision was based on representations from the Village during negotiations to reach the Agreed Order.

21.    As to the actual deconstruction of the partially condemned portion of the Property, in late 2000 the Village initiated its deconstruction of the rear portion of YOTI and the Village Defendants used that occasion to damage the Property, interrupt YOTI's business and further their scheme to injure Curtis and drive him from his Property.

22.    In late 2000, during deconstruction, the Village displaced an exhaust fan and caused piping in YOTI to break and burst the sprinkler system in YOTI, causing a deluge during business hours, thus requiring YOTI to be evacuated and closed, as the 30,000 gallons of water released substantially damaged YOTI and its subfloor and tiles. Temporary repairs to fix these emergencies cost over $12,000. The Village Defendants in furtherance of their scheme would later in 2007 and 2008 cite the damage to the subfloor caused by the Village as claimed code violations, albeit over eight years old and long known to the Village as it caused them, as warranting closure of YOTI.

23.    In the spring of 2001, the Village continued its deconstruction related to the partial condemnation by removing the building west of YOTI, which was connected to YOTI's foundation. The blows from the Village's wrecking ball created cracks in the west wall of the basement of YOTI.

24.    In order to address the damages caused on YOTI by the Village's activities related to the partial condemnation of the Property, Plaintiffs requested on multiple occasions that the Village repair all damages caused by the deconstruction and pay for the repairs that had been made. Pursuant to the Village Defendants scheme, these requests were denied to pressure Plaintiffs to relinquish the Property and leave the Village.

25.    After engaging in discussions with the Village regarding the damages caused by the deconstruction, then Mount Prospect Mayor Skip Farley agreed with Curtis shortly before Farley left office, that the Village should reimburse Curtis for the damages it had caused and Farley sent Curtis correspondence that indicated that the Village would pay for damages caused by the Village's operations relating to the partial condemnation. However, Plaintiffs did not receive any payment from the Village during Mayor Farley's tenure as Mayor.

26.    Moreover, after entering into the Agreed Order in 2000, Curtis made repeated demands on the Village for the $40,000, as he was about to undertake substantial work on the façade of YOTI in an amount that cost in excess of $40,000. Defendant Cooney refused to cause the Village to put any money in trust to be matched by Curtis to accomplish these repairs and made it clear to Curtis that even though the Village had agreed and was ordered to contribute $40,000.00 for remodeling and repairs to the Plaintiffs' building, the Village did not believe it was worthwhile to spend any money to remodel or repair the Plaintiffs' building, and they had no intentions of doing so because the Village wanted to see the property redeveloped.

27.     During this time frame and pursuant to Defendants' scheme, Janonis also stated to Curtis that Curtis would never receive the $40,000 from the Village pursuant to the Agreed Order for the partial condemnation of the Property, and there was no point in Curtis making any repairs because the Village wanted to see the property redeveloped. Later in 2007 and 2008 in an example of hypocrisy, and in furtherance of the scheme, the Village Defendants caused the Plaintiffs to be cited for supposed defects in YOTI's façade that remain unrepaired because the Village had reneged on its promise to pay for these repairs.

28.     Plaintiff continued to make multiple demands for $40,000 throughout 2007, and in response to those demands, the Village Defendants caused the frequency and intensity of their inspections to increase.

29.     After Plaintiffs repeatedly inquired about the Village's payment of the $40,000, owed as part of the partial taking agreement between the Village and the Plaintiff, and on August 20, 2007, Defendant Cooney, pursuant to the scheme, drafted and mailed correspondence to Plaintiffs' counsel that misrepresented that "The Agreed Judgment Order that governed the acquisition of your client's property provided for a matching $40,000 façade grant from the Village within 36 months of the acquisition back in 2000. For whatever reason your client never pursued these funds within this time fame and those funds are no longer available." In fact, Cooney knew this was false and that Curtis had attempted on several occasions to obtain the $40,000, within the 36-month period.

30.     The Village never paid Plaintiffs the $40,000 that was due under the Agreed Order, because the Village Defendants were executing their scheme and an enterprise through the Village to oust Plaintiffs from the Property, a plan that would culminate in endless

inspections and harassments, and the ultimate closing of the Plaintiff's business, and, thus, they had no intention of ever causing the $40,000 to be paid.

31.    In April of 2005, Irvana Wilks was elected as the new Mayor of Mount Prospect. Three months after Wilks' election, Curtis met with her and showed her the letter from Farley and asked for payment and repair. She refused saying the letter "doesn't mean anything to me". Curtis asked her and Janonis to at least have the Village's inspectors stop citing the restaurant for supposed violations as a result of damages caused to the restaurant by the Village, but both refused.

32.    Instead of honoring the correspondence from former Mayor Farley that the Village would repair all damages it caused YOTI, in June 2004, Janonis sent a Village check to Curtis for $16,000 as payment for all damages caused by the Village, even though such amount was far below the money already expended by Plaintiffs to address emergencies caused by the Village and far below what was needed to permanently repair the damages caused by the Village. Curtis returned the check because it was insufficient. Janonis communicated to Plaintiffs' counsel that the Village would not repair any of the damages it caused YOTI and would not spend a dime on the Property to repair anything, and in late 2005 Janonis threatened by telephone to put Curtis out of business.

## Oz Development Joins the Conspiracy Against Plaintiffs

33.    In 2005 and 2006, Oz Development began acquiring small lots, in the downtown Triangle Area parcel in Mount Prospect in which the Property is situated, including the building immediately adjacent to YOTI. The Triangle Area of downtown Mount Prospect is a commercial district that is bounded on the north side by West Busse Avenue, the east side by Main Street, the south side by Northwest Highway, and the west side by South Wille Street. The Triangle Area

had long been the subject of redevelopment discussions by the Village. Janonis and Cooney developed a relationship with Oztekin and the benefits of that relationship soon began to pay off for Oz Development.

34.    In April 2004, a well known and regarded developer in Mount Prospect, Ben Trapani, announced plans to redevelop the block of West Busse Avenue in which the Property was located. Trapani submitted a proposal to the Village to redevelop the block of Busse Avenue with a seven story multi-use building that would contain residential, office, and retail units. This mixed-use development was an appropriate and commercially viable redevelopment of the Triangle Area that Curtis would have supported if approved.

35.    In 2004, Trapani was forced to withdraw his proposed plan for redeveloping the block of West Busse Avenue in which the Property is located because of a lack of support from the Village, which refused to even consider the plan.

36.    In fact, the Defendants had created a scheme and ignored the Trapani proposal in order to move any redevelopment of the Triangle Area to Oz Development and to fraudulently induce Curtis into selling his Property to Oz Development at a below fair market value, falsely representing to Curtis that his Property would not be condemned and would not be required for any redevelopment of the Triangle Area.

37.    On August 15, 2005, Wilks and the Village Board of Trustees executed and mailed a letter to Curtis falsely representing that the Village Board was committed to making a final decision regarding the long-term redevelopment of the property within the Triangle Area by the end of 2005, but that the Village was not interested in acquiring the Property and demanded that Curtis spend more money repairing YOTI for alleged defects caused in substantial part by the Village. As would later become apparent, the Village's statement that it was not interested in

obtaining the Property was false and intentionally misleading, and designed and intended to benefit the Village's favored developer, Oz Development, and induce Curtis to sell the Property to Oz Development and avoid continued harassment by the Village.

38.    On or about October 2005, Oz Development purchased the property immediately east of and adjacent to the Property (the "Oz Property") sharing a common wall with Plaintiff's building and is located at 2 West Busse Avenue, on the corner of Busse Avenue and Main Street in Mount Prospect in the Triangle Area.

39.    On or about May 5, 2006, Oz Development revealed a plan for redevelopment of the Triangle Area, that utilized and included all properties in the Triangle Area except for Curtis' Property (the "Oz Proposal"). The Oz Proposal required the Village to buy or condemn several parcels of private property, allow the use of a public parking garage, and provide $6 million which would come from public TIF funds to build underground parking for their proposed development. The Oz Proposal was fraudulently created and designed by Defendants to persuade Curtis that his Property would never be part of any redevelopment to induce him to sell the property to Oz Development and leave the Village.

40.    The Oz Proposal required the redevelopment of all of the properties around the Triangle Area except Curtis' Property, which would, by design, be left as is, with the clear message to Curtis that he would now have to refurbish his building, even though they had previously stated that it would not be worthwhile to refurbish the building, and that the Village would not contribute to it, and even though they had previously agreed, and were ordered by a court order to do so. The OZ Proposal sought to demolish the building that was attached to Curtis' YOTI and construct the new one, in such a way that, by design, would require numerous trespasses upon the Property, cause frequent interruption of the YOTI's business, eliminate

parking for YOTI's patrons, and ultimately it called for construction of a new Blues Bar on the Oz Property, and other restaurants in the Triangle Area, creating a new entertainment district in downtown Mount Prospect that would ultimately have the effect of forcing the Plaintiffs out of business and driving Curtis out of the Village by putting him in a situation that would make it impossible for him to compete or redevelop his property, given the Village Defendants' favored treatment of Oz Development at the expense of Curtis' property rights.

41.    The Village, through the Village Defendants, gave its enthusiastic public support and approval to the Oz Proposal even though Oz Development did not own all of the properties involved with the proposed plan of the Triangle Area, and the proposed plan failed to provide sufficient parking and open space to support the redevelopment. Again, this public support of the Oz Proposal was designed to fraudulently force Curtis out of the Village as the Village Defendants knew that the Oz Proposal was not a viable project and Mount Prospect did not have the demographics or ability to support an entertainment district, but they were bound and determined to force Curtis out and benefit Oz Development.

42.    After various informal discussions between Curtis and representatives of the Village regarding his plans for the future development of his Property, in July of 2006, Defendant Janonis called for a closed session with the Village Board and Curtis to discuss the possible acquisition of the Property.

43.    At the closed meeting that took place on July 25, 2006 with Village Manager Mike Janonis, Mayor Wilks and four Village trustees, including Curtis and his representatives, Mayor Wilks informed Plaintiffs that the Village had no interest in purchasing the Property, and that the Village fully supported the Oz Proposal that did not include the Property. During the meeting each of the Trustees and the Mayor took turns making it clear that the Village had

absolutely no interest in ever purchasing the Property. One Trustee posed the rhetorical question to Curtis "You don't think we can do this?" impliedly threatening that the Defendants intended to violate Plaintiffs' property rights whether their action was lawful or not.

44.    As would later become apparent, the closed meeting was called by Janonis and Wilks to mislead Plaintiffs regarding their true intentions to purchase or condemn the Property. Plaintiffs were required to expend significant costs to prepare for the July 25, 2006 closed meeting, which meeting was later discovered to have been a sham and called pursuant to defendants' scheme to benefit Oz Development and force Curtis to sell his Property.

45.    On July 14, 2006, the Village Board, including Defendant Wilks, approved the demolition of the building adjacent to YOTI, and in late 2006 the demolition and the construction of the Blues Bar on the Oz Property that was part of the Oz Proposal began.

46.    Refusing to cave in to the pressure, on October 25, 2006, Curtis announced his plan to redevelop his Property as a multi-use building named the Gateway Centre (the "Initial Gateway Proposal"). The Initial Gateway Proposal proposed to have Plaintiffs redevelop the Property with a four-story development including a restaurant, a sports bar, four retail stores, and three stories of condominiums above the retail level. The Village Defendants caused the Village to refuse to even accept the filing of the initial Gateway Centre proposal and made it clear that the Village had no interest in cooperating with Curtis to assist him in redevelopment efforts under any circumstances, and they would do everything possible to obstruct and prevent it.

47.    Pursuant to the Defendant's scheme, on or about December 22, 2006, Oz Development sent a letter of intent to Curtis to purchase the Property for the sum of $1,400,000. Curtis rejected the clearly inadequate offer, refusing to buckle under the pressure. Defendants retaliated.

16

48.    The Defendants in furtherance of their scheme and to apply further pressure on Curtis and to benefit Oz Development, caused the Village on January 25, 2007, to make a "good faith" offer of $1,265,000 to acquire the Property. In the written offer, which was conveyed by the Village attorney, Buzz Hill, the Village indicated that it "is in the process of considering the redevelopment of the property to the east, south and west of Mr. Curtis' property." This absurdly low offer was made in bad faith to pressure Curtis to accept Oz Development's offer, pursuant to the Defendants' scheme.

49.    The offers to purchase the Property by Oz Development and the Village were not made in good faith and were made to pressure Curtis into accepting an artificially low purchase price for the Property for the benefit of Oz Development pursuant to Defendants' scheme. Oz Development and the Village Defendants acted in concert to force Plaintiffs into accepting an offer for the purchase of the Property that was far below its true value, or face isolation in a proposed redevelopment that would force Plaintiffs from the Village.

50.    The retaliation for Curtis' refusal to sell to Oz Development and leave the Village as Defendants wanted and for having the tenacity to attempt to develop his Property, began in earnest in October of 2006, when Oz Development began the demolition and excavation of the Oz Property and the construction of the Blues Bar.

51.    With the encouragement, support and acquiescence of the Village Defendants, and pursuant to Defendants' scheme, during the excavation of the Oz Property and the construction of the Blues Bar, Oz Development's representatives and contractors committed numerous trespasses and caused substantial damages to the Property. Specifically, the excavation and construction of the Blues Bar caused significant damages to YOTI's roof, walls, and steam pipes. Moreover, Oz Development workers or contractors placed construction fences

17

on the Property without consent, excavated land that caused a YOTI employee to be injured, and left debris and garbage on YOTI's roof. The Village did nothing when Curtis complained. Instead, the Village Defendants caused more inspections to be made of YOTI with citations issued for alleged violations caused by the Village's own conduct in 2000 for which it refused to pay, and they continued to allow and encourage such harassing behavior such as allowing Oz Development contractors to toss and scatter all kinds of construction debris on the Plaintiff's building and the Property, and even to intentionally remove bricks from a large area of the Plaintiff's building's east wall, thereby exposing the interior of the building to the elements, all calculated to harass and intimidate the Plaintiffs.

52. Previously, on or about September 22, 2006 soon before the excavation of the Oz Property, the Village Defendants pursuant to their scheme caused the Village to require that Plaintiffs, at their expense, conduct an inspection of the Property to accommodate the neighboring demolition conducted by Oz Development. The alleged purpose of the inspection was to assess the potential effects of the demolition on the Oz Property on the Property.

53. In the report from the inspection on September 22, 2006, Plaintiffs' inspector noted that the Property and the Oz Property shared a common sewage system. Plaintiffs provided Oz Development and the Village with copies of the inspection report, warned of the common sewage system, and were given license by Plaintiffs to enter the Property to make their own inspection of the sewers prior to demolition.

54. With the support and encouragement of the Village Defendants, Oz Development intentionally disregarded the inspection report regarding the common sewage system and did not conduct its own inspection prior to demolition of the building on property neighboring the Property. No representative of the Village conducted an inspection either.

55.    Pursuant to the Defendants' scheme, knowing that the Property and the Oz Property shared a common sewer, Oz Development proceeded with the demolition and excavation of the Oz Property with reckless disregard of the effects that the demolition and excavation would have on the sewage system or what effect the demolition and excavation would have on the Property, in fact, expecting or anticipating damage to the Property to further harass and pressure Curtis and interrupt his business.

56.    Subsequently, on or about March 20, 2007, a problem was discovered with the sewage system. When the sewage system problem was first discovered, despite the fact that Plaintiffs had provided an inspection report to the Village providing that there was a common sewage system on the properties, the Village demanded that Plaintiffs resolve the issue and asserted falsely that Plaintiffs' sump pumps were emptying what appeared to be contaminated effluent into Oz Development's Blues Bar's construction ditch.

57.    On or about March 20, 2007, Defendants Cooney and Schroeder demanded that Plaintiffs "fix a problem with his [Curtis'] sewers," followed by threats to shut down YOTI if "the situation was not resolved."

58.    The Village Defendants made no effort to eliminate any other possibilities for the alleged contaminated effluent problem, because they intended to harass Curtis, interrupt his business and blame him for problems caused by their co-conspirator Oz Development.

59.    On March 20, 2007, Defendant Cooney demanded that the Village be allowed to go into YOTI's basement to inspect the contaminated effluent.

60.    On or about March 21, 2007, a representative of Plaintiffs met with Village officials at the appointed time and was falsely told by Defendant Schroeder that Plaintiffs were responsible for the sewer lines to where the lines connect up with the Village sewer lines, even

though he and Defendant Cooney knew that the sewer lines went through the Oz Property before connecting up to the Village's sewer lines.  Cooney and Schroeder told Plaintiffs that there was an obstruction in the sewer lines, and that Plaintiffs were responsible for clearing it, and demanded that it be cleared by the following day or threatened that YOTI would be closed.  The Village made no diligent effort to eliminate any other possibilities that Oz Development's excavation of the Oz Property could have caused the leak, because they intended only to harass Plaintiffs pursuant to their scheme in favor of their co-conspirator Oz Development and instead, pursuant to their scheme, demanded that Plaintiffs take immediate action to correct the alleged problem, all at great hardship and expense to the Plaintiffs.

61.    On or about March 22, 2007, at approximately noon, Defendant Schroeder threatened to shut down YOTI if the "sump pump-sewer blockage problem" they had been falsely claiming to exist was not fixed by the end of that day.

62.    Consistent with Plaintiffs' sewer contractor's report from September 22, 2006, on March 22, 2007, sewer contractors for Plaintiffs, at the Plaintiffs' expense, investigated the issues with the sewage system, and found that there was a blockage of asphalt and clay 200 feet from the starting point of the Property on the Oz Property.  The contractor confirmed that the blockage was not on the Property, but rather was on the Oz Property, thus he could not resolve the problem without trespassing.

63.    Plaintiffs' sewer contractor convinced that the sewer blockage was not on the Property, and concerned that he did not have proper authority to flush or drill beyond the Property line, informed Plaintiffs of same.

64.    Defendant Roels was on-site during this procedure, and was made aware of these findings.

65.    The next day, on or about March 23, 2007, the Village finally assigned their Public Works Department to "locate the source of the problem," but Village officials still disputed that the problem was on the Oz Property, and questioned the conclusions of Plaintiffs' sewer contractor, and Plaintiffs remained under the threat of having YOTI shut down.

66.    As a result of the unending demands of the Village, Plaintiffs, at their expense, had their sewer contractor come out to the Property for a second day and time to reinspect the sewer lines, and used a video camera to confirm that the Property was not the source of the leaking effluent.  After the inspection, and after four days of hardship to Plaintiffs with threats of the closure of YOTI looming, late in the day of the March 24, 2007, the Village reluctantly was forced to accept the obvious fact that the source of the problem was a collapse of the sewer line on the Oz Property that was caused by a crane used by Oz Development in the demolition and\or excavation. Of course, the Village did not require Oz Development to investigate the source of the problem, even though it would have been much easier and less expensive for them to investigate it, because it was much more likely that the source of this problem was originating from Oz Development's construction site and not the Property. Likewise, Oz Development and the Village did not pay any of the Plaintiff's expenses incurred during their four-day campaign of harassment orchestrated by the Village Defendants.

67.    On February 21, 2007, in the early morning hours, during the course of the construction of the Blues Bar, Oz Development intentionally cut a steam pipe that was connected to the Plaintiffs' building, causing it to emit great amounts of steam and compromising the Plaintiffs' heat delivery system for YOTI and the building's tenants. Village officials then, acting in concert with Oz Development, contacted Curtis in the early morning hours to alert him to an "emergency" situation and ordered him to fix the problem immediately without explaining to

him the true cause of the problem, even though they knew Curtis was vacationing out of the area and knew or should have known the source of the problem. The Plaintiffs had a representative respond and upon arriving at the building, discovered there were no Village officials or Oz Development representatives present to explain what had happened and who was responsible for it.

68.    In addition, during the demolition and construction of the Blues Bar, Oz Development, without authority and to further harass Plaintiffs and disrupt YOTI's business, removed a storm water inlet that was constructed by the Village on the Property sometime in 2002-2003. As a result of the removal of the inlet, Oz Development left a hole approximately eight by eight feet in the parking area of the Property. When this hole was first discovered by the Plaintiffs, they informed the Village and requested help from the Village and Oz Development to fix the hole, but the Village refused to get involved and told the Plaintiff that it was a matter between the Plaintiff and Oz Development, even though the Village allowed the trespass and the removal of its inlet. Likewise, Oz Development denied the trespass even took place and refused to make any repairs. To avoid further hazard and injuries the Plaintiff covered the hole with heavy plywood and parked a vehicle over it so that the hole was covered and inaccessible.

69.    While Plaintiffs were willing to allow the Village to repair the hole left by Oz Development's removal of the storm water inlet, and despite the fact that Plaintiffs did not create the hole, on October 17, 2007, the Village Defendants caused the Village to file a Motion for a Temporary Restraining Order and Preliminary Injunction and/or Request for an Expedited Hearing on the Village's Verified Complaint in Cook County Circuit Court, falsely claiming that Plaintiffs were obstructing the Village's ability to repair the storm water inlet without even mentioning that it knew Oz Development had caused this damage to the storm water inlet. Thus,

the Village Defendants, in furtherance of their conspiracy, came to the aid of Oz Development and repaired the damage to the storm water inlet and the resulting hole, but only after burdening Plaintiffs with a temporary restraining order, creating the false impression that the Plaintiffs were somehow obstructing public safety, when in truth and in fact, it was the Village and Oz Development, acting in concert together, that created the public safety threat at the Plaintiffs' expense and detriment.

70.    On or about September 8, 2007, a representative or contractor from Oz Development trespassed onto the Property and installed electrical service wiring that hung over the Property.  The electrical service wiring was installed despite the fact that ComEd had previously indicated Oz Development could not install the wiring, and without any consent from Plaintiffs. The Village did nothing in response to the Plaintiffs' complaint.

71.    In September and October of 2007, employees from the Blues Bar illegally dumped garbage from the Bar into YOTI's dumpsters on multiple occasions, including dumping cooking oil.   On one occasion, Plaintiffs were required to call the Mount Prospect Police Department in order to document the dumping issues from the Blues Bar. Pursuant to the Defendants' scheme, the Village did nothing in response to these complaints.

72.    On or about October 11, 2007, in a display of the favored relationship between Oztekin and the other Defendants, just prior to the official opening of the Blues Bar, Oztekin hosted a private party for elected Village officials, Village staff, Village inspectors and employees and their families which included all of the Village Defendants.

73.    On or about October 12, 2007, the Blues Bar officially opened for business.

74.    In September and October of 2007, Plaintiffs again notified the Village of the trespasses and damages that were caused by Oz Development's excavation of the Oz Property and the construction of the Blues Bar.

75.    On or about November 28, 2007, Plaintiff again brought the fact of repeated trespasses by Oz Development to the Village Defendants attention, which caused Cooney to notify Plaintiffs by facsimile that it would not investigate or enforce any Village ordinance against Oz Development as a result of the repeated trespasses or damage it caused Plaintiffs.

76.    In a further effort to pressure Plaintiffs to sell the Property and leave the Village and contrary to other prior representations to Curtis, on September 18, 2007, the Village filed a Complaint for Condemnation for the Property against Plaintiffs in Cook County Circuit Court, even though ostensibly and according to the Village Defendants' misrepresentations, the Property was not necessary for the fraudulent entertainment district redevelopment.

77.    That the Oz entertainment district proposal touted by the Village was always a ruse and subterfuge was revealed when it was announced at the time of the condemnation that Errol Oztekin was partnered with developer John Heimbaugh and was working with the Village on a development agreement and plan for the Triangle Area.

78.    In fact, Oztekin was incapable of developing the Triangle Area under any proposed development plan and always needed an experienced partner and the Village Defendants knew that and encouraged and acquiesced in Oz Development's transfer of ownership of parcels to an entity owned by Heimbaugh and Oz Development that Oz Development had ostensibly acquired for the supposed entertainment district. This combination of Oz Development and Heimbaugh had long been planned and supported by the Village Defendants.

24

### Continuing conspiracy between
### Village Defendants, Oz Development, and Heimbaugh Capital

79.    That the Heimbaugh/Oz Development redevelopment plan had long been in the works and supported and encouraged by the Village Defendants to support their favorite developer/dentist and consummate their scheme to force Curtis out of the Village became apparent when in November of 2007, Curtis announced his intention to develop on the Property, with no public funds required, a mixed condominium and retail use called Gateway Centre of Mount Prospect. The Defendants pursuant to their scheme reacted and retaliated by increasing the number and intensity of inspections at YOTI, culminating in obtaining without notice a warrant to inspect the premises in a Gestapo-like raid on YOTI by twelve inspectors in March of 2008.

80.    The Defendants further reacted by rushing to publicize the Heimbaugh/Oz Development redevelopment plan, which called for a much higher density use in three high rise buildings. Under the Heimbaugh/Oz Development proposal, Oz Development kept the Blues Bar, but the rest of the Triangle Area, including West Busse Avenue, a public street, and Curtis' Property would be condemned. This redevelopment plan received a negative response from Village residents.

81.    In February of 2008, Curtis publicly revealed his plans for Gateway Centre of Mount Prospect and his plans received a favorable public response. The Defendants reacted by initiating administrative proceedings without notice to obtain a warrant to search YOTI on March 4, 2008, which search was conducted by twelve inspectors.

82.    On March 5, 2008, Curtis officially submitted a second plan to the Village to develop the Property as the Gateway Centre of Mount Prospect.

83.    The Gateway Centre of Mount Prospect plan consisted of a comprehensive package of information prepared by professionals at great expense about the specifications for constructing the building. The proposal further provided that the additional economic benefit to the Village would be $2.75 million to $3.5 million in additional taxes to the Village. Further, Gateway Centre of Mount Prospect would be built entirely on the Property and only with private funds. The Gateway Centre of Mount Prospect plan further envisioned the development of the area to the south of the Property as a public park with a fountain as a tribute to the Village's history and street level public parking.

84.    Pursuant to the Defendants' scheme, in March of 2008, counsel for Plaintiffs was informed by Buzz Hill, Village Attorney of Mount Prospect, that under no circumstance would the Village approve the Gateway Centre of Mount Prospect plan even though it received more public support, did not involve public money, and was more feasible than the Heimbaugh/Oz Development entity's proposals. The only flaw with the Gateway Centre of Mount Prospect Plan is that it was sponsored by Curtis and did not benefit Oz Development.

85.    On March 11, 2008, Heimbaugh formerly presented the Village with the Heimbaugh/Oz Development entity's redevelopment plan for the Triangle Area in the Village, which included the Property (the "Heimbaugh/Oz Proposal").

86.    The Heimbaugh/Oz Proposal called for the construction of 105 residential condominium units and 35,000 square feet of commercial space that would include a 268 space parking garage. The redevelopment project would be conducted over a three-year period, which would include as phase I a 7-story mixed use structure that would consist of 65 residential units and 20,000 square feet of retail space and the 268 space parking garage, and as phase II a 6-story mixed use structure that would be built at the corner of NW Highway and Main Street. The

26

Proposal would also include the construction of an internal plaza for outdoor restaurants and public gatherings and the elimination of West Busse Avenue, a public street.

87.    To complete the redevelopment included in the Heimbaugh/Oz Proposal would cost $40 million.

88.    The Heimbaugh/Oz Proposal required the redevelopment, and hence, the sale or condemnation of the Property.

89.    Of course, the Heimbaugh/Oz Proposal would not be fully supported by private funds. Instead, the Proposal would require Heimbaugh/Oz Development entity and the Village to enter into a financial redevelopment agreement, in which the Village would need to pledge public TIF funds in the amount of $ 10 million.

90.    On March 11, 2008, the Village Board of Trustees conducted a public meeting to discuss the specifics of the Heimbaugh/Oz Proposal, and a majority of the Board enthusiastically supported the proposal. As to Curtis' Gateway Centre, Trustees have publicly defamed him, falsely calling the plan "amateurish' or falsely representing that it could not be accomplished without involving other property in the Triangle Area. The Village Defendants also reacted by causing the Village to file an administrative proceeding to revoke YOTI's liquor license on the unprecedented basis of building code violations.

91.    On March 31, 2008, Mayor Wilks and the Village Board of Trustees conducted a closed session meeting regarding the "purchase or lease of real property for the use of the public body . . ." This session was called by the Village Defendants to determine how to best push through the Heimbaugh/Oz Plan and punish Curtis for having the temerity to try to redevelop his Property at his expense.

92.    On March 31, 2008, Plaintiffs filed a state court complaint against most of these defendants alleging civil rights violations and civil RICO violation.  The Village Defendants responded by bringing a TRO without notice to shut down YOTI, which has not operated since April 7, 2008.

93.    On May 13, 2008, the Village finally responded to the Gateway Centre of Mount Prospect plan.  In the Village's response, the Village, through Deputy Community Development Director Brian Simmons, falsely stated that the Gateway Centre of Mount Prospect plan had not been scheduled for review by the Village's Planning and Zoning Commission because there were allegedly several code issues that needed to be addressed.  The issues identified by the Village in its response involved issues related to the parking for the Gateway Centre of Mount Prospect, questions about the configurations of certain floor plans, utilities, and other issues related to the specifications of the Gateway Centre of Mount Prospect plan.

94.    Nine days later, without giving Curtis any time to respond, and despite concerns from Village residents that other proposals were not being considered, on May 22, 2008, the Village Board of Trustees held a public hearing and voted to approve the Heimbaugh/Oz Redevelopment Plan.

95.    Not content with having closed the Plaintiffs' business, and approving the Heimbaugh/Oz Proposal, the Defendants continued their scheme of harassing Plaintiffs to drive them out of the Village, the Village attorney, Buzz Hill, warned the Plaintiffs' General Counsel in open court in a status hearing before Judge Richard J. Billik that the Village had reason to believe that the Plaintiffs were receiving deliveries at the YOTI, which would be a violation of the TRO and would be contemptuous of the order. The very next day, a Saturday, Curtis visited the restaurant only to find a truck making a delivery of food in his parking lot. Knowing that the

delivery could not be for YOTI, even though it appeared to be a YOTI delivery, Curtis investigated further, and discovered that the delivery was actually for the Blues Bar next door. Curtis contacted the police and a police report was made, and the driver of the delivery truck was ordered by a police officer to move his truck. If Curtis had not visited, it would have been difficult for him to disprove the allegation that the delivery truck was delivering food to his establishment.

96.    Pursuant to Defendants' scheme, Oztekin continue to be favored by the Village and the Village Defendants when he was given the exclusive opportunity to directly profit from an annual public event, the Mount Prospect Fine Arts Festival, during which a "Blues Festival" was added this year and, of course, the only beneficiary of this event is the Blues Bar.  Village Defendant Wilks and Mount Prospect Village Trustees approved a Blues Festival to be held on public grounds and supported with public funds and sanctioned Oztekin as the sole benefactor. The first knowledge the Plaintiffs had of the Village sanctioned Blues Festival, benefiting only Oztekin, was when Village public employees were observed hanging a promotional banner on Oztekin's Blues Bar building; and from information posted on the Village's website exclusively identifying Oztekin as the sole Blues Festival sponsor and promoting his Blues Bar as the sole venue for the festival provided confirmation the Village Defendants intended to allow Oztekin, and Oztekin only, to profit from this use of public funds and a public event.

**The Village's Endless Inspections and
Legal Proceedings to Pressure Plaintiffs Are Part of
Defendants' Scheme to Drive Curtis Out of the Village**

97.    Prior to 2005, while Plaintiffs had been operating YOTI for 30 years, the Village rarely conducted more than a regular annual inspection of the Property, which rarely yielded any findings of ordinance violations.  However, since 2005, the Village Defendants, pursuant to their

scheme, have used multiple Village departments to conduct repeated and unjustified inspections to pressure Plaintiffs to sell the Property and drive Plaintiffs out of business and out of the Village.

98.    In March 2007, after Plaintiffs had sued Oz Development for trespass, during an inspection by the Village, Defendant Schroeder allegedly observed that the floor of YOTI was not stable.   Despite the fact that the floor was stable, Defendant Schroeder and other representatives from the Village conducted numerous follow up inspections regarding the floor of YOTI, which in fact had been damaged by the Village in 2000.

99.    In April 2007, after Plaintiffs sued the Village over the sewer collapse, the Village's Environmental Health Inspectors inspected the Property and purportedly found issues with the exterior of YOTI, including loose wood, loose conduit and missing mortar in the building's chimney, repairs that the Village was required to assist paying for as a result of the first partial condemnation.

100.    In May 2007, the Village inspected the Property for alleged maintenance issues on the exterior of the building, as well as alleged licensing issues related to the Property's residential units.

101.    For many years, YOTI had a sprinkler system installed that used a cell phone system to communicate with the fire department.   The sprinkler system was approved by the Illinois State Fire Marshal and had never been mentioned as an issue by the Village in any of its inspections.

102.    In June 2007, the Village conducted an inspection of the Property and held that the sprinkler system at YOTI was in violation of the Village code, despite being approved by the

Illinois State Fire Marshal and never cited by the Village. Plaintiffs were required to expend more money unnecessarily as a result.

103.   Plaintiffs have addressed and remedied any allegations from Village inspections related to floor, exterior, or licensing issues.

104.   In early 2008, the Village's Community Development Department conducted multiple inspections of the Property to observe both the exterior and interior condition of the Property.

105.   Specifically, on January 15, 2008, Defendant Roels alleged that there were issues on the Property with the soffit and fascia, cedar shingle roof, brick foundation, and that extension cords were improperly used on the exterior of the building, even though these conditions had existed for years without comment by the Village.

106.   On January 21, 2008, a Village inspector declared the exterior rear stairway "unsafe" and demanded that the same be repaired by January 28, 2008, even though the stairway was not used by patrons of the YOTI and was not accessible to them.

107.   On January 28, 2008, Defendant Roels again inspected the Property's exterior including alleged loose wood, loose conduit and alleged mortar issues.

108.   All of the issues alleged in the January 2008 inspections were being addressed or remedied by Plaintiffs but most of the alleged violations were in the nature of legal but nonconforming uses due to the age of the building, and in any event, they were all long standing conditions that had existed for many years and the Village had not objected to these conditions in prior years' inspections.

109.   In 2007 and 2008, Fire Prevention Officers from the Village inspected the Property numerous times allegedly to determine if the Property was in violation of any Fire Codes.

110.   In 2007 and 2008, Defendant Krupa inspected the Property without notice multiple times.   For example, on January 18, 2008, Krupa conducted an inspection of the Property and prepared a Retail Food Sanitary Inspection Report that alleged twenty-six violations.

111.   On January 27, 2008, the Village conducted an "electrical Hazard Inspection."

112.   All of the issues alleged in the Fire Code, Food Sanitary, or electrical hazard inspections never existed or have been addressed or been remedied.

113.   On February 13, 2008, the Village alleged in a citation that the Property had falling shingles from the roof and demanded that the roof be remedied within six hours or the street in front of the property would be barricaded and YOTI would be shut down. The shingles in question were asphalt shingles and they were less than 12 feet from the ground and they posed little or no danger to anyone. Nevertheless, to avoid being barricaded and shut down, Plaintiffs immediately remedied the alleged roof issue by removing all shingles within six hours. The shingles were removed at great effort and expense to the Plaintiff, causing the building to appear to be vacant and in disrepair.

114.   Since March 1, 2008, the Village Defendants have continued to harass Plaintiffs with unending inspections and reinspections even after having YOTI closed for business on April 7, 2008, as the Village's requirements for YOTI's reopening are ever increasing and shifting.   As soon as all conditions are met, the Village Defendants simply create a new

expensive obstacle to a reopening, which Defendants pursuant to their scheme, do not intend to allow to happen.

115.    Despite the questionable nature of the inspections and the Village's allegations that arise from such inspection, Plaintiffs have always addressed and remedied issues raised by the Village from the inspections, the majority of which were caused by the Village's own wrongful actions. The Village's inspections, reinspections, and promises of further inspections have resulted in Plaintiffs incurring a substantial amount of costs due to the Village's requirements that Plaintiffs immediately retain various contractors to address the Village's concerns.

116.    On March 4, 2008, in a further effort to pressure Plaintiffs into selling the Property, the Village, used as a tool for Defendants' conspiracy, filed with the Circuit Court of Cook County an *ex parte* Petition for an Administrative Search Warrant. The Petition was supported by the Affidavit of Defendant Roels, the Environmental Health Manager of the Village of Mount Prospect. Roel's Affidavit set forth alleged "potential" Village Code violations going back to 2007, almost all of which had been remedied by Plaintiffs as a result of the Village's endless inspections.

117.    Defendants proceeded with the Petition for an Administrative Search Warrant *ex parte*, despite the fact that Defendants knew how to contact Plaintiffs and Plaintiffs' counsel, and had been in regular contact during all of the previous inspections.

118.    On March 4, 2008, based on Defendant Roel's representations under oath, the Circuit Court granted the Village's Petition.

119.    Plaintiffs have moved to quash the Administrative Search Warrant, and are awaiting a hearing date on that motion.

120.   Pursuant to the Court's order, on March 4, 2008, the Village conducted further exterior and interior inspections of the Curtis Property. The inspection was a show of force by the Village, with at least a dozen inspectors storming the Property and conducting 3-4 hours of intrusive and harassing inspections.

121.   Despite the fact that the Village had conducted several inspections prior to March 4, 2008, and even though no new conditions existed that could give rise to new violations, the inspection pursuant to the administrative search warrant resulted in dozens of new allegations and formal citations from the Village.

122.   On March 20, 2008, the Village took another tack in its effort to pressure Plaintiffs by filing a "Notice of Charges" to suspend Elto's liquor license. The basis of the Notice was not based on any alleged abuse of the liquor license, but was instead based on charges related to purported violations of the Village's Property Maintenance, Fire, and Food Codes, none of which had any relation to liquor consumption. The Village attorney, Buzz Hill, acknowledged to Plaintiffs' counsel that this had never been done before.

123.   In a conflict of her duties as Mayor, Wilks was also the Village's Liquor Control Commissioner and was the hearing officer for the hearing on Elto's liquor license. Because of the conflict between Wilks enforcing the Village Code as Mayor on the one hand, and conducting a quasi-judicial hearing on whether Elto violated the Village Code on the other, Elto moved for a Change of Venue to substitute Wilks with a neutral hearing officer. On May 1, 2008, Wilks denied Elto's Motion for a Change of Venue, despite her admission that "I have knowledge of some of the facts in play here."

124.   On April 7, 2008, the Village filed a Complaint against Defendants, and a Motion for a Temporary Restraining and Preliminary Injunction in the Cook County Circuit Court,

alleging that Plaintiffs were in violation of numerous Village ordinances and that YOTI should be closed for business.

125.   On April 10, 2008, the Court entered a temporary restraining order against Plaintiffs that required Plaintiffs to close YOTI.  The Court did so based upon allegations that were misleading and false, and incomplete information, but because TRO proceedings did not provide the Plaintiffs with an opportunity to respond or present evidence in their defense, the Court was obligated to accept the Village's allegations as true, but shortly after it issued the order, on its own motion, the Court transferred the case to the presiding judge for consolidation, as the Court became aware that there was, in fact, preexisting litigation between the parties that had not been brought to its attention by the Village.  To date, YOTI remains closed pursuant to the temporary restraining order.

126.   On or about June 3, 2008, Defendant Cooney stated to a fellow businessman and associate of Curtis, during a private meeting, that Tod Curtis "is done. We are going to run him out and take his property with a quick-take." This statement was made as part of Defendants' scheme to pressure Plaintiffs to relinquish the Property and leave the Village.

127.   The YOTI is involved in interstate commerce, and, thus, Defendants conduct as alleged above that consistently interrupted Plaintiffs' business affected interstate commerce.  In addition, the development of the Property by Plaintiffs would also involve interstate commerce, and, thus, Defendants scheme to stop the development of the Property by Curtis affected interstate commerce.

<u>**Count I**</u>

**Racketeering Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C. §§ 1962(c) and (d) (Against Defendants Wilks, Janonis, Cooney, Schroeder, Roels, Krupa, and Oz Development)**

128.    Plaintiffs incorporate by reference each allegation contained in Paragraphs 1 through 127 as if fully set forth herein.

129.    The Defendants designated above in Count I (the "Count I Defendants") are persons and participants as defined under 18 U.S.C. § 1961(3).

130.    Count I Defendants have committed more than two acts of racketeering activity within the last ten years and therefore have engaged in a pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961(5).  Specifically, Count I Defendants have engaged in the following predicate acts:

a)      After the Village Defendants caused extensive damage to the YOTI through their management of the deconstruction of the property neighboring the Property in late 2000 and early 2001, during 2001 Plaintiffs requested on multiple occasions that the Village repair all damages caused by the deconstruction.  In response, in 2001, Defendants Cooney and Janonis denied Plaintiffs' requests by mails and wires as part of Count I Defendants' scheme to defraud and obtain the Property by false pretenses.  These mail and wire frauds were violations of 18 U.S.C. §§ 1341 and 1343.

b)      On August 20, 2007, Defendant Cooney represented by mail that Plaintiffs had failed to pursue the $40,000 façade money that was subject to the Agreed Order entered in the partial condemnation action.  This representation was false and made with the intent to defraud Plaintiffs of

36

the $40,000 it was entitled to as part of Count I Defendants' fraudulent scheme. This mail fraud was a violation of 18 U.S.C. § 1341 with the intent to further Count I Defendants' scheme against Plaintiffs.

c)    In April of 2005, Wilks refused to honor the promises to pay for repairs to the YOTI as represented by former Mayor Farley, saying that the letter from Farley "doesn't mean anything to me." Wilks actions were an act of intimidation as a public official in violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951, in furtherance of Count I Defendants' scheme to oust Plaintiffs from the Property.

d)    In late 2005, Janonis communicated to Plaintiffs' counsel that the Village would not repair any of the damages it caused the YOTI and would not spend a dime on the Property to repair anything and threatened to put Curtis out of business. Janonis' actions were an act of intimidation as a public official in violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951, in furtherance of Count I Defendants' scheme to oust Plaintiffs from the Property.

e)    In 2002 and 2003, Defendants Wilks, Janonis, and Cooney developed a fraudulent scheme by means of wires and mails with Oz Development to allow Oz Development to develop the Triangle Area to fraudulently induce Plaintiffs to sell the Property at a below fair market value, falsely representing to Plaintiffs that the Property would not be condemned and would not be required for any redevelopment of the Triangle Area. Plaintiffs relied on Defendants' statements and continued to operate the

37

YOTI and maintain the Property pursuant to the misrepresentations. The fraudulent scheme developed by Wilks, Janonis, Cooney and Oz Development during this period was a violation of 18 U.S.C. §§ 1341 and 1343.

f)   On or about August 15, 2005, Defendant Wilks and the Village Board of Trustees, executed and mailed a letter to Curtis representing that the Village Board was committed to making a final decision regarding the long-term redevelopment of the property within the Triangle Area by the end of 2005, but that the Village was not interested in acquiring the Property. Plaintiffs relied on this representation, and proceeded to spend money in reliance on that representation for the YOTI and the Property. In fact, the Village's misleading statement was designed and intended to benefit the Village's favored developer, Oz Development. This statement made in furtherance of Count I Defendants' fraudulent scheme was a mail fraud under 18 U.S.C. § 1341.

g)   On May 5, 2006, Oz Development revealed a plan for redevelopment of the Triangle Area that was fraudulently created and designed to persuade Plaintiffs that the Property would never be part of any redevelopment in the Triangle Area to induce Curtis to sell the Property to Oz Development and leave the Village. Count I Defendants gave their enthusiastic public support and approval to the Oz Proposal as part of their scheme to force Plaintiffs out of the Village, as the Count I Defendants knew that the Oz Proposal was not a viable project. Cooney and Janonis communicated the

Oz Development plan by telephone to Plaintiffs. This redevelopment plan was part of a fraudulent scheme to defraud Plaintiffs, and was a violation of 18 U.S.C. § 1343 in furtherance of Count I Defendants fraudulent scheme, an act of intimidation in furtherance of Count I Defendants' scheme in violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951.

h)    On about July 25, 2006, Janonis, Wilks, and four Village trustees called a meeting by mail, in which Wilks informed Plaintiffs that the Village had no interest in purchasing the Property and that the Village fully supported the plan for redevelopment for the Triangle Area submitted by Oz Development. Janonis' and Wilks use of the mail for the July 25, 2006 meeting was a violation of 18 U.S.C. § 1341 in furtherance of Count I Defendants fraudulent scheme, and the meeting was used as a method of intimidation to pressure Plaintiffs to sell the Property in violation of 720 ILCS 5/12-6 and 18 U.S.C. § 1951.

i)    On December 22, 2006, Oz Development sent a letter to Curtis to purchase the Property for the artificially low price of $1,400,000. This unreasonable offer to purchase the Property was in furtherance of Count I Defendants fraudulent scheme, and was a mail fraud in violation of 18 U.S.C. § 1341.

j)    On January 25, 2007, the Village Defendants caused a letter to be sent, through the Village's attorney, Buzz Hill, purportedly on behalf of the Village making an offer to purchase the Property for $1,265,000. This

unreasonable offer to purchase the Property was in furtherance of Count I Defendants fraudulent scheme, and was a mail fraud in violation of 18 U.S.C. § 1341, an act of intimidation in violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951.

k)   On or about March 20, 2007, Defendants Cooney and Schroeder demanded by telephone that Plaintiffs "fix a problem with his [Curtis'] sewers," followed by threats to shut down YOTI if "the situation was not resolved." Defendants' actions were wire fraud in violation of 18 U.S.C. § 1343, acts of intimidation under 720 ILCS 5/12-6, and acts of attempted extortion in violation of 18 U.S.C. § 1951, made with the intent to further Count I Defendants' scheme.

l)   On March 21, 2007, Defendant Schroeder falsely told Village representatives and Plaintiffs that Plaintiffs were responsible for broken sewer lines, even though Schroeder and Cooney knew that the alleged broken sewer lines were on the Oz Property. Defendants' actions were acts of intimidation under 720 ILCS 5/12-6, and acts of attempted extortion in violation of 18 U.S.C. § 1951, made with the intent to further Count I Defendants' scheme.

m)   On or about March 22, 2007, Defendant Schroeder threatened by telephone to shut down the YOTI if the "sump pump-sewer blockage problem" was not fixed, even though Schroeder knew that the problem was on the Oz Property. Defendant's actions were wire fraud in violation of 18 U.S.C. § 1343, acts of intimidation under 720 ILCS 5/12-6, and acts

of attempted extortion in violation of 18 U.S.C. § 1951, made with the intent to further Count I Defendants' scheme.

n)    On February 21, 2007 during the construction of the Blues Bar, Oz Development intentionally cut a steam pipe that was connected to Plaintiffs' building.  This action was in furtherance of Count I Defendants' scheme and was an intimidation in violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951.

o)    On or about November 28, 2007, after Plaintiffs raised the fact of the repeated trespasses by Oz Development to the Village Defendants, Cooney notified Plaintiffs by telephone that the Village would not investigate or enforce any Village ordinance against Oz Development. The Village Defendants' refusal to investigate was made with the intent to further Count I Defendants scheme, and was an intimidation in violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951.

p)    In March 2007, during an inspection by the Village, Defendant Schroeder falsely claimed that the floor of the YOTI was unstable, and required numerous additional inspections despite knowing that the floor was not unstable.  Schroeder's actions were an act of intimidation violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951, made with the intent to further Count I Defendants' fraudulent scheme.

q)    On January 15, 2008, Defendant Roels alleged that there were issues on the Property with the soffit and fascia, cedar shingle roof, and brick foundation, and that extension cords were improperly used on the exterior of the building, even though these conditions had existed for years without comment by the Village.  Roel's actions were an act of intimidation violation of 720 ILCS 5/12-6, and acts of attempted extortion in violation of 18 U.S.C. § 1951, made with the intent to further Count I Defendants' fraudulent scheme.

r)    On January 28, 2008, Defendant Roels again inspected the Property's exterior including alleged loose wood, loose conduit, and alleged mortar issues, even though such conditions had existed for years without comment by the Village.  Roel's actions were an act of intimidation violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951, made with the intent to further Count I Defendants' fraudulent scheme.

s)    On January 21, 2008, a Village inspector declared the exterior rear stairway "unsafe" and demanded that the same be repaired by January 28, 2008, despite the fact that the stairway was not used b patrons of YOTI and was not accessible to them.  This inspection was conducted at the direction of Cooney and Janonis with the intent to further Count I Defendants' scheme, and was an act of intimidation in violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951.

t)    In 2007 and 2008, Defendant Krupa inspected the Property without notice multiple times. For example, on January 18, 2008, Krupa conducted an inspection of the Property and prepared a Retail Food Sanitary Inspection Report that alleged twenty-six violations. Defendant Krupa's multiple inspections were acts of intimidation in violation of 720 ILCS 5/12-6, and acts of attempted extortion in violation of 18 U.S.C. § 1951, made with the intent to further Count I Defendants' fraudulent scheme.

u)    On or about June 3, 2008, Defendant Cooney stated to a fellow businessman and associate of Curtis, during a private meeting, that Tod Curtis "is done. We are going to run him out and take his property with a quick-take." This statement was made as part of Defendants' scheme to pressure Plaintiffs to relinquish the Property and leave the Village, and was an act of intimidation in violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951, made with the intent to further Count I Defendants' scheme.

131.    The above multiple related and coordinated acts constitute a pattern of racketeering activity aimed at ousting Plaintiffs from the Property and depriving Plaintiffs of their constitutional and property rights.

132.    Each of the above predicate acts are related to one another, as they have the shared aim of harming Plaintiffs and forcing Plaintiffs to relinquish their ownership of the Property.

133.    Count I Defendants engaged in the above pattern of racketeering activities in advancement of an enterprise the Village, which Count I Defendants used to further their

fraudulent scheme against Plaintiffs under a veil of legitimacy. Count I Defendants used their association with the Village to further their racketeering scheme to oust Plaintiffs from the Property.

134.    The Village is an enterprise and the Count I Defendants are conducting the affairs of this enterprise through a pattern of racketeering activity designed and intended to oust Plaintiffs from the Property and to injure Plaintiffs by depriving them of their constitutional and property rights.

135.    Count I Defendants' pattern of racketeering amount to and pose a clear threat of continued criminal activity through the enterprise of the Village, as evidenced by Count I Defendants' accelerated harassment of Plaintiffs during 2007 and 2008.

136.    Count I Defendants' pattern of racketeering activities has continued for the last decade, and based on the past conduct, the pattern of racketeering will most likely continue into the future with no discernable end and continued threat of repetition.

137.    Count I Defendants have orchestrated and conducted the enterprise through a pattern of racketeering activity. Specifically, Count I Defendants, under the guise of their work for the Village, or in the case of Oz Development, as a result of the benefits of the favoritism received from the officers of the Village Defendants, have engaged in a concerted effort to oust Plaintiffs from the Property, and have banded and conspired together to turn the Village into their enterprise designed to "run [Plaintiffs] out of town" through a pattern of racketeering activity.

138.    Each of the Count I Defendants has some part in directing the enterprise's affairs.

139.    Each Count I Defendant agreed to join the conspiracy and to commit predicate acts with the knowledge that such acts were part of a pattern of racketeering activity.

44

140.    The YOTI is involved in interstate commerce, and, thus, Count I Defendants conduct as alleged above that consistently interrupted Plaintiffs' business affected interstate commerce.    In addition, the development of the Property by Plaintiffs would also involve interstate commerce, and, thus, Count I Defendants scheme to stop the development of the Property by Curtis affects interstate commerce.

141.    Plaintiffs have been damaged in an amount in excess of $150,000, and they are entitled to statutory and punitive damages, costs, and attorneys fees related to Count I Defendants' conduct, as a result of the Count I Defendants' wrongful actions.

WHEREFORE, Plaintiffs pray for entry of judgment, jointly and severally, against the Count I Defendants in an amount in excess of the $150,000 in actual damages, in an exact amount to be proved at trial, an award of statutory damages, punitive damages, attorneys fees and costs, and such further relief that the Court deems equitable and just.

## Count II

### Equal Protection

### (Against All Defendants, except Oz Development)

142.    Plaintiffs incorporate by reference each allegation contained in Paragraphs 1 through 141 as if fully set forth herein.

143.    The Mount Prospect Village Code requires that Plaintiffs operate their business and maintain the Property according to the Village Code.

144.    Accordingly, Defendants are required to uniformly enforce the regulations of the Village Code.

145.    Instead of uniformly enforcing the regulations of the Village Code, Defendants have instead subjected Plaintiffs to intentional discrimination by virtue of their selective enforcement of the Village Code regulations.

146.    In so doing, Defendants sought to deprive Plaintiffs of the equal protection of the laws for reasons of a personal nature unrelated to the duties of Defendants' positions with the Village.

147.    Defendants had and have no rational basis for their selective enforcement of the Village Code against Plaintiffs.

148.    Defendants' intentional and purposeful discrimination against Plaintiffs had a discriminatory effect on Plaintiffs.

149.    Defendants' selective enforcement of the Village Code and continuing series of harassing and unmerited inspections have, among other things, forced Plaintiff to expend unnecessary resources and damaged the Property by lowering the market value of the Property, thus pressuring Plaintiffs to sell the Property or settle the Village's current condemnation action for an artificially low amount.

150.    Plaintiffs have been damaged in an amount in excess of $150,000, and they are entitled to punitive damages, costs, and attorneys fees related to Defendants' conduct, as a result of Defendants' wrongful actions.

WHEREFORE, Plaintiffs pray for entry of judgment, jointly and severally, against the Defendants in an amount in excess of the $150,000 in actual damages, in an exact amount to be proved at trial, an award of punitive damages, attorneys' fees and costs, and such further relief that the Court deems equitable and just.

## Count III

### Violations of 42 U.S.C. § 1983
### (Against All Defendants, except Oz Development)

151.    Plaintiffs incorporate by reference each allegation contained in Paragraphs 1 through 150 as if fully set forth herein.

46

152.    Defendants are "persons" as defined under 42 U.S.C. § 1983.

153.    Defendants, acting under color of state law, continue to wrongfully enforce the provisions of the Mount Prospect Village Code against Plaintiffs and deprive Plaintiffs of their constitutional rights to (1) due process under the law, (2) equal protection under the law, (3) just compensation for the taking and damaging of private property, and (4) freedom of speech under the First Amendment of the U.S. Constitution, in violation of 42 U.S.C. § 1983 and the U.S. Constitution.

154.    Defendants maliciously took these actions with reckless indifference to the constitutionally protected rights of Plaintiffs.

155.    Further, Defendants actions as alleged above were objectively unreasonable.

156.    Defendants' acts constitute violations of 42 U.S.C. § 1983.

157.    Plaintiffs have been damaged in an amount in excess of $150,000, and they are entitled to statutory and punitive damages, costs, and attorneys fees related to Defendants' conduct, as a result of Defendants' wrongful actions.

WHEREFORE, Plaintiffs pray for entry of judgment, jointly and severally, against the Defendants in an amount in excess of the $150,000 in actual damages, in an exact amount to be proved at trial, an award of statutory damages, punitive damages, attorneys fees and costs, and such further relief that the Court deems equitable and just.

## Count IV

### Violations of 42 U.S.C. § 1985(3)
### (Against All Defendants, except Oz Development)

158.    Plaintiffs incorporate by reference each allegation contained in Paragraphs 1 through 157 as if fully set forth herein.

159.    As set forth above, a conspiracy exists and has existed among Defendants to harm Plaintiffs and their interests in the Village and to deprive Plaintiffs of the equal protection of the laws, due process rights, and rights under the First Amendment to the U.S. Constitution.

160.    Towards that end, as set forth above, Defendants have committed multiple acts of fraud in furtherance of the conspiracy against Plaintiffs.

161.    The sum of Plaintiffs' acts in furtherance of a common design constitute a conspiracy in violation of 42 U.S.C. § 1985(3).

162.    Plaintiffs have been damaged in an amount in excess of $150,000, and they are entitled to statutory and punitive damages, costs, and attorneys fees related to Defendants' conduct, as a result of Defendants' wrongful actions.

WHEREFORE, Plaintiffs pray for entry of judgment, jointly and severally, against the Defendants in an amount in excess of the $150,000 in actual damages, in an exact amount to be proved at trial, an award of statutory damages, punitive damages, attorneys fees and costs, and such further relief that the Court deems equitable and just.

**TRIAL BY JURY DEMANDED**

48

**TOD CURTIS, individually and as beneficiary, FIRST UNITED TRUST COMPANY, as Trustee under Trust No. 10510, and ELTO RESTAURANT INC., an Illinois corporation,**

By:  s/ William M. McErlean
           One of Their Attorneys

William M. McErlean
David T. Ballard
Theodore J. Koerth
Barnes & Thornburg LLP
One N. Wacker Drive
Suite 4400
Chicago, IL 60606
(312) 357-1313

CHDS01 DTB 470916v3

49

Attorney No. 25892

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| **VILLAGE OF MOUNT PROSPECT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No.   07 L 050940** |
| | ) | |
| **TOD CURTIS, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

### TRAVERSE AND MOTION TO DISMISS

Now come the defendants, Tod Curtis, First United Trust Company, as trustee under trust agreement no. 10510, and Elto Restaurant, Inc., a/k/a Elto Restaurant Corporation (collectively, "Defendants"), by their attorney, Robert J. Weber, and in support of their traverse and motion to dismiss the complaint for condemnation herein, state as follows:

1.    Prior to filing its complaint, the Village of Mount Prospect ("Plaintiff") did not make a good faith attempt to agree about the just compensation to be paid for the taking and damaging of the property that is the subject of the complaint (the "Subject Property").

2.    Plaintiff is not acquiring the Subject Property for a public purpose.

3.    On information and belief, Defendants assert that after acquiring title, Plaintiff will transfer the Subject Property to a private party. In this regard, Plaintiff is not acquiring the Subject Property primarily for the benefit, use or enjoyment of the public nor for a public purpose.

**EXHIBIT**

tabbies®

14

4.      The Subject Property is not blighted nor properly part of a conservation area.

5.      The taking herein is excessive.

WHEREFORE, Defendants move to dismiss the complaint.

_____
Robert J. Weber

Robert J. Weber
Konstantina J. Tsatsoulis
30 N. LaSalle St.
Suite 2900
Chicago, IL 60602
312-920-0120

## Proof of Service

Robert J. Weber, an attorney, on oath, states that he caused a copy of this Traverse and Motion to Dismiss to be served by hand delivery on Plaintiff's counsel, in open court on May 12, 2008.

_____
Robert J. Weber