**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TOD CURTIS, individually and as beneficiary, FIRST UNITED TRUST COMPANY, as Trustee under Trust No. 10510, and ELTO RESTAURANT INC., an Illinois corporation,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | No. 08-cv-3527 |
| **IRVANA K. WILKS, Village of Mount Prospect Mayor and Local Liquor Control Commissioner, MICHAEL E. JANONIS, Village of Mount Prospect Manager, WILLIAM COONEY, Village of Mount Prospect Economic Director, WILLIAM SCHROEDER, Village of Mount Prospect Building Commissioner, ROBERT ROELS, Village of Mt. Prospect Environmental Health Manager, FRANK KRUPA, Village of Mount Prospect Environmental Health Inspector, OZ DEVELOPMENT, LLC, ERROL OZTEKIN, and the VILLAGE OF MOUNT PROSPECT,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | | |

## <u>AMENDED COMPLAINT FOR RELIEF OF CIVIL RIGHTS AND RICO VIOLATIONS</u>

Plaintiffs Tod Curtis ("Curtis"), individually and as a beneficiary, First United Trust

Company, as Trustee under Trust No. 10510, and Elto Restaurant Inc., an Illinois Corporation

("Elto"), for their Amended Complaint against the Village of Mount Prospect Mayor and Local

Liquor Control Commissioner Irvana K. Wilks ("Wilks"), Village of Mount Prospect Manager

Michael E. Janonis ("Janonis"), Village of Mount Prospect Economic Director William Cooney

("Cooney"), Village of Mount Prospect Building Commissioner William Schroeder

("Schroeder"), Village of Mount Prospect Environmental Health Manager Robert Roels

("Roels"), Village of Mount Prospect Environmental Health Inspector Frank Krupa ("Krupa"),[1]
Oz Development, LLC ("Oz Development"), Errol Oztekin ("Oztekin") and the Village of
Mount Prospect, allege as follows:

## Nature of Action

1.     This case arises out of an ongoing enterprise and scheme initiated by
representatives of the Village of Mount Prospect nearly a decade ago, which eventually included
the developer Oz Development and its principal, that is aimed at ousting Plaintiffs from their
ownership, use and enjoyment, and ability to develop the property located at 6-18 W. Busse
Ave., Mount Prospect, Illinois (the "Property"), where Curtis owns and operates the Ye Olde
Town Inn ("YOTI") restaurant and bar.  The enterprise against Plaintiffs is a concerted effort by
Defendants to drive Plaintiffs from the Property and violate their constitutional rights
perpetuated by, among other things:

    i)      A prior partial condemnation of the Property where the Village caused
extensive damage to the Property while deconstructing the condemned
property. The Village first agreed to pay for the damages under Mayor
Skip Farley, but then, under new Mayor Irvana Wilks, the Village chose to
ignore the Village's prior Mayor's representation that the Village would
repair the damage it caused to the Property as a result of the partial
condemnation;

    ii)     The Village ignored an Agreed Order of court in the partial condemnation
and refused to pay to Plaintiffs $40,000.00 for restorative repairs that it
had agreed to;

    iii)    The Village initiated a fraudulent meeting called with Curtis ostensibly,
and on the pretense, to discuss acquisition of the Property, but in reality
the closed meeting was to intimidate the Plaintiff for the benefit of the
Village's favored developer, Oz Development, and Oztekin;

    iv)    The Village employed endless harassing inspections of the Property
(including litigation related to the inspections involving administrative
warrants and temporary restraining orders);

---

[1] Collectively, Wilks, Janonis, Cooney, Schroeder, Roels, Krupa, and the Village of Mount Prospect will be referred
to as the "Village Defendants."

v)    The Village Defendants included Oztekin and Oz Development in their scheme by allowing Oz Development to acquire and demolish property that was joined to the Plaintiff's Property and restaurant by a common wall for the purpose of developing a competing business commonly known as "The Blues Bar." The Village allowed the demolition to occur even though they were repeatedly warned that significant damage would result to Curtis' restaurant during the demolition and construction, and the Village allowed Oz Development to build its Blues Bar even though there was not sufficient parking to accommodate its customers, and that it would have the effect of using up all of the available parking that YOTI had previously enjoyed, and they allowed OZ Development, to build its new Blues Bar all the all the way up to the lot line and east wall of Curtis' building with full knowledge that the Blues Bar construction would not be possible without continuous trespasses upon the Plaintiffs' Property.

vi)   During the course of the Blues Bar Construction various means were employed by the Defendants, and they acted in concert together towards the same end, injuring Plaintiffs and depriving them of their property rights and their actions were calculated to harm and harass the Plaintiffs, and to send a clear message to Curtis that he was to leave the Village, and that his property rights were of no consequence to the Village. Actions included a variety of trespasses, harassments, intentional damage to the Property, bogus emergencies staged by the Village at great burden and expense to the Plaintiffs, and actions ostensibly caused by Oztekin and Oz Development and\or its contractors that resulted in business disruptions and needless expense and hardship to the Plaintiffs;

vii)  The Village announced on several occasions its public support for a fraudulent plan for redevelopment that they coined "The Entertainment District". This was touted as a plan for redevelopment proposed by Oz Development that the Village supported even though Oz Development did not own the property that it proposed to develop, and even though the Village knew that the plan was not consistent with the Village's own comprehensive master plan, and was unrealistic and unworkable. The plan was touted only for the purpose of sending a false message to the Plaintiffs that the Village had no interest in seeing Curtis' Property be redeveloped, or even allowing Curtis to redevelop his own Property, and to induce him to sell out to Oz Development at an outrageously low price;

viii) The Village showed obvious favor to the "Blues Bar" built, owned and operated by Oz Development, and used the establishment in a variety of ways to promote and facilitate its ongoing scheme calculated to harass and harm the Plaintiffs;

ix)   The Village also employed a variety of fraudulent means, using bad faith negotiating schemes involving manipulated proposed purchase prices for the Property from the Village and Oz Development to force a sale of the

Property at an artificially low price, initiating an ongoing bad faith condemnation proceeding at the Property, and refusing to accept Curtis' proposal to redevelop the Property, even though Curtis' proposal requires no use of public funds, and instead the Village has accepted a redevelopment proposal from Oz Development and another developer that will require $10 million in public tax increment financing ("TIF") funds, use of a public parking garage that had been denied to the Plaintiffs, and a successful condemnation of the Curtis' Property.

2.      The Defendants' conspiracy has caused serious injury to Plaintiffs, and continues to cause Plaintiffs to incur ongoing costs for defending against the continued enterprise aimed to expel Plaintiffs from the Property.

3.      Tod Curtis is a pilot and former Marine who for nearly forty years has owned the Property and operated YOTI and has been and continues to be heavily involved in civic, community and philanthropic activities benefiting the Village of Mount Prospect and its citizens. He is well known and well respected in the community, and he speaks his mind and opposes municipal actions that he does not view in the best interests of the Village. He also speaks and communicates freely and honestly to the press, making his views visible and noticeable to the community and the Village officials and staff. As a result, Curtis has often been viewed as a thorn in the side of local politicians and their cronies and staff. As the Village's long-time attorney, Everett ("Buzz") M. Hill told one of Curtis' attorneys in the spring of 2008, Curtis "has been on the Village's radar for nearly 30 years" and "the end is near" for Curtis' continued status as a business and property owner and employer in the Village. Hill has helped orchestrate and implement the scheme of the Village Defendants, which has become increasingly malicious over time and is designed to drive Curtis out of the Village, shutting down his restaurant and seizing the Property to benefit the Village's favored developer, Oz Development, whose principal, Oztekin, is a crony of Village officials, all at an enormous and capricious waste of Village taxpayers' funds. The Village has implemented the scheme by damaging and destroying the

Property and failing to pay for the damages, encouraging and acquiescing in the developer's intentional destruction and damage to Curtis' Property and interference with his business, approving and sponsoring a proposed redevelopment plan for an entertainment district that was never intended to come to fruition but was a charade only intended to try to force Curtis out of his Property to benefit Oz Development and Oztekin, a bad faith and unnecessary condemnation of the Property, to again benefit the Village's favored developer and waste public funds, refusing to fairly consider Curtis' plan to redevelop his Property, which would be without cost to the Village's taxpayers and would realize the supposed goal for redevelopment, and which plan received popular support. Instead, Village officials, over many objections by Village residents, approved a plan by a development team, including the favored developer, that will cost taxpayers an unnecessary $10 million even though the likelihood of the development ever occurring or obtaining financing is unlikely. The Village Defendants' conduct pursuant to this scheme has not only been arbitrary, capricious, and irrational, it has also been malicious and motivated to injure Curtis and deprive him of his constitutional and property rights. Each time Curtis takes a public stand and exercises his right to free speech, or files a suit to protect his rights, Village officials lash out and abuse their authority and taxpayer funds with a spiral of increasing harassing and needless inspections, citing conditions in the restaurant and Property, many of which were longstanding and caused by the Village's conduct and refusal to pay for the damages that it caused, and more still that were nothing more than nonconforming but legal uses that often exist in older buildings. The Village undertakes these inspections as a result of Curtis' unwillingness to buckle under to the Village's demands and to turn over his property, as well as in retaliation for Curtis' communications with the press, in which Curtis criticizes the Village's acts against him. The harassment pursuant to the Defendants' scheme culminated in the spring

of 2008 with the Village, without notice, obtained an *ex parte* emergency inspection search warrant and, in Gestapo-like fashion, invaded the restaurant with twelve inspectors. The Village went into court "ex parte" to obtain the administrative search order by design, when it became frustrated in its inability to drive Curtis out from the Village. The Village could and should have given notice to Plaintiffs, but it chose not to do so because it knew that it would have to misrepresent the facts to obtain their administrative search. Moreover, the Village knew that no true emergency existed, and had Plaintiff been given notice and been allowed to respond, the fact that no emergency existed would have been shown because the Village already had all of the information that it claimed it needed from previous inspections. Moreover, there was no point or reason whatsoever why the inspection needed to be conducted by surprise, except to harass and intimidate the Plaintiffs and YOTI's employees and patrons because, after all, this was not a search for evidence where the need for surprise is necessary to avoid the possibility of removing or destroying evidence, but rather an inspection of a building and its fixtures.

4. After the search warrant was executed, Plaintiffs filed a state court civil rights and RICO suit against these Defendants. Defendants retaliated by obtaining a temporary restraining order without notice and a hearing that has shut down YOTI even though no true public safety issues were presented and the conditions in the restaurant had not changed over several years. Hill may be right that "the end is near," but the end sought by this suit is the cessation of the Defendants' scheme and enterprise designed to deprive Curtis of his constitutional rights and his business and Property through the use of the instrumentalities of interstate commerce, including the wires and the mails.

**Parties**

5.     Plaintiff Tod Curtis is the sole beneficial owner of the Property, as the sole beneficiary with the power of direction of Trust No. 10510, for which First United Trust Company acts as Trustee, and in which Trust title to the Property is held.  Curtis resides in Arlington Heights, Illinois.

6.     Plaintiff Elto is both incorporated and has its principal place of business in Illinois. Elto is the current operator of YOTI in Mount Prospect, Illinois.  Elto is also the holder of the liquor license at YOTI. Tod Curtis is the sole stockholder and President of Elto.

7.     Defendant Wilks is the Mayor and Liquor Control Commissioner for the Village of Mount Prospect, and upon information and belief she resides in Mount Prospect, Illinois.

8.     Defendant Janonis is the Village Manager of the Village of Mount Prospect, and upon information and belief he resides in Mount Prospect, Illinois.

9.     Defendant William Schroeder is the Building Commissioner of the Village of Mount Prospect, and upon information and belief he resides in Arlington Heights, Illinois.

10.     Defendant Robert Roels is the Environmental Health Manager of the Village of Mount Prospect, and upon information and belief he resides in McHenry, Illinois.

11.     Defendant Frank Krupa is a Health inspector for the Village of Mount Prospect, and upon information and belief he resides in Chicago, Illinois.

12.     Defendant William Cooney is the Economic Director of the Village of Mount Prospect, and upon information and belief he resides in Arlington Heights, Illinois.

13.     Defendant Oz Development, is an Illinois limited liability company, and the owner of property located at 2 West Busse Avenue in Mount Prospect, Illinois, which is

7

immediately adjacent to the Property to the east. Oz Development's principal place of business is in Illinois.

14.     Oz Development is owned by Defendant Errol Oztekin, a dentist by trade, whose controlled substance license was suspended in July or August of 2002 as a result of prescribing medications to patients at his father's weight loss clinic after identifying himself as "Dr. Oztekin" without informing patients that he was a dentist and not a medical doctor, and who dabbles in real estate development. Oztekin, Janonis, and Cooney are associates who frequently and regularly communicate with each other about the Defendants' scheme and the Village's redevelopment plan and efforts to favor Oztekin and his business with Village munificence.

15.     The Village of Mount Prospect is an Illinois municipal corporation.

## Jurisdiction and Venue

16.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the United States Constitution, the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 *et seq.*), and 42 U.S.C. §§ 1983 and 1985.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because all of the Defendants reside in Illinois, all of the events and omissions giving rise to Plaintiffs' claims are in Illinois, and the Property that is involved in this action is located in Illinois.

## The Conspiracy and Scheme to
## Drive Curtis Out of the Village Begins in 1999.

18.     For approximately forty years, Plaintiffs owned and operated YOTI as a restaurant and bar on the Property.

8

19.     In the late 1990s a developer submitted a proposal to the Village to redevelop the property directly behind YOTI to the north of the Property with a building containing 340 condominium units.

20.     As part of the proposal, the Village was required to pave a new road for access to the condominiums over a large portion of the north side of the Property, requiring a partial condemnation of the Property, reducing its size by approximately one-third. The Village saw a way to get at least one-third of Curtis' Property off its "radar screen" and in 1999, the Village initiated partial condemnation proceedings of the north portion of the Property so that it could build a private road to access the new condominium development.

21.     On September 27, 2000, the Plaintiffs and the Village entered into an Agreed Final Judgment Order in the partial condemnation case. The Agreed Order provided that the Village would match Plaintiffs' costs dollar-for-dollar to upgrade the exterior façade of the front and rear of the building on the Property, in an amount not to exceed $40,000. This provision was based on representations from the Village during negotiations to reach the Agreed Order.

22.     As to the actual deconstruction of the partially condemned portion of the Property, in late 2000 the Village initiated its deconstruction of the rear portion of YOTI and the Village Defendants used that occasion to damage the Property, interrupt YOTI's business and further their scheme to injure Curtis and drive him from his Property.

23.     In late 2000, during deconstruction, the Village displaced an exhaust fan and caused piping in YOTI to break and burst the sprinkler system in YOTI, causing a deluge during business hours, thus requiring YOTI to be evacuated and closed, as the 30,000 gallons of water released substantially damaged YOTI and its subfloor and tiles. Temporary repairs to fix these emergencies cost over $12,000. The Village Defendants in furtherance of their scheme would

9

later in 2007 and 2008 cite the damage to the subfloor caused by the Village as claimed code violations, albeit over eight years old and long known to the Village as it caused them, as warranting closure of YOTI.

24.    In the spring of 2001, the Village continued its deconstruction related to the partial condemnation by removing the building west of YOTI, which was connected to YOTI's foundation.  The blows from the Village's wrecking ball created cracks in the west wall of the basement of YOTI.

25.    In order to address the damages caused on YOTI by the Village's activities related to the partial condemnation of the Property, Plaintiffs requested on multiple occasions that the Village repair all damages caused by the deconstruction and pay for the repairs that had been made.  Pursuant to the Village Defendants scheme, these requests were denied to pressure Plaintiffs to relinquish the Property and leave the Village.

26.    After engaging in discussions with the Village regarding the damages caused by the deconstruction, then Mount Prospect Mayor Skip Farley agreed with Curtis shortly before Farley left office, that the Village should reimburse Curtis for the damages it had caused and Farley sent Curtis correspondence that indicated that the Village would pay for damages caused by the Village's operations relating to the partial condemnation.  However, Plaintiffs did not receive any payment from the Village during Mayor Farley's tenure as Mayor.

27.    Moreover, after entering into the Agreed Order in 2000, Curtis made repeated demands on the Village for the $40,000, as he was about to undertake substantial work on the façade of YOTI in an amount that cost in excess of $40,000.  Defendant Cooney refused to cause the Village to put any money in trust to be matched by Curtis to accomplish these repairs and made it clear to Curtis that even though the Village had agreed and was ordered to contribute

$40,000.00 for remodeling and repairs to the Plaintiffs' building, the Village did not believe it was worthwhile to spend any money to remodel or repair the Plaintiffs' building, and they had no intentions of doing so because the Village wanted to see the property redeveloped.

28.     During this time frame and pursuant to Defendants' scheme, Janonis also stated to Curtis that Curtis would never receive the $40,000 from the Village pursuant to the Agreed Order for the partial condemnation of the Property, and there was no point in Curtis making any repairs because the Village wanted to see the property redeveloped.  Later in 2007 and 2008 in an example of hypocrisy, and in furtherance of the scheme, the Village Defendants caused the Plaintiffs to be cited for supposed defects in YOTI's façade that remain unrepaired because the Village had reneged on its promise to pay for these repairs.

29.     Plaintiff continued to make multiple demands for $40,000 throughout 2007, and in response to those demands, the Village Defendants caused the frequency and intensity of their inspections to increase.

30.     After Plaintiffs repeatedly inquired about the Village's payment of the $40,000, owed as part of the partial taking agreement between the Village and the Plaintiff, and on August 20, 2007, Defendant Cooney, pursuant to the scheme, drafted and mailed correspondence to Plaintiffs' counsel that misrepresented that "The Agreed Judgment Order that governed the acquisition of your client's property provided for a matching $40,000 façade grant from the Village within 36 months of the acquisition back in 2000.  For whatever reason your client never pursued these funds within this time fame and those funds are no longer available."  In fact, Cooney knew this was false and that Curtis had attempted on several occasions to obtain the $40,000, within the 36-month period.

11

31.     The Village never paid Plaintiffs the $40,000 that was due under the Agreed Order, because the Village Defendants were executing their scheme and an enterprise through the Village to oust Plaintiffs from the Property, a plan that would culminate in endless inspections and harassments, and the ultimate closing of the Plaintiff's business, and, thus, they had no intention of ever causing the $40,000 to be paid.

32.     In April of 2005, Irvana Wilks was elected as the new Mayor of Mount Prospect. Three months after Wilks' election, Curtis met with her and showed her the letter from Farley and asked for payment and repair. She refused saying the letter "doesn't mean anything to me." Curtis asked her and Janonis to at least have the Village's inspectors stop citing the restaurant for supposed violations as a result of damages caused to the restaurant by the Village, but both refused.

33.     Instead of honoring the correspondence from former Mayor Farley that the Village would repair all damages it caused YOTI, in June 2004, Janonis sent a Village check to Curtis for $16,000 as payment for all damages caused by the Village, even though such amount was far below the money already expended by Plaintiffs to address emergencies caused by the Village and far below what was needed to permanently repair the damages caused by the Village. Curtis returned the check because it was insufficient. Janonis communicated to Plaintiffs' counsel that the Village would not repair any of the damages it caused YOTI and would not spend a dime on the Property to repair anything, and in late 2005 Janonis threatened by telephone to put Curtis out of business.

### Oz Development Joins the Conspiracy Against Plaintiffs

34.     In 2005 and 2006, Oz Development began acquiring small lots, in the downtown Triangle Area parcel in Mount Prospect in which the Property is situated, including the building

12

immediately adjacent to YOTI. The Triangle Area of downtown Mount Prospect is a commercial district that is bounded on the north side by West Busse Avenue, the east side by Main Street, the south side by Northwest Highway, and the west side by South Wille Street. The Triangle Area had long been the subject of redevelopment discussions by the Village. Janonis and Cooney developed a relationship with Oztekin and the benefits of that relationship soon began to pay off for Oztekin and Oz Development.

35.     In April 2004, a well known and regarded developer in Mount Prospect, Ben Trapani, announced plans to redevelop the block of West Busse Avenue in which the Property was located. Trapani submitted a proposal to the Village to redevelop the block of Busse Avenue with a seven story multi-use building that would contain residential, office, and retail units. This mixed-use development was an appropriate and commercially viable redevelopment of the Triangle Area that Curtis would have supported if approved.

36.     In 2004, Trapani was forced to withdraw his proposed plan for redeveloping the block of West Busse Avenue in which the Property is located because of a lack of support from the Village, which refused to even consider the plan.

37.     In fact, the Defendants had created a scheme and ignored the Trapani proposal in order to move any redevelopment of the Triangle Area to Oz Development and to fraudulently induce Curtis into selling his Property to Oz Development at a below fair market value, falsely representing to Curtis that his Property would not be condemned and would not be required for any redevelopment of the Triangle Area.

38.     On August 15, 2005, Wilks and the Village Board of Trustees executed and mailed a letter to Curtis falsely representing that the Village Board was committed to making a final decision regarding the long-term redevelopment of the property within the Triangle Area by

the end of 2005, but that the Village was not interested in acquiring the Property and demanded that Curtis spend more money repairing YOTI for alleged defects caused in substantial part by the Village. As would later become apparent, the Village's statement that it was not interested in obtaining the Property was false and intentionally misleading, and designed and intended to benefit Oztekin and Oz Development, and induce Curtis to sell the Property to Oz Development and avoid continued harassment by the Village.

39. On or about October 2005, Oztekin, on behalf of Oz Development, purchased the property immediately east of and adjacent to the Property (the "Oz Property") sharing a common wall with Plaintiff's building and is located at 2 West Busse Avenue, on the corner of Busse Avenue and Main Street in Mount Prospect in the Triangle Area.

40. On or about May 5, 2006, Oztekin, through Oz Development, revealed a plan for redevelopment of the Triangle Area, that utilized and included all properties in the Triangle Area except for Curtis' Property (the "Oz Proposal"). The Oz Proposal required the Village to buy or condemn several parcels of private property, allow the use of a public parking garage, and provide $6 million which would come from public TIF funds to build underground parking for their proposed development. The Oz Proposal was fraudulently created and designed by Defendants to persuade Curtis that his Property would never be part of any redevelopment to induce him to sell the property to Oz Development and leave the Village.

41. The Oz Proposal required the redevelopment of all of the properties around the Triangle Area except Curtis' Property, which would, by design, be left as is, with the clear message to Curtis that he would now have to refurbish his building, even though they had previously stated that it would not be worthwhile to refurbish the building, and that the Village would not contribute to it, and even though they had previously agreed, and were ordered by a

court order to do so. The Oz Proposal sought to demolish the building that was attached to Curtis' YOTI and construct the new one, in such a way that, by design, would require numerous trespasses upon the Property, cause frequent interruption of the YOTI's business, eliminate parking for YOTI's patrons, and ultimately it called for construction of a new Blues Bar on the Oz Property, and other restaurants in the Triangle Area, creating a new entertainment district in downtown Mount Prospect that would ultimately have the effect of forcing the Plaintiffs out of business and driving Curtis out of the Village by putting him in a situation that would make it impossible for him to compete or redevelop his property, given the Village Defendants' favored treatment of Oztekin and Oz Development at the expense of Curtis' property rights.

42.     The Village, through the Village Defendants, gave its enthusiastic public support and approval to the Oz Proposal even though neither Oztekin nor Oz Development owned all of the properties involved with the proposed plan of the Triangle Area, and the proposed plan failed to provide sufficient parking and open space to support the redevelopment. Again, this public support of the Oz Proposal was designed to fraudulently force Curtis out of the Village as the Village Defendants knew that the Oz Proposal was not a viable project and Mount Prospect did not have the demographics or ability to support an entertainment district, but they were bound and determined to force Curtis out and benefit Oztekin and Oz Development.

43.     After various informal discussions between Curtis and representatives of the Village regarding his plans for the future development of his Property, in July of 2006, Defendant Janonis called for a closed session with the Village Board and Curtis to discuss the possible acquisition of the Property.

44.     At the closed meeting that took place on July 25, 2006 with Village Manager Mike Janonis, Mayor Wilks and four Village trustees, including Curtis and his representatives,

Mayor Wilks informed Plaintiffs that the Village had no interest in purchasing the Property, and that the Village fully supported the Oz Proposal that did not include the Property. During the meeting each of the Trustees and the Mayor took turns making it clear that the Village had absolutely no interest in ever purchasing the Property. One Trustee posed the rhetorical question to Curtis "You don't think we can do this?" impliedly threatening that the Defendants intended to violate Plaintiffs' property rights whether their action was lawful or not.

45.     As would later become apparent, the closed meeting was called by Janonis and Wilks to mislead Plaintiffs regarding their true intentions to purchase or condemn the Property. Plaintiffs were required to expend significant costs to prepare for the July 25, 2006 closed meeting, which meeting was later discovered to have been a sham and called pursuant to Defendants' scheme to benefit Oztekin and Oz Development and force Curtis to sell his Property.

46.     On July 14, 2006, the Village Board, including Defendant Wilks, approved the demolition of the building adjacent to YOTI, and in late 2006 the demolition and the construction of the Blues Bar on the Oz Property that was part of the Oz Proposal began.

47.     Refusing to cave in to the pressure, on October 25, 2006, Curtis announced his plan to redevelop his Property as a multi-use building named the Gateway Centre (the "Initial Gateway Proposal"). The Initial Gateway Proposal proposed to have Plaintiffs redevelop the Property with a four-story development including a restaurant, a sports bar, four retail stores, and three stories of condominiums above the retail level. The Village Defendants caused the Village to refuse to even accept the filing of the initial Gateway Centre proposal and made it clear that the Village had no interest in cooperating with Curtis to assist him in redevelopment efforts under any circumstances, and they would do everything possible to obstruct and prevent it.

16

48. Pursuant to the Defendants' scheme, on or about December 22, 2006, Oztekin authorized Oz Development to send a letter of intent to Curtis to purchase the Property for the sum of $1,400,000. Curtis rejected the clearly inadequate offer, refusing to buckle under the pressure. Defendants retaliated.

49. The Defendants, in furtherance of their scheme and to apply further pressure on Curtis and to benefit Oztekin and Oz Development, caused the Village on January 25, 2007, to make a "good faith" offer of $1,265,000 to acquire the Property. In the written offer, which was conveyed by the Village attorney, Buzz Hill, the Village indicated that it "is in the process of considering the redevelopment of the property to the east, south and west of Mr. Curtis' property." This absurdly low offer was made in bad faith to pressure Curtis to accept Oz Development's offer, pursuant to the Defendants' scheme.

50. The offers to purchase the Property by Oz Development and the Village were not made in good faith and were made to pressure Curtis into accepting an artificially low purchase price for the Property for the benefit of Oztekin and Oz Development pursuant to Defendants' scheme. Oztekin—through Oz Development—and the Village Defendants acted in concert to force Plaintiffs into accepting an offer for the purchase of the Property that was far below its true value, or face isolation in a proposed redevelopment that would force Plaintiffs from the Village.

51. The retaliation for Curtis' refusal to sell to Oz Development and leave the Village as Defendants wanted and for having the tenacity to attempt to develop his Property began in earnest in October of 2006, when Oztekin and Oz Development began the demolition and excavation of the Oz Property and the construction of the Blues Bar.

52. With the encouragement, support and acquiescence of the Village Defendants, and pursuant to Defendants' scheme, during the excavation of the Oz Property and the

construction of the Blues Bar, Oz Development's representatives and contractors committed numerous trespasses and caused substantial damages to the Property. Specifically, the excavation and construction of the Blues Bar caused significant damages to YOTI's roof, walls, and steam pipes. Moreover, Oz Development's workers or contractors placed construction fences on the Property without consent, excavated land that caused a YOTI employee to be injured, and left debris and garbage on YOTI's roof. The Village did nothing when Curtis complained. Instead, the Village Defendants caused more inspections to be made of YOTI with citations issued for alleged violations caused by the Village's own conduct in 2000 for which it refused to pay, and they continued to allow and encourage such harassing behavior such as allowing Oz Development contractors to toss and scatter all kinds of construction debris on the Plaintiff's building and the Property, and even to intentionally remove bricks from a large area of the Plaintiff's building's east wall, thereby exposing the interior of the building to the elements, all calculated to harass and intimidate the Plaintiffs.

53.     Previously, on or about September 22, 2006 soon before the excavation of the Oz Property, the Village Defendants pursuant to their scheme caused the Village to require that Plaintiffs, at their expense, conduct an inspection of the Property to accommodate the neighboring demolition conducted by Oztekin and Oz Development. The alleged purpose of the inspection was to assess the potential effects of the demolition on the Oz Property on the Property.

54.     In the report from the inspection on September 22, 2006, Plaintiffs' inspector noted that the Property and the Oz Property shared a common sewage system. Plaintiffs provided Oztekin and the Village with copies of the inspection report, warned of the common

18

sewage system, and were given license by Plaintiffs to enter the Property to make their own inspection of the sewers prior to demolition.

55.     With the support and encouragement of the Village Defendants, Oztekin intentionally disregarded the inspection report regarding the common sewage system and did not conduct its own inspection prior to demolition of the building on property neighboring the Property.  No representative of the Village conducted an inspection either.

56.     Pursuant to the Defendants' scheme, knowing that the Property and the Oz Property shared a common sewer, Oztekin and Oz Development proceeded with the demolition and excavation of the Oz Property with reckless disregard of the effects that the demolition and excavation would have on the sewage system or what effect the demolition and excavation would have on the Property, in fact, expecting or anticipating damage to the Property to further harass and pressure Curtis and interrupt his business.

57.     Subsequently, on or about March 20, 2007, a problem was discovered with the sewage system.  When the sewage system problem was first discovered, despite the fact that Plaintiffs had provided an inspection report to the Village providing that there was a common sewage system on the properties, the Village demanded that Plaintiffs resolve the issue and asserted falsely that Plaintiffs' sump pumps were emptying what appeared to be contaminated effluent into the Blues Bar's construction ditch.

58.     On or about March 20, 2007, Defendants Cooney and Schroeder demanded that Plaintiffs "fix a problem with his [Curtis'] sewers," followed by threats to shut down YOTI if "the situation was not resolved."

59.     The Village Defendants made no effort to eliminate any other possibilities for the alleged contaminated effluent problem, because they intended to harass Curtis, interrupt his

business and blame him for problems caused by their co-conspirators, Oztekin and Oz Development.

60.     On March 20, 2007, Defendant Cooney demanded that the Village be allowed to go into YOTI's basement to inspect the contaminated effluent.

61.     On or about March 21, 2007, a representative of Plaintiffs met with Village officials at the appointed time and was falsely told by Defendant Schroeder that Plaintiffs were responsible for the sewer lines to where the lines connect up with the Village sewer lines, even though he and Defendant Cooney knew that the sewer lines went through the Oz Property before connecting up to the Village's sewer lines. Cooney and Schroeder told Plaintiffs that there was an obstruction in the sewer lines, and that Plaintiffs were responsible for clearing it, and demanded that it be cleared by the following day or threatened that YOTI would be closed. The Village made no diligent effort to eliminate any other possibilities that Oztekin's excavation of the Oz Property could have caused the leak, because they intended only to harass Plaintiffs pursuant to their scheme in favor of their co-conspirators, Oztekin and Oz Development, and instead, pursuant to their scheme, demanded that Plaintiffs take immediate action to correct the alleged problem, all at great hardship and expense to the Plaintiffs.

62.     On or about March 22, 2007, at approximately noon, Defendant Schroeder threatened to shut down YOTI if the "sump pump-sewer blockage problem" they had been falsely claiming to exist was not fixed by the end of that day.

63.     Consistent with Plaintiffs' sewer contractor's report from September 22, 2006, on March 22, 2007, sewer contractors for Plaintiffs, at the Plaintiffs' expense, investigated the issues with the sewage system, and found that there was a blockage of asphalt and clay 200 feet from the starting point of the Property on the Oz Property. The contractor confirmed that the

blockage was not on the Property, but rather was on the Oz Property, thus he could not resolve the problem without trespassing.

64. Plaintiffs' sewer contractor convinced that the sewer blockage was not on the Property, and concerned that he did not have proper authority to flush or drill beyond the Property line, informed Plaintiffs of same.

65. Defendant Roels was on-site during this procedure, and was made aware of these findings.

66. The next day, on or about March 23, 2007, the Village finally assigned their Public Works Department to "locate the source of the problem," but Village officials still disputed that the problem was on the Oz Property, and questioned the conclusions of Plaintiffs' sewer contractor, and Plaintiffs remained under the threat of having YOTI shut down.

67. As a result of the unending demands of the Village, Plaintiffs, at their expense, had their sewer contractor come out to the Property for a second day and reinspect the sewer lines, and used a video camera to confirm that the Property was not the source of the leaking effluent. After the inspection, and after four days of hardship to Plaintiffs with threats of the closure of YOTI looming, late in the day of the March 24, 2007, the Village reluctantly was forced to accept the obvious fact that the source of the problem was a collapse of the sewer line on the Oz Property caused by a crane used by Oztekin and Oz Development in the demolition and\or excavation. Of course, the Village did not require Oztekin to investigate the source of the problem, even though it would have been much easier and less expensive for them to investigate it, because it was much more likely that the source of this problem was originating from Oz Development's construction site and not the Property. Likewise, Oztekin, Oz Development, and

the Village did not pay any of the Plaintiff's expenses incurred during their four-day campaign of harassment orchestrated by the Village Defendants.

68.     On February 21, 2007, in the early morning hours, during the course of the construction of the Blues Bar, Oz Development or Oztekin intentionally cut a steam pipe that was connected to the Plaintiffs' building, causing it to emit great amounts of steam and compromising the Plaintiffs' heat delivery system for YOTI and the building's tenants. Village officials then, acting in concert with Oztekin and Oz Development, contacted Curtis in the early morning hours to alert him to an "emergency" situation and ordered him to fix the problem immediately without explaining to him the true cause of the problem, even though they knew Curtis was vacationing out of the area and knew or should have known the source of the problem. The Plaintiffs had a representative respond and, upon arriving at the building, discovered there were no Village officials or Oz Development representatives present to explain what had happened and who was responsible for it.

69.     In addition, during the demolition and construction of the Blues Bar, Oztekin, without authority and to further harass Plaintiffs and disrupt YOTI's business, ordered the removal of a storm water inlet constructed by the Village on the Property sometime in 2002-2003. As a result of the removal of the inlet, Oztekin left a hole approximately eight by eight feet in the parking area of the Property. When the Plaintiffs first discovered this hole, they informed the Village and requested help from the Village and Oz Development to fix the hole, but the Village refused to get involved and told the Plaintiff that it was a matter between the Plaintiff and Oz Development, even though the Village allowed the trespass and the removal of its inlet. Likewise, Oz Development denied the trespass even took place and refused to make

any repairs. To avoid further hazard and injuries the Plaintiff covered the hole with heavy plywood and parked a vehicle over it so that the hole was covered and inaccessible.

70.     While Plaintiffs were willing to allow the Village to repair the hole left by Oztekin's removal of the storm water inlet, and despite the fact that Plaintiffs did not create the hole, on October 17, 2007, the Village Defendants caused the Village to file a Motion for a Temporary Restraining Order and Preliminary Injunction and/or Request for an Expedited Hearing on the Village's Verified Complaint in Cook County Circuit Court, falsely claiming that Plaintiffs were obstructing the Village's ability to repair the storm water inlet without even mentioning that it knew Oztekin had caused this damage to the storm water inlet. Thus, the Village Defendants, in furtherance of their conspiracy, came to the aid of Oztekin and Oz Development and repaired the damage to the storm water inlet and the resulting hole, but only after burdening Plaintiffs with a temporary restraining order and creating the false impression that the Plaintiffs were somehow obstructing public safety, when in truth and in fact, it was the Village, Oztekin, and Oz Development, acting in concert together, that created the public safety threat at the Plaintiffs' expense and detriment.

71.     On or about September 8, 2007, a representative or contractor from Oz Development trespassed onto the Property and installed electrical service wiring that hung over the Property.  The electrical service wiring was installed despite ComEd's previous indication that Oz Development could not install the wiring, and without any consent from Plaintiffs.  The Village did nothing in response to the Plaintiffs' complaint.

72.     In September and October of 2007, employees from the Blues Bar illegally dumped garbage from the Bar into YOTI's dumpsters on multiple occasions, including dumping cooking oil.  On one occasion, Plaintiffs were required to call the Mount Prospect Police

Department in order to document the dumping issues from the Blues Bar. Pursuant to the Defendants' scheme, the Village did nothing in response to these complaints.

73.     On or about October 11, 2007, in a display of the favored relationship between Oztekin and the other Defendants, just prior to the official opening of the Blues Bar, Oztekin hosted a private party for elected Village officials, Village staff, Village inspectors and employees and their families which included all of the Village Defendants.

74.     On or about October 12, 2007, the Blues Bar officially opened for business.

75.     In September and October of 2007, Plaintiffs again notified the Village of the trespasses and damages that were caused by Oztekin's excavation of the Oz Property and the construction of the Blues Bar.

76.     On or about November 28, 2007, Plaintiff again brought the fact of repeated trespasses by Oztekin and Oz Development to the Village Defendants' attention, which caused Cooney to notify Plaintiffs by facsimile that the Village would not investigate or enforce any Village ordinance against Oz Development (or, by extension, Oztekin) as a result of the repeated trespasses or damage it caused Plaintiffs.

77.     In a further effort to pressure Plaintiffs to sell the Property and leave the Village and contrary to other prior representations to Curtis, on September 18, 2007, the Village filed a Complaint for Condemnation for the Property against Plaintiffs in Cook County Circuit Court, even though ostensibly and according to the Village Defendants' misrepresentations, the Property was not necessary for the fraudulent entertainment district redevelopment.

78.     That the Oz entertainment district proposal touted by the Village was always a ruse and subterfuge was revealed when it was announced at the time of the condemnation that

Oztekin was partnered with developer John Heimbaugh and was working with the Village on a development agreement and plan for the Triangle Area.

79. In fact, Oztekin was incapable of developing the Triangle Area under any proposed development plan and always needed an experienced partner and the Village Defendants knew that and encouraged and acquiesced in Oztekin's transfer of ownership of parcels to an entity owned by Heimbaugh and Oz Development that Oz Development had ostensibly acquired for the supposed entertainment district. This combination of Oz Development and Heimbaugh had long been planned and supported by the Village Defendants.

**Continuing conspiracy between**
**Village Defendants, Oztekin, Oz Development, and Heimbaugh Capital**

80. That the Heimbaugh/Oz Development redevelopment plan had long been in the works and supported and encouraged by the Village Defendants to support their favorite developer/dentist and consummate their scheme to force Curtis out of the Village became apparent when, in November of 2007, Curtis announced his intention to develop on the Property, with no public funds required, a mixed condominium and retail use called Gateway Centre of Mount Prospect. The Defendants, pursuant to their scheme, reacted and retaliated by increasing the number and intensity of inspections at YOTI, culminating in obtaining without notice a warrant to inspect the premises in a Gestapo-like raid on YOTI by twelve inspectors in March of 2008.

81. The Defendants further reacted by rushing to publicize the Heimbaugh/Oz Development redevelopment plan, which called for a much higher density use in three high rise buildings. Under the Heimbaugh/Oz Development proposal, Oz Development kept the Blues Bar, but the rest of the Triangle Area, including West Busse Avenue, a public street, and Curtis'

Property would be condemned. This redevelopment plan received a negative response from Village residents.

82.    In February of 2008, Curtis publicly revealed his plans for Gateway Centre of Mount Prospect and his plans received a favorable public response. The Defendants reacted by initiating administrative proceedings without notice to obtain a warrant to search YOTI on March 4, 2008, which search was conducted by twelve inspectors.

83.    On March 5, 2008, Curtis officially submitted a second plan to the Village to develop the Property as the Gateway Centre of Mount Prospect.

84.    The Gateway Centre of Mount Prospect plan consisted of a comprehensive package of information prepared by professionals at great expense about the specifications for constructing the building. The proposal further provided that the additional economic benefit to the Village would be $2.75 million to $3.5 million in additional taxes to the Village. Further, Gateway Centre of Mount Prospect would be built entirely on the Property and only with private funds. The Gateway Centre of Mount Prospect plan further envisioned the development of the area to the south of the Property as a public park with a fountain as a tribute to the Village's history and street level public parking.

85.    Pursuant to the Defendants' scheme, in March of 2008, counsel for Plaintiffs was informed by Buzz Hill, Village Attorney of Mount Prospect, that under no circumstance would the Village approve the Gateway Centre of Mount Prospect plan even though it received more public support, did not involve public money, and was more feasible than the Heimbaugh/Oz Development entity's proposals. The only flaw with the Gateway Centre of Mount Prospect Plan is that it was sponsored by Curtis and did not benefit Oztekin or Oz Development.

86.     On March 11, 2008, Heimbaugh formerly presented the Village with the Heimbaugh/Oz Development entity's redevelopment plan for the Triangle Area in the Village, which included the Property (the "Heimbaugh/Oz Proposal").

87.     The Heimbaugh/Oz Proposal called for the construction of 105 residential condominium units and 35,000 square feet of commercial space that would include a 268 space parking garage. The redevelopment project would be conducted over a three-year period, which would include as phase I a 7-story mixed use structure that would consist of 65 residential units and 20,000 square feet of retail space and the 268 space parking garage, and as phase II a 6-story mixed use structure that would be built at the corner of NW Highway and Main Street. The Proposal would also include the construction of an internal plaza for outdoor restaurants and public gatherings and the elimination of West Busse Avenue, a public street.

88.     To complete the redevelopment included in the Heimbaugh/Oz Proposal would cost $40 million.

89.     The Heimbaugh/Oz Proposal involved paying in excess of $2.4 million to Oztekin to reimburse him for properties and development costs incurred in obtaining certain properties within the Triangle district. Oztekin was also granted a $150,000 membership interest in Homebrook Prospect without having to contribute any cash to that entity.

90.     The Heimbaugh/Oz Proposal required the redevelopment, and hence, the sale or condemnation of the Property.

91.     Of course, the Heimbaugh/Oz Proposal would not be fully supported by private funds. Instead, the Proposal would require Heimbaugh/Oz Development entity and the Village to enter into a financial redevelopment agreement, in which the Village would need to pledge public TIF funds in the amount of $ 10 million.

92.     On March 11, 2008, the Village Board of Trustees conducted a public meeting to discuss the specifics of the Heimbaugh/Oz Proposal, and a majority of the Board enthusiastically supported the proposal. As to Curtis' Gateway Centre, Trustees publicly defamed him, falsely calling the plan "amateurish" or falsely representing that it could not be accomplished without involving other property in the Triangle Area. The Village Defendants also reacted by causing the Village to file an administrative proceeding to revoke YOTI's liquor license on the unprecedented basis of building code violations.

93.     On March 31, 2008, Mayor Wilks and the Village Board of Trustees conducted a closed session meeting regarding the "purchase or lease of real property for the use of the public body...." This session was called by the Village Defendants to determine how to best push through the Heimbaugh/Oz Plan and punish Curtis for having the temerity to try to redevelop his Property at his expense.

94.     On March 31, 2008, Plaintiffs filed a state court complaint against most of these defendants alleging civil rights violations and civil RICO violation. The Village Defendants responded by bringing a TRO without notice to shut down YOTI, which has not operated since April 7, 2008.

95.     On May 13, 2008, the Village finally responded to the Gateway Centre of Mount Prospect plan. In the Village's response, the Village, through Deputy Community Development Director Brian Simmons, falsely stated that the Gateway Centre of Mount Prospect plan had not been scheduled for review by the Village's Planning and Zoning Commission because there were allegedly several code issues that needed to be addressed. The issues identified by the Village in its response involved issues related to the parking for the Gateway Centre of Mount Prospect,

questions about the configurations of certain floor plans, utilities, and other issues related to the specifications of the Gateway Centre of Mount Prospect plan.

96.     Nine days later, without giving Curtis any time to respond, and despite concerns from Village residents that other proposals were not being considered, on May 22, 2008, the Village Board of Trustees held a public hearing and voted to approve the Heimbaugh/Oz Redevelopment Plan.

97.     Not content with having closed the Plaintiffs' business, and approving the Heimbaugh/Oz Proposal, the Defendants continued their scheme of harassing Plaintiffs to drive them out of the Village, the Village attorney, Buzz Hill, warned the Plaintiffs' General Counsel in open court in a status hearing before Judge Richard J. Billik that the Village had reason to believe that the Plaintiffs were receiving deliveries at the YOTI, which would be a violation of the TRO and would be contemptuous of the order. The very next day, a Saturday, Curtis visited the restaurant only to find a truck making a delivery of food in his parking lot. Knowing that the delivery could not be for YOTI, even though it appeared to be a YOTI delivery, Curtis investigated further, and discovered that the delivery was actually for the Blues Bar next door. Curtis contacted the police and a police report was made, and the driver of the delivery truck was ordered by a police officer to move his truck. If Curtis had not visited, it would have been difficult for him to disprove the allegation that the delivery truck was delivering food to his establishment.

98.     Pursuant to Defendants' scheme, Oztekin continued to be favored by the Village and the Village Defendants when he was given the exclusive opportunity to directly profit from an annual public event, the Mount Prospect Fine Arts Festival, during which a "Blues Festival" was added in 2008. Village Defendant Wilks and Mount Prospect Village Trustees approved the

Blues Festival, to be held on public grounds and supported with public funds. The first knowledge the Plaintiffs had of the Village-sanctioned Blues Festival, which benefited only Oztekin, was when Village public employees were observed hanging a promotional banner on Oztekin's Blues Bar building, and from information posted on the Village's website exclusively identifying Oztekin as the sole Blues Festival sponsor and promoting his Blues Bar as the sole venue for the festival. This provided confirmation that the Village Defendants intended to allow Oztekin, and Oztekin only, to profit from this use of public funds and a public event.

### The Village's Endless Inspections and Legal Proceedings to Pressure Plaintiffs Are Part of Defendants' Scheme to Drive Curtis Out of the Village

99.     Prior to 2005, while Plaintiffs had been operating YOTI for 30 years, the Village rarely conducted more than a regular annual inspection of the Property, which rarely yielded any findings of ordinance violations. However, since 2005, the Village Defendants, pursuant to their scheme, have used multiple Village departments to conduct repeated and unjustified inspections to pressure Plaintiffs to sell the Property and drive Plaintiffs out of business and out of the Village.

100.    In March 2007, after Plaintiffs had sued Oz Development for trespass, during an inspection by the Village, Defendant Schroeder allegedly observed that the floor of YOTI was not stable. Despite the fact that the floor was stable, Defendant Schroeder and other representatives from the Village conducted numerous follow up inspections regarding the floor of YOTI, which in fact had been damaged by the Village in 2000.

101.    In April 2007, after Plaintiffs sued the Village over the sewer collapse, the Village's Environmental Health Inspectors inspected the Property and purportedly found issues with the exterior of YOTI, including loose wood, loose conduit and missing mortar in the

building's chimney, repairs that the Village was required to assist paying for as a result of the first partial condemnation.

102.    In May 2007, the Village inspected the Property for alleged maintenance issues on the exterior of the building, as well as alleged licensing issues related to the Property's residential units.

103.    For many years, YOTI had a sprinkler system installed that used a cell phone system to communicate with the fire department.  The sprinkler system was approved by the Illinois State Fire Marshal and had never been mentioned as an issue by the Village in any of its inspections.

104.    In June 2007, the Village conducted an inspection of the Property and held that the sprinkler system at YOTI was in violation of the Village code, despite being approved by the Illinois State Fire Marshal and never cited by the Village.  Plaintiffs were required to expend more money unnecessarily as a result.

105.    Plaintiffs have addressed and remedied any allegations from Village inspections related to floor, exterior, or licensing issues.

106.    In early 2008, the Village's Community Development Department conducted multiple inspections of the Property to observe both the exterior and interior condition of the Property.

107.    Specifically, on January 15, 2008, Defendant Roels alleged that there were issues on the Property with the soffit and fascia, cedar shingle roof, brick foundation, and that extension cords were improperly used on the exterior of the building, even though these conditions had existed for years without comment by the Village.

108.    On January 21, 2008, a Village inspector declared the exterior rear stairway "unsafe" and demanded that the same be repaired by January 28, 2008, even though the stairway was not used by patrons of the YOTI and was not accessible to them.

109.    On January 28, 2008, Defendant Roels again inspected the Property's exterior including alleged loose wood, loose conduit and alleged mortar issues.

110.    All of the issues alleged in the January 2008 inspections were being addressed or remedied by Plaintiffs but most of the alleged violations were in the nature of legal but nonconforming uses due to the age of the building, and in any event, they were all long standing conditions that had existed for many years and the Village had not objected to these conditions in prior years' inspections.

111.    In 2007 and 2008, Fire Prevention Officers from the Village inspected the Property numerous times allegedly to determine if the Property was in violation of any Fire Codes.

112.    In 2007 and 2008, Defendant Krupa inspected the Property without notice multiple times.  For example, on January 18, 2008, Krupa conducted an inspection of the Property and prepared a Retail Food Sanitary Inspection Report that alleged twenty-six violations.

113.    On January 27, 2008, the Village conducted an "electrical Hazard Inspection."

114.    All of the issues alleged in the Fire Code, Food Sanitary, or electrical hazard inspections never existed or have been addressed or been remedied.

115.    On February 13, 2008, the Village alleged in a citation that the Property had falling shingles from the roof and demanded that the roof be remedied within six hours or the street in front of the property would be barricaded and YOTI would be shut down. The shingles

in question were asphalt shingles and they were less than 12 feet from the ground and they posed little or no danger to anyone. Nevertheless, to avoid being barricaded and shut down, Plaintiffs immediately remedied the alleged roof issue by removing all shingles within six hours. The shingles were removed at great effort and expense to the Plaintiff, causing the building to appear to be vacant and in disrepair.

116. Since March 1, 2008, the Village Defendants have continued to harass Plaintiffs with unending inspections and reinspections even after having YOTI closed for business on April 7, 2008, as the Village's requirements for YOTI's reopening are ever increasing and shifting. As soon as all conditions are met, the Village Defendants simply create a new expensive obstacle to a reopening, which Defendants pursuant to their scheme, do not intend to allow to happen.

117. Despite the questionable nature of the inspections and the Village's allegations that arise from such inspection, Plaintiffs have always addressed and remedied issues raised by the Village from the inspections, the majority of which were caused by the Village's own wrongful actions. The Village's inspections, reinspections, and promises of further inspections have resulted in Plaintiffs incurring a substantial amount of costs due to the Village's requirements that Plaintiffs immediately retain various contractors to address the Village's concerns.

118. On March 4, 2008, in a further effort to pressure Plaintiffs into selling the Property, the Village, used as a tool for Defendants' conspiracy, filed with the Circuit Court of Cook County an *ex parte* Petition for an Administrative Search Warrant. The Petition was supported by the Affidavit of Defendant Roels, the Environmental Health Manager of the Village of Mount Prospect. Roel's Affidavit set forth alleged "potential" Village Code violations going

33

back to 2007, almost all of which had been remedied by Plaintiffs as a result of the Village's endless inspections.

119.     Defendants proceeded with the Petition for an Administrative Search Warrant *ex parte*, despite the fact that Defendants knew how to contact Plaintiffs and Plaintiffs' counsel, and had been in regular contact during all of the previous inspections.

120.     On March 4, 2008, based on Defendant Roels's representations under oath, the Circuit Court granted the Village's Petition.

121.     Plaintiffs have moved to quash the Administrative Search Warrant, and are awaiting a hearing date on that motion.

122.     Pursuant to the Court's order, on March 4, 2008, the Village conducted further exterior and interior inspections of the Curtis Property.  The inspection was a show of force by the Village, with at least a dozen inspectors storming the Property and conducting 3-4 hours of intrusive and harassing inspections.

123.     Despite the fact that the Village had conducted several inspections prior to March 4, 2008, and even though no new conditions existed that could give rise to new violations, the inspection pursuant to the administrative search warrant resulted in dozens of new allegations and formal citations from the Village.

124.     On March 20, 2008, the Village took another tack in its effort to pressure Plaintiffs by filing a "Notice of Charges" to suspend Elto's liquor license.  The basis of the Notice was not based on any alleged abuse of the liquor license, but was instead based on charges related to purported violations of the Village's Property Maintenance, Fire, and Food Codes, none of which had any relation to liquor consumption.  The Village attorney, Buzz Hill, acknowledged to Plaintiffs' counsel that this had never been done before.

125.   In a conflict of her duties as Mayor, Wilks was also the Village's Liquor Control Commissioner and was the hearing officer for the hearing on Elto's liquor license. Because of the conflict between Wilks enforcing the Village Code as Mayor on the one hand, and conducting a quasi-judicial hearing on whether Elto violated the Village Code on the other, Elto moved for a Change of Venue to substitute Wilks with a neutral hearing officer. On May 1, 2008, Wilks denied Elto's Motion for a Change of Venue, despite her admission that "I have knowledge of some of the facts in play here."

126.   On April 7, 2008, the Village filed a Complaint against Defendants, and a Motion for a Temporary Restraining and Preliminary Injunction in the Cook County Circuit Court, alleging that Plaintiffs were in violation of numerous Village ordinances and that YOTI should be closed for business.

127.   On April 10, 2008, the Court entered a temporary restraining order against Plaintiffs that required Plaintiffs to close YOTI. The Court did so based upon allegations that were misleading and false, and incomplete information, but because TRO proceedings did not provide the Plaintiffs with an opportunity to respond or present evidence in their defense, the Court was obligated to accept the Village's allegations as true, but shortly after it issued the order, on its own motion, the Court transferred the case to the presiding judge for consolidation, as the Court became aware that there was, in fact, preexisting litigation between the parties that had not been brought to its attention by the Village. To date, YOTI remains closed pursuant to the temporary restraining order.

128.   On or about June 3, 2008, Defendant Cooney stated to a fellow businessman and associate of Curtis, during a private meeting, that Tod Curtis "is done. We are going to run him

out and take his property with a quick-take." This statement was made as part of Defendants'
scheme to pressure Plaintiffs to relinquish the Property and leave the Village.

129.    The YOTI is involved in interstate commerce, and, thus, Defendants conduct as
alleged above that consistently interrupted Plaintiffs' business affected interstate commerce. In
addition, the development of the Property by Plaintiffs would also involve interstate commerce,
and, thus, Defendants scheme to stop the development of the Property by Curtis affected
interstate commerce.

### Count I
### Racketeering Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C. §§ 1962(c) and (d) (Against Defendants Wilks, Janonis, Cooney, Schroeder, Roels, Krupa, Oztekin, and Oz Development)

128.    Plaintiffs incorporate by reference each allegation contained in Paragraphs 1
through 127 as if fully set forth herein.

129.    The Defendants designated above in Count I (the "Count I Defendants") are
persons and participants as defined under 18 U.S.C. § 1961(3).

130.    Count I Defendants have committed more than two acts of racketeering activity
within the last ten years and therefore have engaged in a pattern of racketeering activity as that
term is defined in 18 U.S.C. § 1961(5). Specifically, Count I Defendants have engaged in the
following predicate acts:

a)      After the Village Defendants caused extensive damage to the YOTI
through their management of the deconstruction of the property
neighboring the Property in late 2000 and early 2001, during 2001
Plaintiffs requested on multiple occasions that the Village repair all
damages caused by the deconstruction. In response, in 2001, Defendants
Cooney and Janonis denied Plaintiffs' requests by mails and wires as part

of Count I Defendants' scheme to defraud and obtain the Property by false pretenses. These mail and wire frauds were violations of 18 U.S.C. §§ 1341 and 1343.

b)  On August 20, 2007, Defendant Cooney represented by mail that Plaintiffs had failed to pursue the $40,000 façade money that was subject to the Agreed Order entered in the partial condemnation action. This representation was false and made with the intent to defraud Plaintiffs of the $40,000 it was entitled to as part of Count I Defendants' fraudulent scheme. This mail fraud was a violation of 18 U.S.C. § 1341 with the intent to further Count I Defendants' scheme against Plaintiffs.

c)  In April of 2005, Wilks refused to honor the promises to pay for repairs to the YOTI as represented by former Mayor Farley, saying that the letter from Farley "doesn't mean anything to me." Wilks actions were an act of intimidation as a public official in violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951, in furtherance of Count I Defendants' scheme to oust Plaintiffs from the Property.

d)  In late 2005, Janonis communicated to Plaintiffs' counsel that the Village would not repair any of the damages it caused the YOTI and would not spend a dime on the Property to repair anything and threatened to put Curtis out of business. Janonis' actions were an act of intimidation as a public official in violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951, in furtherance of Count I Defendants' scheme to oust Plaintiffs from the Property.

e)    In 2002 and 2003, Defendants Wilks, Janonis, and Cooney developed a fraudulent scheme by means of wires and mails with Oztekin to allow Oztekin—through Oz Development—to develop the Triangle Area to fraudulently induce Plaintiffs to sell the Property at a below fair market value, falsely representing to Plaintiffs that the Property would not be condemned and would not be required for any redevelopment of the Triangle Area. Plaintiffs relied on Defendants' statements and continued to operate the YOTI and maintain the Property pursuant to the misrepresentations. The fraudulent scheme developed by Wilks, Janonis, Cooney, and Oztekin (through Oz Development) during this period was a violation of 18 U.S.C. §§ 1341 and 1343.

f)    On or about August 15, 2005, Defendant Wilks and the Village Board of Trustees, executed and mailed a letter to Curtis representing that the Village Board was committed to making a final decision regarding the long-term redevelopment of the property within the Triangle Area by the end of 2005, but that the Village was not interested in acquiring the Property. Plaintiffs relied on this representation, and proceeded to spend money in reliance on that representation for the YOTI and the Property. In fact, the Village's misleading statement was designed and intended to benefit the Village's favored developer, Oztekin and Oz Development. This statement made in furtherance of Count I Defendants' fraudulent scheme was a mail fraud under 18 U.S.C. § 1341.

g)     On May 5, 2006, Oztekin and Oz Development revealed a plan for redevelopment of the Triangle Area that was fraudulently created and designed to persuade Plaintiffs that the Property would never be part of any redevelopment in the Triangle Area to induce Curtis to sell the Property to Oz Development and leave the Village. Count I Defendants gave their enthusiastic public support and approval to the Oz Proposal as part of their scheme to force Plaintiffs out of the Village, as the Count I Defendants knew that the Oz Proposal was not a viable project. Cooney and Janonis communicated the Oz Development plan by telephone to Plaintiffs. This redevelopment plan was part of a fraudulent scheme to defraud Plaintiffs, and was a violation of 18 U.S.C. § 1343 in furtherance of Count I Defendants fraudulent scheme, an act of intimidation in furtherance of Count I Defendants' scheme in violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951.

h)     On about July 25, 2006, Janonis, Wilks, and four Village trustees called a meeting by mail, in which Wilks informed Plaintiffs that the Village had no interest in purchasing the Property and that the Village fully supported the plan for redevelopment for the Triangle Area submitted by Oztekin and Oz Development. Janonis' and Wilks use of the mail for the July 25, 2006 meeting was a violation of 18 U.S.C. § 1341 in furtherance of Count I Defendants fraudulent scheme, and the meeting was used as a method of intimidation to pressure Plaintiffs to sell the Property in violation of 720 ILCS 5/12-6 and 18 U.S.C. § 1951.

i)    On December 22, 2006, Oztekin authorized Oz Development to send a letter to Curtis to purchase the Property for the artificially low price of $1,400,000. This unreasonable offer to purchase the Property was in furtherance of Count I Defendants fraudulent scheme, and was a mail fraud in violation of 18 U.S.C. § 1341.

j)    On January 25, 2007, the Village Defendants caused a letter to be sent, through the Village's attorney, Buzz Hill, purportedly on behalf of the Village making an offer to purchase the Property for $1,265,000. This unreasonable offer to purchase the Property was in furtherance of Count I Defendants fraudulent scheme, and was a mail fraud in violation of 18 U.S.C. § 1341, an act of intimidation in violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951.

k)    On or about March 20, 2007, Defendants Cooney and Schroeder demanded by telephone that Plaintiffs "fix a problem with his [Curtis'] sewers," followed by threats to shut down YOTI if "the situation was not resolved." Defendants' actions were wire fraud in violation of 18 U.S.C. § 1343, acts of intimidation under 720 ILCS 5/12-6, and acts of attempted extortion in violation of 18 U.S.C. § 1951, made with the intent to further Count I Defendants' scheme.

l)    On March 21, 2007, Defendant Schroeder falsely told Village representatives and Plaintiffs that Plaintiffs were responsible for broken sewer lines, even though Schroeder and Cooney knew that the alleged broken sewer lines were on the Oz Property. Defendants' actions were

acts of intimidation under 720 ILCS 5/12-6, and acts of attempted extortion in violation of 18 U.S.C. § 1951, made with the intent to further Count I Defendants' scheme.

m) On or about March 22, 2007, Defendant Schroeder threatened by telephone to shut down the YOTI if the "sump pump-sewer blockage problem" was not fixed, even though Schroeder knew that the problem was on the Oz Property. Defendant's actions were wire fraud in violation of 18 U.S.C. § 1343, acts of intimidation under 720 ILCS 5/12-6, and acts of attempted extortion in violation of 18 U.S.C. § 1951, made with the intent to further Count I Defendants' scheme.

n) On February 21, 2007 during the construction of the Blues Bar, Oz Development intentionally cut a steam pipe that was connected to Plaintiffs' building. This action was in furtherance of Count I Defendants' scheme and was an intimidation in violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951.

o) On or about November 28, 2007, after Plaintiffs raised the fact of the repeated trespasses by Oz Development to the Village Defendants, Cooney notified Plaintiffs by telephone that the Village would not investigate or enforce any Village ordinance against Oztekin or Oz Development. The Village Defendants' refusal to investigate was made with the intent to further Count I Defendants scheme, and was an intimidation in violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951.

p)  In March 2007, during an inspection by the Village, Defendant Schroeder falsely claimed that the floor of the YOTI was unstable, and required numerous additional inspections despite knowing that the floor was not unstable. Schroeder's actions were an act of intimidation violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951, made with the intent to further Count I Defendants' fraudulent scheme.

q)  On January 15, 2008, Defendant Roels alleged that there were issues on the Property with the soffit and fascia, cedar shingle roof, and brick foundation, and that extension cords were improperly used on the exterior of the building, even though these conditions had existed for years without comment by the Village. Roel's actions were an act of intimidation violation of 720 ILCS 5/12-6, and acts of attempted extortion in violation of 18 U.S.C. § 1951, made with the intent to further Count I Defendants' fraudulent scheme.

r)  On January 28, 2008, Defendant Roels again inspected the Property's exterior including alleged loose wood, loose conduit, and alleged mortar issues, even though such conditions had existed for years without comment by the Village. Roel's actions were an act of intimidation violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951, made with the intent to further Count I Defendants' fraudulent scheme.

s)    On January 21, 2008, a Village inspector declared the exterior rear stairway "unsafe" and demanded that the same be repaired by January 28, 2008, despite the fact that the stairway was not used b patrons of YOTI and was not accessible to them. This inspection was conducted at the direction of Cooney and Janonis with the intent to further Count I Defendants' scheme, and was an act of intimidation in violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951.

t)    In 2007 and 2008, Defendant Krupa inspected the Property without notice multiple times. For example, on January 18, 2008, Krupa conducted an inspection of the Property and prepared a Retail Food Sanitary Inspection Report that alleged twenty-six violations. Defendant Krupa's multiple inspections were acts of intimidation in violation of 720 ILCS 5/12-6, and acts of attempted extortion in violation of 18 U.S.C. § 1951, made with the intent to further Count I Defendants' fraudulent scheme.

u)    On or about June 3, 2008, Defendant Cooney stated to a fellow businessman and associate of Curtis, during a private meeting, that Tod Curtis "is done. We are going to run him out and take his property with a quick-take." This statement was made as part of Defendants' scheme to pressure Plaintiffs to relinquish the Property and leave the Village, and was an act of intimidation in violation of 720 ILCS 5/12-6, and an act of attempted extortion in violation of 18 U.S.C. § 1951, made with the intent to further Count I Defendants' scheme.

43

131. The above multiple related and coordinated acts constitute a pattern of racketeering activity aimed at ousting Plaintiffs from the Property and depriving Plaintiffs of their constitutional and property rights.

132. Each of the above predicate acts are related to one another, as they have the shared aim of harming Plaintiffs and forcing Plaintiffs to relinquish their ownership of the Property.

133. Count I Defendants engaged in the above pattern of racketeering activities in advancement of an enterprise the Village, which Count I Defendants used to further their fraudulent scheme against Plaintiffs under a veil of legitimacy. Count I Defendants used their association with the Village to further their racketeering scheme to oust Plaintiffs from the Property.

134. The Village is an enterprise and the Count I Defendants are conducting the affairs of this enterprise through a pattern of racketeering activity designed and intended to oust Plaintiffs from the Property and to injure Plaintiffs by depriving them of their constitutional and property rights.

135. Count I Defendants' pattern of racketeering amount to and pose a clear threat of continued criminal activity through the enterprise of the Village, as evidenced by Count I Defendants' accelerated harassment of Plaintiffs during 2007 and 2008.

136. Count I Defendants' pattern of racketeering activities has continued for the last decade, and based on the past conduct, the pattern of racketeering will most likely continue into the future with no discernable end and continued threat of repetition.

137. Count I Defendants have orchestrated and conducted the enterprise through a pattern of racketeering activity. Specifically, Count I Defendants, under the guise of their work

for the Village, or in the case of Oztekin and Oz Development, as a result of the benefits of the favoritism received from the officers of the Village Defendants, have engaged in a concerted effort to oust Plaintiffs from the Property, and have banded and conspired together to turn the Village into their enterprise designed to "run [Plaintiffs] out of town" through a pattern of racketeering activity.

138.    Each of the Count I Defendants has some part in directing the enterprise's affairs.

139.    Each Count I Defendant agreed to join the conspiracy and to commit predicate acts with the knowledge that such acts were part of a pattern of racketeering activity.

140.    The YOTI is involved in interstate commerce, and, thus, Count I Defendants conduct as alleged above that consistently interrupted Plaintiffs' business affected interstate commerce.   In addition, the development of the Property by Plaintiffs would also involve interstate commerce, and, thus, Count I Defendants scheme to stop the development of the Property by Curtis affects interstate commerce.

141.    Plaintiffs have been damaged in an amount in excess of $150,000, and they are entitled to statutory and punitive damages, costs, and attorneys fees related to Count I Defendants' conduct, as a result of the Count I Defendants' wrongful actions.

WHEREFORE, Plaintiffs pray for entry of judgment, jointly and severally, against the Count I Defendants in an amount in excess of the $150,000 in actual damages, in an exact amount to be proved at trial, an award of statutory damages, punitive damages, attorneys fees and costs, and such further relief that the Court deems equitable and just.

## Count II

### Equal Protection

### (Against All Defendants, except Oztekin and Oz Development)

142.    Plaintiffs incorporate by reference each allegation contained in Paragraphs 1 through 141 as if fully set forth herein.

143.    The Mount Prospect Village Code requires that Plaintiffs operate their business and maintain the Property according to the Village Code.

144.    Accordingly, Defendants are required to uniformly enforce the regulations of the Village Code.

145.    Instead of uniformly enforcing the regulations of the Village Code, Defendants have instead subjected Plaintiffs to intentional discrimination by virtue of their selective enforcement of the Village Code regulations.

146.    In so doing, Defendants sought to deprive Plaintiffs of the equal protection of the laws for reasons of a personal nature unrelated to the duties of Defendants' positions with the Village.

147.    Defendants had and have no rational basis for their selective enforcement of the Village Code against Plaintiffs.

148.    Defendants' intentional and purposeful discrimination against Plaintiffs had a discriminatory effect on Plaintiffs.

149.    Defendants' selective enforcement of the Village Code and continuing series of harassing and unmerited inspections have, among other things, forced Plaintiff to expend unnecessary resources and damaged the Property by lowering the market value of the Property, thus pressuring Plaintiffs to sell the Property or settle the Village's current condemnation action for an artificially low amount.

46

150.   Plaintiffs have been damaged in an amount in excess of $150,000, and they are entitled to punitive damages, costs, and attorneys fees related to Defendants' conduct, as a result of Defendants' wrongful actions.

WHEREFORE, Plaintiffs pray for entry of judgment, jointly and severally, against the Defendants in an amount in excess of the $150,000 in actual damages, in an exact amount to be proved at trial, an award of punitive damages, attorneys' fees and costs, and such further relief that the Court deems equitable and just.

### Count III

### Violations of 42 U.S.C. § 1983
### (Against All Defendants, except Oztekin and Oz Development)

151.   Plaintiffs incorporate by reference each allegation contained in Paragraphs 1 through 150 as if fully set forth herein.

152.   Defendants are "persons" as defined under 42 U.S.C. § 1983.

153.   Defendants, acting under color of state law, continue to wrongfully enforce the provisions of the Mount Prospect Village Code against Plaintiffs and deprive Plaintiffs of their constitutional rights to (1) due process under the law, (2) equal protection under the law, (3) just compensation for the taking and damaging of private property, and (4) freedom of speech under the First Amendment of the U.S. Constitution, in violation of 42 U.S.C. § 1983 and the U.S. Constitution.

154.   Defendants maliciously took these actions with reckless indifference to the constitutionally protected rights of Plaintiffs.

155.   Further, Defendants actions as alleged above were objectively unreasonable.

156.   Defendants' acts constitute violations of 42 U.S.C. § 1983.

157. Plaintiffs have been damaged in an amount in excess of $150,000, and they are entitled to statutory and punitive damages, costs, and attorneys fees related to Defendants' conduct, as a result of Defendants' wrongful actions.

WHEREFORE, Plaintiffs pray for entry of judgment, jointly and severally, against the Defendants in an amount in excess of the $150,000 in actual damages, in an exact amount to be proved at trial, an award of statutory damages, punitive damages, attorneys fees and costs, and such further relief that the Court deems equitable and just.

## Count IV

### Violations of 42 U.S.C. § 1985(3)
### (Against All Defendants, except Oztekin and Oz Development)

158. Plaintiffs incorporate by reference each allegation contained in Paragraphs 1 through 157 as if fully set forth herein.

159. As set forth above, a conspiracy exists and has existed among Defendants to harm Plaintiffs and their interests in the Village and to deprive Plaintiffs of the equal protection of the laws, due process rights, and rights under the First Amendment to the U.S. Constitution.

160. Towards that end, as set forth above, Defendants have committed multiple acts of fraud in furtherance of the conspiracy against Plaintiffs.

161. The sum of Plaintiffs' acts in furtherance of a common design constitute a conspiracy in violation of 42 U.S.C. § 1985(3).

162. Plaintiffs have been damaged in an amount in excess of $150,000, and they are entitled to statutory and punitive damages, costs, and attorneys fees related to Defendants' conduct, as a result of Defendants' wrongful actions.

WHEREFORE, Plaintiffs pray for entry of judgment, jointly and severally, against the Defendants in an amount in excess of the $150,000 in actual damages, in an exact amount to be

proved at trial, an award of statutory damages, punitive damages, attorneys fees and costs, and

such further relief that the Court deems equitable and just.

**TRIAL BY JURY DEMANDED**

> **TOD CURTIS, individually and as beneficiary, FIRST UNITED TRUST COMPANY, as Trustee under Trust No. 10510, and ELTO RESTAURANT INC., an Illinois corporation,**

> By: /s/ William M. McErlean _____
>         One of Their Attorneys

William M. McErlean
David T. Ballard
Theodore J. Koerth
Barnes & Thornburg LLP
One N. Wacker Drive
Suite 4400
Chicago, IL 60606
(312) 357-1313

CHDS01 520818v1