**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TOD CURTIS, individually and as beneficiary,** | ) | |
| **FIRST UNITED TRUST COMPANY, as** | ) | |
| **Trustee under Trust No. 10510, and ELTO** | ) | |
| **RESTAURANT INC., an Illinois corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 08 C 3527** |
| | ) | |
| **IRVANA WILKS, Village of Mount Prospect** | ) | **Judge Ronald A. Guzmán** |
| **Mayor & Local Liquor Control Commissioner,** | ) | |
| **MICHAEL E. JANONIS, Village of Mount** | ) | |
| **Prospect Manager, WILLIAM COONEY,** | ) | |
| **Village of Mount Prospect Economic Director,** | ) | |
| **WILLIAM SCHROEDER, Village of Mount** | ) | |
| **Prospect Building Commissioner, ROBERT** | ) | |
| **ROELS, Village of Mount Prospect** | ) | |
| **Environmental Health Manager, FRANK** | ) | |
| **KRUPA, Village of Mount Prospect** | ) | |
| **Environmental Health Inspector, OZ** | ) | |
| **DEVELOPMENT, LLC, ERROL OZTEKIN,** | ) | |
| **and the VILLAGE OF MOUNT PROSPECT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Tod Curtis, First United Trust Company, and Elto Restaurant, Inc., have sued

defendants pursuant to 42 U.S.C. §§ ("section") 1983, 1985(3) for violating, and conspiring to

violate, constitutional rights as guaranteed by the First, Fifth and Fourteenth Amendments to the

U.S. Constitution and pursuant to 18 U.S.C. § ("section") 1962(c) and (d) for their engaging in a

pattern of racketeering activity in order to deprive him of his property in Mount Prospect,

Illinois.  Defendants move for summary judgment under Federal Rule of Civil Procedure

("Rule") 56.  For the reasons provided, the Court grants in part and denies in part the motion.

 **Motion to Strike Rotolo's Declaration and Report and Chick's Declarations and Report**

Defendants move to strike William Rotolo's Declaration and Report and Kevin Chick's Report because they do not qualify as experts regarding the opinions they give. "*Daubert*'s general principles apply to the expert matters described in Rule 702." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"The trial court acts as a gatekeeper to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Owens v. Amtrol, Inc.*, 94 F. Supp. 2d 952, 955 (N.D. Ind. 2000) (quotation omitted).

Rotolo's curriculum vitae states that he was a city planner for Schaumburg and Wilmette, Illinois approximately twenty-four to thirty-three years ago. Because Rotolo gained most, if not all, of his knowledge of the practices and usage of other suburban municipalities' planning practices two or three decades ago, he is not qualified to testify about the current-day practices of the Village of Mount Prospect or other municipalities in the Northwest Municipal Conference. (*See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 43-44, 46-51, 55-56, 69, 72, 77; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 27, 41, 52, 57, 63-69.) Merely because Rotolo owned and occupied an office in another village near Mount Prospect also does not qualify Rotolo as an expert on the practices of other suburban municipalities. Plaintiffs have simply failed to connect the dots, *i.e.*, establish that Rotolo's private sector experience qualifies him as an expert on suburban, and in particular the Village of Mount Prospect's, downtown redevelopment practices and professional standards of

property appraisal. Moreover, neither he nor anyone else is qualified to speculate as to another's intent. (*See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 43-44, 46-51, 55-56, 69, 72, 77; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 27, 41, 52, 57, 63-69; *see, e.g., id.* ¶ 63 ("the Village engaged in selective and vindictive enforcement of Village codes and regulations to harass Tod Curtis and to force him to sell his property"); *id.* ¶ 65 ("the Village Defendants and Oztekin were complicit and had some covert unwritten agreement to drive Curtis out of the Village of Mount Prospect").) In short, Rotolo's experience does not qualify him as an expert regarding the matters to which he attests.[1] The Court grants defendants' motion to strike Rotolo's declaration and report from plaintiffs' LR 56.1 submissions.

Next, defendants move to strike Kevin Chick's declarations and report. For purposes of the summary judgment motion, plaintiffs rely on Chick's Declaration for a single fact statement: "[T]he excavation and construction of the Blues Bar, that began in October 2006, caused significant damages to YOTI's roof, walls, and steam pipes, which will require Plaintiffs to spend approximately $965,000.00 to repair the building's east wall." (*See* Pl.'s LR 56.1(b)(3)(C) ¶ 28.) Thus, plaintiffs rely on Chick's declarations and report to establish: (1) the cause of the damage to plaintiffs' property; and (2) that $965,000.00 in repairs are necessary to fix the damage.

First, with regard to Chick's opinion that the excavation and construction of the Blues Bar caused damage to plaintiffs' property, the Court agrees with defendants. It is undisputed

---

[1]Even if the Court were to hold that he was qualified as an expert, which it does not, because Rotolo utterly fails to explain his methodology for reaching his conclusions, the Court would still grant the motion because there has been no showing regarding the reliability of his conclusions.

that Chick has been in the remodeling contracting business for thirty years and his current company, Artistic Creation Designs LLC, builds homes, renovates buildings and designs cabinetry. However, because Chick does not state that he has an engineering degree[2] or particular experience in analyzing the cause of structural damage, he is not qualified to testify as an expert regarding the cause of any existing or impending structural damage to plaintiffs' property's roof, walls or steam pipes. Further, he does not provide the methodology he used to reach his opinion, and thus the Court finds that his *ipse dixit* conclusions are not sufficiently reliable. For example, although he inspected the interior and exterior east wall of plaintiffs' property after the construction of the Blues Bar, he does not state that he relied on the review of other scientific data gathered by others (such as a person with specific experience in such matters, which might include, but would not necessarily be, someone with an engineering background) in reaching his conclusion that the structural damage to plaintiffs' property was caused by the excavation and construction of the Blues Bar. (*Cf.* Pl.'s Ex. 3, Chick Decl. Ex. B (stating estimated cost does not include cost of architect and engineer).)

Second, with regard to Chick's opinion that plaintiffs are required to spend $965,000.00 to repair the damage, the Court, again, agrees with defendants. Without a relevant engineering degree or any explanation of the particular knowledge he has gained from a sufficiently analogous experience, he is not qualified as an expert to give an opinion as to the extent and manner of repairs necessary to restore the structural integrity of plaintiffs' property.[3] Further, his

---

[2]He states that he has an Associates Degree in Art from Northern Illinois University. (Pl.'s Ex. 3, Chick Decl., Part 5 of 6.)

[3]Chick's prior experience constructing a basement underneath a preexisting building is not sufficiently analogous to the structural issue presented in the instant case, i.e., the methods

cost estimate does not provide any way for the Court to determine the portions, if any, about which he is qualified to testify. (*See id.*, *see also* Pl.'s Ex. 3, Chick Decl. ¶ 19.) As an example, Chick might have provided lay testimony that upon inspection of plaintiffs' property, he saw that certain bricks and parapet caps on the exterior of the east wall were missing or damaged, and Chick might have been qualified to testify as to the cost to replace or repair those bricks and parapet caps if plaintiffs had established a foundation that he has sufficient experience in estimating the costs of such materials. However, his cost estimate in his declarations and report does not separate the cost of replacing or repairing missing or damaged bricks or parapet caps from the cost of demolishing and rebuilding the entire wall. The presumption underlying the estimate is that all of the categorized repairs are necessary to restore the structural integrity of plaintiffs' property. However, as stated above, Chick is not qualified as an expert to testify that all of his suggested repairs are necessary to make the building structurally sound. He has not explained how he concluded that all of the repairs were necessary or provided an analysis as to precisely how he estimated the cost of those repairs.

Chick has not sufficiently explained how his experience qualifies him as an expert in determining the cause of structural damage and in estimating the extent and manner of repairs necessary to make a building structurally sound. Although Chick has inspected the premises, he has not shown that his conclusion is based on sufficient facts or data using reliable principles and methods. Therefore, the Court grants defendants' motion to strike Chick's declarations and reports from plaintiffs' LR 56.1 submissions.

---

required to repair the potentially compromised structural integrity of an exterior wall without being able to access the wall from the exterior of the building.

<u>**Facts**</u>[4]

Curtis is the sole owner of the property located at 6-18 W. Busse Avenue in Mount Prospect, Illinois ("plaintiffs' property"), as the sole beneficiary with the power of direction of Trust No. 10510, for which First United Trust Co. acts as trustee, which holds title to plaintiffs' property. (Defs.' LR 56.1(a)(3) Stmt. ¶ 1.) Elto Restaurant, Inc., an Illinois corporation solely owned by Curtis, has for forty years owned and operated Ye Olde Town Inn ("YOTI"), a restaurant and bar located in the building on plaintiffs' property. (*Id.* ¶ 2.) At least one business has rented retail space on plaintiffs' property. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 38.)

Irvana K. Wilks is the Mayor and Liquor Control Commissioner of Mount Prospect, which is an Illinois municipal corporation. (Defs.' LR 56.1(a)(3) Stmt. ¶¶ 3, 9.) Michael E. Janonis is the Village Manager of Mount Prospect. (*Id.* ¶ 4.) William Schroeder is the Building Commissioner of Mount Prospect. (*Id.* ¶ 5.) Robert Roels is the Environmental Health Manager of Mount Prospect. (*Id.* ¶ 6.) Frank Krupa is a Health Inspector for Mount Prospect. (*Id.* ¶ 7.) William Cooney is the Economic Director of Mount Prospect. (*Id.* ¶ 8.)

Oz Development, LLC is an Illinois limited liability company, which owns the property located at 2 W. Busse Avenue in Mount Prospect, and is solely owned by Errol Oztekin. (*Id.* ¶ 10.) Oztekin is also the sole owner of Blues Bar, LLC, which owns and operates a restaurant and bar called "Blues Bar" located in the building on Oz Development LLC's property adjacent to plaintiffs' property. (*Id.* ¶ 11.)

---

[4]The following facts are either undisputed or deemed admitted by the parties' failure to comply with Local Rule 56.1. The Court sua sponte strikes defendants' reply to plaintiffs' response to defendants' statement of facts because Local Rule 56.1 does not contemplate such a filing.

In the 1990s, a developer redeveloped property directly behind the YOTI to the north of plaintiffs' property with a building featuring 340 condominium units. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 3.) As part of the redevelopment, the Village initiated partial condemnation proceedings of the north portion of plaintiffs' property so that the Village could build a private road to access the new condominium building. (*Id.*)

In 2004, Mount Prospect's Board of Trustees formed a Downtown Redevelopment Ad Hoc Committee ("the committee") for the purpose of reviewing current redevelopment opportunities within the downtown area. (Defs.' LR 56.1(a)(3) Stmt. ¶ 20.) The committee divided the downtown area into six sub-areas in order to focus on varying issues that may impact the redevelopment of different parcels. (*Id.* ¶ 21.) Sub Area #1 was "the Triangle," an area bordered by Main Street (Route 83), Northwest Highway and the north and south sides of Busse Avenue. (*Id.* ¶ 22.) The committee found that the majority of the existing buildings in the Triangle did not meet the Village's current building code standards and regulations and recommended a complete unified redevelopment of the parcels located within the Triangle. (*Id.* ¶ 23; Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 53.) Plaintiffs' property and the Oz property are located in the Triangle. (Defs.' LR 56.1(a)(3) Stmt. ¶ 24.)

In April 2004, Robert Roels, Mount Prospect Environmental Health Manager, inspected YOTI and found property maintenance violations on the exterior of the property that included loose shingles, a hole in the roof of the overhang in front of the YOTI, a missing ballister on the rear stairway, garbage, debris/rubbish/storage behind the YOTI, flaking paint and rotting wood on the exterior of the front of the building and the soffit and fascia. (*Id.* ¶ 42.) On April 21, 2004, Roels sent a letter to Curtis notifying him of the violations. (Pls.' LR 56.1(b)(3)(B) Stmt.

¶ 42.)

In the fall of 2005, Oztekin presented the Village with a redevelopment concept for the Triangle that included the Blues Bar, which would be a restaurant and entertainment venue, and other restaurants ("Entertainment District Proposal"). (Defs.' LR 56.1(a)(3) Stmt. ¶ 30.) The layout he gave the Village included the whole Triangle except for plaintiffs' property. (*Id.*) On August 15, 2005, the Village notified Curtis via letter that it was not interested in buying his property. (*Id.* ¶ 69.)

In late 2005 through 2006, in conjunction with the Entertainment District Proposal, Oztekin, through Oz Development, purchased several parcels located in the Triangle, including the property at 2 W. Busse Avenue ("the Oz property"). (*Id.* ¶ 32.) It is disputed whether the Village Board approved the initial Entertainment District Proposal. (*Id.*) It is also disputed whether the Village board and Oztekin agreed that Oztekin would purchase the properties in the Triangle and the Village board would pay a premium of twenty-five percent above the appraised value to either the property owner or Oztekin. (*See* Pls.' Ex. 6, Cooney Dep. at 231; Pls.' Ex. 13, Oztekin Dep. at 98. *Compare* Defs.' LR 56.1(a)(3) Stmt. ¶ 33, *with* Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 33.) However, it is undisputed that the Village was set to pay Oztekin $1,250,000.00 to purchase properties in the Triangle. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 20.)

On March 22, 2006, the Village's Department of Finance, with the input of Economic Director William Cooney, created a spreadsheet entitled "Village of Mount Prospect, Illinois Downtown Redevelopment TIF Cash Flow Projections" which estimated that the Village's potential acquisition cost of plaintiffs' property was $1,500,000.00. (*Id.* ¶ 25.)

In late 2006 or early 2007, Oztekin determined that the Entertainment District Proposal

was infeasible because it would result in a loss in investment. (*Id.*) Oz met with developers, including John Heimbaugh, to discuss a viable redevelopment plan for the Triangle. (*Id.*) Although it is disputed whether Heimbaugh and Oztekin discussed their plans with the Village beginning in late 2006, it is undisputed that on May 20, 2008, the Village Board approved Heimbaugh and Oztekin's "Homebrook redevelopment plan," a mixed-use, multi-story residential/commercial project, which included the YOTI property. (Defs.' LR 56.1(a)(3) Stmt. ¶ 38.)

On July 25, 2006, Mayor Wilks, Village Manager Janonis and four Village trustees met with Curtis and told him that the Village had no interest in ever purchasing plaintiffs' property. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 21.) At this meeting, the defendants stated that they supported the Entertainment District Proposal, which did not include plaintiffs' property. (*Id.*)

On October 16, 2006, plaintiffs' counsel asked the Village for twenty-five percent of the Tax Increment Financing ("TIF") funds earmarked for a downtown redevelopment project and plan. (*Id.* ¶ 45; Defs.' LR 56.1(a)(3) ¶ 17.) On October 18, 2006, Mayor Wilks responded that plaintiffs were not entitled to any TIF funds because they had not submitted plans for redeveloping the YOTI or taken any effort to maintain the building or address its poor appearance. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 45.) On October 25, 2006, Curtis publicly announced his plan to redevelop plaintiffs' property without the use of TIF funds with a development including a restaurant, sports bar, four retail stores and three stories of condominiums above the retail level ("the Gateway Centre"). (*Id.* ¶ 46.)

In October 2006, Oz and Oztekin demolished the existing building on the Oz Property and constructed a new two-story building housing the Blues Bar, which opened on October 10,

2007.  (Defs.' LR 56.1(a)(3) Stmt. ¶ 34.)  It is disputed whether the demolition, excavation and

construction of the Blues Bar caused damage to plaintiffs' property and the extent to which

plaintiffs have repaired any of the damage, but it is undisputed that a steam pipe on plaintiffs'

property was cut.  (Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 28, 30, 35, 37, 40.)  Before doing so,

Oztekin's counsel sent plaintiffs' counsel a letter that stated that Oz would not be liable for any

damages to plaintiffs' building caused by work on the Oz property and cited Illinois law in

support.  (*Id.* ¶ 29.)

On December 22, 2006, Oz sent Curtis a letter offering to purchase plaintiffs' property

for $1,400,000.00.  (*Id.* ¶ 26.)  Curtis rejected the offer that same day.  (*Id.*)

In January 2007, John Mundie, an Illinois certified real estate appraiser, appraised the

fair market value of plaintiffs' property as $1,265,000.00 or $90.00 per square foot.  (Defs.' LR

56.1(a)(3) Stmt. ¶ 72.)  On January 25, 2007, the Village offered Curtis $1,265,000.00 for the

property.  (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 26.)

On February 19, 2007, Curtis' attorney sent a letter to Oz offering to purchase two of

Oz's properties, 15 W. Busse Avenue and 19 W. Busse Avenue, for $80.00 per square foot,

which was later increased to $90.00 per square foot.  (Defs.' LR 56.1(a)(3) Stmt. ¶ 73.)

On March 8, 2007, Everette "Buzz" Hill, Village Attorney for Mount Prospect, sent a

letter to plaintiffs' counsel stating that Mayor Wilks and the Village Board "will not enter into

any agreement with Mr. Curtis for the redevelopment of TIF Sub Area #1.  Neither does the

Village intend to sell any of its properties in Sub Area #1 to your client or to facilitate the

purchase of other properties by your client."  (*Id.* ¶ 47.)

On April 30, 2007, the Village Environmental Health Manager Roels inspected the

exterior of YOTI and found that conditions he had cited three years earlier – loose, rotting wood and conduit hanging over public walks and the YOTI entrance and deterioration of the rear porch – had not been addressed. (*Id.* ¶ 44; Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 56.) On May 29, 2007, Roels sent Curtis a letter requesting that these hazardous conditions be repaired by June 30, 2007. (*Id.* ¶ 44.)

In the fall of 2007, the Village filed an eminent domain action on plaintiffs' property. (Defs.' LR 56.1(a)(3) Stmt. ¶ 74.) In September or October 2007, Cooney told one of plaintiffs' tenants, Debbie Cook, that the Village was going to knock plaintiffs' building down and that she should relocate her business. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 38.)

On January 15, 2008, at the request of Economic Director Cooney, Roels inspected YOTI to follow up on earlier inspections and to determine whether the problems persisted. (Defs.' LR 56.1(a)(3) Stmt. ¶ 48.) On January 18, 2008, Frank Krupa, Village of Mount Prospect Environmental Health Manager, conducted a routine inspection of YOTI and assigned it a sanitation score of 68 out of 100, a score that Krupa considered unacceptable. (*Id.* ¶ 49.) On January 21, 2008, Village Inspector Cheryl Scherbaum inspected the rear stairs and rear porch of YOTI and noted that the stairs were unsafe. (*Id.* ¶ 50.)

On January 28, 2008, Roels reinspected plaintiffs' property. (*Id.* ¶ 51.) During the inspection, a cedar shingle flew off of the roof in front of him and struck the public sidewalk. (*Id.*)

At some point, Roels requested to inspect the residential living spaces in plaintiffs' property, and on February 18, 2008, plaintiffs' counsel requested that the inspection be continued to another day. (*Id.* ¶ 52.) On February 22, 2008, plaintiffs' counsel, Richard

Valentino, told Roels that his request for the inspection would be continued permanently and it is disputed whether plaintiffs' counsel stated that plaintiffs' other attorney, Richard Jalovec, would discuss any issues regarding inspection. (*Id.* ¶ 53; Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 53.) It is undisputed that on February 25, 2008, Valentino stated to the Village's attorney, George Wagner, that his client was willing to make or allow required repairs or remodeling "provided that the Village was willing to suspend all hearings and inspections and provide the financial assistance needed to accomplish those repairs and/or remodeling." (Defs.' LR 56.1(a)(3) Stmt. ¶ 54; Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 54.)

In February 2008, Curtis again publicly announced his intention to develop plaintiffs' property even though the Village had initiated a condemnation action on it. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 50.) On March 5, 2008, Curtis submitted, and the Village rejected, another Gateway Centre redevelopment proposal that consisted of a seven-story building on plaintiffs' property and "green space" adjacent to it comprised of land he expected the Village to donate. (Defs.' LR 56.1(a)(3) Stmt. ¶ 51.)

In March 2008, the Village obtained an administrative search warrant for plaintiffs' property. (*Id.* ¶ 55.) As a result of the search, Roels determined that plaintiffs' property continued to deteriorate, and there was reason to believe that property maintenance and/or health and safety violations existed and that these violations constituted a serious threat to the health and safety of residents living on plaintiffs' property as well as neighboring residents. (*Id.* ¶ 56.) On April 7, 2008, the Village filed a verified complaint for injunctive relief against Curtis listing a number of code violations found during the search of the YOTI pursuant to the administrative search warrant. (*Id.* ¶ 57.)

**<u>Discussion</u>**

A district court will grant a summary judgment motion "only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009). The court "construe[s] all facts and draw all inferences in the light most favorable to the non-moving party." *Id.* "The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009).

## I.  Section 1983 and Section 1985(3)

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To prevail on a claim pursuant to section 1983, the plaintiff must show that he (1) "held a constitutionally protected right;" (2) was "deprived of this right in violation of the Constitution;" (3) "defendant [ ] intentionally caused this deprivation;" and (4) "defendant[ ] acted under color of law." *Donald v. Polk County*, 836 F.2d 376, 379 (7th Cir.1988).

### A.  Takings and Substantive Due Process

Plaintiffs concede that their section 1983 takings claim is premature under *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson County*, 473 U.S. 172,

199-200 (1985).  The Court dismisses plaintiffs' takings claim without prejudice for lack of jurisdiction.

In addition, "*Williamson* holds that even if a taking can be challenged as a denial of substantive due process, a suit based on this theory is premature if the plaintiff has possible state remedies against the zoning regulation or other state action that he wants to attack."  *Gamble v. Eau Claire County*, 5 F.3d 285, 287 (7th Cir. 1993).  *Williamson*, therefore, is dispositive as to plaintiffs' substantive due process claim.  *See, e.g., id.* at 287-88 ("[T]his requirement . . . dooms the plaintiff's substantive due process claim in this case . . . ."); *Forseth v. Vill. of Sussex*, 199 F.3d 363, 370 (7th Cir. 2000) ("[A] property owner may not avoid *Williamson* by applying the label 'substantive due process' to the claim.")  Because plaintiffs have not exhausted their state remedies, the Court dismisses their substantive due process claim without prejudice for lack of jurisdiction.

### B.  Equal Protection

In both Counts II and III, Curtis asserts a violation of his right to equal protection.  Curtis never explains why he has alleged the denial of equal protection in two different counts.  Regardless of the reason, however, the Court holds that he has failed to raise a triable issue as to any equal protection claim.

Curtis asserts a "class of one" theory to support his equal protection claim.  *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).  "A plaintiff alleging a class-of-one equal-protection claim must establish that (1) a state actor has intentionally treated him differently than others similarly situated, and (2) there is no rational basis for the difference

in treatment." *Reget v. City of La Crosse*, 595 F.3d 691, No. 06-1621, 2010 WL 424581, at *3 (7th Cir. Feb. 8, 2010). "A class of one equal protection claim may be brought where . . . there is no rational basis for the difference in treatment or the cause of the differential treatment is a totally illegitimate animus toward the plaintiff by the defendant." *Srail v. Vill. of Lisle*, 588 F.3d 940, 944 (7th Cir. 2009) (quotations omitted).

"To be similarly situated for purposes of a class-of-one equal-protection claim, the persons alleged to have been treated more favorably must be identical or directly comparable to the plaintiff in all material respects." *Reget*, 595 F.3d 691, 2010 WL 424581, at *3. Although there is no "precise formula," it is "clear that similarly situated individuals must be very similar indeed." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004).

Curtis asserts that he, himself, is a similarly situated individual for purposes of his equal protection claim based on the inspections. Curtis cannot point to himself as a comparator because he falls within the class of one. He must point to another, not himself. *See Messner v. Calderone*, No. 07 C 893, 2009 WL 3124768, at *9 (N.D. Ill. Sept. 23, 2009) (stating "Messner would be required, at the very least, to point to a second individual").

Curtis also points to other unnamed Mount Prospect business owners as comparators for his equal protection claim based on code enforcement and inspections. (*See* Pls.' Resp. Br. 29.) Curtis cites in support a memorandum regarding the Village's redevelopment that states without explanation: "many of the [Busse Avenue businesses] do not meet building code standards. They will require significant façade and interior improvements to keep them viable in the long term." (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 53; Defs.' Ex. 3, Zadel Dep. Ex. 29, 2004 Downtown Strategic Plans, Mem. of 2/20/04 from Downtown Redevelopment Ad Hoc Committee - Phase II

to Michael E. Janonis at 5.)  He also cites 159 pages of raw data from food inspections

performed by Frank Krupa from 2003 to present.  (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 62; Pls.' Ex.

10, Roels Dep. Ex. 258, Food Inspections 2003- Present.)  However, no reasonable jury could

find, based on this evidence, that a similarly situated entity with similar code violations was not

subjected to inspections or, in other words, was treated more favorably.   There simply is not

enough information in the record from which to determine whether any business is identical or

directly comparable to plaintiffs in all material respects.  In other words, no rational jury could

conclude from this record that the other businesses:  (1) did not experience the same number and

frequency of food or code violation inspections over time; (2) had not attempted to remedy the

same code violations year after year; and (3) were unwilling to remedy the code violations

(loose, cracked and missing floor tiles, loose shingles, hole in roof of overhang in front of

restaurant, missing ballister on rear stairway, garbage, debris and rubbish and storage behind

restaurant, chipping, flaking paint and rotting wood on exterior in front of building and soffit and

facia, *see* Defs.' LR 56.1(a)(3) Stmt. ¶¶ 42-44, 46-51), unless the Village suspended all hearings

and inspections and provided financial assistance for the repairs and remodeling.  (*See* Pls.' Ex.

32, Letter from R. Valentino to G. Wagner of 2/25/08.)  Because the record is devoid of this

pertinent information about other businesses, no rational jury could find that these other

businesses were similarly situated.  Thus, the Court grants defendants' motion for summary

judgment as to plaintiffs' equal protection claim based on code enforcement and inspections.

With regard to plaintiffs' equal protection claim based on the Village's treatment of

redevelopment proposals for the Triangle in Mount Prospect, Curtis points to Oz Development,

LLC ("Oz") as a comparator.  However, viewing all facts in their favor, plaintiffs have failed to

create a triable issue as to whether Oz is similarly situated.

First, the Oz Redevelopment Plan and the Curtis Gateway Centre Redevelopment Plan were proposed during two different time periods and at different stages of the redevelopment of the Triangle. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 30, 32; Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 46, 48, 51.) Oztekin met with Mayor Farley, Village Manager Janonis and Economic Director Cooney approximately three months before Mayor Farley left office in April 2005 and in October 2005, Oztekin presented his initial concept for a restaurant and entertainment venue to Mayor Wilks. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 29-30.) From October 2005 through early January 2006, Oztekin purchased four properties in the Triangle. (Pls.' Ex. 13, Oztekin Dep. at 98.) On January 3, 2006, the Village Board agreed to pay Oztekin up to $1,250,000.00 for his acquisition of properties in the Triangle, some of which he had already purchased. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 33; Pls.' Ex. 6, Cooney Dep. at 230-31.) Within the first six months of 2006, Oz and Oztekin created a preliminary site plan for the Entertainment District Proposal (that did not include plaintiffs' property), but no feasibility or demographic study was submitted. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 30; Pls.' Ex. 13, Oztekin Dep. at 20, 94, 104.)

In late 2006, Oztekin met with developers, including John Heimbaugh, to discuss a different way of redeveloping the Triangle, and it is disputed whether Oz and Oztekin already knew at this time that their Entertainment District Proposal was economically infeasible. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 36.) In January 2007, Jeff Gardner, who was working with Heimbaugh Capital Development Corp., concluded that Oztekin's original redevelopment plan was not financially viable. (*Id.*) Oztekin was forced to find a developer to create a viable redevelopment plan. (*Id.* ¶ 37.) On February 25, 2007, Oz and Oztekin sold four Triangle properties to

Homebrook Prospect LLC ("HP LLC"), a joint venture formed by Heimbaugh, Oztekin and other investors. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 43; Pls.' Ex. 6, Cooney Dep. at 315.) In February or March 2008, it became publicly known that HP LLC's redevelopment project proposal for the Triangle included a six- or seven-story building of condominiums on all of the properties in the Triangle, including plaintiffs' property. (Pls.' Ex. 6, Cooney Dep. at 315; Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 43.) This project has since been put on hold. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 44.)

Unlike Oz, which had submitted a redevelopment plan to the Village in 2005 and early 2006, Curtis did not submit any redevelopment plan until October 25, 2006. (*Id.* ¶ 46; *see* Pls.' Ex. 49, Letter from Wilks to Valentino of 10/18/06.) Further, Curtis' plan, unlike Oz's, included only the redevelopment of plaintiffs' property, not other properties in the Triangle.[5] Curtis' plan was limited in scope to the redevelopment of the Curtis Property alone. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 46, 49, 51; *see* Pls.' Ex. 1, Curtis Decl. ¶¶ 21-22, 24.) Moreover, Curtis' plan required the Village to donate the rest of the property in the Triangle for use as green space. (Pls.' Ex. 15, Curtis Dep. at 242.) Given the timing, sequence and scope of the two proposals, no rational jury could find that Oz is similarly situated to plaintiffs.

Because the Court holds that plaintiffs have failed to create a triable issue as to whether similarly situated individuals or entities were treated more favorably, there is no need to reach the second issue of whether there is a rational basis for the difference in treatment. The Court

_____

[5]Therefore, unlike Oz, which had already purchased four Triangle properties by early 2006, plaintiffs had not purchased any additional Triangle properties in order to make the redevelopment of the entire Triangle a reality. (*See* Pls.' Ex. 6, Cooney Dep. at 232.) Plaintiffs asked the Village to facilitate their purchase of other properties in 2007, but that request was denied. (*See* Pls.' Ex. 50, Letter from Hill to Valentino of 3/8/07.)

therefore grants defendants' motion for summary judgment as to plaintiffs' equal protection claim.

**C.  Section 1985(3) Conspiracy**

A plaintiff must establish a constitutional violation in order to recover on a conspiracy claim. *Holm v. Vill. of Coal City*, No. 08-3639, 2009 WL 2952168, at *4 (7th Cir. Sept. 16, 2009) (affirming district court's grant of summary judgment on conspiracy claim due to lack of triable issue as to constitutional claims); *see Reynolds v. Jamison*, 488 F.3d 756, 764 n.4 (7th Cir. 2007); *Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006); *see also Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 642 (7th Cir. 2006) (stating it is necessary to establish deprivation of equal protection to state a section 1985(3) claim).

Because plaintiff has failed to establish a triable issue as to his equal protection claim, the Court grants defendants' summary judgment motion as to plaintiffs' section 1985(3) claim based on equal protection.  Further, although Curtis also seeks to base his section 1985(3) claim on the denial of his due process and First Amendment rights (*see* Am. Compl. ¶ 159), section 1985(3) does not create a cause of action for the deprivation of the right to due process, see *Jennings v. Nester,* 217 F.2d 153, 154 (7th Cir. 1954), or freedom of speech, see *Egan v. City of Aurora*, 291 F.2d 706, 707 (7th Cir. 1961).  Therefore, the Court grants summary judgment as to Count IV in its entirety.

**D.  First Amendment Claim**

To succeed on a section 1983 First Amendment retaliation claim, a plaintiff "must prove

that (1) he engaged in constitutionally protected speech; (2) the defendants, as public officials, engaged in adverse conduct against him; and (3) the defendants were motivated, at least in part, by his protected speech." *Bivens v. Trent*, 591 F.3d 555, 559 (7th Cir. 2010). While "[t]here is no bright-line rule as to the amount of evidence necessary to survive summary judgment . . . it is clear that mere temporal proximity is not enough to establish a genuine issue of material fact." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004); *see Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006) ("[S]uspicious timing alone rarely is sufficient to create a triable issue.").

The record shows that on October 18, 2006, Mayor Wilks denied plaintiffs' request for twenty-five percent of the TIF funds allotted for the Triangle because plaintiffs had not provided any plans that would be complementary to the redevelopment then underway. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 45.) Viewing the disputed facts in the nonmovants' favor, on October 25, 2006, Curtis publicly announced in local newspapers his renovation plan for his property that did not require the use of any public funds. (*Id.* ¶ 46.) Viewing the disputed facts in plaintiffs' favor, in late 2006, Village Manager Janonis stated that the Village would retaliate with all means available if Curtis continued to bring his cause to the attention of the media and "play his case out in the press." (*Id.* ¶ 14.)[6] On March 8, 2007, the Village told Curtis that it would not sell any of its property in the Triangle to him or help him purchase other properties in the Triangle and it would begin eminent domain proceedings if Curtis did not respond to the Village's offer to buy his property by March 28, 2007. (*Id.* ¶ 47; Pls.' Ex. 50, Letter from Hill to

---

[6]Contrary to defendants' argument, this asserted fact is relevant because it clearly bears on the issue of retaliatory motive and is admissible nonhearsay because it is a party admission under Federal Rule of Evidence 801(d)(2)(A).

Valentino of 3/8/07.)  On April 30, 2007, at the request of Economic Director Cooney, Village Environmental Health Inspector Cheryl Scherbaum and Environmental Health Manager Roels inspected the exterior of plaintiffs' restaurant property and cited plaintiffs for code violations. (Defs.' LR 56.1(a)(3) Stmt. ¶ 44.)  The Village also inspected Curtis' property on January 15, 18, 21, and 28, 2008.  (*Id.* ¶¶ 48-51.)  It is undisputed that on or around February 25, 2008, plaintiffs told a local newspaper that, despite the Village's threat of condemnation, Curtis planned to pursue the redevelopment of his property as Gateway Centre.  (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 50.)  In March 2008, the Village obtained an administrative search warrant for YOTI.  (Defs.' LR 56.1(a)(3) Stmt. ¶ 55.) On April 7, 2008, based in part on the code violations discovered during search, the Village filed a lawsuit seeking an injunction requiring plaintiffs to cure the code violations within seven days.  (*Id.* ¶ 57.)

A reasonable jury may infer from this evidence the Village's actions with respect to plaintiffs' property after Curtis' October 2006 announcement of his privately-financed redevelopment plan were motivated by retaliation or were a pretext for retaliation for his statements to the press.[7]  Therefore, the Court denies defendants' summary judgment motion as to plaintiffs' First Amendment retaliation claim.


## II.  RICO

18 U.S.C. § 1962(c) provides:

---

[7]Although it is disputed whether Curtis' plan required public funds due to its involving land donated by the Village for "green space," even if the plan involved public funds, it does not negate a reasonable inference from Janonis' statement that the Village acted with a retaliatory motive.

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To establish a RICO claim under section 1962(c), a plaintiff must show: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (footnote omitted). In addition to showing at least two predicate acts, a RICO plaintiff must show "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

As a threshold matter, as a matter of law, a municipality cannot be held liable under RICO. *See Genty v. Resolution Trust Corp.*, 937 F.2d 899, 908-14 (3d Cir. 1991) (following *Tellis v. U.S. Fid. & Guar. Co.*, 805 F.2d 741, 746 (7th Cir. 1986), in holding that RICO's mandatory treble damages provision is punitive and stating that Congress did not intend to impose punitive damages on innocent taxpayers); *see also City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 261-62 (1981); *Pedrina v. Chun*, 97 F.3d 1296, 1300 (9th Cir. 1996); *Rogers v. City of N.Y.*, No. 08-4416, 2009 WL 5159768, at *2 (2d Cir. Dec. 31, 2009); *LaFlamboy v. Landek*, 587 F. Supp. 2d 914, 937 (N.D. Ill. 2008); *Lathrop v. Juneau & Assocs., Inc. P.C.,* 220 F.R.D. 330, 334 (S.D. Ill. 2004); *Pelfresne v. Vill. of Rosemont*, 22 F. Supp. 2d 756, 761 (N.D. Ill. 1998). Therefore, the Court grants defendants' motion for summary judgment as to plaintiffs' RICO claim against the Village of Mount Prospect as well as the individually named Village defendants sued in their official capacity.

Defendants also argue that plaintiffs have presented no evidence of: (1) the existence of an enterprise, (2) participation in an enterprise, (3) a pattern of racketeering activity, (4)

proximate cause of injury to plaintiffs' business or property or (5) a section 1962(d) conspiracy.

The Court deems these arguments waived for purposes of summary judgment because

defendants fail to apply the law to the facts of this case in any meaningful fashion or rely on any

properly supported fact statement in the summary judgment record.  (*See* Defs.' Joint Mem. Law

Supp. Joint Mot. Summ. J. 4, 14 (collectively referring to a single paragraph of plaintiffs'

complaint and one, unsupported fact statement).  *Compare* Defs.' LR 56.1(a)(3) ¶ 78, *with* Pls.'

Ex. 15, Curtis Dep. at 33-34.)

Second, defendants argue that plaintiffs have failed to raise a genuine issue of material

fact regarding whether the Village defendants are liable under RICO for Hobbs Act[8]- and Illinois

Intimidation Statute[9]-based predicate offenses.  (*See, e.g.,* Am Compl. ¶ 130(c), (d), (g), (h), (j),

(k), (l), (m), (n), (o), (p), (q), (r), (s), (t), (u).)  In support,

defendants rely on *Wilkie v. Robbins*, 551 U.S. 537, 563-64 (2007).

In *Wilkie*, the Supreme Court addressed whether government officials could be liable for

an extortion- and blackmail-based RICO claim where they allegedly used extortion to obtain an

easement over private land for the benefit of the federal government.  551 U.S. 537, 563-64

(2007).  The Supreme Court explained that the harm targeted by RICO is that created by public

officials who sell public favors for personal gain, *i.e.*, take bribes, not on the harm caused by

---

[8]The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

[9]The Illinois Intimidation statute provides in pertinent part: "A person commits intimidation when, with intent to cause another to perform or to omit the performance of any act, he communicates to another, whether in person, by telephone or by mail, a threat to perform without lawful authority . . . [an] action as a public official against anyone or anything, or withhold official action, or cause such action or withholding." 720 Ill. Comp. Stat. 5/12-6.

officials' efforts to obtain property for the government. *Id.* at 563-67. In particular, the Supreme Court stated that "it is not reasonable to assume that . . . RICO . . . was intended to expose all federal employees . . . to extortion charges whenever they stretch in trying to enforce Government property claims." *Id.* at 566. The Court stated that Congress' drawing "a line between private and public beneficiaries prevents suits (not just recoveries) against public officers whose jobs are to obtain property owed to the Government." In addition, the Court held that the alleged violation of a Wyoming blackmail statute, *see* Wyo. Stat. Ann. § 6-2-402, did not qualify as predicate offense under RICO because it was not "capable of being generically classified as extortionate." *Id.* at 567. The Supreme Court held that because the individuals sued did not personally benefit from obtaining property from, or compelling action by, a person against his will, the conduct did not fit the traditional definition of extortion. *Id.* at 566-67.

In the instant case, unlike in *Wilkie*, there is a dispute as to whether Oztekin and Oz, as well as the Village, would benefit if plaintiffs were forced to sell their property. It is undisputed that on December 22, 2006, Oztekin offered to purchase plaintiffs' property. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 26.) It is also undisputed that on January 25, 2007, the Village offered to purchase plaintiffs' property. (*Id.* ¶ 27.) Reading the disputed facts in plaintiffs' favor, there was an agreement between the Village Board and Oztekin on or before January 3, 2006 that Oztekin would purchase the properties in the Triangle and the Village Board would pay a premium of twenty-five percent above the appraised value to either the property owner or Oztekin. (*Compare* Defs.' LR 56.1(a)(3) Stmt. ¶ 33, *with* Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 33.) It is undisputed that after Oztekin purchased the 2 W. Busse Avenue property immediately adjacent to plaintiffs' property, he sold the property to his own company, not to the Village.

(Defs.' LR 56.1(a)(3) Stmt. ¶ 10; Pls.' Ex. 6, Oztekin Dep. at 98.)  A reasonable jury could

conclude from these facts that Oztekin and Oz may benefit from the sale of plaintiffs' property.

However, even if Oztekin and Oz were to benefit from plaintiffs' sale of their property,

plaintiffs still have failed to raise a triable issue as to whether the individual Village defendants

would benefit personally from the purported enterprise's activities as required by the Supreme

Court's holding in *Wilkie*.  Although plaintiffs state that Cooney, Schroeder and Janonis received

free food at the grand opening party for the Blues Bar, which Oz operates on its Triangle

property, (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 77), this *de minimis* benefit is not one that is prohibited

by RICO.  *See Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992)

(stating that "the venerable maxim *de minimis non curat lex* ('the law cares not for trifles') is

part of the established background of legal principles against which all enactments are adopted").

Because plaintiffs have failed to raise a triable issue as to whether the individual Village

defendants engaged in conduct akin to selling public favors for personal gain, the Court holds

that based on the particular facts of this case, they may not be held liable under RICO based on

the Hobbs Act and the Illinois Intimidation Statute.[10]  The Court thus grants defendants' motion

for summary judgment as to plaintiffs' RICO claim against the individual Village defendants to

the extent that the claim is based on violations of the Hobbs Act and the Illinois Intimidation

Statute.

However, the Court denies defendants' summary judgment motion as to plaintiffs' RICO

---

[10]Although the Seventh Circuit has held that the offense defined by 720 Ill. Comp. Stat. 5/12-6 meets the federal definition of extortion, these cases were decided prior to *Wilkie* and involved intimidation to obtain a personal benefit.  *See, e.g., United States v. McNeal*, 77 F.3d 938, 944-45 (7th Cir. 1996) (involving a criminal defendant's intimidation of others in order to compel them to return his money).

claim against Oztekin and Oz based on violations of the Hobbs Act and the Illinois Intimidation Statute.  Defendants do not argue that *Wilkie* bars the RICO claim against Oztekin and Oz based on those alleged violations and do not argue that those statutes are inapplicable to Oztekin and Oz.  (*See* Defs.' Joint Mem. Law Supp. Joint Mot. Summ. J. 6-8.)  Thus, those arguments are deemed waived for purposes of the summary judgment motion.

Third, defendants argue that any RICO claim based on alleged wire fraud fails.  The Court agrees.  To prove wire fraud, plaintiff must establish that the defendant "devised or intend[ed] to devise any scheme or artifice . . . for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in *interstate* . . . commerce, any writings . . . for the purpose of executing such scheme." 18 U.S.C. § 1343 (emphasis added).  Where all parties are residents of Illinois, there is an absence of interstate communication required to establish wire fraud.  *Meier v. Musburger,* 588 F. Supp. 2d 883, 907 (N.D. Ill. 2008); *Arenson v. Whitehall Convalescent & Nursing Home, Inc.*, 880 F. Supp. 1202, 1212 (N.D. Ill. 1995); *Harris Trust & Sav. Bank v. Ellis*, 609 F. Supp. 1118, 1122 (N.D. Ill. 1985), *aff'd*, 810 F.2d 700 (7th Cir. 1987).

It is undisputed that the parties in this case are all residents of Illinois.  (Village Defs.' Answer ¶¶ 5-14; Defs.' LR 56.1(a)(3) Stmt. ¶ 10.)  Because any wire communications were intrastate, not interstate as required by 18 U.S.C. § 1343, the Court grants defendants' summary judgment motion with respect to any RICO claim based on the purported acts of wire fraud.  (*See* Am. Compl. ¶ 130(a), (e), (g), (k), (o).)[11]

---

[11]Because plaintiffs concede that the August 20, 2007 communication was a facsimile and thus falls under the wire fraud statute, rather than a mail fraud statute as originally pleaded (*see* Am. Compl. ¶ 130(b)), the Court grants summary judgment as to plaintiffs' RICO claim

Fourth, defendants argue that plaintiffs should not be allowed to introduce new conduct that was never previously alleged. A review of plaintiffs' LR 56.1 submissions shows that they assert twenty-nine new instances of conduct in their response to defendants' statement of facts, their own statement of additional facts and/or their brief in response to defendants' motion for summary judgment. (*Compare* Pls.' LR 56.1(b)(3)(C) Stmt., *and* Pls.' Resp. Mem. 16-26, *with* Am. Compl. ¶ 130(a)-(u), *and* Pls.' Resp. Defs.' First Set of Interrogs. ¶ 6.)[12] Any facts plaintiffs assert in their response brief that were not included in their LR 56.1 submissions will not be considered. *See* LR 56.1(b); *see, e.g., Johal v. Little Lady Foods, Inc.*, No. 02 C 8481, 2004 WL 1745749, at *12 n.11 (N.D. Ill. July 30, 2004); *Ogborn v. United Food & Comm'l Workers, Local No. 881*, No. 98 C 4623, 2000 WL 1409855, at *3 (N.D. Ill. Sept. 25, 2000). Thus, the Court ignores additional predicate acts 1, 6, 7 and 10 as described and enumerated in defendants' reply brief because they were raised in plaintiffs' response brief but not in their fact statements. (*See* Defs.' Reply Br. 3-4.) The Court will, however, consider additional predicate acts that plaintiffs did not specifically plead in their complaint but were included in their LR 56.1 fact statements because the complaint is broad enough to encompass these acts, and defendants did not move to dismiss it for failure to allege any of the RICO predicate acts with more particularity. *See United Nat'l Records, Inc. v. MCA, Inc.*, 609 F. Supp. 33, 38-39 (N.D. Ill. 1984) ("A party who fails to raise a Rule 9(b) objection normally waives the requirement."). Moreover, defendants have not explained with any particularity how they have been prejudiced

_____

based on the August 20, 2007 facsimile.

    [12]The Court notes that its grant of summary judgment as to certain claims (discussed herein) may have mooted plaintiffs' reliance on these fact statements as to certain defendants.

by plaintiffs' reliance on the additional predicate acts. These acts involved communication between defendants and plaintiffs. For example, because some of the additional predicate acts are letters authored by Cooney, Roels and Hill, the Village defendants clearly had access to them and could have discussed them during these defendants' depositions. Thus, although plaintiffs should have amended their discovery responses to include the additional predicate acts, their failure to do so does not constitute unfair surprise within the meaning of Federal Rule of Civil Procedure 26. *Westefer v. Snyder*, 422 F.3d 570, 584 (7th Cir. 2005). Therefore, the Court holds that plaintiffs may, to the extent that it is not inconsistent with the Court's rulings herein, base their RICO claim on additional predicate acts 2-5, 8-9, and 11-29 as enumerated on pages three through five of defendants' reply brief. (*See* Defs.' Reply Br. 3-5.) Defendants do not address on the merits whether plaintiffs have created a triable issue as to the additional predicate acts based on mail fraud raised in plaintiffs' fact statements (enumerated in defendants' reply brief as predicate acts 2-4, 13-14, 18-23, 25-29). (*See id.* at 3-5, 9-12; *see also* Defs.' Joint Mem. Law Supp. Joint Mot. Summ. J. 9-14.) Thus, there must be a trial as to any RICO claim based on the additional predicate acts.

Defendants argue that several acts alleged in the amended complaint do not constitute mail fraud to qualify as RICO predicate acts. "The elements of mail fraud under 18 U.S.C. § 1341 are: (1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme." *Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 298-99 (7th Cir. 2003). "[T]he words 'to defraud' in the mail fraud statute have the common understanding of wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of

something of value by trick, deceit, chicane or overreaching." *Carpenter v. United States*, 484 U.S. 19, 27 (1987) (quotations omitted). "[I]t is not necessary to establish, as it is in the case of common law fraud, that there was a misrepresentation of present fact." *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 252 (7th Cir. 1995). However, a plaintiff must establish that there was a scheme to defraud, which requires a plaintiff to "establish[] that the defendants had the intent to implement such a scheme." *Id.*

The record shows that after the partial condemnation of plaintiffs' property in the 1990s, on April 21, 2004, Curtis provided the Village with an estimate in the amount of $16,840.00 for the damages to his property, on April 28, 2004, the Village rejected that estimate as beyond the scope of necessary repairs, on June 4, 2004, the Village offered to pay $10,000.00 to cover the reasonable costs incurred and on July 2, 2004, the Village stated that a check was being cut for $16,840.00. (*See* Pls.' Ex. 39, Letter from Cooney to Curtis of 4/28/04; Pls.' Ex. 40, Letter from Cooney to Curtis of 6/4/04; Pls.' Ex. 41, Letter from Janonis to Curtis of 7/2/04.) Defendants first argue that the April 28, June 4 and July 2, 2004 mailings do not constitute mail fraud. The Court agrees. Plaintiffs have failed to create a triable issue as to whether these mailings were anything more than the negotiation and payment of the precise amount requested by Curtis. (*See* Pls.' Ex. 35, Letter from Curtis to Cooney of 4/21/04 (providing estimate of $16,840.00 dated 9/5/02 "for the damages to my property").) Although Curtis argues that he was owed more than $16,840.00, no reasonable jury could find that these particular letters were part of the purported scheme to defraud because these letters did not give the Village any leverage against plaintiffs by agreeing to pay damages in the amount that Curtis, himself, requested in his letter of April 21, 2004.

Next, defendants argue that the record contains no evidence to support the plaintiffs' allegations that: (1) Wilks, Janonis, Cooney, Oztekin and Oz committed mail fraud in 2002 and 2003 (see Am. Compl. ¶ 130(e)) when they communicated with each other via mail to concoct a scheme to develop the Triangle to induce plaintiffs to sell their property at below fair market value; and (2) Wilks, Janonis and four Village Trustees committed mail fraud on July 25, 2006 when they sent a letter to schedule a meeting to inform plaintiffs that the Village had no interest in purchasing their properties (see *id.* ¶ 130(h)). There is no evidence of any mailings related to the redevelopment of the Triangle in 2002-03 or the scheduling a meeting with plaintiff in July 2006. Accordingly, the Court grants defendants' motion for summary judgment as to plaintiffs' RICO claim based on the purported mail fraud committed by Wilks, Janonis, Cooney, Oztekin and Oz in 2002 and 2003 and Janonis, Wilks and four Village Trustees on July 25, 2006.

Defendants also argue that the August 15, 2005 letter from the Village to Curtis, which explained that the Village was not interested in purchasing plaintiffs' property, does not constitute mail fraud. (*See id.* ¶ 130(f).) The Court disagrees.

It is undisputed that the Village had already partially condemned for eminent domain part of plaintiffs' property in late 2000. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 5.) Despite the ad hoc committee's recommendation that there be a complete, unified redevelopment of all properties within the Triangle, the Village initially considered redevelopment plans that included all properties but plaintiffs'. In spring 2005, the Village Board considered a series of scenarios for the possible redevelopment of the Triangle, all of which excluded plaintiffs' property. (Defs.' LR 56.1(a)(3) Stmt. ¶ 67.) Oztekin informally presented his redevelopment plan for the Triangle (which excluded plaintiffs' property) to then-Mayor Farley in early 2005 and began purchasing

property in late 2005. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 29; Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 15;

Defs.' LR 56.1(a)(3) Stmt. ¶ 10; Pls.' Ex. 13, Oztekin Dep. at 98, 104-08.) Viewing the record

in plaintiffs' favor, the Village Board and Oztekin agreed that Oztekin would purchase the

properties in the Triangle and the Village Board would pay a premium of twenty-five percent

above the appraised value to either the property owner or Oztekin. (*See* Pls.' Ex. 6, Cooney Dep.

at 231; Pls.' Ex. 13, Oztekin Dep. at 98. *Compare* Defs.' LR 56.1(a)(3) Stmt. ¶ 33, *with* Pls.' LR

56.1(b)(3)(B) Stmt. ¶ 33.) Defendants state that they did not realize that Oztekin's

redevelopment plan was infeasible until 2007, but that statement is disputed by the fact that (1)

they could have, but did not, conduct a feasibility study of Oztekin's plan until that time; (2)

Oztekin had met with developers to create a new redevelopment plan prior to 2007; and (3) a

Village spreadsheet dated March 22, 2006 created by the Village estimated that $1.5 million in

funds had been earmarked for the potential purchase of plaintiffs' property. (Pls.' LR

56.1(b)(3)(C) Stmt. ¶¶ 15, 22, 25.) On July 25, 2006, Wilks, Janonis and four Village trustees

met with Curtis and told him that the Village had no interest in ever purchasing plaintiffs'

property. (*Id.* ¶ 21.) On December 22, 2006, Oztekin offered to purchase plaintiffs' property.

(*Id.* ¶ 26.) On January 25, 2007, the Village offered to purchase plaintiffs' property. (*Id.* ¶ 27.)

In fall 2007, the Village filed an eminent domain action on plaintiffs' property. (Defs.' LR

56.1(a)(3) Stmt. ¶ 74.) A reasonable jury could infer from these and other facts in the record that

on August 15, 2005, defendants knew they would have to oust plaintiffs from their property to

redevelop the Triangle.

Next, defendants argue that the following does not constitute mail fraud: (1) the

Village's January 25, 2007 letter offering plaintiffs $1,265,000.00 for their property; and (2) the

December 22, 2006 letter from Oz to Curtis in which it offered Curtis $1,400,000.00 for plaintiffs' property. (*See* Am. Compl. ¶ 130(I), (j).) Plaintiffs argue that both offers were part of a scheme to force plaintiffs to sell their property at an unreasonably low price, but they offer no evidence to create a genuine issue of fact as to whether the offers were unreasonable.

Plaintiffs assert in their statement of additional facts that the Village's offer of $1,267,000.00 was based on an improper appraisal that was in conflict with the written professional standards of the Appraisal Institute because it used properties in Wheaton, Downers Grove, Prospect Heights and Palatine rather than properties in the immediate vicinity as comparables. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 27.) However, plaintiffs' assertion is not supported by the record because the Court has stricken Rotolo's declaration and report, John Mundie's opinion that the fair market value of plaintiffs' property is $1,265,000.00 or $90.00 per square foot stands uncontested.[13] (*See* Defs.' LR 56.1(a)(3) Stmt. ¶ 72.) Further, the portion of Cooney's deposition merely discusses the fact that an appraisal was conducted, not the standards for conducting one. (*See* Pls.' Ex. 6, Cooney Dep., at 331-32.) Lastly, the cited portion of Valentino's deposition contains legal conclusions and speculation (both of which are insufficient to preclude summary judgment) that the Village's offer was not made in good faith. (*See* Pls.' Ex. 16, Valentino Dep. at 418-19 ("That, in my opinion . . . was not a good-faith offer . . . . [T]he fact that the appraisal was not attached to the letter gave me even greater [c]ause [sic] for suspicion and concern.").)

Further, Mundie's appraisal also compared plaintiffs' property to two properties in

---

[13]It is also undisputed that on February 19, 2007, Curtis offered to purchase two of Oz's properties in the Triangle at $90.00 per square foot. (Defs.' LR 56.1(a)(3) Stmt. ¶ 73.)

Mount Prospect, one of which was located a few blocks north of plaintiffs' property, in its comparable improved sales analysis. (Pls.' Ex. 6, Cooney Dep. Ex. 351 at 000099-101.) Because the appraisal clearly compares the subject property to the value of properties in Mount Prospect which increased the price per square foot that the Village ultimately offered, no reasonable jury could find that the appraisal solely relied on properties that were not in proximity to plaintiffs' property. (*See id.* at 000097-101.) In sum, plaintiffs have failed to create a genuine issue of fact as to whether the Village's offer was unreasonable or below fair market value.

Plaintiffs also assert that the December 22, 2006 letter from Oz to Curtis offering $1,400,000.00 for plaintiffs' property was part of a scheme to obtain the property at an artificially low price. (*See* Pls.' Resp. Mem. 27.) However, they do not assert this fact in their statement of additional facts, which results in the Court's ignoring the assertion, and they offer no evidence to support it. (See Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 26.) Accordingly, plaintiffs have failed to create a triable issue as to whether Oz's offer was unreasonable or below fair market value.

Plaintiffs argue that the sequence of offers shows that defendants intended to force plaintiffs to sell their property to Oz or face condemnation.[14] However, it is undisputed that plaintiffs received and rejected Oz's offer of $1,400,000.00 on December 22, 2006, *before* plaintiffs received the Village's offer of $1,265,000.00 on January 25, 2007. (*Id.*) There is no

---

[14]"Under Illinois law, a person who wishes to challenge the propriety of a condemnation proceeding must file a motion to dismiss during the preliminary stage of the condemnation proceedings." *Shaikh v. City of Chi.*, 341 F.3d 627, 633 (7th Cir. 2003). Further, "the state-court condemnation process, with possibility of ultimate appeal to the U.S. Supreme Court, provides the appropriate venue to raise constitutional or statutory challenges to the exercise of the eminent-domain power by state or local governments." *Id.* (stating that a plaintiff may not attack the result of state-court condemnation proceedings collaterally in a federal civil rights action).

evidence in the record that there was any further attempt by Oz to purchase plaintiffs' property after the Village made its offer. Moreover, plaintiffs fail to point to any evidence that the Village coerced or encouraged plaintiffs to sell their property to Oz. No jury could infer from the facts in the record that the sequence of offers was intended to force plaintiffs to sell their property to Oz.

In sum, the Court grants defendants' summary judgment claims as to the RICO claims against: (1) the Village and the Village defendants sued in their official capacity; (2) the Village defendants sued in their individual capacity based on the Hobbs Act and the Illinois Intimidation Statute; (3) all defendants based on wire fraud; and (4) all defendants based on the following purported incidents of mail fraud: (a) the April 28, June 4 and July 2, 2004 letters; (b) the 2002 and 2003 mailings by Wilks, Janonis, Cooney, Oztekin and Oz; (c) the July 25, 2006 mailings by Wilks, Janonis and four Village Trustees; (d) the December 22, 2006 letter from Oz to Curtis; and (e) the January 25, 2007 letter from the Village to plaintiffs' counsel.

The Court denies defendants' summary judgment motion as to the RICO claims against: (1) Oztekin and Oz based on the Hobbs Act and the Illinois Intimidation Statute; and (2) the individually named Village defendants, Oztekin and Oz based on the alleged mail fraud occurring on August 15, 2005, as well as the alleged mail fraud and other predicate acts that were not addressed by defendants' arguments on the merits but that fall within the scope of plaintiffs' allegations in the amended complaint and were included in plaintiffs' LR 56.1 statements of fact. Within twenty days of the date of this Memorandum Opinion and Order, plaintiffs shall file a numbered list of predicate acts upon which they base their RICO claim (excluding those acts as to which summary judgment has been granted) in spreadsheet form

describing the alleged conduct and indicating the precise date on which it occurred, the defendant(s) it is asserted against, the governing statute, the paragraph of the complaint that put defendants on notice of the claim, and the paragraph of their statement of facts that put defendants on notice of the predicate act and the citation to the summary judgment record that was already included in the statement of facts.  Any response by defendants shall wait for the filing of the final pretrial order in the form of a motion in limine.

<u>Conclusion</u>

For the foregoing reasons, the Court grants defendants' motion to strike [doc. no. 172] and grants in part and denies in part defendants' motions for summary judgment [doc. nos. 125, 128].  The Court dismisses without prejudice plaintiffs' section 1983 takings and substantive due process claims for lack of jurisdiction.  The Court grants the motion for summary judgment:  (1) as to the section 1983 equal protection claim and section 1985(3) claim; (2) as to the RICO claim against:  (1) the Village of Mount Prospect and the Village defendants sued in their official capacity; (2) the Village defendants sued in their individual capacity based on the Hobbs Act and the Illinois Intimidation Statute; (3) all defendants based on wire fraud; (4) all defendants based on the following purported incidents of mail fraud:  (a) the April 28, June 4, and July 2, 2004 letters; (b) the 2002 and 2003 mailings by Wilks, Janonis, Cooney, Oztekin and Oz; (c) the July 25, 2006 mailings by Wilks, Janonis and four Village Trustees; (d) the December 22, 2006 letter from Oz to Curtis; and (e) the January 25, 2007 letter from the Village to plaintiffs' counsel. The Court denies the motion as to:  (1) the section 1983 First Amendment retaliation claim against all defendants; and (2) the section 1962(c) and (d) RICO claims against:  (a) Oztekin and

Oz based on the Hobbs Act and the Illinois Intimidation Statute; and (b) the Village defendants sued in their individual capacity, Oztekin and Oz based on the alleged mail fraud occurring on August 15, 2005, as well as the mail fraud and other predicate acts that defendants failed to address on the merits in their summary judgment motion to the extent that doing so comports with the rulings herein.

**SO ORDERED.**                                 **ENTERED:**

**March 29, 2010**

_Ronald A. Guzman_

_____

**HON. RONALD A. GUZMAN**
**United States District Judge**